UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>LBRY, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No.<br>)<br>) JURY TRIAL DEMANDED<br>)<br>) |

# COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendant LBRY, Inc. ("LBRY").

## SUMMARY

1. This case concerns LBRY's failure to register an offering of securities pursuant to the Securities Act of 1933 ("Securities Act"). From 2016 through the present, LBRY offered and sold millions of dollars' worth of unregistered securities to investors, in the form of a digital asset called LBRY Credits ("LBC"), which LBRY told investors was to be used to fund its business and build its product – a digital content marketplace or network offering video and audio recordings, images, and other information ("LBRY Network").

2. LBC were offered and sold as investment contracts and, therefore, securities. LBRY offered and sold the LBC in exchange for U.S. dollars, bitcoins, and other consideration such as non-monetary contributions to its enterprise. LBRY pooled the money it raised such that the successes (or failures) of the LBC holders were inextricably intertwined with other holders of LBC, the largest of whom was LBRY itself. And LBC holders reasonably would have expected a return on their investment based on the entrepreneurial or managerial efforts of LBRY.

3. Beginning in mid-2016, LBRY offered and sold LBC to the public in exchange

for contributions designed to allow LBRY to build the LBRY Network. Similarly, to pay for LBRY's construction and development of the LBRY Network, LBRY offered and sold LBC to investors. In particular, between 2016 and 2020, LBRY sold more than 13 million LBC to the general public through accounts it controlled at two online digital asset trading platforms (i.e., online platforms that allow buyers and sellers to trade a range of digital assets). LBRY sold the LBC on the digital asset trading platforms in exchange for bitcoin then valued at more than $5 million.

4. Concurrently, LBRY offered LBC to institutional investors at a discount to the secondary market trading price. As early as July and August 2016, LBRY offered to sell LBC directly to institutional investors, but LBRY did not consummate any sales of LBC to institutional investors at that time. Instead, it obtained investment funding from venture capitalists.

5. From October 2017 through April 2018, LBRY made multiple direct sales of LBC to a series of investment funds focusing on digital assets. In total, the investment funds paid LBRY more than $250,000 for LBC from October 2017 through April 2018. In May 2018, LBRY agreed to sell 2 million LBC (then worth approximately $360,000) to an institutional investor rather than transferring LBRY common stock to the investor. The terms of LBRY's sale to the institutional investor required the investor to wait one year before selling the 2 million LBC.

6. LBRY used the capital it raised from sales of LBC to pay for the operational costs to grow the LBRY Network, which, as LBRY publicly represented, would cause the price of LBC held by investors to appreciate. Because LBRY was the largest holder of LBC, it also expected to profit from any appreciation in value of LBC. At various times, LBRY represented to venture capital investors that it projected the LBC that it held itself would eventually be worth

billions of dollars once it built the LBRY Network to its anticipated scale.

7. LBRY did not register its offer and sale of LBC with the Commission. As a result, LBRY violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act.

8. The Commission seeks a permanent injunction enjoining LBRY from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and a conduct-based injunction prohibiting LBRY from participating, directly or indirectly, in any unregistered digital asset securities offering. The Commission also seeks disgorgement of all ill-gotten gains from the unlawful conduct set forth here together with prejudgment interest, civil penalties, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

10. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of New Hampshire, and were effected, directly or indirectly, by using means or instrumentalities of transportation or communication in interstate commerce, or the mails. Among other things, LBRY is headquartered in Manchester, NH, and LBRY's founder and current president, resides in Manchester, NH.

## THE DEFENDANT

11. LBRY, Inc. is a privately owned Delaware corporation with its principal place of business in Manchester, New Hampshire. LBRY was incorporated in April 2015, and its securities are not registered with the Commission in any capacity.

## SECTION 5 OF THE SECURITIES ACT

12.     Congress enacted the Securities Act to regulate the offer and sale of securities.  In particular, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions.  Such disclosures are ordinarily set forth in a registration statement, which provides investors with financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

13.     Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce.  Section 5(c) of the Securities Act provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed.  Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce.

## FACTS

**A.     Background.**

14.     LBRY describes itself as a company founded to create a way to distribute and purchase digital content that would be open to the public and would not involve an intermediary.  LBRY first targeted video distribution and sought to compete with YouTube, Amazon, and other video entertainment platforms.

15.     To accomplish its business objectives, LBRY represented that it would use blockchain-related technology (a blockchain is a an electronic distributed ledger or list of entries maintained by various participants in a network of computers) as follows: (a) LBRY would create a blockchain "protocol" (i.e., a set of rules or procedures that govern the transfer of data

between electronic devices); (b) LBRY would create a user application; (c) LBRY would create the software that would enable the user application to use the LBRY protocol; (d) LBRY would recruit creators and producers to publish their videos, shows, and movies to the LBRY protocol; and (e) LBRY would publicize the protocol and application to attract consumers.

16. To financially support its operations and promotional efforts, LBRY planned to offer and sell LBC to investors. In March 2016, LBRY represented to the public on its website:

> In the early days of our protocol, LBRY Inc. will be making a concerted effort to deploy LBC in a non-neutral way. We will be incentivizing early adopters, amazing content publishers, and even nonprofits which share our vision of a free and open internet. We will be retaining a portion to finance the continued development of the ecosystem. LBRY Credits will work on behalf of development of the LBRY content distribution network, not the other way around.

17. LBRY launched its protocol in June 2016. By its design, LBRY held the first 400 million LBC in its possession, representing 40% of the total allowable supply of LBC under the protocol. LBRY divided its LBC into three self-described "funds" and used the LBC in those funds to raise money and develop its network at various times.

18. In particular, LBRY divided the 400 million LBC that it held into accounts that it called the "Operational Fund," the "Community Fund," and the "Institutional Fund." LBRY used the LBC from each fund slightly differently in hopes of achieving its goals of building the Network, increasing the value of LBC, and profiting from selling LBC that had increased in value. LBRY explained the following on its publicly-available website:

   a. "The Community Fund is [200 million] LBC reserved for spreading usage and adoption of the LBRY protocol. The more people that use and love LBRY, the stronger the LBRY network is . . . . this fund will be used for . . . . [s]eeding consumers with initial credits … [r]ecruiting producers to use LBRY… [r]ewarding community contributors."

5

    b. "The Institutional Fund is [100 million] LBC reserved for the formation of institutional partnerships, and for grants, donations, and other ways of strengthening relationships with organizations of need or like-mindedness."

    c. The Operational Fund exists "[t]o allow LBRY, Inc. to function and profit . . . LBRY Inc. has reserved [100 million LBC] to fund continued development and provide profit for the founders. Since credits only gain value as the use of the protocol grows, the company has an incentive to continue developing this open-source project."

Because LBRY held such a large amount of LBC, its fortunes were inextricably intertwined with those of other investors holding LBC.

**B.    LBRY Offered and Sold Securities.**

    19.    Beginning in 2016, LBRY offered LBC derived from the Community Fund in exchange for contributions to the network, including to software testers and developers.

    20.    Similarly, at various times in 2017 through 2020, LBRY offered and sold LBC derived from the Operational Fund and the Institutional Fund to investors.

    21.    For example, in July 2017, LBRY was running low on cash to pay for its development of the network, so in July and August 2017 it sold 1 million LBC directly to secondary market purchasers through two online digital asset trading platforms. Later, in November 2017, the price of LBC on the digital asset trading platforms climbed after dipping in October 2017. To profit from rising prices, LBRY continued to sell LBC on and after November 8, 2017 directly to secondary market purchasers through those trading platforms. As the price for LBC continued to climb throughout November and December 2017, LBRY sold 5 million LBC to investors generating more than $1.6 million in proceeds.

    22.    In addition, on various dates in 2018, LBRY sold another 5 million LBC, from its

Operational Fund directly to investors through one or more digital asset trading platforms. LBRY generated more than $3.4 million from these sales of LBC.

23. Starting in 2017, LBRY also issued LBC to LBRY employees as compensation incentives in exchange for their labor and later issued LBC through an employee purchase program in exchange for money. Many LBRY employees personally held LBC as an investment and expressed satisfaction when LBC increased in value. LBRY's social media spokesperson publicly identified himself as an "investor" in LBC and expressed on a social media site to LBC traders, "I want the price [of LBC] to be higher just as much as anyone else…."

24. Starting in June 2016 and continuing through the present, LBRY has engaged in one continuous (or in the alternative, an integrated) offering of securities in the form of LBC to institutional and retail investors. LBRY offered and sold investment contracts and, thus, securities, when it offered and sold LBC. An investment contract (a type of security) exists when individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin, and other consideration such as labor in the form of services to LBRY); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

25. Here, and as described in more detail below: individuals and entities purchased LBC in exchange for United States currency, bitcoin, or other consideration such as their services; the money, bitcoin, and other consideration raised by LBRY was pooled and investors, whose collective fortunes were inextricably intertwined, shared in the profits and risks of the enterprise as the value of LBC collectively rose and fell; and they made these purchases with a reasonable expectation of profit in that the value of LBC (and the anticipated return on investment) was predicated on the development, growth, and success of the LBRY Network due to LBRY's efforts. Indeed, LBRY led investors to believe that the value of LBC would increase

if LBRY's business developed and was a success.

### 1. *Investment Contract First Prong: LBC Holders Invested Money.*

26.     From around June 2016 through the present, LBRY offered and sold LBC to institutional investors and retail investors in exchange for U.S. dollars, bitcoins, and other consideration, such as services that would help LBRY to develop its business. Over two years, from around July 2017 to July 2019, LBRY transferred the proceeds of LBC sales to its bank account, which was held in United States dollars. These transfers totaled about $6.17 million, and represented almost all of the money available to LBRY.

### 2. *Investment Contract Second Prong: LBC Holders Invested in a Common Enterprise.*

27.     LBC holders invested in a common enterprise. The fortunes of LBC holders' investments were inextricably intertwined because LBRY pooled the assets it received from investors in exchange for LBC, and deployed those assets collectively to fund its business operations. The success of the enterprise depended on LBRY's build out of the network and the value of LBC rose and fell for each LBC holder in the same manner.

28.     Similarly, the fortunes of LBC holders' investments were also aligned with LBRY's success or failure. If the LBRY Network succeeded, the LBC holders and LBRY would stand to profit because LBRY was the largest holder of LBC. If the LBRY Network failed, then the value of LBC would decline dramatically (or be worthless).

29.     Shortly after LBC began trading in July 2016, LBRY highlighted this common enterprise when it posted the following statement on its publicly available website in response to a price spike in the value of LBC (resulting, at the time, in a $1.2 billion market capitalization for the company): the "long-term value proposition of LBRY is tremendous, but also dependent on our team staying focused on the task at hand: building this thing . . . focus now and

henceforth will be on the long-term value of the LBRY protocol.  Over the long-term, the interests of LBRY and the holders of credits [i.e., LBC] are aligned."  The financial interests of the LBC holders and LBRY also were aligned because LBRY held a large amount of LBC.

   3.   *Investment Contract Third Prong: LBC Holders Reasonably Expected a Profit from LBRY's Efforts.*

   30.   LBRY led LBC holders to believe that the value of LBC would appreciate based on LBRY's efforts:

   a. Using its website and social media, LBRY represented to the public (and thus to LBC holders) that LBC would appreciate in value if the LBRY Network grew its functionality, usability, publishing base (i.e., content), and consumers.  LBRY represented to the public through its publicly available website that: "[LBC] only gain[s] value as the use of the protocol [the LBRY Network] grows . . . ."

   b. On its publicly available website, LBRY highlighted and publicized its employees, including advertising their technical prowess and business acumen, thereby representing that LBRY's team could create and build its network.  Consistent with its representations to venture capitalists, LBRY publicly announced its assertion that the value of the LBC would increase based on LBRY's efforts.  For example, in September 2016, LBRY posted the following information on its publicly available website:

   > "Our goal is to increase the long-term value of the protocol, which if adopted globally will make our [LBC Operational Fund] many times more valuable than any short-term bubble.  We've already invested 10,000 working hours into this project, and it will take many more, but we're patient and focused on the future."

   c. In late 2016, the value of LBC declined.  In response, LBRY stated on its publicly available website that the price of LBC "will go up when we've built a product

9

        that is compelling enough to change people's habits. . . . [and that LBRY would be] focusing all of our efforts on creating a product that people will love and getting that product in front of the people that will love it."

    d.  Through March 2021, LBRY continued to offer and sell LBC and continued to represent on its publicly available website that buying LBC was a worthy investment, claiming that the price of LBC would increase in the future based on LBRY's efforts. LBRY continually represented throughout the applicable period, in statements on its website and in social media, that LBRY itself was driving and actually accomplishing developments to the network. LBRY represented that it had redesigned the applications' interface; incorporated new features; strengthened the protocol; fixed problems with the code; acquired and published content; operated servers to host content; launched new applications; developed versions compatible with various operating systems and platforms; improved application speed; recruited publishers; and marketed the network.

31.  LBC holders' expectation that they would profit from LBRY's efforts matched LBRY's own expectations that it would profit from that network-building effort. LBRY echoed those expectations in statements it made to various venture capital investors in 2016, including the following:

    a.  LBRY represented to these investors that LBC had "a value proportional to the sum of all information transacted on the network . . . [and that] the most reasonable path to profit is to reserve a portion of [LBC] . . . [and that] if any significant portion of the $2 trillion media market happens through the LBRY network [the] credits [i.e., LBC] will hold significant value."

    b.  Similarly, LBRY provided a pitch deck (a presentation used to sell an idea,

product, or investment) to venture capital firms in which LBRY represented that the value of the LBC in its Operational Fund would represent billions of dollars in value to LBRY once LBRY scaled up its network, that is LBRY expected that the price of LBC would increase as LBRY built out the network.

### C.     LBRY Continues to Offer and Sell LBC.

32.     During the first half of 2020, LBRY sought additional capital because it again was low on cash to pay for the development of the LBRY Network.  Despite a relatively low price for LBC in the digital market trading platforms, LBRY sold 10,000,000 LBC to retail investors to raise capital.  The total approximate value at the time of issuance of the LBC was between $87,700 and $525,000.

33.     In June 2020, LBRY publicly announced in a video posted to its website that it would begin offering and selling LBC from its Operational Fund directly through its applications using a third-party vendor.  LBRY also announced that it did not want to drain its Operational Fund too fast.  LBRY stated that if it sold more than 500,000 LBC per month through its applications it would purchase LBC "on the market."  LBRY's market purchases of LBC would effectively prop up the price of LBC for other sellers on the trading platforms.  LBRY's statements about its Operational Fund conveyed to investors assurances that it would act to avoid negative pressure on the LBC price and so investors would reasonably believe that LBRY was working to make the enterprise profitable as it continued to develop the network.  LBRY did not want to reduce its Operational Fund when it expected LBC prices to rise.  In June, LBRY sold 435,000 LBC through the third-party vendor.

34.     On June 29, 2020, LBRY announced that it was going to take action to stabilize short-term prices of LBC and insulate the price of LBC from market volatility.  In its announcement, LBRY explained that it believed price volatility of LBC was hindering publisher

and user adoption of LBRY's network, and thereby the growth of the network. To mitigate the problem, LBRY enlisted a vendor (the "Agent") to use 40 million LBC from its Institutional Fund to act as its agent and a market maker. A market maker is an individual or entity that operates as a middle party to buy and sell securities on a regular and continuous basis at prevailing market prices. LBRY represented to investors that the Agent would place orders to buy and sell LBC on the trading platforms at all times, to provide liquidity to the market at near current prices. This conduct further led investors reasonably to believe that LBRY would take steps to make the enterprise profitable.

35. In October 2020, LBRY still represented on its website that LBC will only gain value as the use of its Network grows. In a post on its website, LBRY represented that, in its view, the amount of LBC being used on the Network was not growing in line with its expectations, that is the demand for LBC had flattened. In its post, LBRY announced it would make changes to the Network to correct this problem. LBRY announced it was going to build the "LBRY economy" and thereby make it more compelling to buy LBC than to buy tokens from other companies. In its post, LBRY represented that it was underappreciated in the blockchain space and would rectify this lack of appreciation by partnering with and aligning long-term incentives with blockchain promoters and influencers. In its post, LBRY represented that it was going to undertake efforts and give economic incentives to limit the circulating supply of LBC. These representations led investors reasonably to believe that LBRY would be taking steps to drive demand (or reduce circulating supply) of LBC to increase the price of LBC and make the enterprise more profitable.

36. As of March 2021, LBRY's efforts to deliver on its promises and develop the LBRY Network are on-going. LBRY maintains managerial and entrepreneurial control over the LBRY Network. LBRY continues to control its software code for its applications and the

protocol. LBRY continues to unilaterally make strategic and managerial decisions about the future of the LBRY Network. LBRY continues to unilaterally decide how to allocate the capital and resources it has pooled from investors to grow the Network, which it represents on its website will increase the value of LBC.

37. LBRY continues to post updates about its efforts to create new features like live-streaming video and playlists for content. LBRY also publicly represents in posts on its website, on social media, and during interviews, what it is currently developing, what it will soon release, and that it is directing the Network in a way to attract the greatest number of users and grow the Network exponentially. In a website post in February 2021, LBRY updated readers about changes it recently made and promised future evolutions in its applications. LBRY concluded the update with its prediction that the "best is yet to come." LBRY punctuated the sentence with a rocket ship icon signifying to readers that LBC was going to rocket to higher prices.

38. In 2021, LBRY continues to work to get LBC listed on more digital asset trading platforms, which investors have represented is an important element to increasing the trading price of LBC. In March 2021, LBC is traded on at least four different digital asset trading platforms. The number of LBC traded daily by investors on the digital asset trading platforms constituted a large percentage of the outstanding supply of LBC. In March 2021, the daily volume of LBC traded by investors ranged from a low of 43 million LBC to more than 620 million LBC. 620 million is significantly greater than the total circulating supply of LBC, meaning that investors are buying and selling the same LBC multiple times in a single day. The reported value of daily trades on the digital asset trading platforms ranged from approximately $6.3 million in sales to approximately $163 million in sales.

39. Consistent with prior periods, the trading on digital assert trading platforms in March 2021 dwarfed any use of LBC by third parties through LBRY's video applications. For

example, in one 24-hour period in March 2021 the number of LBC traded on the digital asset platforms exceeded 43 million LBC.  By comparison, during that same approximate 24-hour period, less than 85,000 LBC was used to tip or pledge support for publishers through LBRY's video applications, according to a third-party website.  This amounts to less than 0.2% of that day's trading volume.  Because LBRY distributes LBC to publishers through its video applications, the relatively small amount of LBC used on LBRY's video applications (as reported by the third-party website) is mostly the result of LBRY's own sales of LBC in exchange for goods and services.

40.     In 2021, investors have continued to communicate on social media platforms about their investment in LBC, the price of LBC, and LBRY's efforts to continue to develop the Network.  For example, in mid-March 2021, when the price of LBC increased, investors on one social media site tried to determine which recent development announcement by LBRY caused the price to go up.  At the same time, LBRY continues to offer securities in the form of LBC to investors without an effective registration statement, and therefore, without disclosing to investors all of the business and financial information required to be disclosed in a registration statement.  Consequently, investors continue to trade LBC between each other on digital asset trading platforms without the benefit of the disclosure information that LBRY is required to provide.

**D.     LBRY Did Not Register its Offer and Sale of Securities.**

41.     LBRY did not register its offer and sale of LBC pursuant to Section 5 of the Securities Act.  LBRY failed to file a registration statement under the Securities Act with respect to its offering of LBC.

42.     LBRY deprived purchasers of LBC of the audited financial statements, auditor's opinion letter, business description, risk disclosures, and other information that are required to be

disclosed in an effective registration statement.

### FIRST CLAIM FOR RELIEF
### UNREGISTERED OFFERING OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act)**

43. Paragraphs 1 through 42 above are re-alleged and incorporated by reference as if fully set forth herein.

44. Through the conduct described above, LBRY, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect, and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

45. As a result of the conduct described above, LBRY violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A. Enter a permanent injunction restraining the Defendant and each of its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, including email, fax, or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 5(a) and (c) thereunder [17 C.F.R. 240.10b-5(a) and (c)].

B. Order the Defendant to disgorge its ill-gotten gains, plus prejudgment interest;

C. Order the Defendant to pay appropriate civil monetary penalties in accordance with Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

D. Enter a conduct-based injunction prohibiting LBRY from participating, directly or indirectly, in any unregistered digital asset securities offering;

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,
Respectfully submitted,

/s/ Marc Jones
Marc Jones (Mass. Bar No. 645910)
  Senior Trial Counsel
Peter Bryan Moores (Mass. Bar No. 658033)
  Senior Enforcement Counsel
Eric Forni (Mass. Bar No. 669685)
  Senior Trial Counsel
Amy Gwiazda (Mass. Bar No. 663494)
  Assistant Regional Director
Martin F. Healey (Mass. Bar No. 227550)
  Regional Trial Counsel
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
(617) 573-4576