UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,                                   :

                      Plaintiff,                      :

     -against-                                    :                Civil Action No. 1:21-cv-00260-PB

LBRY, INC.,                                   :

                     Defendant.                     :

------------------------------------- X

## ANSWER

      Defendant LBRY, Inc. ("LBRY"), by and through its undersigned counsel, hereby answers and asserts affirmative defenses to Plaintiff Securities and Exchange Commission's ("SEC's") Complaint and reserves its rights to request dismissal of the Complaint on any and all grounds.  Unless expressly admitted, all allegations set forth in the Complaint are denied.[1]

## PRELIMINARY STATEMENT

      1.      In bringing this misguided action, the SEC takes concerted steps to stifle an innovative blockchain company that has consistently endeavored to comply with the law despite the SEC's failure to provide reasonable and clear guidance.  As described further below, for years the SEC has issued varying statements about digital assets that have left the industry guessing about whether a particular digital asset will be deemed a security and thus must be registered with the SEC.

---

[1] To the extent the headings in the Complaint are intended to constitute factual allegations, LBRY denies each and every such allegation.

2.      In addition, the SEC's arbitrary and selective prosecution of LBRY violates the Due Process Clause of the Fifth Amendment and requires dismissal of the Complaint.  Among other things, the SEC has stated publicly that "ICOs," or Initial Coin Offerings, bear hallmarks of securities offerings that merit enforcement action, yet the SEC relentlessly pursues LBRY which never conducted an ICO while the SEC has failed to prosecute numerous companies that did conduct ICOs.  Furthermore, many of those companies sold tokens and used proceeds from ICOs to build products; in contrast, LBRY had built its network before selling any of its digital assets—LBRY Credits, or "LBC"—and LBC could immediately be used for its utility purpose.  The SEC does not dispute these critical facts concerning LBRY which demonstrate that LBC is not a security.  The SEC has conducted itself inconsistently and in violation of its own purported standards of enforcement in this area.

3.      To illustrate the extent to which the SEC is singling out LBRY, according to CoinMarketCap, a website that tracks cryptocurrency prices, there are more than 5,000 digital assets in existence, the two most prominent being Bitcoin and Ethereum.[2]  Yet the SEC has declined to pursue enforcement actions for registration violations concerning Bitcoin, Ethereum, and thousands of other digital assets.  Before the SEC filed this lawsuit, the SEC brought only about 42 enforcement actions against entities or individuals who created and sold unregistered tokens.  Unlike here, the majority of those actions involved fraud allegations.  Only about 19 actions involved registration violations without fraud allegations, and it is a mystery why the SEC chose to pursue those matters—and why the SEC now pursues LBRY—while leaving thousands of other digital assets relatively untouched.

---

[2] *See* https://www.coinmarketcap.com/.

4.      No reasonable explanation exists for the SEC's Javert-like pursuit of LBRY. After years of exhaustively investigating LBRY, a small New Hampshire-based start-up company, the SEC does not and cannot allege any intentional wrongdoing by anyone associated with LBRY.  Instead, the SEC contends only that LBRY's sales of its digital assets—which never involved an ICO—constitute unregistered offers and sales of securities.  LBRY's sales of LBC do not resemble securities in any meaningful way.  Indeed, LBC is intended for consumptive use on LBRY's blockchain-enabled network, as explained further below.  The Supreme Court's "investment contract" test for the definition of a "security" does not extend to situations where, like here, one "purchases a commodity for personal consumption"; rather, an investment contract exists "where one parts with his money in the hope of receiving profits from the efforts of others."  *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975).  Instead of recognizing the reality of the new blockchain-based technology, the SEC attempts to squeeze a new technology into an outdated and vague definition of "security."  In doing so, the SEC stretches the federal securities laws in order to crush ground-breaking companies like LBRY. Left unchecked, the SEC's refusal to accept technological innovation in a modern economy—or even to provide any guidance to companies like LBRY on how they can operate without drawing the SEC's ire—will wreak havoc on the blockchain industry and drive cutting-edge companies out of the United States.

***The LBRY Protocol***

5.      In 2015, LBRY began developing a blockchain-enabled network (the "LBRY Protocol" or "Protocol") that would allow creators to publish digital content and consumers to explore and buy content using LBC.  Like many start-up companies, LBRY sought early funding from investors.  LBRY raised approximately $410,000 from venture capital firms and individual

accredited investors in the form of convertible promissory notes.  This traditional fundraising did not include the sale of LBC.  LBRY used part of these funds to develop the LBRY Protocol.

6.      On July 4, 2016, LBRY launched the LBRY Protocol and for the first time made LBC available to the public.  At the time of launch, users could immediately begin using LBC on the LBRY Protocol.  The core idea behind the LBRY Protocol is to enable the distribution of digital content so that no single person or entity can control the availability and storage of user content.  Rather, LBRY decided to create and support a decentralized community where anyone could publish and host their content without the need of an intermediary authority.  Such a configuration prevents the abuses of power that LBRY's founders had observed among other online distribution platforms.  To that end, as described further below, LBRY designed the LBRY Protocol so that it would rely on a decentralized community of users, not LBRY itself, in order to continue to function after the LBRY Protocol launched.

7.      Users generally interact with the LBRY Protocol by installing the "LBRY Application" on their computer or smartphone.  Users can publish content and pay for other users' content through the LBRY Application.

8.      The LBRY Protocol enables digital content storage and access without relying on a centralized infrastructure.  Content published using the LBRY Protocol is stored in a distributed fashion among users of the LBRY Application.  In other words, anyone who has downloaded the LBRY Application participates in the storage of the content.  New content that is added to the LBRY Protocol is split into many smaller encrypted pieces.  When a user wants to purchase digital content, the user pays the content creator in LBC using the LBRY Application.  When payment is received, the LBRY Application works with the LBRY Protocol to collect the

encrypted segments of the requested digital content, put it back together, and deliver it to the user who purchased it.

9.      From the very beginning, LBRY was committed to transparency with its users. And while LBRY built the LBRY Protocol, once the LBRY Protocol was launched, it was a mature, fully functional network, and the software and its decentralized community of users did not rely upon LBRY to continue to exist or function.

10.     The LBRY Protocol has millions of active users.  The Protocol itself is available to the public for free, and LBRY encourages participation and contributions from a broad community of developers and creators.  The LBRY Protocol—like all software—is continually improved and updated with new tools and features making it more user-friendly and robust over time.  Indeed, hundreds of open-source developers who have no affiliation with LBRY have contributed thousands of lines of code to LBRY's code base over the years.  LBRY often gives away small amounts of LBC as "tips" for making helpful contributions to the Protocol.  In addition, a decentralized group of blockchain "miners" not affiliated with LBRY contributes computational resources required to process transactions and secure the LBRY Protocol.  Thus, if LBRY ceased to exist, the LBRY Protocol and LBC could continue to exist and function.

***LBRY Credits***

11.     Over time, approximately 1 billion LBC will become available on the LBRY Protocol.  At launch, LBRY retained 400 million LBC for its own use, and the remaining 600 million LBC will be distributed via mining over the course of 20 years according to an algorithmic schedule.

12.     The 400 million LBC that LBRY held in reserve are allocated into three pools. 200 million LBC are allocated to a "Community Fund," which is used for various activities that

support the LBRY Protocol and the community.  For example, LBRY provides small in-application LBC rewards to teach new users how to use the Protocol.  LBRY also rewards open-source developers for coding tasks.  Approximately 100 million LBC are allocated to an "Institutional Fund."  These tokens are used to support causes aligned with LBRY's mission and values.  The remaining 100 million LBC are used by LBRY to fund ongoing operations and are thus allocated to an "Operational Fund."

13.     Consistent with its commitment to transparency, LBRY publishes quarterly reports on its website describing LBRY's use of LBC from each of the three pools of tokens.

14.     LBRY has never offered and sold LBC as an investment, and holders of LBC have no claim to the assets or profits of LBRY and have no ownership interest in LBRY.

***The SEC's Lack of Clear Guidance Regarding Digital Assets***

15.     Since Bitcoin first launched in 2009, the SEC consistently has failed to provide clear guidance about how the federal securities laws apply to the blockchain industry.  For years, the SEC's few statements addressing cryptocurrencies did not even address the securities-analysis question.  On July 23, 2013, the SEC issued an "Investor Alert" warning of "fraudulent investment schemes that may involve Bitcoin and other virtual currencies," but did not comment on how to determine whether a given digital asset is a security.[3]

16.     On May 7, 2014, the SEC again issued an "Investor Alert" about the "potential risks of investments involving Bitcoin and other forms of virtual currency."[4]  Again, the SEC did not provide guidance to blockchain companies, nor did it bring an enforcement action alleging Bitcoin to be a security.

---

[3] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-7.
[4] https://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html.

17.     The SEC did not offer any meaningful statement concerning the application of the federal securities laws to tokens until the SEC issued the "DAO Report" on July 25, 2017—a year <u>after</u> LBRY launched LBC.  But the DAO Report essentially stated that the offer and sale of a cryptocurrency could be an "investment contract" under Supreme Court precedent depending on the "facts and circumstances."[5]  On the same day, the SEC released a statement titled, "Investor Bulletin: Initial Coin Offerings," in which the SEC similarly stated that "[d]epending on the facts and circumstances of each individual ICO, the virtual coins or tokens that are offered or sold may be securities."[6]  Rather than offering any helpful guidance to blockchain companies or token purchasers as to what constitutes a security, the SEC merely suggested to investors that, "[b]efore investing in an ICO, ask whether the virtual tokens or coins are securities and whether the persons selling them registered the offering with the SEC."[7]  At most, the statement appeared to indicate a focus by the SEC on "ICOs or token sales" used "to raise capital."[8]

18.     Consistent with this focus on ICOs, in December 2017, then-Chairman Jay Clayton stated that "companies and individuals increasingly have been using initial coin offerings to raise capital for their businesses and projects" and that "[b]y and large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities and directly implicate the securities registration requirements and other investor protection provisions of our federal securities laws."[9]

---

[5] DAO Report, at 17-18, *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.
[6] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-16.
[7] *Id.*
[8] *Id.*
[9] Jay Clayton, Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), *available at* https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

19.     On June 14, 2018, an SEC official delivered a speech echoing former Chairman Clayton's focus on ICOs.[10]  For instance, the speech emphasized that tokens may be securities when companies seek "to raise money to develop networks" and continue to play a "significant role" in developing and maintaining the network.[11]  As explained above, LBRY did not conduct an ICO in order to develop the LBRY Protocol, which was fully functional and decentralized at launch.  In another revealing statement, the official also said that companies that "conduct the initial funding through a . . . debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and the digital assets offer" would "allow[] the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise."[12]  This is exactly what LBRY did:  It raised money from venture capital firms to develop the LBRY Protocol and LBC before launching a functioning, decentralized network.

20.     In April 2019, the SEC issued a "Framework for 'Investment Contract' Analysis of Digital Assets,"[13] which one of the SEC's Commissioners, Hester M. Peirce, recently called "difficult to apply."[14]  Indeed, Commissioner Peirce acknowledged that "clear answers" to the question whether a digital asset is a security "are rare," and "[t]he breadth of our statutory definition of the term 'security' and the complexity of the guidance the Commission has provided contribute to this lack of clarity."[15]  Commissioner Peirce further stated that "[n]either

---

[10] Director William Hinman, Division of Corporate Finance, Remarks at the Yahoo Finance All Markets Summit: Crypto, *Digital Asset Transactions:  When Howey Met Gary (Plastic)*, June 14, 2018, *available at* https://www.sec.gov/news/speech/speech-hinman-061418.
[11] *Id.*
[12] *Id.*
[13] https://www.sec.gov/files/dlt-framework.pdf.
[14] Commissioner Hester M. Peirce, Remarks at the British Blockchain Association's Conference "Success Through Synergy: Next Generation Leadership for Extraordinary Times," *Paper, Plastic, Peer-to-Peer,* Mar. 15, 2021, *available at* https://www.sec.gov/news/speech/peirce-paper-plastic-peer-to-peer-031521.
[15] *Id.*

-8-

complex staff guidance nor enforcement actions are a satisfactory way to guide people who are eager to comply with the law, but unsure how to do so."[16]

21.     Even after the SEC brought this action, the same commissioner issued yet another statement calling into question the standard the SEC will apply to companies that sell blockchain tokens.  On April 13, 2021, Commissioner Peirce released a proposal for a "token safe harbor," which "seeks to provide network developers with a three-year grace period" to develop "a functional or decentralized network, exempted from the registration provisions of the federal securities laws."[17]  Commissioner Peirce suggested that "[t]oken transactions may not constitute securities transactions if the network has matured to a functioning or decentralized network."[18]  Again, the LBRY Protocol has been a mature network since it was launched because it was both functioning and decentralized.

***The SEC Investigation***

22.     In late 2017 and early 2018, numerous blockchain companies created their own tokens, many of which were sold through ICOs.  Even though LBRY never held an ICO, in May 2018—nearly two years after the LBRY Protocol launched—the SEC began its investigation into LBRY regarding whether LBC constitutes a security that should be registered with the SEC.

23.     For nearly three years, LBRY has turned over hundreds of thousands of pages of documents to the SEC, and the SEC has taken in-person testimony from several LBRY executives.  For months at a time, the SEC would remain silent, leaving LBRY in the dark about the status of the investigation.  And although LBRY provided the requested documentation and readily explained its business and technology to the SEC, the SEC continued to hound LBRY.

---

[16] *Id.*
[17] Commissioner Hester M. Peirce, *Token Safe Harbor Proposal 2.0*, Apr. 13, 2021, *available at* https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0.
[18] *Id.*

4827-0874-6989, v. 1

24.     The SEC staff even threatened to continue making investigatory demands upon LBRY so that LBRY might exhaust its resources in defending itself.  In this regard, the SEC staff understood that LBRY was a small company and that the turmoil and expense of an extended investigation and litigation would cause significant harm to the company.  Even as LBRY cooperated with the investigation and complied with subpoenas, SEC staff—knowing that LBRY did not have extensive resources to defend itself—threatened to seek even more voluminous materials through administrative subpoenas in order to bankrupt the company.

25.     The SEC has refused to articulate clear, practical standards by which companies like LBRY will be held under the federal securities laws.  Rather, the SEC has made a mishmash of vague and shifting statements over the years—<u>after</u> LBRY launched the LBRY Protocol and even <u>after</u> this action was filed—which leave LBRY and many other blockchain companies guessing as to whether the SEC will view them to be in compliance with the law despite their best efforts.  The SEC ultimately brought this lawsuit, and consequently LBRY is left to defend a lawsuit without having received any meaningful guidance from the SEC as to how to comply with the federal securities laws.

26.     The Complaint's overreaching allegations and claims have caused harm not only to LBRY, but also to millions of non-parties publishers and users of LBRY.

## ANSWER TO SPECIFIC ALLEGATIONS

1.     This case concerns LBRY's failure to register an offering of securities pursuant to the Securities Act of 1933 ("Securities Act"). From 2016 through the present, LBRY offered and sold millions of dollars' worth of unregistered securities to investors, in the form of a digital asset called LBRY Credits ("LBC"), which LBRY told investors was to be used to fund its business and build its product – a digital content marketplace or network offering video and audio recordings, images, and other information ("LBRY Network").

**ANSWER**:  Paragraph 1 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations, except LBRY admits that it sold LBC and that LBRY is a blockchain enabled-network that allows creators to publish digital content and consumers to explore and buy content using LBC.

2.      LBC were offered and sold as investment contracts and, therefore, securities. LBRY offered and sold the LBC in exchange for U.S. dollars, bitcoins, and other consideration such as non-monetary contributions to its enterprise. LBRY pooled the money it raised such that the successes (or failures) of the LBC holders were inextricably intertwined with other holders of LBC, the largest of whom was LBRY itself. And LBC holders reasonably would have expected a return on their investment based on the entrepreneurial or managerial efforts of LBRY.

**ANSWER**:  Paragraph 2 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations except LBRY admits that it sold LBC in exchange for fiat or other currencies.

3.      Beginning in mid-2016, LBRY offered and sold LBC to the public in exchange for contributions designed to allow LBRY to build the LBRY Network. Similarly, to pay for LBRY's construction and development of the LBRY Network, LBRY offered and sold LBC to investors. In particular, between 2016 and 2020, LBRY sold more than 13 million LBC to the general public through accounts it controlled at two online digital asset trading platforms (i.e., online platforms that allow buyers and sellers to trade a range of digital assets). LBRY sold the LBC on the digital asset trading platforms in exchange for bitcoin then valued at more than $5 million.

**ANSWER**:  LBRY denies the allegations in paragraph 3.

4.      Concurrently, LBRY offered LBC to institutional investors at a discount to the secondary market trading price. As early as July and August 2016, LBRY offered to sell LBC directly to institutional investors, but LBRY did not consummate any sales of LBC to institutional investors at that time. Instead, it obtained investment funding from venture capitalists.

**ANSWER**:  LBRY denies the allegations in paragraph 4, except LBRY admits that it obtained funding from venture capitalists in 2015.

5.      From October 2017 through April 2018, LBRY made multiple direct sales of LBC to a series of investment funds focusing on digital assets. In total, the investment funds paid LBRY more than $250,000 for LBC from October 2017 through April 2018. In May 2018, LBRY agreed to sell 2 million LBC (then worth approximately $360,000) to an institutional investor rather than transferring LBRY common stock to the investor. The terms of LBRY's sale to the institutional investor required the investor to wait one year before selling the 2 million LBC.

**ANSWER**:  LBRY denies the allegations in paragraph 5, except LBRY admits that between October 2017 and April 2018, it sold LBC to a "crypto club" in exchange for more than $250,000.

6.      LBRY used the capital it raised from sales of LBC to pay for the operational costs to grow the LBRY Network, which, as LBRY publicly represented, would cause the price of LBC held by investors to appreciate. Because LBRY was the largest holder of LBC, it also expected to profit from any appreciation in value of LBC. At various times, LBRY represented to venture capital investors that it projected the LBC that it held itself would eventually be worth billions of dollars once it built the LBRY Network to its anticipated scale.

**ANSWER**:  LBRY denies the allegations in paragraph 6.

7.      LBRY did not register its offer and sale of LBC with the Commission. As a result, LBRY violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act.

**ANSWER**:  Paragraph 7 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations except LBRY admits that it did not register its sales of LBC with the SEC because no registration was required, as LBC is not a security.

8.      The Commission seeks a permanent injunction enjoining LBRY from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and a conduct-based injunction prohibiting LBRY from participating, directly or indirectly, in any unregistered digital asset securities offering. The Commission also seeks disgorgement of all ill-gotten gains from the unlawful conduct set forth here together with prejudgment interest, civil penalties, and such other relief as the Court may deem appropriate.

**ANSWER**:  The allegations in paragraph 8 describe the SEC's prayer for relief to which no response is required.  To the extent any response is necessary, LBRY denies the allegations and denies that the SEC is entitled to any relief.

<u>**JURISDICTION AND VENUE**</u>

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

**ANSWER**:  The allegation in paragraph 9 is a legal conclusion to which no response is required.  To the extent any response is necessary, LBRY admits that this Court has jurisdiction over this action.

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of New Hampshire, and were effected, directly or indirectly, by using means or instrumentalities of transportation or communication in interstate commerce, or the mails. Among other things, LBRY is headquartered in Manchester, NH, and LBRY's founder and current president, resides in Manchester, NH.

**ANSWER**:  The allegations in paragraph 10 are legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations, except LBRY admits that it is headquartered in Manchester, New Hampshire, and that its founder and current president resides in Manchester, New Hampshire.

## THE DEFENDANT

11.     LBRY, Inc. is a privately owned Delaware corporation with its principal place of business in Manchester, New Hampshire. LBRY was incorporated in April 2015, and its securities are not registered with the Commission in any capacity.

**ANSWER**:  LBRY denies the allegations in paragraph 11, except LBRY admits that it is a Delaware corporation with its principal place of business in Manchester, New Hampshire, and that it was incorporated in April 2015.

## SECTION 5 OF THE SECURITIES ACT

12.     Congress enacted the Securities Act to regulate the offer and sale of securities. In particular, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions. Such disclosures are ordinarily set forth in a registration statement, which provides investors with financial and managerial information about the issuer

of the securities, details about the terms of the securities offering, the proposed use of investor

proceeds, and an analysis of the risks and material trends that would affect the enterprise.

> **ANSWER**:  The allegations in paragraph 12 are legal conclusions to which no response
>
> is required.  To the extent any response is necessary, LBRY refers the Court to the text of the
>
> Securities Act, 15 U.S.C. § 77a *et seq*., and its implementing regulations.

13.     Section 5(a) of the Securities Act provides that, unless a registration statement is

in effect as to a security, it is unlawful for any person, directly or indirectly, to sell securities in

interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against

offers to sell or offers to buy, unless a registration statement has been filed. Thus, Sections 5(a)

and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate

commerce.

> **ANSWER**:  The allegations in paragraph 13 are legal conclusions to which no response
>
> is required.  To the extent any response is necessary, LBRY refers the Court to the text of the
>
> Securities Act, 15 U.S.C. § 77a *et seq*., and its implementing regulations.

## **FACTS**

**A.     Background.**

14.     LBRY describes itself as a company founded to create a way to distribute and

purchase digital content that would be open to the public and would not involve an intermediary.

LBRY first targeted video distribution and sought to compete with YouTube, Amazon, and other

video entertainment platforms.

> **ANSWER**:  LBRY admits the allegations in paragraph 14.

15.     To accomplish its business objectives, LBRY represented that it would use

blockchain-related technology (a blockchain is a an electronic distributed ledger or list of entries

maintained by various participants in a network of computers) as follows: (a) LBRY would

create a blockchain "protocol" (i.e., a set of rules or procedures that govern the transfer of data

between electronic devices); (b) LBRY would create a user application; (c) LBRY would create

the software that would enable the user application to use the LBRY protocol; (d) LBRY would

recruit creators and producers to publish their videos, shows, and movies to the LBRY protocol;

and (e) LBRY would publicize the protocol and application to attract consumers.

**ANSWER**:  LBRY admits that it created a blockchain-enabled network that allows

creators to publish digital content and consumers to explore and buy content using LBC.  LBRY

further admits that it created the software for the LBRY Application, which users may install

locally on their computers or smartphones.  LBRY further admits that it encouraged creators and

producers to publish their content to the LBRY protocol and publicized the LBRY protocol so

that users would access and use the product LBRY built.  LBRY otherwise denies the remaining

allegations in paragraph 15.

16.     To financially support its operations and promotional efforts, LBRY planned to

offer and sell LBC to investors. In March 2016, LBRY represented to the public on its website:

> In the early days of our protocol, LBRY Inc. will be making a concerted effort to
> deploy LBC in a non-neutral way. We will be incentivizing early adopters,
> amazing content publishers, and even nonprofits which share our vision of a free
> and open internet. We will be retaining a portion to finance the continued
> development of the ecosystem. LBRY Credits will work on behalf of
> development of the LBRY content distribution network, not the other way around.

**ANSWER**:  LBRY denies the allegations in paragraph 16.  To the extent paragraph 16

purports to quote or characterize LBRY's website, the website speaks for itself, and LBRY

respectfully refers the Court to the full text of the website for an accurate and complete record of

its contents.

17.     LBRY launched its protocol in June 2016. By its design, LBRY held the first 400 million LBC in its possession, representing 40% of the total allowable supply of LBC under the protocol. LBRY divided its LBC into three self-described "funds" and used the LBC in those funds to raise money and develop its network at various times.

**ANSWER**:  LBRY denies the allegations in paragraph 17, except LBRY admits that it held 400 million LBC in reserve out of a total of 1 billion LBC that would become available over time.  The 400 million LBC held in reserve were allocated among an Operational Fund, a Community Fund, and an Institutional Fund.

18.     In particular, LBRY divided the 400 million LBC that it held into accounts that it called the "Operational Fund," the "Community Fund," and the "Institutional Fund." LBRY used the LBC from each fund slightly differently in hopes of achieving its goals of building the Network, increasing the value of LBC, and profiting from selling LBC that had increased in value. LBRY explained the following on its publicly-available website:

a.   "The Community Fund is [200 million] LBC reserved for spreading usage and adoption of the LBRY protocol. The more people that use and love LBRY, the stronger the LBRY network is . . . . this fund will be used for . . . . [s]eeding consumers with initial credits … [r]ecruiting producers to use LBRY… [r]ewarding community contributors."

b.   "The Institutional Fund is [100 million] LBC reserved for the formation of institutional partnerships, and for grants, donations, and other ways of strengthening relationships with organizations of need or like-mindedness."

c.   The Operational Fund exists "[t]o allow LBRY, Inc. to function and profit . . . LBRY Inc. has reserved [100 million LBC] to fund continued development and

> provide profit for the founders. Since credits only gain value as the use of the
> protocol grows, the company has an incentive to continue developing this
> opensource project."

Because LBRY held such a large amount of LBC, its fortunes were inextricably intertwined with those of other investors holding LBC.

**ANSWER**:  LBRY admits that it allocated the 400 million LBC it held in reserve among an Operational Fund, a Community Fund, and an Institutional Fund.  To the extent paragraph 18 purports to quote or characterize LBRY's website, the document speaks for itself, and LBRY respectfully refers the Court to the full text of the document for an accurate and complete record of its contents.  LBRY otherwise denies the remaining allegations in paragraph 18.

**B.     LBRY Offered and Sold Securities.**

19.     Beginning in 2016, LBRY offered LBC derived from the Community Fund in exchange for contributions to the network, including to software testers and developers.

**ANSWER**:  LBRY denies the allegations in paragraph 19, except LBRY admits that it has periodically provided LBC from the Community Fund as rewards.

20.     Similarly, at various times in 2017 through 2020, LBRY offered and sold LBC derived from the Operational Fund and the Institutional Fund to investors.

**ANSWER**:  LBRY denies the allegations in paragraph 20, except LBRY admits it has periodically sold LBC from the Operational Fund and the Institutional Fund.

21.     For example, in July 2017, LBRY was running low on cash to pay for its development of the network, so in July and August 2017 it sold 1 million LBC directly to secondary market purchasers through two online digital asset trading platforms. Later, in November 2017, the price of LBC on the digital asset trading platforms climbed after dipping in October 2017. To profit from rising prices, LBRY continued to sell LBC on and after November

8, 2017 directly to secondary market purchasers through those trading platforms. As the price for LBC continued to climb throughout November and December 2017, LBRY sold 5 million LBC to investors generating more than $1.6 million in proceeds.

**ANSWER**:  LBRY denies the allegations in paragraph 21, except LBRY admits that in July and August 2017, it sold 1 million LBC on the open market, and in November and December 2017, it sold 5 million LBC on the open market in exchange for approximately $1.6 million.

22.     In addition, on various dates in 2018, LBRY sold another 5 million LBC, from its Operational Fund directly to investors through one or more digital asset trading platforms. LBRY generated more than $3.4 million from these sales of LBC.

**ANSWER**:  LBRY denies the allegations in paragraph 22, except LBRY admits that in 2018, it sold 5 million LBC on the open market from its Operational Fund in exchange for approximately $3.4 million

23.     Starting in 2017, LBRY also issued LBC to LBRY employees as compensation incentives in exchange for their labor and later issued LBC through an employee purchase program in exchange for money. Many LBRY employees personally held LBC as an investment and expressed satisfaction when LBC increased in value. LBRY's social media spokesperson publicly identified himself as an "investor" in LBC and expressed on a social media site to LBC traders, "I want the price [of LBC] to be higher just as much as anyone else…."

**ANSWER**:  LBRY admits that it has periodically provided LBC to LBRY employees. LBRY lacks sufficient knowledge to either admit or deny the allegations in the second sentence of paragraph 23 and therefore denies them.  To the extent paragraph 23 purports to quote or characterize a social media post by someone affiliated with LBRY, the document speaks for

itself, and LBRY respectfully refers the Court to the full text of the document for an accurate and complete record of its contents.  LBRY otherwise denies the allegations in paragraph 23.

24.     Starting in June 2016 and continuing through the present, LBRY has engaged in one continuous (or in the alternative, an integrated) offering of securities in the form of LBC to institutional and retail investors. LBRY offered and sold investment contracts and, thus, securities, when it offered and sold LBC. An investment contract (a type of security) exists when individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin, and other consideration such as labor in the form of services to LBRY); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

**ANSWER**:  Paragraph 24 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations.

25.     Here, and as described in more detail below: individuals and entities purchased LBC in exchange for United States currency, bitcoin, or other consideration such as their services; the money, bitcoin, and other consideration raised by LBRY was pooled and investors, whose collective fortunes were inextricably intertwined, shared in the profits and risks of the enterprise as the value of LBC collectively rose and fell; and they made these purchases with a reasonable expectation of profit in that the value of LBC (and the anticipated return on investment) was predicated on the development, growth, and success of the LBRY Network due to LBRY's efforts. Indeed, LBRY led investors to believe that the value of LBC would increase if LBRY's business developed and was a success.

**ANSWER**:  Paragraph 25 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations,

except LBRY admits that individuals and entities have purchased LBC in exchange for fiat and other currencies.

### 1. *Investment Contract First Prong: LBC Holders Invested Money.*

26.     From around June 2016 through the present, LBRY offered and sold LBC to institutional investors and retail investors in exchange for U.S. dollars, bitcoins, and other consideration, such as services that would help LBRY to develop its business. Over two years, from around July 2017 to July 2019, LBRY transferred the proceeds of LBC sales to its bank account, which was held in United States dollars. These transfers totaled about $6.17 million, and represented almost all of the money available to LBRY.

**ANSWER**:  LBRY denies the allegations in paragraph 26, except LBRY admits that it has sold LBC in exchange for fiat and other currencies and that from July 2017 to July 2019, LBRY transferred proceeds of LBC sales to its bank account totaling approximately $6.17 million.

### 2. *Investment Contract Second Prong: LBC Holders Invested in a Common Enterprise.*

27.     LBC holders invested in a common enterprise. The fortunes of LBC holders' investments were inextricably intertwined because LBRY pooled the assets it received from investors in exchange for LBC, and deployed those assets collectively to fund its business operations. The success of the enterprise depended on LBRY's build out of the network and the value of LBC rose and fell for each LBC holder in the same manner.

**ANSWER**:  Paragraph 27 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations.

28.     Similarly, the fortunes of LBC holders' investments were also aligned with LBRY's success or failure. If the LBRY Network succeeded, the LBC holders and LBRY would

stand to profit because LBRY was the largest holder of LBC. If the LBRY Network failed, then
the value of LBC would decline dramatically (or be worthless).

**ANSWER**:  Paragraph 28 contains characterizations and legal conclusions to which no
response is required.  To the extent any response is necessary, LBRY denies the allegations.

29.     Shortly after LBC began trading in July 2016, LBRY highlighted this common
enterprise when it posted the following statement on its publicly available website in response to
a price spike in the value of LBC (resulting, at the time, in a $1.2 billion market capitalization for
the company): the "long-term value proposition of LBRY is tremendous, but also dependent on
our team staying focused on the task at hand: building this thing . . . focus now and henceforth
will be on the long-term value of the LBRY protocol. Over the long-term, the interests of LBRY
and the holders of credits [i.e., LBC] are aligned." The financial interests of the LBC holders and
LBRY also were aligned because LBRY held a large amount of LBC.

**ANSWER**:  To the extent paragraph 29 purports to quote or characterize LBRY's
website, the website speaks for itself, and LBRY respectfully refers the Court to the full text of
the website for an accurate and complete record of its contents.  LBRY otherwise denies the
remaining allegations in paragraph 29.

### 3.     Investment Contract Third Prong: LBC Holders Reasonably Expected a Profit from LBRY's Efforts.

30.     LBRY led LBC holders to believe that the value of LBC would appreciate based
on LBRY's efforts:

  a.  Using its website and social media, LBRY represented to the public (and thus to
      LBC holders) that LBC would appreciate in value if the LBRY Network grew its
      functionality, usability, publishing base (i.e., content), and consumers. LBRY

represented to the public through its publicly available website that: "[LBC] only

gain[s] value as the use of the protocol [the LBRY Network] grows . . . ."

b.  On its publicly available website, LBRY highlighted and publicized its

employees, including advertising their technical prowess and business acumen,

thereby representing that LBRY's team could create and build its network.

Consistent with its representations to venture capitalists, LBRY publicly

announced its assertion that the value of the LBC would increase based on

LBRY's efforts. For example, in September 2016, LBRY posted the following

information on its publicly available website:

> "Our goal is to increase the long-term value of the protocol, which if
> adopted globally will make our [LBC Operational Fund] many times more
> valuable than any short-term bubble. We've already invested 10,000
> working hours into this project, and it will take many more, but we're
> patient and focused on the future."

c.  In late 2016, the value of LBC declined. In response, LBRY stated on its publicly

available website that the price of LBC "will go up when we've built a product

that is compelling enough to change people's habits. . . . [and that LBRY would

be] focusing all of our efforts on creating a product that people will love and

getting that product in front of the people that will love it."

d.  Through March 2021, LBRY continued to offer and sell LBC and continued to

represent on its publicly available website that buying LBC was a worthy

investment, claiming that the price of LBC would increase in the future based on

LBRY's efforts. LBRY continually represented throughout the applicable period,

in statements on its website and in social media, that LBRY itself was driving and

actually accomplishing developments to the network. LBRY represented that it

had redesigned the applications' interface; incorporated new features;

-23-

strengthened the protocol; fixed problems with the code; acquired and published

content; operated servers to host content; launched new applications; developed

versions compatible with various operating systems and platforms; improved

application speed; recruited publishers; and marketed the network.

**ANSWER**:  To the extent paragraph 30 purports to quote or characterize LBRY's

website, the document speaks for itself, and LBRY respectfully refers the Court to the full text of

the document for an accurate and complete record of its contents.  LBRY otherwise denies the

remaining allegations in paragraph 30, except LBRY admits it periodically posted updates on its

website regarding the LBRY Protocol, LBRY Application, and other news relevant to LBRY's

millions of users.

31.    LBC holders' expectation that they would profit from LBRY's efforts matched

LBRY's own expectations that it would profit from that network-building effort. LBRY echoed

those expectations in statements it made to various venture capital investors in 2016, including

the following:

a.  LBRY represented to these investors that LBC had "a value proportional to the

sum of all information transacted on the network . . . [and that] the most

reasonable path to profit is to reserve a portion of [LBC] . . . [and that] if any

significant portion of the $2 trillion media market happens through the LBRY

network [the] credits [i.e., LBC] will hold significant value."

b.  Similarly, LBRY provided a pitch deck (a presentation used to sell an idea,

product, or investment) to venture capital firms in which LBRY represented that

the value of the LBC in its Operational Fund would represent billions of dollars in

value to LBRY once LBRY scaled up its network, that is LBRY expected that the

price of LBC would increase as LBRY built out the network.

**ANSWER**:  To the extent paragraph 31 purports to quote or characterize LBRY

documents, the documents speak for themselves, and LBRY respectfully refers the Court to the

full text of the documents for an accurate and complete record of their contents.  LBRY

otherwise denies the remaining allegations in paragraph 31.

## C.     LBRY Continues to Offer and Sell LBC.

32.     During the first half of 2020, LBRY sought additional capital because it again was

low on cash to pay for the development of the LBRY Network. Despite a relatively low price for

LBC in the digital market trading platforms, LBRY sold 10,000,000 LBC to retail investors to

raise capital. The total approximate value at the time of issuance of the LBC was between

$87,700 and $525,000.

**ANSWER**:  LBRY denies the allegations in paragraph 32, except LBRY admits that

during the first half of 2020, it sold 10 million LBC.

33.     In June 2020, LBRY publicly announced in a video posted to its website that it

would begin offering and selling LBC from its Operational Fund directly through its applications

using a third-party vendor. LBRY also announced that it did not want to drain its Operational

Fund too fast. LBRY stated that if it sold more than 500,000 LBC per month through its

applications it would purchase LBC "on the market." LBRY's market purchases of LBC would

effectively prop up the price of LBC for other sellers on the trading platforms. LBRY's

statements about its Operational Fund conveyed to investors assurances that it would act to avoid

negative pressure on the LBC price and so investors would reasonably believe that LBRY was

working to make the enterprise profitable as it continued to develop the network. LBRY did not

want to reduce its Operational Fund when it expected LBC prices to rise. In June, LBRY sold 435,000 LBC through the third-party vendor.

**ANSWER**:  To the extent paragraph 33 purports to quote, summarize, or characterize a video posted on the LBRY website, the video speaks for itself, and LBRY respectfully refers the Court to the full video for an accurate and complete record of its contents.  LBRY otherwise denies the remaining allegations in paragraph 33.

34.     On June 29, 2020, LBRY announced that it was going to take action to stabilize short-term prices of LBC and insulate the price of LBC from market volatility. In its announcement, LBRY explained that it believed price volatility of LBC was hindering publisher and user adoption of LBRY's network, and thereby the growth of the network. To mitigate the problem, LBRY enlisted a vendor (the "Agent") to use 40 million LBC from its Institutional Fund to act as its agent and a market maker. A market maker is an individual or entity that operates as a middle party to buy and sell securities on a regular and continuous basis at prevailing market prices. LBRY represented to investors that the Agent would place orders to buy and sell LBC on the trading platforms at all times, to provide liquidity to the market at near current prices. This conduct further led investors reasonably to believe that LBRY would take steps to make the enterprise profitable.

**ANSWER**:  To the extent paragraph 34 purports to summarize or characterize an announcement by LBRY, the document speaks for itself, and LBRY respectfully refers the Court to the full document for an accurate and complete record of its contents.  LBRY admits it loaned 40 million LBC from the Institutional Fund to an independent market-making firm.  LBRY otherwise denies the remaining allegations in paragraph 34.

4827-0874-6989, v. 1

35.     In October 2020, LBRY still represented on its website that LBC will only gain value as the use of its Network grows. In a post on its website, LBRY represented that, in its view, the amount of LBC being used on the Network was not growing in line with its expectations, that is the demand for LBC had flattened. In its post, LBRY announced it would make changes to the Network to correct this problem. LBRY announced it was going to build the "LBRY economy" and thereby make it more compelling to buy LBC than to buy tokens from other companies. In its post, LBRY represented that it was underappreciated in the blockchain space and would rectify this lack of appreciation by partnering with and aligning long-term incentives with blockchain promoters and influencers. In its post, LBRY represented that it was going to undertake efforts and give economic incentives to limit the circulating supply of LBC. These representations led investors reasonably to believe that LBRY would be taking steps to drive demand (or reduce circulating supply) of LBC to increase the price of LBC and make the enterprise more profitable.

**ANSWER**:  To the extent paragraph 35 purports to quote or characterize the LBRY website, the website speaks for itself, and LBRY respectfully refers the Court to the full text of the website for an accurate and complete record of its contents.  LBRY otherwise denies the remaining allegations in paragraph 35.

36.     As of March 2021, LBRY's efforts to deliver on its promises and develop the LBRY Network are on-going. LBRY maintains managerial and entrepreneurial control over the LBRY Network. LBRY continues to control its software code for its applications and the protocol. LBRY continues to unilaterally make strategic and managerial decisions about the future of the LBRY Network. LBRY continues to unilaterally decide how to allocate the capital

and resources it has pooled from investors to grow the Network, which it represents on its website will increase the value of LBC.

**ANSWER**:  LBRY denies the allegations in paragraph 36.

37.    LBRY continues to post updates about its efforts to create new features like livestreaming video and playlists for content. LBRY also publicly represents in posts on its website, on social media, and during interviews, what it is currently developing, what it will soon release, and that it is directing the Network in a way to attract the greatest number of users and grow the Network exponentially. In a website post in February 2021, LBRY updated readers about changes it recently made and promised future evolutions in its applications. LBRY concluded the update with its prediction that the "best is yet to come." LBRY punctuated the sentence with a rocket ship icon signifying to readers that LBC was going to rocket to higher prices.

**ANSWER**:  To the extent paragraph 37 purports to quote or characterize the LBRY website, the website speaks for itself, and LBRY respectfully refers the Court to the full text of the website for an accurate and complete record of its contents.  LBRY otherwise denies the remaining allegations in paragraph 37, except LBRY admits it periodically posted updates on its website regarding the LBRY Protocol, LBRY Application, and other news relevant to LBRY's millions of users.

38.    In 2021, LBRY continues to work to get LBC listed on more digital asset trading platforms, which investors have represented is an important element to increasing the trading price of LBC. In March 2021, LBC is traded on at least four different digital asset trading platforms. The number of LBC traded daily by investors on the digital asset trading platforms constituted a large percentage of the outstanding supply of LBC. In March 2021, the daily

volume of LBC traded by investors ranged from a low of 43 million LBC to more than 620 million LBC. 620 million is significantly greater than the total circulating supply of LBC, meaning that investors are buying and selling the same LBC multiple times in a single day. The reported value of daily trades on the digital asset trading platforms ranged from approximately $6.3 million in sales to approximately $163 million in sales.

**ANSWER**: LBRY denies that it works to get LBC listed on more digital asset trading platforms.  LBRY lacks sufficient knowledge to either admit or deny the remaining allegations in paragraph 38 and therefore denies them.

39.     Consistent with prior periods, the trading on digital assert trading platforms in March 2021 dwarfed any use of LBC by third parties through LBRY's video applications. For example, in one 24-hour period in March 2021 the number of LBC traded on the digital asset platforms exceeded 43 million LBC. By comparison, during that same approximate 24-hour period, less than 85,000 LBC was used to tip or pledge support for publishers through LBRY's video applications, according to a third-party website. This amounts to less than 0.2% of that day's trading volume. Because LBRY distributes LBC to publishers through its video applications, the relatively small amount of LBC used on LBRY's video applications (as reported by the third-party website) is mostly the result of LBRY's own sales of LBC in exchange for goods and services.

**ANSWER**: LBRY lacks sufficient knowledge or information to either admit or deny the allegations in paragraph 39 and therefore denies them.

40.     In 2021, investors have continued to communicate on social media platforms about their investment in LBC, the price of LBC, and LBRY's efforts to continue to develop the Network. For example, in mid-March 2021, when the price of LBC increased, investors on one

social media site tried to determine which recent development announcement by LBRY caused the price to go up. At the same time, LBRY continues to offer securities in the form of LBC to investors without an effective registration statement, and therefore, without disclosing to investors all of the business and financial information required to be disclosed in a registration statement. Consequently, investors continue to trade LBC between each other on digital asset trading platforms without the benefit of the disclosure information that LBRY is required to provide.

**ANSWER**:  LBRY lacks sufficient knowledge or information to either admit or deny the allegations in the first two sentences in paragraph 40 and therefore denies them.  LBRY denies the remaining allegations in paragraph 40.

**D.     LBRY Did Not Register its Offer and Sale of Securities.**

41.     LBRY did not register its offer and sale of LBC pursuant to Section 5 of the Securities Act. LBRY failed to file a registration statement under the Securities Act with respect to its offering of LBC.

**ANSWER**:  LBRY admits that it did not file a registration statement for LBC with the SEC because no registration statement was required, as LBC is not a security.  LBRY otherwise denies the remaining allegations in paragraph 41.

42.     LBRY deprived purchasers of LBC of the audited financial statements, auditor's opinion letter, business description, risk disclosures, and other information that are required to be disclosed in an effective registration statement.

**ANSWER**:  The allegations in paragraph 44 are legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations.

**FIRST CLAIM FOR RELIEF**
**UNREGISTERED OFFERING OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act)**

43.      Paragraphs 1 through 42 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER**:  LBRY incorporates by reference its responses to paragraphs 1 through 42.

44.      Through the conduct described above, LBRY, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect, and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

**ANSWER**:  The allegations in paragraph 44 are legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations.

45.      As a result of the conduct described above, LBRY violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

**ANSWER**:  The allegations in paragraph 45 are legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations.

**PRAYER FOR RELIEF**

The SEC's prayer for relief does not require a response, but to the extent any response is necessary, LBRY denies that the SEC is entitled to the requested relief and judgment or to any relief whatsoever.  In addition, LBRY denies that the SEC may obtain a permanent injunction based on a violation that the SEC has not substantively alleged, including a violation of 17

C.F.R. 240.10b-5, which the SEC cites in its prayer for relief despite the absence of any claim arising out of this provision.

## DEFENSES

Without assuming any burden that it would not otherwise have, and without waiving the SEC's obligation to prove each and every element of its claims, LBRY asserts the following defenses:

## FIRST DEFENSE

The Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

LBC is not a security or "investment contract" and was not required to be registered with the SEC.  Therefore, LBRY's sales of LBC did not violate Section 5 of the Securities Act.

## THIRD DEFENSE

The SEC's action represents impermissible selective enforcement of the federal securities laws against LBRY as a "class of one" in violation of equal protection under the Fifth Amendment.  By accusing LBRY of violating registration requirements under Section 5 of the Securities Act, the SEC has treated LBRY differently from other similarly situated blockchain companies with no rational basis for the difference in treatment.  Moreover, the manner and circumstances under which the SEC has pursued its investigation and brought this action, including threatening to continue making investigatory demands upon LBRY so that LBRY might exhaust its resources in defending itself, demonstrate that the selective treatment is based on a malicious or bad faith intent to injure LBRY.

The SEC has failed to enforce the same registration requirements against thousands of other similarly situated blockchain companies, including companies that have sold digital assets bearing indicia of investment contracts under the SEC's publicly stated standards. For example, unlike LBRY, many of these companies conducted ICOs and engaged in other activities suggesting their token sales were offers and sales of securities. Former Chairman Jay Clayton stated in December 2017 that "[b]y and large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities."[19] Former Chairman Clayton went on to say that he had "asked the SEC's Division of Enforcement to continue to police this area vigorously and recommend enforcement actions against those that conduct initial coin offerings in violation of the federal securities laws."[20] In seeming defiance of the Chairman's directive, the SEC began investigating LBRY a few months later in May 2018 despite the fact that LBC is not a security and LBRY never conducted an ICO.

Over the next several years, the SEC's investigation of LBRY grasped at straws. The SEC issued voluminous requests for documents, and LBRY produced close to one million pages of materials in response. The SEC also took testimony of several LBRY executives in June and July 2019. The SEC then fell silent for months at a time, only to come back and demand more documents with the open threat of requiring LBRY to incur defense costs that could put it out of business. The SEC has now brought this enforcement action, intentionally singling LBRY out as a "class of one" while ignoring thousands of similarly situated blockchain companies.

---

[19] Jay Clayton, Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), *available at* https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.
[20] *Id.*

## **FOURTH DEFENSE**

LBRY did not have fair notice of whether its sales of LBC constituted securities or investment contracts under the federal securities laws, and thus whether its conduct violated the law.  Accordingly, the definition of "investment contract" as applied to LBC is unconstitutionally vague because it did not adequately cabin the SEC's discretion to apply it in violation of LBRY's due process rights.

The Due Process Clause requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them.  Such notice is particularly important in the context of statutes such as Section 5 of the Securities Act that impose strict liability or civil penalties.

The application of the federal securities laws to digital assets has lacked clarity and failed to provide LBRY fair notice of its obligations under the law as it relates to LBC sales.  When the Securities Act of 1933 was enacted, Congress could not have envisioned blockchain technology or how an innovative, decentralized technology like the LBRY Protocol would incorporate tokens into its decentralized model.  The statute simply was never intended to apply to a technology like the LBRY Protocol and LBC.

The SEC to date has steadfastly refused to provide sufficient clarity to LBRY or to the blockchain industry in general about its obligations and the SEC's interpretation of the law.  What little guidance the SEC has given indicates that LBC is not a security in any event.  For example, the SEC did not meaningfully comment on the application of the federal securities laws to tokens until July 2017—a full year <u>after</u> the LBRY Protocol and LBC launched—with the issuance of the DAO Report.  But the specific example discussed in the DAO Report bears little

resemblance to LBRY or LBC.  To take just a couple of examples, unlike LBRY, the company

there issued its tokens for the express purpose of raising "funds to grow" the company, and token

holders possessed certain voting rights.[21]  The DAO Report plainly could not have provided

sufficient clarity to LBRY as to whether the SEC would view sales of LBC to be offers and sales

of securities.  Nearly a year later—approximately two years after LBRY launched the LBRY

Protocol and LBC—an SEC official underscored former Chairman Clayton's emphasis on

ICOs.[22]  Despite the SEC's stated focus on ICOs, which LBRY never conducted, the SEC now

alleges that LBRY should have registered its sales of LBC as securities.  And as discussed above,

even after the SEC brought this action, one of its commissioners issued another statement

regarding a proposed "token safe harbor" for mature, decentralized networks like LBRY.

 The SEC's varying statements about how it might apply the federal securities laws in the

blockchain-technology context provide no real guidance at all.  If anything, the statements

confirm that LBC is not a security.  To hold LBRY liable for failing to register LBC as a security

given this utter lack of fair notice would violate LBRY's due process rights.

## FIFTH DEFENSE

 Insofar as LBRY's LBC sales are found to be securities, which they were not, the SEC's

claim is barred in whole or in part because LBRY's sales of LBC were exempt from registration

under the Securities Act and applicable regulations.

## RESERVATION OF RIGHTS

 LBRY presently has insufficient knowledge or information upon which to form a belief

as to whether there may be other, as yet unstated, defenses available to LBRY and therefore

---

[21] DAO Report, at 17-18, *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.
[22] Director William Hinman, Division of Corporate Finance, Remarks at the Yahoo Finance All Markets Summit: Crypto, *Digital Asset Transactions:  When Howey Met Gary (Plastic)*, June 14, 2018, *available at* https://www.sec.gov/news/speech/speech-hinman-061418.

expressly (1) reserves the right to amend or supplement its Answer, defenses, and all other

pleadings, and (2) reserves the right to assert any additional defenses under any applicable law in

the event that discovery indicates such defenses would be appropriate.

## DEMAND FOR JURY TRIAL

LBRY requests a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

Wherefore, LBRY respectfully requests that the Court (1) dismiss the SEC's Complaint

against LBRY in its entirety and with prejudice and (2) grant such other and further relief as it

may deem just and proper.


DATED:  June 7, 2021

Respectfully submitted,

LBRY, INC.

/s/ William E. Christie
William E. Christie #11255
Steven M. Gordon #964
Shaheen & Gordon, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302
(603) 225-7262
wchristie@shaheengordon.com
sgordon@shaheengordon.com

Keith W. Miller (*pro hac vice*)
Adam H. Schuman (*pro hac vice*)
John T. Dixon (*pro hac vice*)
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
(212) 262-6900
KeithMiller@perkinscoie.com
ASchuman@perkinscoie.com
JohnDixon@perkinscoie.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


DATED:  June 7, 2021                    /s/ William E. Christie
                                        William E. Christie

4827-0874-6989, v. 1