# Exhibit F

# Exhibit B

## Redacted Portions

## Filed Under Seal

1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3     -----------------------------  )

 4     SECURITIES AND EXCHANGE          )

 5     COMMISSION,                      )

 6                    Plaintiff,     )Case No.

 7         vs.                        )20 CV 10832 (AT)

 8     RIPPLE LABS, INC.; BRADLEY      )

 9     GARLINGHOUSE, and CHRISTIAN A.  )

10     LARSEN,                         )

11                    Defendants.     )

12     -----------------------------  )

13

14        DEPOSITION OF WILLIAM HAROLD HINMAN, JR.

15                    WASHINGTON, D.C.

16                    JULY 27, 2021

17

18

19     REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

20     _____
                       DIGITAL EVIDENCE GROUP
21            1730 M Street, NW, Suite 812
                    Washington, D.C. 20036
22                    (202) 232-0646
```

1    expertise with respect to the application of the

2    federal securities laws to transactions in digital

3    assets?

4         A.  I was someone in the firm that people came

5    to with questions of that sort.  So, you know, sort

6    of in the middle.  It was new for everyone, but I

7    had taken an interest in it and had studied it a

8    little bit.  So probably above average, but no one

9    knew a whole lot.

10        Q.  And why is that no one knew a whole lot?

11        A.  Because the instruments were just being

12   shaped and formed and it was early days of this

13   activity.

14        Q.  And there had not been a lot of litigation

15   as to when a transaction in a digital asset would

16   constitute a security, correct?

17             MR. TENREIRO:  Object to form.

18        A.  I don't believe so.

2          A.   I don't think they were ever a client.

3     They might have been involved with matters I was

4     involved in, but I don't think they were a client.

5          Q.   And how about ConsenSys?

6          A.   No.

7          Q.   And how about the Etherium Foundation?

8          A.   No.

9          Q.   And I mean this in a very broad sense When

10    I talk about the Ethereum foundation and I'm

11    reading from language on their Website.  So if

12    you'll bear with me.

13          "The Ethereum Foundation is not a company

14    or even a traditional nonprofit.  Their role is not

15    to control or lead Ethereum, nor are they the only

16    organization that funds critical development of

17    Ethereum-related technologies.  The Ethereum

18    FoundationSo with that very amorphous, broad

19    definition of the Ethereum Foundation do you

20    believe you represented any company, individual, or

21    entity that was involved in the Ethereum Foundation

22    as I just described it?

39





41





Case 1:20-cv-10832-AT-SN Document 800-2 Filed 08/17/21 Page 8 of 91

15          THE REPORTER:  Can I get a spelling on

16   Ethereum.

17          MR. FIGEL:  E-T-H-E-R-E-U-M.

18          THE REPORTER:  Thank you.

19     Q.  I'd like to now direct your attention to

20   the period after you announced your retirement from

21   Simpson Thacher until you joined the SEC as a

22   director of the division of corporate finance?

50

1    because I didn't know what order we were going to

2    be offering the documents there's an internal

3    document.

4            So Mr. Hotseater, I'm showing Mr. Hinman a

5    document that is in the outline as Exhibit CC.  I'm

6    sorry.  AA.

7                        (Hinman Exhibit 6 was marked

8                         for identification.)

9    BY MR. FIGEL:

10       Q.  Do you have Exhibit 6 in front of you?

11       A.  The only thing I have is my bio.

12       Q.  So I show you what's been marked as

13   Exhibit 6.  I'll represent to you that I believe

14   this is the Supreme Court's decision in SEC versus

15   Howey.  I just want to follow up on your earlier

16   testimony that you said that prior to joining the

17   SEC you had familiarized yourself with Howey as it

18   may relate to digital assets, correct?

19       A.  I believe so.

20       Q.  Okay.  Approximately when was that?

21       A.  Probably mid 2016, late 2016 I believe.

22       Q.  And did you do that in anticipation of

51

1  becoming the director of the division of corporate

2  finance?

3      A.  No.



20      Q.  All right.  Prior to joining the SEC had

21  you applied the Supreme Court's decision in Howey

22  to any facts that you had at that time about

1  under the federal securities laws?

2     A.  And, again, we're talking about the first

3  six months of my tenure?

4     Q.  Uh-huh.

5     A.  No.

6     Q.  Again, it may have happened, but as you

7  sit here today, you're not aware of it?

8     A.  Exactly.

9        MR. FIGEL:  Okay.  I'm sorry.  We've had a

10  motion to take a break.  Is that all right?

11       MR. TENREIRO:  Whatever you want.

12       THE VIDEOGRAPHER:  Off the record at

13  10:04.

14              (A short break was had.)

15       THE VIDEOGRAPHER:  Back on the record at

16  10:18.

17  BY MR. FIGEL:

61





63

▪

▪

▪

▪

▪

▪

▪

▪

▪

▪

11          Q.  Again, we will -- I think we've created

12     the record and, you know, just so the record's

13     clear, we don't believe that's an appropriate

14     privilege instruction, but we'll move on.

15               Before the break I was asking you about

16     whether you were aware in, say, the first six

17     months after you became the division director about

18     various work product that had been created.  Were

19     you aware of any work product that had been created

20     within the division of corporate finance as to

21     whether XRP or transactions in XRP were securities

22     or investment contracts under the federal

95

1          Q.  So any time the division of corporate

2    finance issued a no action letter that would be

3    publicly available?

4          A.  That's right.

5          Q.  So let's put aside interactions with

6    lawyers and the public that are requesting a no

7    action letter.

8          A.  Okay.

9          Q.  Do you recall other issues that were

10   brought to you and members of your staff about the

11   application of the federal securities laws to

12   digital asset transactions in which they sought

13   guidance without seeking a no action letter?

14         A.  Yes.

15         Q.  Tell me what you -- tell me what you

16   recall on that issue.

17         A.  Frankly, the one I recall the most clearly

18   is probably the one when XRP came in with a person

19   who had my position before me, as well as

20   enforcement counsel.  They were interested in is

21   there a way to restructure what we're doing to

22   bring it within compliance of the securities laws,

96

1    and the first thing I said to them was you're

2    continuing to offer XRP without any kind of

3    restrictions that would apply as a securities

4    offering.  If you want to come into compliance you

5    have to stop doing that, and they understood that.

6         Q.  All right.  Other than the issues with

7    respect to Ripple, can you identify any other

8    lawyers that came to you, not seeking a no action

9    letter, but seeking guidance with respect to

10   transactions in digital assets?

11        A.  Yes.

97

2       Q.  Any other lawyers representing --

3   withdrawn.

4       Any other lawyers you recall coming to you

5   or members of the staff seeking advice on digital

6   asset -- the application of the federal securities

7   laws to digital asset transactions other than what

8   you've testified to?

9       A.  Yes.  I mean, this is a -- this is a big

10  topic at the SEC.  So there's lots of folks coming

11  in and asking for advice how to comply.  I don't

12  want to get into law firm names or -- unless you

13  think it's relevant, but, you know, other folks at

14  law firms would come in, talk about an idea that

15  would be embedded in a token, and there were a

16  number of folks that said we'd like to do this on a

17  registered basis because we think -- we recognize

18  it is a security and how would we best do that,

19  could we use regulation A, could we use form S1.

20      Because these were somewhat novel

21  securities there were questions around what's

22  material in terms of the disclosures you might have

1   to do in that context.  We had those kinds of

2   discussions with XRP specifically, if they were

3   going to register, what would the things be that

4   would be relevant.

5        Q.  Move to strike about XRP because I asked

6   you for your recollection of meetings that didn't

7   involve XRP or --

8        A.  I'm sorry.  I missed that.

9        Q.  There were frequent meetings; is that fair

10  to say?

11       A.  Yes.  I mean, it was something that

12  happened with some frequency at the division.

13       Q.  And when lawyers or industry participants

14  came to you and asked for guidance, I believe you

15  earlier testified that the division of corporate

16  finance didn't provide legal advice, correct?

17       A.  That's right.

18       Q.  So how were you able to -- withdrawn.  Let

19  me try this differently.

20           Did you keep a calendar when you were at

21  the SEC?

22       A.  Yes.

1   will "play a key role in shaping the future

2   regulatory environment in which we and they

3   operate."

4        A.  Right.

102



103





118

1    So a number of instances.

2    Q.  Okay.  So picking up on your testimony

3  with respect to Ms. Szczepanik --

4    A.  Yes.

5    Q.  -- I'd like to show you 9; is that

6  correct?

7    THE REPORTER:  Yes.

8         (Hinman Exhibit 9 was marked

9          for identification.)

10  BY MR. FIGEL:

11    Q.  What I'll ask the court reporter to mark

12  as Exhibit 9.  It's DD in the outline.  Again, I'll

13  represent to you this is a copy of a page on the

14  SEC's Website -- or available on the SEC's Website,

15  which I believe is the press release announcing

16  Ms. Szczepanik in the position that you just

17  described.

18    A.  Okay.

19    Q.  The date of this press release is

20  June 4th, 2018, correct?

21    A.  That's right.

22    Q.  And is that approximately the date on

119

1      which you appointed Ms. Szczepanik to be the senior

2      advisor for digital assets and innovation?

3          A.  That's the date it was announced.  She was

4      sort of functionally operating this way for some

5      time, but in terms of making a formal announcement

6      of it and creating the actual office, yes, June 4th

7      is about the time.

8          Q.  And that office was within the division of

9      corporate finance, correct?

10         A.  That's right.

11         Q.  So Ms. Szczepanik reported to you?

12         A.  That's right.

13         Q.  And this you testified to earlier I

14     believe was one of the examples of an action that

15     you spearheaded as described in the Andreessen

16     Horowitz blog post, correct?

17             MR. TENREIRO:  Object to form.

18         A.  This is an action that was done under my

19     direction.

20         Q.  But this would be an action that would

21     fall within the statement on Exhibit 8 that you

22     spearheaded the SEC's early work with digital

159

```
 1            MR. TENREIRO:  Okay.

 2            MR. FIGEL:  For the hotseat this would be

 3     a document that you would have received this

 4     morning that has -- that's marked JJ2, and I'll ask

 5     the court reporter to mark this document as

 6     Exhibit 14.

 7                      (Hinman Exhibit 14 was marked

 8                       for identification.)

 9     BY MR. FIGEL:

10        Q.  Mr. Hinman, you're not on this e-mail.

11        A.  Uh-huh.

12        Q.  So you're free to read it if you'd like,

13     but I'll represent to you you're not on it.

14            MR. TENREIRO:  Reid, is this from last

15     night's production?

16            MR. FIGEL:  Yes.

17            MR. TENREIRO:  Okay.

18            MR. FIGEL:  I'll explain to Mr. Tenreiro,

19     you can correlate these to the earlier ones --

20            MR. TENREIRO:  The earlier ones being

21     Exhibits 1 through 3?

22            MR. FIGEL:  Yes.
```

160

1    BY MR. FIGEL:

2        Q.  I believe you testified earlier, but what

3    was Amy Starr's responsibility on or about

4    December 7, 2017?

5        A.  At that point I don't think the FinHub had

6    been set up which she later joined.  So I think she

7    was just a senior person in the division with

8    oversight of novel securities.

9        Q.  Did you direct Ms. Starr to contact

10   Mr. Lubin to set up a meeting with the division of

11   corporate finance?

12       A.  I don't remember doing that.  It's

13   possible, but I don't have a specific recollection

14   of asking her to do that.

15       Q.  If you'd take a look at the Bates No. 446

16   of Exhibit 14.

17       A.  446?  Yeah.

161



162

19    A.  Okay.

20    Q.  And the issues as he describes it above

21  are issues involving blockchain tokens and

22  securities regulations.

163

1        A.   Okay.

2        Q.   Did you have an understanding in advance

3   of the December 13th meeting with ConsenSys as to

4   what specific issues involving blockchain tokens

5   and securities regulations they wanted to address?

6        A.   No, I don't have a recollection of a

7   specific set of topics.

8        Q.   This may be an unfair question, but I'm

9   going to ask it.  Do you have any recollection of

10  clicking on the links to these e-mails or reviewing

11  the documents that are associated with these links?

12            MR. TENREIRO:  He's not copied on the

13  e-mail, but go ahead.

14       A.   Yeah.  I was just going to say that.  I'm

15  not sure I got this e-mail, but I don't remember

16  clicking on any links.

17       Q.   Do you remember doing any reading before

18  the December 13th meeting?

19       A.   No, I don't.

20       Q.   So let's go to the meeting on December 13,

21  2017.  You attended a meeting on that date with

22  representatives of ConsenSys, correct?

                                                                        170

 1            MR. FIGEL:  Oh, did he?

 2            MR. TENREIRO:  Now he has up Exhibit 146,

 3    which is Exhibit 3.

 4            MR. FIGEL:  So let's go back to the one

 5    you did have up then.  He was correct.  Sorry.

 6                      (Hinman Exhibit 15 was marked

 7                       for identification.)

 8    BY MR. FIGEL:

 9        Q.  Do you recall reading this document before

10    the meeting that you attended that you recall as

11    the first meeting you had with representatives of

12    ConsenSys?

13        A.  I don't recall that.

14                      (Hinman Exhibit 16 was marked

15                       for identification.)

16    BY MR. FIGEL:

17        Q.  I'm going to show you a document that I'll

18    ask the court reporter to mark as Hinman

19    Exhibit 16.  Again, you're not on this, but I think

20    for the record it will be useful.

21        A.  Okay.

22            MR. FIGEL:  And Mr. Tenreiro, I'll just

171

1    represent to you that our understanding of the

2    documents we got from ConsenSys last night suggests

3    that Exhibit 15, which is in front of Mr. Hinman,

4    was attached to this e-mail that has been marked as

5    Exhibit 16 and was transmitted by Mr. Corva to Amy

6    Starr on December 12th.

7         Q.  I don't have any questions for you on

8    that, Mr. Hinman, other than I'm just making a

9    representation that our understanding is this was

10   something that was circulated to the division of

11   corporate finance before the meeting.

12        A.  When you say "the meeting" --

13        Q.  Well, the meeting --

14        MR. TENREIRO:  There's no -- there's no

15   question on the record.  I don't have any -- I

16   don't have any -- you know, thank you for your

17   representation.  I don't think there's any question

18   pending.

19        MR. FIGEL:  There is not.

20        If you could take a look at --

21        MR. TENREIRO:  Just, you know, you do keep

22   saying "the meeting" and there's a little bit of

172

1    confusion here because, you know, he says he

2    doesn't remember attending this meeting.  I think

3    that's hopefully clear on the record to everybody.

4            MR. FIGEL:  Fair enough.

5    BY MR. FIGEL:

6        Q.  The meeting that you recall, do you recall

7    any discussion at the meeting of Exhibit 15?

8        A.  No.

9        Q.  Let me direct your attention to Bates

10   No. 280 -- ending 286 in Exhibit 16.  You'll see on

11   the left there's a reference to the blockchain

12   project at Cardozo School of Law; do you see that?

13       A.  Yes.

14       Q.  Is that the project that you testified to

15   earlier that Mr. Wright was affiliated with in some

16   way?

20       Q.  Do you recall anyone stating to you at the

21   meeting that you recall in substance that the

22   purpose of what Mr. Wright was working on was to

1  explore the regulatory challenges raised by

2  blockchain technology?

3      A.  Do I recall someone saying that to me?

4      Q.  Yes.

5      A.  No.

6      Q.  In substance.

7          If you could look at the page of this

8  exhibit that ends with Bates 299.  Do you recall

9  seeing this page in connection with the meeting

10 that you recall?

11     A.  I don't recall this slide deck.  So

12 certainly not this page.

13     Q.  Do you remember anyone telling you in

14 substance that entrepreneurs and others lack

15 guidance on how to sell tokens that should not be

16 securities?

17         MR. TENREIRO:  From the outside, is that

18 what you're asking, someone from the outside

19 telling him that?

20         MR. FIGEL:  Yes.  Yes.  Sorry.

21         Did you understand my question,

22 Mr. Hinman?

174

1           A.  Why don't you repeat it.

2           Q.  I'm focusing you on the meeting that you

3     recall and Mr. Tenreiro's observation that you

4     don't remember the date, which I understand.  I

5     think the record's clear on that.  I'm now asking

6     you if you recall that during that meeting that you

7     remember you were told in substance that

8     entrepreneurs and others lack guidance on how to

9     sell tokens that should not be securities.

10          A.  I don't have a specific recollection of

11    that being said to me at that meeting, no.

12          Q.  How about a general recollection?

13          A.  Well, you made a very specific statement.

14    Anything like that in terms of people lacking

15    guidance?

16          Q.  Uh-huh.

17          A.  No, I don't remember that coming up.

18          Q.  If you could turn the page to the next

19    page ending in Bates No. 300.

20          A.  Yes.

21          Q.  I take it this doesn't refresh your

22    recollection of seeing this slide deck, correct,

175

```
 1    seeing this page?

 2         A.  It doesn't.

 3         Q.  All right.  Do you remember anyone stating

 4    in substance at the meeting you remember that

 5    entrepreneurs and investors may lack an

 6    appreciation for regulatory risk?

 7         A.  Not at that -- not at the meeting I do

 8    recall, no.

 9         Q.  How about more generally?  Do you remember

10    hearing from third parties that entrepreneurs and

11    investors lack an appreciation of the regulatory

12    risk of transactions in digital assets?

13         A.  I didn't hear something specifically

14    lacking an appreciation of regulatory risk.  I did

15    hear -- not at this meeting that we're talking

16    about, but in general that some people had the idea

17    that if you called something a token it wouldn't be

18    subject to the U.S. securities laws, that just by

19    naming it a token and by creating a digital token

20    you create an instrument that wasn't subject to

21    U.S. securities law regulation.

22         Q.  And that was a perception that you
```

1  approach is what he said.

2          MR. TENREIRO:  He said that.

3          THE REPORTER:  Hey, guys.

4          MR. FLUMENBAUM:  The record should reflect

5  what he said.

6          MR. TENREIRO:  Absolutely.

7          MR. FLUMENBAUM:  Principle-based approach,

8  and then you interrupted.

9          MR. TENREIRO:  Yes.  I just want to

10  caution Director Hinman not to discuss

11  deliberations with the staff.

12          THE WITNESS:  Got it.

13          MR. TENREIRO:  Sorry.  And thank you.

14  BY MR. FIGEL:

15      Q.  Why don't we try this.  Yes or no, did the

16  commission promulgate regulations that created a

17  safe harbor for the issuance of digital assets

18  during your tenure as the director of the division

19  of corporate finance?

20      A.  No.

21          MR. FIGEL:  All right.  Let's go to in the

22  outline it is tab UU, and we're up to 19.

218

1    seems to be a response to the chairman's question,

2    Chairman Huizenga.

3         MR. FIGEL:  Did I miss that?

4         MR. TENREIRO:  I just want there to be a

5    clear record.  Towards the top it says "Chairman

6    Huizenga:  Thank you."

7         MR. FIGEL:  Thanks.  You're correct.

8         You gave that testimony, correct?

9    A.  Yes.

10   Q.  And you were under oath?

11   A.  Yes.

12   Q.  Was it true that you were trying to

13   provide as much guidance as you could to the

14   marketplace?

15   A.  Yes.

16   Q.  As of April 26, 2018 had the division of

17   corporate finance issued an interpretive relief

18   about the circumstances under which a digital asset

19   transaction would be an investment contract or a

20   security?

21   A.  Did you say "interpretive release"?

22   Q.  Uh-huh.

219

```
 1        A.  No.

 2        Q.  As of April 26, 2018 had the SEC --

 3   withdrawn.

 4             As of April 26, 2018 had the division of

 5   corporate finance issued a regulation about the

 6   circumstances under which a digital asset

 7   transaction would be an investment contract or a

 8   security?

 9        A.  No.

10        Q.  And the division of corporate finance had

11   not engaged in any rulemaking activity about the

12   circumstances in which a digital asset transaction

13   would be a security, correct?

14             MR. TENREIRO:  I object to form and also

15   instruct the witness not to answer internal

16   deliberations about potential rulemaking.  Are you

17   talking about rulemaking activities externally such

18   as requesting notice of comments or --

19             MR. FIGEL:  Yes.

20             MR. TENREIRO:  Okay.

21             MR. FIGEL:  Public announcement of a

22   potential rulemaking as to when a digital asset
```

220

1    transaction would be viewed as a security under the

2    federal securities laws.

3            A.  No.

4            Q.  And that is all guidance that you could

5    have provided, correct?

6            A.  That's a form of guidance, yes.

7                        (Hinman Exhibit 26 was marked

8                         for identification.)

9    BY MR. FIGEL:

10           Q.  Director Hinman, I'm now going to show you

11   what's in the binder as tab YY and which I will ask

12   the court reporter to mark as Exhibit 26 I believe.

13                       (Witness reviewing document.)

14           A.  Okay.

15           Q.  Do you recall receiving this e-mail from

16   Ms. Szczepanik on May 16, 2018?

17           A.  This refreshes my recollection.

18           Q.  And you responded to that e-mail, correct,

19   at the top?

20           A.  Yes.

21           Q.  Any reason to believe this is not a true

22   and accurate copy of the e-mail that you exchanged

254

1    response.

2         A.  That's right.  This is not a proposed

3    response.  These are, I believe, subtopics for the

4    major heading.  These were additional questions

5    they were thinking of asking.

6         Q.  What is your basis for your testimony that

7    you understood that these were subtopics that they

8    proposed?

9         A.  Because when you read them all in context,

10   it's clear that they are sort of follow-on

11   questions.  If you read No. 2, for instance, it's

12   pretty clear that's another question they're going

13   to ask.

14        Q.  And focusing now on 4A --

15        A.  Right.

16        Q.  -- you'll see that it was deleted?

17        A.  Right.

18        Q.  And I will represent to you my

19   understanding is that Mr. Seaman deleted this

20   portion of the document.

21             MR. TENREIRO:  What's the basis of that

22   understanding, Reid?

255

1          MR. FIGEL:  Our review of the metadata.

2     If you look to -- depends how you present it, but

3     if you go to the second document, it says on some

4     version of it deleted by Michael Seaman.

5          MR. TENREIRO:  Okay.  I think there's no

6     foundation to that right now in the record, but go

7     ahead and ask the question.

8          MR. FIGEL:  Let's open the native file and

9     I'll try and show you because I think it's

10    important.

11         MR. TENREIRO:  Even if it is, you can ask

12    him if he directed Seaman to delete it, I mean,

13    does he remember that.

14    BY MR. FIGEL:

15        Q.  Did you direct Mr. Seaman to delete these

16    subtopics?

17        A.  I don't recall directing him to do that.

18        Q.  Do you have an understanding as to why he

19    deleted these subtopics?

20         MR. TENREIRO:  Without disclosing

21    deliberations or conversations.

22        A.  I don't have a specific recollection of

256

1    reading the particular deletion here.  I think he

2    may have been looking for a broader question rather

3    than something that was characterizing some of our

4    advice or our guidance in this area.  This looks

5    very narrow and we might not have agreed with the

6    premise of the question.

7         Q.  Well, do you agree that one of the key --

8    one of the key points of your June 14, 2018 speech

9    was that "The token and the offering may be

10   distinct.  The token may be offered in a securities

11   offering at some point and the future offerings may

12   be nonsecurities.  Nonetheless the touchstone of

13   the analysis is likely the Howey test prong

14   regarding an expectation of profit solely from the

15   efforts of others.  A sufficiently decentralized

16   network token does not rely on the efforts of

17   others"?

18             MR. TENREIRO:  Object to form.  Do you

19   want to break that up?  I mean --

20             MR. FIGEL:  No.

21             MR. TENREIRO:  It's impossible to answer

22   that.  Go ahead.

257

1          MR. FIGEL:  Do you disagree that that was

2     a key point of your June 14, 2018 speech?

3          MR. TENREIRO:  Object to form.

4          A.  I think that is too narrow a reading of

5     the speech.  I think it's -- again, I think why

6     Michael may have deleted this is the premise of

7     this was that these were the key items, and I think

8     it was reducing a five-page speech or six-page

9     speech, whatever it is, to one paragraph.

10         Q.  Turn the page, if you would, and go to

11    question 6.

12         A.  Yeah.

13         Q.  So you'll see in the portion of the e-mail

14    that's in different colors that, according to your

15    understanding, "The moderators suggested another

16    issue is that to the outside observer the SEC can

17    be opaque.  With all the divisions -- different

18    divisions and offices how do you know who to call?

19    You call ten different law firms, they give you ten

20    different answers, each of them has their own

21    particular spin.  It's like the white light of your

22    speech went through a prism and came out in ten

1   different colors of legal advice."

2       Let's just focus on those sentences.  Do

3   you know why -- did you direct Mr. Seaman to delete

4   that portion of the proposed question?

5       MR. TENREIRO:  Object to form.

6     A.  I don't recall directing him to do that.

7   It's hard to tell from the way this document's

8   presented whether he added the statement "Another

9   issue is that to the outside observer is that the

10   SEC can be opaque.  With all the different

11   divisions and offices how do we know who to call."

12   That looks like that's something he added.  It was

13   probably trying to give me an opportunity to say

14   here's how you can get your answers -- answers to

15   questions you may have.

16     Q.  Do you believe that Mr. Seaman wrote "You

17   call ten different law firms, they give you ten

18   different answers"?

19     A.  No.  I think that is struck out in the

20   document I have in front of me.  So my guess is

21   that this is a very long three-paragraph, almost a

22   full page question, and he may have deleted it for

1    any number of reasons.

2        Q.  Fair to say that the moderators believe

3    that "You call ten different law firms, they give

4    you ten different answers," correct?

5            MR. TENREIRO:  I'm just going to -- Reid,

6    I'm going -- I'm going to just to note an

7    objection.  Judge Netburn has ruled on your fair

8    notice defense.  The focus is not on what the

9    market participants believed.  It's an objective

10   test.  You're skating dangerously close in my

11   opinion to opening the door to what people

12   believed, including your client.  Go on if you'd

13   like.

14           MR. FIGEL:  Noted.

15           Can you answer my question?

16       A.  Sure.  I just want to make sure -- answer

17   the question?  Okay.

18           I don't know what the moderators thought

19   when they were coming up with these questions, what

20   was in their mind, if they thought It was a

21   colorful way to describe a question or ask a

22   question.  I don't really know what they had in

260

```
 1    their mind.  It's hard for me to read somebody

 2    else's mind.

 3         Q.  But you have no reason to believe that

 4    Mr. Seaman added that portion to this document,

 5    correct, "You call ten different law firms" all the

 6    way down to "Ten different colors of legal

 7    advice"?

 8         A.  No.  Again, I think this was a deletion,

 9    but I don't know the history of the -- of the

10    questions, who initially drafted them, who changed

11    them, but my best guess would be that Mr. Seaman

12    added the language that's in red but not struck out

13    and struck the things that are struck.

14         Q.  All right.  Let's go to sub A on 6.

15         A.  Sub A on 6.  Okay.

16         Q.  Beginning with "Another issue" and ending

17    with "Different lawyers."  Do you have an

18    understanding as to whether Mr. Seaman added that

19    or whether Mr. Seaman deleted that?

20         A.  Again, I don't know the editorial history

21    here.  So my previous statement that I think he

22    probably struck things that are marked out and
```

261

1    added things that are just in red, but I don't have

2    firsthand knowledge of that.

3        Q.  All right.  Same question with respect to

4    the next portion of this, "New insights are based

5    on who can get a meeting or which lawyer says they

6    know someone in the right office.  There have been

7    some efforts to avoid this and to try to bring the

8    conversations on this topic into an open forum and

9    find consensus on best practice."  Do you have any

10    reason to believe that Mr. Seaman added this?

11         MR. TENREIRO:  Object to form.

12        A.  Same answer.

13        Q.  And same set of questions all the way to

14    the bottom.  Any information about who added the

15    language and who deleted it?

16        A.  No.  Again, I think things that are in red

17    such as "Do you have plans to issue more guidance"

18    were likely added by Mr. Seaman, and other things I

19    just don't know the editorial history.

20        Q.  Do you know whether there was a video

21    recording made of your remarks at the Tech GC

22    National Summit on November 26th?

301



15              (Hinman Exhibit 35 and

16               Exhibit 36 were marked for

17               identification.)

18   BY MR. FIGEL:

19       Q.  So I'm now showing you what is in the

20   outline as PPP and which I will ask the court

21   reporter to mark as Exhibit 35.  In light of the

22   concern about the time I'm going to also show you

302

1   what's in the outline as QQQ and which I'll ask the

2   court reporter to mark as Exhibit 36.

3                    (Witness reviewing document.)

4       A.  Okay.

5       Q.  You're not on Exhibit 35, but have you

6   seen that document?

7       A.  I don't remember seeing that e-mail.

8       Q.  And the attachment, do you recall seeing

9   that document?

10      A.  I don't.

11      Q.  All right.  You'll see on

12  Exhibit 35 -- let me back up.  Do you know Robert

13  Cohen in the division of enforcement?

14      A.  I do know Rob, yes.

15      Q.  And who is he?

16      A.  At the time I think he was, you know, a

17  staff member in enforcement.  He may have -- I

18  don't know the exact date, but there was a crypto

19  asset group and Rob may have been heading it at

20  that point.

21      Q.  And you'll see in the e-mail there's a

22  reference to setting up a potential meeting.  Did

303

1    you attend a meeting with Mr. Cohen and Ms. Johnson

2    and Mr. Rosenblum?

3        A.  I don't think so.

4        Q.  To your knowledge, did anyone from the

5    division of corporate finance attend a meeting with

6    Ms. Johnson, Mr. Rosenblum, and --

7        A.  I don't know.

8        Q.  Let's go to tab 36, and if you could take

9    a look at the page here that ends in 2983.  In

10    outline form it's direct your attention to D1.

11        A.  B1.

12        Q.  D as in David.

13        A.  I'm probably on the wrong page.  Give me

14    the page number again.

15        Q.  The Bates is 2983.

16        A.  Okay.

17        Q.  And the portion of the outline is the --

18    is D and D1, D and Romanette 1.

19        A.  My 2983 is -- okay.  So it's 85.  Oh, 85

20    on mine.

21        MR. TENREIRO:  There's two Bates.  That's

22    why it's confusing him.  I think it's from where it

1   says "From a petitioner's perspective," right?

2         MR. FIGEL:  Correct.  As I understand

3   your --

4         A.  All these pages are 83 except for the

5   specific page you're trying to get to is 85.

6         Q.  I believe the way the SEC produces

7   documents is the top one suggests a number that is

8   posted on all things that are connected, and then

9   the one below it is the sequential number.

10        MR. TENREIRO:  Your guess is as good as

11  mine.

12        A.  I think it's the other way around, but

13  that's okay.

14        Q.  If you could just read into the record D

15  and Romanette 1.

16        A.  "From a practitioner's perspective the

17  situation in the cryptocurrency markets is

18  extremely unusual.  Token issuers can speak to two

19  different well-regarded experienced law firms and

20  get diametrically opposite views on the current and

21  future applicability of federal securities laws and

22  what steps the token issuer needs to take to engage

1    in a compliant token offering."

2          Did you learn from any source on or about

3    October 23rd, 2018, you know, within weeks that

4    Ms. Johnson and Mr. Rosenblum had informed

5    Mr. Cohen in substance of the information you just

6    read?

7          A.  I don't remember ever hearing about that.

8          Q.  If you could read D Romanette 3-2 into the

9    record, please.

10         A.  "This is not normal and, in fact, this is

11   largely unprecedented in our experience."

12         Q.  Go down to 2, if you would.

13         A.  You want me to read the --

14         Q.  Yeah.  "Lawyers, law firms, and other

15   gatekeepers."

16         A.  So not the general one, the other one?

17   Okay.

18              "Lawyers, law firms, and other

19   gatekeepers, however, do not typically disagree on,

20   for example, whether federal securities laws apply

21   at all or what analysis is for determining

22   whether -- or what the analysis is for determining

306

1   whether instruments are securities."

2       Q.  Did you learn from any source on or about

3   October 23rd, 2018 that Ms. Johnson and

4   Mr. Rosenblum had expressed this view to Mr. Cohen

5   and others?

6       A.  I don't recall that, no, I don't think I

7   did.

8           MR. FIGEL:  Can we go off the record for a

9   second.

10          THE VIDEOGRAPHER:  Off the record at 5:39.

11                  (A short break was had.)

12          THE VIDEOGRAPHER:  Back on the record at

13  5:45.

14                  EXAMINATION

15  BY MR. FLUMENBAUM:

16      Q.  Good afternoon, Mr. Hinman.

17      A.  Hi.

18      Q.  I'm going back to the privilege logs that

19  Mr. Figel introduced.  They reflect that you sent

20  your speech to Mr. Clayton, correct?

21      A.  Among others, yes.

22      Q.  Did you send them to any other

308

1          MR. FLUMENBAUM:  You may answer.

2      A.  I didn't feel like the input was going to

3  be worth the extra delay.

4      Q.  So the only commissioner that you cared

5  about was Mr. Clayton, correct?

6          MR. TENREIRO:  Object to form.

7      A.  That's not true.

8      Q.  Do you know whether Mr. Clayton had a

9  relationship with ConsenSys or Ether or any of the

10  entities in the Ether network prior to his joining

11  the SEC?

12      A.  Not that I'm aware of.

13      Q.  Are you aware that Sullivan & Cromwell

14  represented ConsenSys?

15          MR. TENREIRO:  Objection to form.  Go

16  ahead.

17      A.  I didn't know if they were a firm client.

18  I think some of the people at the ConsenSys

19  meetings had a Sullivan & Cromwell background.  I

20  don't know if they were still there appearing as,

21  you know, the law firm for ConsenSys.  So I wasn't

22  aware if they -- of their relationship.

1    Q.  Now, you testified earlier that the SEC

2    had policy against owning digital assets for quite

3    some time; do you remember that?

4    A.  Do I remember testifying to that?

5    Q.  Yes.

6    A.  Yes.

7    Q.  And when did you first become aware that

8    the SEC had a policy against owning digital assets?

9         MR. TENREIRO:  Object to form and to

10   relevance.  This is way beyond what she ordered you

11   to ask him about.  Go ahead.

12   A.  When did I become aware of that policy?

13   Q.  Yes.

14   A.  While I was at the SEC, probably the first

15   year I was at the SEC.

16   Q.  When you joined the SEC in May of 2017 did

17   the SEC have a policy against owning digital

18   assets?

19   A.  I'm not sure.

20   Q.  Isn't it a fact that the policy against

21   owning digital assets wasn't instituted until 2018?

22        MR. TENREIRO:  Objection to form.

324

```
 1        A.  I'm not sure that's right.

 2        Q.  When do you think it was instituted?

 3            MR. TENREIRO:  Objection to form.

 4        A.  I think a policy was adopted probably

 5    around the time you're suggesting, but prior to

 6    that time I think if you had any financial interest

 7    in something you were involved in you were to

 8    recuse yourself or not have the interest.  So I

 9    think the policies are broad enough to, you know,

10    stop people from having interest in assets that

11    they were involved in.

12        Q.  You're talking about two different things,

13    aren't you?  You're talking about a conflict of

14    interest policy as opposed to a policy against

15    owning digital assets, correct?

16            MR. TENREIRO:  Objection to form.

17        A.  I'm talking about policies that might

18    restrict someone from owning digital assets.

19        Q.  Did the policy against conflicts of

20    interest restrict people from owning digital assets

21    if they didn't have any conflicts of interest?

22            MR. TENREIRO:  Objection to form.
```

325

```
1         A.  I'm not sure how the policy would have

2    been applied at that point.

3         Q.  When -- you stated that you did not own

4    any digital assets, correct?

5         A.  Correct.

6         Q.  Did you own stock in any company that did

7    own digital assets?

8             MR. TENREIRO:  Are you talking about at

9    the time at the SEC?

10            MR. FLUMENBAUM:  Yeah.

11            MR. TENREIRO:  Okay.

12        A.  Not that I'm aware of.

13        Q.  Did you own stock in Alibaba?

14        A.  No.

15        Q.  Did you own stock in Ant Financial?

16        A.  No.
```

326





20    Q.  Thank you.

21         Let me show you a document which is dated

22    January 15, 2014 and it's SEC production

328

1    No. 1345799.  We'll mark this as -- what are we up

2    to?  38?

3            MS. PROSTKO:  38.  And for the hotseat

4    this is document 040.

5                        (Hinman Exhibit 38 was marked

6                         for identification.)

7    BY MR. FLUMENBAUM:

8        Q.  Have you ever seen this document before

9    today?

10       A.  I may have seen this.  I don't recall

11   specifically.

12       Q.  Am I correct, sir, that this is a policy

13   with respect to ethics conflicts among the staff,

14   correct?

15       A.  Right.

16           MR. TENREIRO:  Object to form.

17       Q.  And this policy doesn't prohibit anybody

18   from owning Bitcoin; isn't that correct?

19           MR. TENREIRO:  Objection to form and

20   mischaracterizing, the document speaks for itself.

21       A.  Does it prohibit owning Bitcoin?  I'm

22   sorry.

329

```
 1        Q.  Yes.
 2        A.  Well, again, looking at this quickly, "I
 3   own Bit-" -- the document has a question, "I own
 4   Bitcoin, have been assigned to part of a working
 5   group at the SEC making recommendations with
 6   respect to Bitcoin, can I do this."  "Answer:  No."
 7   Then it goes on to cite parts of the U.S. code that
 8   say federal employees are -- prohibits all federal
 9   employees from working on any particular matter
10   where they may have a direct or particular effect
11   on the employees's financial interest, and then
12   they go on to give examples.
13        Q.  So am I correct, sir, that if you were not
14   involved in making recommendations as to how to
15   regulate Bitcoin, you would be able to own Bitcoin
16   by the SEC?
17             MR. TENREIRO:  Objection to form.  You're
18   asking him to give you a legal opinion --
19             MR. FLUMENBAUM:  Come on.  Object to form
20   and let's move on.  No speeches.
21        A.  I'm sorry.  Could you ask your question
22   again?
```

330

1    Q.  Yeah.  Does this refresh your recollection

2    that employees of the SEC unless they had a

3    conflict of interest were permitted to own digital

4    assets?

5         MR. TENREIRO:  Object to form.

6    A.  Again, if they were not involved in the

7    space in any way, which, you know, that's a pretty

8    broad -- SEC views these things pretty broadly.  So

9    potentially I think you could own Bitcoin if you

10   were involved in something completely away from it.

11   Q.  And would you actually need permission to

12   buy Bitcoin if you were in that position of not

13   having anything to do with the regulation of

14   Bitcoin?

15        MR. TENREIRO:  Objection to form.

16   A.  I'd have to refresh myself on the

17   securities clearance procedures.  If you buy

18   securities you're supposed to get them precleared.

19   Q.  And am I correct that digital assets were

20   not covered by the securities clearance form until

21   2018?

22        MR. TENREIRO:  Objection to form.

331

1       A.  Again, I'll take your word for that, but

2    I --

3       Q.  Didn't you help write the policy in 2018?

4           MS. KELLY:  Object to form.

5           MR. TENREIRO:  Object to form.  Go ahead.

6       A.  I don't remember specifically helping on

7    the policy.  I probably had conversations with

8    people on the staff about it.

9       Q.  I want to point your attention to also it

10   says in this document that the "OEC has been

11   informed that the status of Bitcoin as either

12   currency or securities is undetermined at this

13   time"; do you see that?

14      A.  Yeah.

15      Q.  And as far as you knew, that was true?

16          MR. TENREIRO:  Objection to form.

17      A.  With respect to the ethics office?  The

18   document speaks for itself.

19      Q.  Did there come a time that the status of

20   Bitcoin as either currency or securities changed?

21          MR. TENREIRO:  Objection to form.

22      A.  For what purpose?  For the purpose of the

340

1   regulations from the Department of Treasury?

2         MR. TENREIRO:  Object to form.

3     A.  I don't know what Treasury had applied in

4   terms of their money laundering rules to Ether.  I

5   don't know off the top of my head.

6     Q.  And what about with respect to Bitcoin?

7         MR. TENREIRO:  Object to form.

8     A.  Same answer.  I'm not sure how they are

9   applying those rules to those two assets.

10     Q.  Now, you mentioned in response to

11   Mr. Figel's questioning that you were not aware of

12   any rulemaking proceedings that you were involved

13   in in connection with digital assets; is that

14   correct?

15         MR. TENREIRO:  Object to form.

16     A.  Rulemaking proceedings is very broad.  So,

17   you know, we did a lot of rulemaking while I was at

18   the SEC in my division and in other divisions.

19   Would they -- you asked broadly would they apply to

20   digital assets.  If someone was in the business of,

21   you know, mining Bitcoin or pick a digital asset

22   business and they were a registered company with

341

1  us, the rulemakings would be relevant to them in

2  terms of disclosures.  So you're asking a very

3  broad question.  If you mean are there specific

4  digital asset rules -- rulemakings that I was

5  involved in, I don't think we had a specific

6  rulemaking per se.

7      Q.  That's what I was getting at.

8      A.  Okay.

9      Q.  And you also mentioned no action letters?

10     A.  Right.

11     Q.  Were there any no action publicly -- no

12  action letters approved in 2017 that related to the

13  applicability of digital assets to securities laws?

14     A.  I don't know if anyone sought one in 2017.

15  There were some people trying to use blockchain

16  technology for stock transfers.  I don't know if

17  they got a no action letter, but some of that would

18  precede a little of my time all 2017.

19     Q.  Well, the first no action letter that I

20  see under your regime was in 2019.  Am I missing

21  something?

22          MR. TENREIRO:  Objection to form.

342

```
1        A.  I'd have to go back and look at the no

2   action letters to see, you know, each one that was

3   granted and dates.

4        Q.  Do you recall any that specifically

5   related to the applicability of the securities laws

6   to digital assets in 2017 or 2018?

7        A.  I don't remember when we issued the pocket

8   full of coins or there was a -- I forget the name

9   of it -- a jet token, what the dates of those are.

10  Maybe you do.

11       Q.  Is that the only one you remember?

12       A.  I think there were some others, but I

13  might have been less involved with those.  Again,

14  you asked very broadly if that applied to digital

15  assets.  So you were --

16       Q.  I changed the question slightly --

17       A.  Okay.

18       Q.  -- to involve the applications of

19  securities laws to digital assets.

20       A.  Again, I remember the two, and I'd have to

21  go back and do some work to see if there were

22  others that were relevant.
```

343

1    Q.  But there wasn't a plethora of no action

2    letters issued by the SEC in this space during your

3    tenure?

4         MR. TENREIRO:  Objection to form.

5    A.  I remember the ones I remember.  So...

6    Q.  The two?

7    A.  Yes.

8    Q.  Okay.

9    A.  Actually I think there might have been a

10   third, but, again, I'd have to go back and look.

11   Q.  Mr. Figel showed you the Dow report, that

12   was in 2017?

13   A.  Yes.

14   Q.  And that was issued a couple months after

15   you joined?

16   A.  Yes.

17   Q.  And what role did you play in the issuance

18   of that report?

19        MR. TENREIRO:  Just generally the role.

20   A.  I reviewed it, I commented on it, talked

21   to different members -- you know, enforcement about

22   it, talked to the chairman's office about it.

371

```
1    clients that hired them or just instead as
2    objective observers of the market?
3              MR. FLUMENBAUM:  Objection as to form.
4              MR. FIGEL:  Objection.
5         A.  Generally people were -- if they were
6    counsel, they had been hired by someone to present
7    their views on their behalf.
8         Q.  Thank you.
9              Did you attend meetings while you were
10   director of the division of corporation finance
11   with representatives of Ripple in connection with
12   the SEC's staff's investigation of Ripple?
13        A.  Yes.
14        Q.  Approximately how many meetings?
15        A.  Probably four, maybe a few phone calls as
16   well.
17        Q.  Where were those meetings?
18        A.  Either in the SEC's offices or on Zoom
19   calls.
20        Q.  Was Mr. Garlinghouse at some of those
21   meetings?
22        A.  I think he may have been at one or two of
```

372

1    the early meetings.

2         Q.  What about Andrew Ceresney, do you know

3    who that is?  Do you know who Andrew Ceresney is?

4         A.  I do.

5         Q.  Who is that in connection with this case?

6         A.  I believe he was Ripple's counsel and

7    formerly the director of the division of

8    enforcement at the SEC.

9         Q.  What about Meredith Cross?

10        A.  She's -- she attended some of these

11   meetings and is a partner at WilmerHale and

12   formerly held the same position I formerly hold,

13   director of the division of corporation finance.

14        Q.  Did you have meetings with either

15   Ms. Cross or Mr. Ceresney about the SEC staff's

16   investigation of Ripple's conduct?

17        A.  Yes.

18        Q.  Have you ever at any time told any

19   Ripple's representatives that you did not think

20   their offers and sales of XRP were securities

21   transactions?

22             MR. FLUMENBAUM:  Objection as to form, and

373

1    I'm specifically stating that if you enlisted an

2    answer, you're violating the process.

3          MR. TENREIRO:  No.  This is external.

4    External statements -- just you --

5          MR. FLUMENBAUM:  We're going to ask for

6    notes of his meetings.  You're opening the door to

7    things that you've claimed privilege on.

8          MR. TENREIRO:  You've asked for those

9    notes already.

10         MR. FLUMENBAUM:  We're going to get them

11   this time.  Go ahead.

12         MR. TENREIRO:  Have you ever, Mr. Hinman,

13   at any time told any Ripple's representatives that

14   you did not think their offers and sales of XRP

15   were securities transactions?

16         MR. FLUMENBAUM:  Objection as to form.

17   You may answer.

18         A.  No.

19         Q.  Have you ever told any Ripple

20   representative that the SEC itself or any of its

21   commissioners did not think that Ripple's offers

22   and sales of XRP were securities transactions?

374

1          MR. FLUMENBAUM:  Objection as to form.

2      A.  No.

3      Q.  Did you ever witness anyone at the SEC

4  tell any such thing to any Ripple representative

5  while you worked at the SEC?

6          MR. FIGEL:  Objection.

7          MR. FLUMENBAUM:  Objection as to form.

8      A.  No.

9      Q.  What did you tell Ripple's representatives

10  at these meetings about sort of your views?  And

11  only communicate what you told them externally.

12     A.  A number of things.  So that's a broad

13  topic, but when Meredith Cross came in with Andrew,

14  one of the purposes of that meeting as I understood

15  it was to try to bring the company into compliance

16  and to examine ways that that could happen.  So one

17  of the things I told them was the first thing you

18  need to do and I'm kind of surprised you haven't

19  done it already is stop selling XRP on an

20  unregistered basis publicly.

21          We also told them that we were concerned

22  about the asymmetries between what they -- what the

1    people at Ripple knew about the prospects for XRP

2    and what the market knew, and we explored with them

3    the idea of Ripple becoming a public company to

4    help reduce those asymmetries.

5         THE REPORTER:  Did you say "help reduce"?

6         THE WITNESS:  Help reduce those

7    asymmetries.

8         Q.  Anything else you recall generally that

9    you told -- that you told them at these meetings?

10        A.  Yeah.  I think I expressed concerns about

11   did investors have all the information that they

12   should have about the prospects and did they get

13   that on a timely basis.  I expressed the concern

14   about the lack of transparency.

15        Q.  These meetings, can you give us the time

16   frame for them approximately?

17        A.  I think they were the last couple of

18   years.  It was a pretty long process.  I don't

19   remember exactly when Meredith first got involved.

20   You know, Meredith as a capital markets lawyer

21   would be someone who would understand the

22   undertakings to become a public company, to provide

376

```
 1    the disclosure, to bring the sales of XRP into

 2    compliance.

 3         Q.  But in terms of the years, I think you

 4    said the last few years?  Are you talking about the

 5    last few years of your tenure there?

 6         A.  Yes.  I'm sorry.  Yeah.  So that would

 7    have been probably -- I think some of these

 8    meetings began in 2018 and some early meetings with

 9    XRP representatives, general meetings, and then

10    meetings trying to figure out how XRP could come

11    into compliance were later, probably 2020.

12         Q.  Okay.

13             Now, setting aside meetings with other

14    members of any government, did you ever tell any

15    person outside of the SEC that you did not view

16    Ripple sales of XRP as securities transactions?  So

17    I'm talking about third parties only.

18         A.  No.

19             MR. FLUMENBAUM:  Objection.

20         Q.  Did you ever witness any person from the

21    SEC tell any person in the, again, outside world,

22    not U.S. Government or other governments, that the
```

1    SEC did not view Ripple's sales of XRP as

2    securities transactions?

3            MR. FLUMENBAUM:  Objection as to form.

4        A.  No.

5        Q.  Did you have a meeting with Chair Clayton

6    and representatives of Ripple sometime in 2018?

7        A.  I believe they came in to meet with the

8    chairman, yes.

9        Q.  Did you ever hear Mr. Clayton tell anyone

10   at Ripple that Mr. Clayton did not view Ripple's

11   transactions as securities transactions?

12           MR. FLUMENBAUM:  Objection as to form.

13       A.  No.

14       Q.  Did you ever hear Mr. Clayton give any

15   assurances to anyone at Ripple that the SEC would

16   determine that Ripple's sales were not securities

17   transactions?

18           MR. FLUMENBAUM:  Objection as to form.

19       A.  No.

20           MR. TENREIRO:  I'm going to mark -- I

21   guess Exhibit 41 will be the next one?

22           THE REPORTER:  Yes.

378

1          (Hinman Exhibit 41 was marked

2               for identification.)

3    BY MR. TENREIRO:

4          Q.  For the record, this is a memorandum SEC-

5    LIT-E-MAILS-456558.  The date is August 20, 2018.

6          A.  Okay.

7          Q.  Mr. Hinman, do you see this memorandum

8    says it's written from Sean Memon?

9          A.  Yes, I see that.

10         Q.  Who is that in 20 -- in August 2018?

11         A.  Deputy chief of staff to the chairman.

12         Q.  Okay.  Have you seen this memorandum

13   before?

14         A.  You showed them to me.

15         Q.  Okay.  And have you had a chance to read

16   it now?

17         A.  Yes.

18         Q.  Okay.  Do you -- are the statements in

19   this memorandum consistent with whatever

20   recollection you might have -- actually, do you see

21   that it says here that you attended a meeting on

22   August 20, 2018 with representatives from Ripple?

379

1  Do you see that part?

2      A.  Yes.

3      Q.  Do you have any reason to doubt that that

4  is true?

5          MR. FLUMENBAUM:  Objection as to form.

6      A.  No.

7      Q.  Having read the document, is whatever

8  stated here consistent with whatever recollection

9  you might have about what occurred at this meeting?

10        MR. FIGEL:  Objection.

11     A.  Let me finish reading.

12        It's consistent.

13     Q.  Okay.  And so just to be -- just to wrap

14  up on the prior point, setting aside this meeting

15  in this document, Director Hinman, I just want to

16  be sure I understood you.  You at some point told

17  Andrew Ceresney in his capacity as Ripple's

18  attorney that you thought the XRP transactions

19  might be problematic under the securities laws; is

20  that correct?

21        MR. FLUMENBAUM:  Objection as to form.

22  It's inconsistent with his testimony.

1        MR. TENREIRO:  Did you ever tell

2    Mr. Ceresney in his capacity as Ripple's attorney

3    that you thought that their transactions in XRP

4    might, you know, have an issue under the securities

5    laws?

6        MR. FLUMENBAUM:  Objection as to form.

7        MR. FIGEL:  The leading is really

8    inappropriate with the commission witness.

9        MR. TENREIRO:  Okay.  Can you answer,

10    please.

11        A.  Basically my answer would be what I

12    told -- what I remember telling Mr. Ceresney and

13    Meredith Cross about my views on XRP, that I viewed

14    it as a security and I viewed the continuing

15    offerings -- periodic offerings of XRP in a way

16    where they were not restricted in the way a

17    securities offering would be restricted and

18    therefore exempt or they weren't registered as a

19    problem under the securities laws.  If they were

20    interested into coming into compliance they should

21    start by stopping those sales.

22        Q.  Based on the meetings you attended and

381

```
 1    your conversations with Ripple's representatives,

 2    did you have any reason to believe that Ripple's

 3    representatives did not understand the securities

 4    laws principles that might apply to their conduct?

 5            MR. FLUMENBAUM:  Objection as to form.

 6        A.  I had no reason to believe they didn't

 7    understand it.  Meredith was a very accomplished

 8    securities lawyer.

 9            MR. TENREIRO:  I don't have anything else.

10    Thank you.

11                    FURTHER EXAMINATION

12    BY MR. FLUMENBAUM:

13        Q.  Meredith Cross occupied your position as

14    head of corp fin?

15        A.  She did.

16        Q.  And she -- she said to you that in her

17    view XRP was not a security, correct?

18        A.  I don't think she ever said that to me.

19        Q.  She never said that to you?

20        A.  I don't recall her saying that, no.

21        Q.  Mr. Ceresney was head of enforcement at

22    the SEC?
```

404

```
 1    at some point in 2018 that sales of XRP may violate

 2    the securities laws.  Is that what you testified

 3    to?

 4              MR. TENREIRO:  Object to form.

 5         A.   That I had a view that their sales

 6    violated securities laws?

 7         Q.   Yes.

 8         A.   Yes.

 9         Q.   Okay.  And just to be clear, in 2018 there

10    was no preliminary injunctive relief that the

11    commission sought against Ripple in relation to any

12    sales of XRP; is that correct?

13         A.   That's right.

14         Q.   And that's true of 2019 also, correct?

15         A.   Correct.

16         Q.   And that's true of 2020 also, right?

17         A.   That's right.

18         Q.   In fact, the lawsuit wasn't brought

19    against Ripple in relation to any of its sales of

20    XRP until December 22nd, 2020, correct?

21              MR. TENREIRO:  Go ahead.  Object to form.

22    If you're going to keep asking him facts that are
```

405

```
1    in the record, we're going to instruct -- we're

2    going to finish the deposition and you can

3    call Judge --

4            MR. SOLOMON:  I'm trying to move through

5    this quickly if you'll give me a few more minutes.

6            MR. TENREIRO:  Matt, it is in the record

7    when the lawsuit was filed.

8            MR. SOLOMON:  Is that correct?

9        A.  When this lawsuit was filed?

10       Q.  Yes.

11       A.  I've not examined the record.  So I don't

12   know the date --

13       Q.  Was it late December 2020?

14           THE REPORTER:  Guys.

15       A.  I don't -- I don't know.  I think it was

16   December 20, 22nd, somewhere in that range.

17       Q.  Fair enough.  And when that lawsuit was

18   brought there was no preliminary injunctive relief

19   sought in relation to sales of XRP; is that your

20   recollection?

21       A.  Not that I'm aware of.

22       Q.  No, there was no preliminary injunctive
```

406

 1  relief sought at that time?

 2      A.  I wasn't at the SEC at that time.  So not

 3  that I was aware of.

 4      Q.  Let's take a look at one document that

 5  Mr. Tenreiro showed you which is an August 20, 2018

 6  memorialization of one of the meetings that you

 7  testified to where my client Brad Garlinghouse

 8  attended.  Do you have that document in front of

 9  you?

10      A.  I do.

11      Q.  Okay.  This looks like a post-speech

12  memorandum authored by two individuals, Sean Memon,

13  deputy chief of staff, and Brian Rabbitt, senior

14  policy advisor; is that right?

15      A.  Yeah.  I just want to --

16      Q.  Sorry.  This is just a one-page document.

17      A.  Yes.  Yes.

18      Q.  Okay.  And this memorandum, is there

19  anything about this that strikes you as inaccurate,

20  or does this seem to you to be an accurate

21  memorialization, albeit a summary memorialization,

22  of the meeting that you attended and testified

407

1    about on August 20th, 2018?

2        A.  Yes, it was a short meeting.  This seems

3    accurate.

4        Q.  Okay.  And to be clear, by August 20, 2018

5    you had delivered your speech to the marketplace

6    where you gave your view that neither Ether nor

7    Bitcoin are securities; is that correct?

8            MR. TENREIRO:  Object to form.

9        A.  Yes.

10       Q.  Okay.  And in this memo there was a

11   discussion involving my client and Schwartz.  Is

12   that David Schwartz?

13       A.  I believe so.  That's what the memo says.

14       Q.  Okay.  About Ripple's business in

15   technology, that's what the memo writes, right?

16       A.  Correct.

17       Q.  Okay.  And it looks like there's also a

18   notation that towards the end of the meeting

19   Garlinghouse briefly noted that Ripple was in

20   purgatory due to uncertainty as to whether XRP, the

21   cryptocurrency with which Ripple is associated, is

22   or is not a security.  Do you see that sentence?

408

```
 1        A.  I do.

 2        Q.  Okay.  So two individuals who attended

 3   that meeting were reporting back to an internal

 4   memo that at this point in time, August 2018, my

 5   client had orally indicated that there was

 6   uncertainty around the status of XRP.  That's what

 7   this memo establishes, right?

 8             MR. TENREIRO:  Objection to form.

 9        A.  The memo says that.  It says what it says.

10        Q.  Do you have any reason to believe that the

11   memo inaccurately reflects what my client said

12   during that meeting?

13        A.  No.

14        Q.  Because Sean Memon and Brian Rabbitt

15   wouldn't put something in an internal memo the day

16   it happened if it was not accurate, right?

17             MR. TENREIRO:  Object to form.

18        A.  That's right.

19        Q.  I'm sorry.  What was your answer?

20        A.  That's right.

21        Q.  Thank you.

22             Then it goes on, the memo, to say "In
```

409

1   response Chairman Clayton immediately stated that

2   the meeting was not the proper forum for a

3   discussion about that topic."  Do you see that

4   sentence?

5       A.  Yes.

6       Q.  So there's no note in here that Chairman

7   Clayton responded that there is clarity around

8   whether XRP is a security, right?

9           MR. TENREIRO:  Objection to form.

10          MR. SOLOMON:  That's not in the memo.

11      A.  I don't see that in the memo.  Do you?  I

12  don't see it.

13      Q.  Doesn't matter what I see.  Do you see it?

14      A.  I don't see it.

15      Q.  I don't either.  Okay.

16          Then it says "He then asked Garlinghouse

17  to back up from that issue and steered the meeting

18  to a discussion about Ripple's business in

19  technology."  Do you see that sentence?

20      A.  I do.

21      Q.  And then the last sentence of the memo,

22  "Following further discussion of these issues, the

1    memo concluded and Chairman Clayton encouraged the

2    Ripple executives to continue ongoing discussions

3    with the staff, the division of corporation

4    finance."  Do you see that as well?

5        A.  I do.

6        Q.  Is there anything in this memo that

7    indicates that Chairman Clayton was of the view

8    that sales of XRP in August of 2018 were security

9    sales?

10            MR. TENREIRO:  Objection to form.  You

11   mean other than when he tells him not to talk about

12   that with him?

13            MR. SOLOMON:  That wasn't my question.

14            Is there anything in the memo that

15   indicates that Chairman Clayton stated the view

16   that XRP sales were sales of securities?  Do you

17   see that here?

18            MR. TENREIRO:  Objection to form.

19       A.  I don't see him saying one way or another

20   anything about the characterization of Ripple --

21   XRP.

22       Q.  And that would have been a significant

411

1    piece of information had he said that, correct?

2        A.  I think the chairman was steering the

3    conversation away from that topic because I think

4    he was aware that people were gathering more

5    information about XRP at that point.

6        Q.  Okay.  And is there anything in here,

7    Mr. Hinman, that indicates that you expressed a

8    view at this meeting that you believed sales of XRP

9    were security sales at this point in time?

10       A.  No.

11           MR. SOLOMON:  That's all I have.

12           MR. TENREIRO:  Great.  We're done.  You

13   guys have spent more time than we did on the

14   questions.  If you want to move to bring him back,

15   we'll see your motion.

16           MR. FIGEL:  Jorge --

17           MR. TENREIRO:  He's been here for 11

18   hours.  He has been here for 11 hours.  You showed

19   him about 20 documents that he was not even copied

20   on with Rob Cohen on them and with other people on

21   them.  You've had him for 11 hours and you could

22   have asked him all of these questions.  You had

413

1          As I understand your testimony both in

2      response to Mr. Tenreiro's questions and

3      Mr. Flumenbaum's questions about the meetings with

4      Ripple or representatives of Ripple, there was a

5      meeting that you attended in December, sometime

6      after December 11th when you apparently resigned

7      but before you were off the payroll, correct?

8          A.  Yeah.  I wasn't officially resigned until

9      December 20th I believe or 18th, something like

10     that.  Because of the amount of unpaid leave I had

11     accumulated I was in effect taking vacation, but I

12     had additional people calling me with questions

13     during that period even though --

14         Q.  So you attended a meeting by Zoom with

15     Ripple representatives?

16         A.  I believe so.

17             THE REPORTER:  Guys.

18         Q.  And there was also a meeting I believe in

19     September that Ms. Cross, Mr. Ceresney, and various

20     people attended, correct?

21         A.  You would know the date better than I, but

22     yes.

414

1       Q.  And then there was a meeting with the

2   chairman in August; is that correct?

3       A.  August of 2018, yes.

4       Q.  All right.

5           Now, directing your attention to the

6   meeting in September where you answered questions

7   in response to Mr. Tenreiro about what you said to

8   Ripple.

9       A.  Right.

10      Q.  Did you prepare talking points prior to

11  that meeting?

12      A.  No.

13      Q.  Was there a memorandum or a transcript

14  made of what was discussed at that meeting?

15      A.  Not that I'm aware of.

16      Q.  Now, you testified that you didn't have a

17  specific recollection about what was discussed in

18  December, the December 2020 meeting, correct?

19      A.  Yes.  Yes.

20      Q.  All right.  And the September meeting

21  obviously was a few months before that?

22      A.  Yes.

415

1      Q.  Mr. Tenreiro asked you a series of leading

2  questions in which you described what you said.

3  I'd like to have you focus on what your

4  recollection is of specifically what you said.

5      MR. TENREIRO:  Object to form.

6      MR. FIGEL:  Do you have a specific

7  recollection of the words you spoke on the issue of

8  bringing the company into compliance?

9      A.  Yes.

10     Q.  What specifically did you say?

11     A.  This is probably not verbatim, but I think

12  the beginning of the conversation was we understand

13  you want to come into compliance.  If you want to

14  come into compliance you need to register these

15  sales or stop these sales that you're doing

16  periodically on -- I remember expressing some

17  surprise that that had been ongoing.

18     Q.  And you remember speaking those words?

19  You're not describing what you said.  Those are the

20  words you remember saying; is that correct?

21     A.  Again, it's probably not verbatim, but

22  that was the message I was providing.

416

```
 1        Q.  I'm not asking about the message.  I'm

 2   asking about the words.

 3        A.  Okay.  The words were I think I started

 4   with I'm very surprised to see that you are still

 5   offering XRP on an unregistered basis.  You're here

 6   to talk about how to come into compliance, you

 7   should stop doing that before we even think about

 8   anything else that we could do here.

 9        Q.  What did Ms. Cross say in response to

10   that?

11        A.  I think she said she understood.

12   Basically her response was one of I get it.

13        Q.  Do you remember the specific words she

14   said in response?

15        A.  I don't.

16        Q.  How about Mr. Ceresney?

17        A.  I don't think he had much to say about

18   it.

19        Q.  Did you refresh -- prior to your testimony

20   in connection with the preparation for your

21   deposition did you review any documents that

22   refreshed your recollection about what specifically
```

418

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2         I, TINA M. ALFARO, Registered Professional
     Reporter, Certified Realtime Reporter, and Notary
3    Public, the officer before whom the foregoing
     deposition was taken, do hereby certify that the
4    foregoing transcript is a true and correct record
     of the testimony given; that said testimony was
5    taken by me stenographically and thereafter reduced
     to typewriting under my direction; that reading and
6    signing was requested; and that I am neither
     counsel for, related to, nor employed by any of the
7    parties to this case and have no interest,
     financial or otherwise, in its outcome.
8         IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this 27th day of
9    July, 2021.

10   My Commission expires October 31, 2025.

11

12

13

14

15

16

17

18

19

20   _____

21   NOTARY PUBLIC IN AND FOR THE

22   DISTRICT OF COLUMBIA