UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br>                      Plaintiff, <br>     v. <br><br> LBRY, INC., <br>                      Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 21-cv-00260<br>)<br>)<br>)<br>) |


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# **CONTENTS**

I.  SUMMARY ................................................................................................. 1

II. UNDISPUTED FACTS ............................................................................. 2

   A. LBRY, Inc., the LBRY Protocol, and the LBRY Network .......................... 2

   B. LBRY Credits ............................................................................................. 5

   C. LBRY Believed and Repeatedly Stated Publicly that the Value of LBC Would Increase as the LBRY Network Grew ........................................................ 7

   D. Purchasers Bought Large Quantities of LBC .............................................. 9

   E. LBRY Offered and Sold LBC Investment Contracts ................................. 10

      1. LBRY's Sales via Digital Asset Trading Platforms ......................... 10

      2. LBRY's Sales to Institutional Investors and Trading Platforms ........ 11

      3. LBRY's Other Sales ...................................................................... 12

III. LBRY VIOLATED SECTION 5 BY OFFERING AND SELLING UNREGISTERED SECURITIES ................................................................ 13

   A. LBRY Violated Section 5 .......................................................................... 13

   B. LBC Offered and Sold Investment Contracts ............................................ 14

      1. Investment of Money ..................................................................... 14

      2. LBRY Established a Common Enterprise ......................................... 15

      3. Expectation of Profits from the Efforts of Others............................. 16

IV. LBRY CANNOT ESTABLISH ITS FAIR NOTICE AFFIRMATIVE DEFENSE . 19

   A. Standard for Unconstitutional Vagueness................................................... 20

   B. Courts Have Uniformly Rejected Similar Vagueness Challenges.............. 21

   C. A Person of Ordinary Intelligence Would Have Fair Notice...................... 22

   D. The Securities Act Does Not Invite Arbitrary Enforcement...................... 23

V.  CONCLUSION ........................................................................................ 25

## I.    SUMMARY

LBRY, Inc. ("LBRY") is a fairly ordinary software company.  It makes web and mobile applications software primarily used for viewing videos.  LBRY's claimed difference is that it uses a blockchain to enable its video sharing and related services.  Instead of relying primarily on stock sales or venture capital to raise the money to develop and operate its business, LBRY created a digital asset called LBRY Credits ("LBC") that it then offered and sold to get operating capital.  LBRY formed "investment contracts" by the way it offered and sold LBC.  Investment contracts are a type of security, and by offering and selling those securities without filing a registration statement, LBRY violated Section 5 of the Securities Act of 1933 ("Securities Act").

LBRY concedes that it offered and sold LBC and that it did not file a registration statement with the Commission.  LBRY's offering meets the definition of an "investment contract" because it meets the three prongs of the "*Howey* test" established by the Supreme Court seventy-five years ago and consistently applied by courts since.  *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); *SEC v. SG Ltd.*, 265 F.3d 42, 47 (1st Cir. 2001).  First, there was an investment of money because LBRY offered and sold LBC for money and other valuable consideration.  Second, that money was invested in a common enterprise because LBRY pooled and used the money from its LBC sales to develop and operate the digital content sharing service it had created.  Third, a reasonable purchaser of LBC would have the expectation of profits to be derived from the efforts of the promoter or a third party.  LBRY stated repeatedly that it expected LBC to increase in value as the LBRY Network and applications were further developed by LBRY, tying together its efforts with the value of the LBC it was selling.  LBRY also kept much of the LBC it created, and so had a large financial stake in increasing the price of LBC by developing the network and applications.  And LBRY repeatedly told people that LBRY itself expected to profit from the appreciation in the value of the LBC, signaling to purchasers that

LBRY would undertake the efforts necessary to increase the price of LBC.  Thus, when purchasers bought LBC between 2016 and 2021, they were investing money in a common venture, and they reasonably expected profits derived from the entrepreneurial efforts of LBRY. In other words, they were buying an investment contract from LBRY.

LBRY seeks to avoid responsibility for its violation of Section 5 of the Securities Act by arguing that it lacked fair notice of what constitutes a security.  In its Fourth Affirmative Defense, LBRY claims that the Securities Act's term "investment contract" is void for vagueness as applied to LBRY's offer and sale of investment contracts.  But LBRY has no basis for its claim of constitutional defect.  Decades of court cases have explained and applied *Howey* to determine whether a multitude of novel investment schemes qualified as investment contracts. LBRY had fair notice that regulators and courts could determine that it was offering and selling investment contracts, and it cannot establish that the Securities Act invites arbitrary enforcement.

## II.    UNDISPUTED FACTS

### A.    LBRY, Inc., the LBRY Protocol, and the LBRY Network

In 2015, LBRY started creating and developing a blockchain protocol[1] and associated software "to create a market for accessing and publishing information."[2]  [Statement of Facts ¶¶1-2 ["¶__".]  LBRY focused on video content and sought to compete with YouTube and other video entertainment platforms.  [¶¶3-4.]  The protocol, blockchain, and associated software and hardware, collectively, are referred to as the "LBRY Network."  LBRY "launched" the LBRY blockchain in June 2016.  [¶6.]  At that time, LBRY's user application was limited to a computer

---

[1] The protocol is a set of digital rules that govern the transfer of data between electronic devices.  For LBRY, this is called the "LBRY Protocol."  [¶5.]

[2] "On a blockchain, each transaction is recorded in a block, which is linked to a prior block through cryptographic code … This results in the chain of blocks making up the ledger, or blockchain … Blockchains … rely on the combined computing power of different networks of computers to process and verify transactions."  *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 173 (S.D.N.Y. 2020).

"command line" where users needed to type in commands and did not have any kind of freely available graphical/visual interface to find videos.  [¶140].  In fact, at the beginning LBRY's Network could only support three videos, and LBRY limited the number of users allowed to use the LBRY Network.  [¶¶30b, 68.]  LBRY's user application was closed to the public until around August 2017.  [¶141.]

Since then, LBRY has worked continuously to improve and grow the LBRY Network. LBRY has created different user applications, including versions that are downloadable and for the web and mobile devices, and later discontinued some as well.  [¶8.]  LBRY has also developed the software required for the user applications to interact with the blockchain, hosted petabytes of videos[3] on its own servers, developed servers that allow search functionality and enhance user download speeds, and defended the LBRY blockchain from cyberattack.  [¶¶9-15.] While much of its software is open-source and available on a software-sharing site, LBRY tightly controls editorial rights to the software operating on the LBRY Network.  No one other than LBRY employees and contractors can edit or change LBRY's master copy of its software. [¶16.]  And, while LBRY cannot unilaterally change a blockchain "consensus rule," only LBRY has proposed these types of changes to the LBRY Protocol and each change that it proposed was adopted by the other users of the Protocol.  [¶¶17-19.]

On top of its technical work building and maintaining the software and infrastructure critical to the LBRY Network, LBRY has worked continuously to grow the number of people using the Network.  [¶¶20-26.]  LBRY has (a) recruited creators and producers to publish their videos to the LBRY Protocol [¶23]; (b) developed an automated system called the YouTube sync

---

[3] By one estimate, a petabyte of video could be 11,000 movies at 4k resolution, or about 2.5 years of 2-hour movies for a viewer.  At "DVD" quality, that number would grow to about 223,000 movies.

system to download videos from YouTube, host them on its servers, and publish them to the LBRY Network [¶24]; (c) promoted the LBRY Network to attract consumers [¶25]; and (d) provided incentives to attract publishers and consumers [¶26].

Since its beginning, LBRY has continuously touted the abilities of its leadership team to accomplish its development goals and announced the many actions it would take, or was taking, to develop, improve, and create value in the LBRY Network.  In "roadmaps" posted on its website and on social media, LBRY outlined its "top priorities, definitions of success, status, and target completion dates for key initiatives."  [¶27.]  On its websites, blog, and social media, LBRY promoted capabilities of its engineering team and posted regular development updates. [¶¶27-28.]  LBRY also conducted interactive forums with the public where LBRY informed the public what they were working on and answered questions posed by the audience.  [¶29.]

Throughout all of its public messaging, LBRY reiterated its commitment to continual development and consistently said, "we're building LBRY":

- "What we do know is that the long-term value proposition of LBRY is tremendous, but it is also dependent on our team staying focused on the task at hand: building this thing."  [¶30.]

- "[w]e hope to keep improving the app, protocol and continue our content acquisition process."  [¶31.]

- "We've already invested 10,000 working hours into this project, and it will take many more, but we're patient and focused on the future."  [¶32.]

- "we plan to do a managed rollout of the protocol.  In other words, we the founders are not simply going to release our system and hope that people adopt it.  That's not how applications typically succeed."  [¶35.]

- "we view LBRY as a network app startup like Facebook was in its early days.  It will be up to us to make the strategic decisions that see user adoption grow exponentially and make the network a viable competitor to centralized services like Netflix or iTunes."  [¶35.]

- "For the first time ever, it's economically feasible for companies to compete to create the best technology instead of capture and then abuse their users. That's why we're building LBRY, and it's why we're open source." [¶37.]

[*See also* ¶¶33-34, 36 for additional examples.]

**B.    LBRY Credits**

LBRY designed the LBRY Protocol to include a digital asset called LBRY Credits, or "LBC." [¶38.] LBRY designed the LBRY Protocol so that LBC are created over time, with a planned total volume around 1 billion LBC. [¶39.] And LBRY designed the LBRY Protocol so that LBC can be used to make four transactions on the LBRY Network: paying to watch video content; tipping content creators; pledging LBC as a "stake" to show support for content or a creator; and claiming a name for particular content. [¶40.]

LBRY also designed the LBRY Protocol to award to itself the first 400 million LBC that were created. This reserve is sometimes called the pre-mine. [¶41.] On its website, LBRY explained that it retained "a portion to finance the continued development of the ecosystem. LBRY Credits will work on behalf of development of the LBRY content distribution network…." [¶42.] LBRY told the public that it would "be making a concerted effort to deploy LBC in a non-neutral way … incentivizing early adopters, amazing content publishers, and even nonprofits which share our vision of a free and open internet." [¶42.]

LBRY divided the pre-mine into three funds. The first ("Operational Fund") held 100 million LBC, and LBRY publicly represented that it was to "allow LBRY, Inc. to function and profit…." The second ("Institutional Fund") was another 100 million LBC reserved for "institutional partnerships." The third ("Community Fund") held 200 million LBC, and was reserved for spreading usage and adoption of the LBRY Protocol, including recruiting content producers (who were given LBC for publishing on LBRY), attracting video content consumers (who were given LBC to watch videos), and "rewarding community contributors" (who were

given LBC to build a community among users).  [¶43.]

LBRY's pre-mine made LBRY the largest holder of LBC and embodied a substantial financial stake in the value of LBC and success of the LBRY Network.  [¶44.]  If the value of LBC increased, LBRY would reap the largest reward.  Because LBRY held so many LBC, its fortunes were intertwined with those of other LBC holders.  LBRY underscored this alignment in many public statements, such as:

- "LBRY Inc. has reserved 10% of all LBRY credits to fund continued development and provide profit for the founders.  Since credits only gain value as the use of the protocol grows, the company has an incentive to continue developing this open-source project."  [¶33.]

- "[O]ur focus now and henceforth will be on the long-term value of the LBRY protocol.  Over the long-term, the interests of LBRY and the holders of credits are aligned."  [¶30d.]

- "[N]o one believes in the LBRY protocol more or has more incentive for its success, than LBRY, Inc.  We believe LBRY can be a world-altering technology and as such our intentions are to minimize the expenditure of [our pre-mine] until we've achieved that reality.  [¶45.]

- "I want the price to be higher just as much as anyone else…"  [¶130.]

As a business, LBRY depended upon the value of LBC because it was not generating meaningful amounts of revenue from other sources, and, in fact, has not generated significant revenue other than from the sales of LBC.  [¶125.]  By design, LBC was to provide "a source of funding for the development of the protocol," and LBRY was to capitalize the company from the sale of LBC.  [¶50.]

LBRY worked to create an attractive market for LBC.  It facilitated the listing of LBC on digital asset trading platforms.  [¶46.]  And it hired a "market maker" to provide liquidity and decrease short-term price volatility to traders.  [¶47.]

**C.     LBRY Believed and Repeatedly Stated Publicly that the Value of LBC Would Increase as the LBRY Network Grew**

LBRY's business plan relied on its belief that the value of LBC would go up with the growth of the LBRY Network.  [¶56.]  LBRY projected that its pre-mine would be worth billions of dollars when it built the LBRY Network to scale.  [¶57.]  LBRY employees bought LBC, held LBC, considered themselves investors in LBC, and believed or hoped LBC would "gain value as the use of the protocol grows."  [¶58 (quoting LBRY's CEO), ¶¶59-61.]  LBRY employees created an internal channel in a messaging application called Slack to discuss the price of LBC.  [¶62.]  When the price of LBC rose on trading platforms, LBRY's CEO told a board member, "the price of LBRY credits has been continuing to rise … as more people realize what we've built."  [¶63.]  And when prices rose and LBRY needed cash to keep developing the LBRY Network, it sold LBC on trading platforms.  [¶64.]

LBRY also regularly highlighted the potential for LBC (and its reserve of LBC) in investment pitches and offers.  For example, in August 2016, a LBRY executive pitched a potential investor by writing, "[t]he opportunity is obvious – buy a bunch of credits, put them away safely, and hope that in 1-3 years we've appreciated even 10% of how much Bitcoin has in the past few years.  If our product has the utility we planned, a credit should appreciate accordingly."  [¶65.]  In a pitch deck for venture capitalists, LBRY explained in May 2020 "How LBRY Profits," and presented that LBRY held 350M LBC, and "1 LBC could be worth $100 or more if LBRY becomes protocol of choice for media distribution."  [¶66.]

Throughout its selling of LBC, LBRY proclaimed to the market the value proposition for LBC:  "Credits only gain value as the use of the protocol grows…."  [¶¶32, 33, 54.]  In fact, the day after LBRY announced the rollout of LBC, a LBRY executive stated, "The value of LBRY credits will be tied to the success of our media marketplace."  [¶48.]  LBRY's executives

highlighted the investment value benefit of increased use of the LBRY Network, leading to

"cryptocurrency speculators and users … feel[ing] more comfortable holding and using an asset

that has a more widely-demanded end use."  [¶36.]  When LBRY explained to the public (or to a

potential investor) how LBRY made money, they told people that LBRY's profits would come

from the increase in the value of LBC generated by the increased functionality (and use) of the

LBRY Network.  [¶¶30-37, 48-66, 129, 134-139.]  For instance, LBRY posted on its website that

"Our goal is to increase the long-term value of the protocol, which if adopted globally will make

our reserve [of LBC] many times more valuable than any short-term bubble."  [¶¶32, 34.]

From the start, LBRY has consistently made public statements tying the long-term value

of LBC it was selling to LBRY's efforts to develop the LBRY Network:

- "LBRY did not run an ICO, but instead allocated credits for various purposes. The only way those credits are worth something in the future is if LBRY delivers on their promises to create a revolutionary way to share and monetize content." [¶49.]

- A "token has value in proportion to the usage and success of the network."  [¶50.]

-  "LBC will go up when we've built a product that is compelling enough to change people's habits.  A product that causes people to use it instead of YouTube, Gumroad, Amazon, or Streamable…We'll be focusing all of our efforts entirely on creating a product that people will love and getting that product in front of the people that will love it."  [¶52.]

- Our goal is to create value for the LBC token and we hope our current path does so organically."  [¶31.]

- "LBRY is still in its infancy in terms of a platform and content – personally, I think there is lots of room for improvement and growth, which would lead to higher utilization of LBRY credits and hopefully a higher value due to the network effect." [¶53.]

In October 2020, while LBRY's website continued to state that LBC will gain value as

the use of its Network grows,[4] LBRY outlined on its website its plans to "tweak" the "LBRY

---

[4] LBRY continued to have this representation on its website until March 2022.  [¶54.]

economy" to make it more compelling to buy LBC than to buy tokens from other companies. [¶55.]  In its post, LBRY represented that it was underappreciated in the blockchain space and would remedy this lack of appreciation by partnering with and aligning long-term incentives with blockchain promoters and influencers.  [*Id.*]

### D.     Purchasers Bought Large Quantities of LBC

The public responded to LBRY's pronouncements and, over time, bought LBC in great volumes on digital asset trading platforms.  By July 15, 2016, according to LBRY, LBC had achieved a market capitalization of $1.2 billion, despite LBRY limiting access to its user application to only 2,000 software testers and the availability of about three videos.  [¶68.]  From then until at least March 2021, daily trading volume on the platforms consistently and considerably exceeded any new LBC usage by publishers or consumers using the LBRY blockchain.  [¶69.]  Even when LBRY was transferring millions of LBCs to publishers as part of its rewards programs, trading on the digital asset platforms exceeded LBC usage on the LBRY Network.  For example, on December 31, 2019, approximately 470,000 LBC were recorded on the LBRY blockchain as having been used that day for either claims, supports/tips, or payments (including LBRY transfers).  [¶71.]  In contrast, on the same day about 10.3 million LBC were bought or sold on trading platforms.  [¶72.]  Similarly, on December 31, 2020, about 951.4 million LBC was traded while the total amount of LBC that had accumulated in claims and supports/tips and been used for payments on the LBRY Network *since the launch* of the blockchain in June 2016 was only 39.6 million LBC – all the LBC that had accumulated for 4.5 years was less than 5% of the LBC traded on that single day.  [¶¶73-74.]

Against the backdrop of so much trading activity, LBC holders were often discussing their investment in LBC on messaging boards and social media and complaining about the price

of LBC.  [¶¶75-77.]  Crypto enthusiasts published articles touting LBC as an investment, and internally, LBRY called LBC traders investors and speculators.  [¶77.]

E.      **LBRY Offered and Sold LBC Investment Contracts**

LBRY offered LBC in investment contracts from 2015 to the present.  During that time, LBRY offered and sold LBC to individuals and entities in exchange for U.S. currency, bitcoin, or other considerations such as their services.  [¶78.]  LBRY has sold more than 200 million LBC (half of the LBC it first reserved for itself) during this offering.  [¶79.]  Between 2016 and September 30, 2021, LBRY deposited into its bank accounts about $12.2 million in proceeds from selling LBC.  [¶80.]  It also, as of September 2021, held about $2.5 million in digital assets (other than LBCs) that it received from sales of LBC.  [*Id.*]  All the money that LBRY received from the sales of LBC has been used to grow, develop, and promote LBRY, the LBRY Network, and the LBRY user base.  [¶81.]

1.      **LBRY's Sales via Digital Asset Trading Platforms**

From July 2017 through at least July 2021, LBRY sold LBC on digital asset trading platforms to raise capital for its business operations and the further development of the LBRY Network.  [¶82.]  During 2017-2018 and 2020-2021, LBRY sold LBC on different trading platforms, all of which listed LBC for public trading.  [¶83.]  In total, LBRY sold more than 44 million LBC on the trading platforms.  [¶¶84-85.]  LBRY did not know to whom it was selling the LBC, but they believed the traders on the platforms were speculators and investors.  [¶89.]

In June 2020, LBRY hired Altonomy, Inc. to perform market making services in LBC on multiple digital asset trading platforms.  [¶¶47, 90-91.]  LBRY's objective was to provide liquidity in the LBC market and reduce the short-term volatility in the price of LBC.  [*Id.*]  LBRY at first transferred 40 million LBC to LBRY accounts controlled by Altonomy to build its positions and buy and sell LBC.  [¶92.]  Later in 2020, LBRY transferred another 1.8 million

LBC for market making.  [¶93.]  From June 2020 through March 2021, LBRY, through Altonomy's market making efforts, bought and sold more than 7.4 *billion* LBC on the trading platforms.  [¶94.]  Any cash proceeds generated from sales were transferred to LBRY's bank accounts and used for operational expenses.  [¶95.]

### 2.   LBRY's Sales to Institutional Investors and Trading Platforms

From 2016 through 2020, LBRY offered and sold more than 3.7 million LBC to institutional investors.  [¶96.]  Purchasers included Flipside Crypto, which ran crypto asset investment clubs and funds; Pillar Companies Management, a venture capital firm and equity investor in LBRY; as well as Shapeshift and CoinEx, both trading platforms.  [¶¶97-108.]

*Flipside Crypto:*  From October 2017 through April 2018, LBRY sold LBC from its reserves to investment clubs run by a company called FlipSide Crypto.  Flipside Crypto told LBRY that it was running "cryptocurrency clubs" and wanted to include LBC in what it bought for club members.  [¶97.]  LBRY gave Flipside Crypto a discounted price, and LBRY obtained operating capital.  [¶¶98-100.]  Over a six-month period, LBRY sold more than 1.1 million LBC to Flipside Crypto's investment clubs (a value of more than $260,000).  [¶101.]  LBRY knew they were selling a large number of LBC to a small number of club members and that Flipside Crypto intended to store the LBC where it could not be used on the LBRY Network.  [¶102.]

*Pillar:*  In May 2018, LBRY agreed to sell 2 million LBC (then worth about $360,000) to its equity investor, Pillar.  [¶103.]  The deal for the LBC followed a discussion between LBRY and Pillar about increasing Pillar's equity share of LBRY.  [¶104.]  Instead, and in consideration for an extension on the debt LBRY owed to Pillar, LBRY issued 2 million LBC to Pillar.  [¶105.]  Under the "Token Issuance Agreement" executed by LBRY and Pillar, the LBC were subject to a lockup period:  Pillar could not spend, sell, use, or transfer them for one year.  [¶106.]

*Sales to Trading Platforms:*  LBRY also sold LBC investment contracts directly to

digital asset trading platforms.  Shapeshift was a digital asset trading platform that allowed users to convert between different forms of digital assets (e.g., from Bitcoin to LBC and back).  [¶107.]  In 2016, LBRY sold 100,000 LBC to Shapeshift at a discount to the market price at the time.  *Id.*  In 2020, LBRY sold 500,000 LBC to digital asset trading platform CoinEx.  [¶108.]

### 3.  LBRY's Other Sales

LBRY has also offered and sold LBC investment contracts for other valuable consideration.  For instance, from 2015 to the present, LBRY has sold more than 2.6 million LBC to employees and contractors either as part of their compensation or through LBRY's employee LBC purchase program.  [¶109.]  In 2017-2018, LBRY paid contractors and employees part of their salaries in LBC, including paying one employee entirely in LBC.  [¶¶110-112.]  This employee publicly described himself as an "investor" in LBC.  [¶112.]  Starting in 2018, LBRY sold LBC to employees through the "LBRY team member LBC purchase program."  [¶113.]  Employees bought LBC at a discount, paying cash deducted directly from their paychecks.  *Id.*  From 2018 to the present, LBRY has sold more than 1.4 million LBC through its employee purchase program, but did not require the employees to use the LBC they purchased on the LBRY Network.  [¶¶114-115.]

LBRY also offered and sold LBC to users, software testers, and software developers in exchange for their time, labor, and services.  LBRY wanted to grow the LBRY Network and offered LBC through various incentive programs to help do so.  [¶¶116-118.]  From 2015 through the present, LBRY promised and issued more than 142 million LBC through these programs.  [¶117.]

In 2020, LBRY partnered with MoonPay, Inc. to offer LBC directly through LBRY's website and applications.  [¶86.]  LBRY sold more than 9.8 million LBC for money with MoonPay's assistance from May 2020 through November 2021.  [¶87.]

12

**III.     LBRY VIOLATED SECTION 5 BY OFFERING AND SELLING UNREGISTERED SECURITIES**

Courts routinely grant summary judgment on Securities Act Section 5 claims, and this Court should do so when there is no genuine dispute as to any material fact about LBRY's unregistered offer and sales.  *See* Fed. R. Civ. P. 56(a); *SEC v. Smith*, 14-cv-192-PB, 2015 WL 4067095 (D.N.H. July 2, 2015)(Barbadoro, J.)(detailing summary judgment standard and granting summary judgment on Commission's Section 5 and other claims); *SEC v. Sargent*, 19-cv-11416, 2022 WL 686452, at *24 (D. Mass. March 8, 2022)(granting summary judgment on Section 5 claims); *see also SEC v. Saxena*, 26 Fed. Appx. 22, 23 (1st Cir. 2001)(affirming summary judgment on Section 5 claims).

**A.     LBRY Violated Section 5**

Section 5(a) and 5(c) of the Securities Act make it "unlawful for any person, directly or indirectly" to "sell," "offer to sell," or "offer to buy, a "security" unless a registration statement is in effect or has been filed as to that security.  15 U.S.C. §§ 77e(a), (c).  Section 2(a)(1) of the Securities Act defines "security" to include "an investment contract."  15 U.S.C. § 77b(a).  To prove LBRY violated Section 5, the Commission must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly sold or offered to sell the investment contracts, (3) through interstate commerce.  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir 2006).  "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption."  *Id.*

LBRY does not dispute that it never had a registration statement filed or in effect. [¶120.]  LBRY does not dispute that it offered and sold LBC.  [¶78.]  LBRY cannot credibly dispute it used interstate commerce because it used websites, social media, email, and software applications to promote the LBRY Network and LBC, offer LBC, buy and sell LBC on trading

13

platforms, and deliver LBC to buyers.  [*e.g.,* ¶¶8, 28-37, 42-43, 46, 49-55, 70-73.]  The only question left to resolve is whether LBRY offered and sold LBC in a manner that formed an investment contract with purchasers.

> ### B.    LBC Offered and Sold Investment Contracts

The Supreme Court defined "investment contracts" in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and courts have continuously re-confirmed and applied this test in cases ever since. There are three parts to the *Howey* test:  (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived from the efforts of the promoter or a third party.  *SEC v. SG Ltd.*, 265 F.3d 42, 47 (1st Cir. 2001)(citing *Howey*).  The First Circuit has emphasized that the focus must be on the "economic realities" of the transaction.  *Id.*  The undisputed evidence shows that LBRY offered and sold LBC investment contracts.

> ### 1.    Investment of Money

LBC purchasers made an investment of money, digital assets, and services, all of which satisfy the first prong of *Howey*.  "The determining factor is whether an investor 'chose to give up a specific consideration in return for the separable financial interest with the characteristics of a security.'"  *SG Ltd.*, 265 F.3d at 48 (quoting *Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979)).  The exchange of digital assets (such as Bitcoin) constitutes an investment of money.  *See SEC v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013)(holding that an investment of Bitcoin constitutes "money" for purposes of the first prong of *Howey*).  Some LBC purchasers bought LBCs using dollars, Bitcoin, or other digital assets, satisfying this prong of the *Howey* test.  [¶78.]  Other purchasers traded labor, services, or something else of value to LBRY in exchange for LBC (*e.g.*, through LBRY's programs giving LBC to software testers).  [¶116.]  Those investments also satisfy this prong.  *See, e.g.*, *Daniel*, 439 U.S. at 561 n.12 ("goods and services").

### 2.   LBRY Established a Common Enterprise

*Howey*'s second prong is the existence of a common enterprise.  In the First Circuit, the "common enterprise" prong is satisfied by "horizontal commonality," the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise.  *See SG Ltd.*, 265 F.3d at 49.  Some circuits also recognize vertical commonality.  LBRY's offering satisfies both.

Horizontal commonality exists here because LBRY pooled investors' assets to fund the development and growth of the LBRY Network.  [¶¶121-123.]  The value of LBC was tied to the development and growth of the LBRY Network.  [¶¶30-37, 48-66, 129, 134-139.]  Thus, the LBC purchasers comprised a common enterprise, whose fortunes were intertwined because they had a pooled interest in, and shared in the profits and risks of, the LBRY Network.  *See id.*, 265 F.3d at 49-51 (defining horizontal commonality).  If LBC increased in value, all investors would share in that increased value on a pro rata basis.  *See, e.g.*, *Kik Interactive*, 492 F. Supp. 3d at 178 (horizontal commonality exists as to digital asset trading in the market because, "[r]ather than receiving a prorata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of" the traded asset); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 370 (S.D.N.Y. 2020)(horizontal commonality exists because, as here, "there was a pooling of assets and . . . the fortunes of investors were tied to the success of the enterprise as well as to the fortunes of other investors").

The economic reality is that LBRY, as it said it would, pooled proceeds from its LBC sales to develop the LBRY Network and thus boost the value of the investment.  Applying the language of the *Kik* court here:

> "This is the nature of a common enterprise, to pool invested proceeds to … increase the range of goods and services that holders of [LBC] would find beneficial to buy and sell with [LBC] … The stronger the ecosystem that [LBRY] built, the greater the demand for [LBC], and thus the greater the value of each purchaser's investment."

*SEC v. Kik Interactive*, 492 F. Supp. 3d at 179 (internal citation omitted); *see also Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("[T]he value of the [digital asset] was dictated by the success of the … enterprise as a whole, thereby establishing horizontal commonality.").

The First Circuit has not expressed a view on vertical commonality.  One form of vertical commonality recognized by other circuits is "strict," which requires the "fortunes of investors be tied to the fortunes of the promoter."  *See, e.g.*, *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994)(discussing both broad and strict commonality).  Here, there is strict vertical commonality between LBRY and LBC purchasers because LBRY was the largest holder of LBC, which it had retained and believed would be worth billions of dollars after it built the LBRY Network to scale.  [*e.g.*, ¶¶44, 124.]  LBRY also did not generate enough revenue to operate its business, and depended on selling LBC on trading platforms to generate money for continued development of its enterprise.  [¶125.]  As a result, LBRY and LBC purchasers would both profit from the rise in trading value of LBC.  Their fortunes were tied together like strands of a rope.  *See SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021)(allegations sufficient to allege strict vertical commonality where defendants had retained a "healthy share" of tokens for their personal and corporate coffers); *Telegram Grp., Inc.*, 448 F. Supp. 3d at 370 (strict vertical commonality where Telegram's most valuable asset was to be its token reserve and it relied on funds from the sales of its token to pay its expenses).

### 3.  Expectation of Profits from the Efforts of Others

LBRY's offer of LBC meets the third prong of the *Howey* test, that the investment come with a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *United Hous. Found. v. Forman*, 421 U.S. 837, 852 (1975).  The reasonable LBC purchaser would believe that LBC would go up in value from LBRY's efforts to develop

the LBRY Network and expand its user base.  LBRY's statements and actions reflected and reinforced this expectation.

A purchaser may expect profits from "capital appreciation from the original investment." *SG Ltd.*, 265 F.3d at 53; *SEC v. Edwards*, 540 U.S. 389, 394 (2004)(profits include "the increased value of the investment").  Here, the profits are the increase in the value of LBC.  The potential for profit need not be the sole reason why a purchaser buys LBC.  Even when the expectation of profit is secondary to another motive, the requisite expectation of profit exists. *See SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019); *Telegram Grp.*, 448 F. Supp. 3d at 371. The possibility of using LBC on the LBRY Network for video-related purposes (which purchasers could do during most of the offering, but not at the beginning when LBRY promised LBC to testers) does not negate the expectation of profits by a reasonable LBC purchaser.

The reasonable purchaser would expect the profits to come from LBRY's managerial and entrepreneurial efforts because LBRY told the market that it was working to develop the LBRY Network and working to increase the value of LBC to make it a profitable long-term investment. LBRY also told the public that LBC would gain value as LBRY (fueled by its sales of the LBC pre-mine) worked to develop the LBRY Network.  [¶¶30-37, 48-66, 129, 134-139.]  The existence of the pre-mine of LBC made unmistakable to LBC purchasers LBRY's financial incentive to develop the LBRY Network (and thereby increase the long-term value of LBC). [¶¶41, 44.]  LBRY's statements about its large financial stake in the LBC it reserved [¶¶43, 45, 132], its statements that LBRY's profits would come from this reserve [¶¶32-34, 43, 66, 132, 135-136, 139], and its statements that the reserve provided LBRY an incentive to keep developing the LBRY Network [¶¶30-36, 49-60, 65, 128, 131-132, 137] fed reasonable expectations that LBRY would continue to take actions that would increase the value of LBC.

17

*See Telegram Grp*., 448 F. Supp. 3d at 378 (cumulative effect of statements that offeror would continue efforts after sale of digital asset).

The demand for LBC, and thus the value of the investment, would not and did not grow on its own.  The increase in value came mainly, if not exclusively, from LBRY's entrepreneurial and managerial efforts to:  create and develop the LBRY Network with websites and applications the average user could operate; increase the function and features of the LBRY Network so more users would participate; recruit content creators, expand video offerings, and provide the hardware and software necessary to watch them; promote the LBRY Network to attract consumers; maintain and repair LBRY Network systems; and establish and stabilize the markets for LBC.  [¶¶8-26, 46-47, 86-87, 90-94.]  LBRY's efforts were vital to the value of LBC.  LBC purchasers would know that LBC had no inherent value without development of the LBRY Network, development LBRY repeatedly promised to accomplish.  *See Kik Interactive*, 492 F. Supp. 3d at 180.

Moreover, the size and concentration of the LBC investment contracts LBRY sold to the investment clubs, the digital asset trading platforms, its market maker, and its venture capital investor all show that these purchasers were acquiring LBC with investment, not consumptive, intent.  Pillar acquired 2 million LBC all at once and FlipSide Crypto acquired 1.1 million LBC over six months for its few investment club members.  [¶¶100-106.]  In addition, the one-year lockup period on the Pillar acquisition (which *prohibited* spending those LBC on the LBRY Network for a year) shows investment intent.  [¶106.]  *See Telegram Grp.*, 448 F. Supp. 3d at 373 (2020)("a rational economic actor would not agree to freeze millions of dollars for up to 18 months … if the purchaser's intent was to obtain a substitute for fiat currency").  Flipside Crypto was putting the LBC it bought in "cold storage," in other words, away from where they could be

18

spent on the LBRY Network.  [¶102.]  This storing of the credits, like a lockup, also shows investment intent.

LBRY worked to increase the value of LBC through its constant efforts to develop the LBRY Network and expand the user base, thus increasing the demand for LBC.  But the increase in the value of LBC need not come "solely" from the efforts of LBRY and its employees.  As the First Circuit has highlighted, courts of appeals have "declin[ed] to give literal meaning to the word 'solely' in this context…"  *SG Ltd.*, 265 F.3d at 54.  Instead, the requirement is satisfied if "the efforts made by others than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Id.* (quoting *Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973).  The key is that the reasonable purchaser expects someone else to do the work to increase the value of the investment.  Here, LBRY provided the managerial and entrepreneurial efforts to develop the LBRY Network, giving a reasonable purchaser cause to believe LBRY and those it directed would do the work needed to increase the value of LBC.

The undisputed facts above show that LBRY's offering and sales meets the three prongs of the *Howey* test.  It admits it did not register its offering, and it cannot show that it is exempt from the registration requirement.  LBRY's violation has been established by the undisputed material facts, so the Commission should be granted summary judgment on this claim.

## IV.    LBRY CANNOT ESTABLISH ITS FAIR NOTICE AFFIRMATIVE DEFENSE

For more than seventy-five years, courts have applied the *Howey* test to determine whether a defendant was offering an investment contract.  If digital assets, or anything else, are offered in a way that meets the three prongs of *Howey*, an investment contract exists and the securities laws apply.  Yet LBRY claims that it "did not have fair notice of whether its sales of LBC constituted securities or investment contracts under the federal securities laws, and thus

whether its conduct violated the law."  Answer at 34 (ECF No. 13).  LBRY cannot sustain its burden on this "as-applied" challenge, so the Court should grant the Commission summary judgment on this affirmative defense.

### A.    Standard for Unconstitutional Vagueness

A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).  The court considers the statutory language and the particular facts of the party challenging the statute. *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016)(discussing how courts consider statutory language in "as-applied" vagueness defense).  Judicial decisions that clarify the scope of a statute may be consulted as part of the inquiry.  *United States v. Lanier*, 520 U.S. 259, 266 (1997)("Clarity … may be supplied by judicial gloss on an otherwise uncertain statute.").  The test is an objective one; subjective information about the mindset of the defendant (or of the enforcer of the statute) should not.  *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018); *Kik Interactive*, 492 F. Supp. 3d at 182 (rejecting claim *Howey* was vague as applied to crypto asset).[5]

Here, vagueness should not be judged by a stringent standard.  "[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses … can be expected to consult relevant legislation in advance of each action." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489-498-99 (1982); *see also Gen. Media Commun., Inc. v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997)(noting lower "standards

---

[5] This Court also has stated that inquiry is an objective one.  Tr. of Feb. 23, 2022 Mot. Hearing at 12:22-13:1 ("fair notice defenses really turn on objective evaluations of the available information and not the subjective understandings of the people who are enforcing or promulgating the doctrine that's being challenged.").

of certainty" for statutes "depending primarily on civil sanction for enforcement.").

**B.  Courts Have Uniformly Rejected Similar Vagueness Challenges**

No federal court has ever found that the term "investment contract," as used in the

Securities Act and as construed in *Howey*, is unconstitutionally vague.  The *Howey* test has been

unsuccessfully challenged many times.  *See, e.g.*, *Feng*, 935 F.3d at 734 n.8 (affirming grant of

judgment on the pleadings because "Section 15(a) was enacted 80 years ago, and it has been

applied countless times by the courts."); *United States v. Wetherald*, 636 F.3d 1315, 1326 (11th

Cir. 2011)("this is not a case in which it is impossible or even difficult to classify the partnership

interests involved; they fall well within the securities statute"); *SEC v. Brigadoon Scotch Distrib.*

*Co.*, 480 F.3d 1047, 1052 n.6 (2d Cir. 1973)("untenable" that term "investment contract" was

void for vagueness "in light of the many Supreme Court decisions defining and applying the

term").

Nor have courts found the term "investment contract" to be vague when applied to crypto

assets or other internet-related cases.  In *Kik Interactive*, the court dismissed a similar as-applied

challenge because *Howey* and cases applying it "give[] a reasonable opportunity to understand

what conduct and devices" the term investment contract covers.  492 F. Supp. 3d at 182-83.  In

*United States v. Zaslavsky*, the court rejected defendant's as-applied vagueness challenge as

applied to digital assets and defendant's specific token.  The court wrote, "the test expounded in

*Howey* has – for over 70 years – provided clear guidance to courts and litigants as to the

definition of 'investment contract' …."  No. 17-CR-647, 2018 WL 4346339, at *8-9 (E.D.N.Y.

Sept. 11, 2018).[6]

---

[6] In *SEC v. Ripple Labs, Inc.*, the Magistrate Judge denied the Commission's motion to strike the affirmative defense as inappropriate at the pleadings stage given the limited record and presumptions due the defendant at that early stage of litigation.  2022 WL 748150, at *5 (S.D.N.Y. Mar. 11, 2022).

LBRY can present no fact that makes the application of the term "investment contract" here different from cases in which courts rejected claim of constitutionally defective vagueness.

### C.     A Person of Ordinary Intelligence Would Have Fair Notice

A person of ordinary intelligence has fair notice of what is prohibited.  LBRY, like all securities offerors, had readily available the last seventy-five years of judicial precedent construing the meaning and application of "investment contract."

A person of ordinary intelligence would readily determine that "investment contract" is an inclusive term.  The *Howey* test is designed to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299; *see also Lorenzo v. SEC*, 139 U.S. 1094, 1103 (2019)(quoting *Howey*).  "[T]he reach of the [Securities] Act does not stop with the obvious and commonplace.  Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if" they operate as investment contracts.  *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943); *see also SG Ltd.*, 265 F.3d at 47 (stating that the Supreme Court has long endorsed a broad construction of "investment contract").

Thus, courts have found the *Howey* test to be satisfied for interests in:  orange groves in *Howey* itself; payphone leases, *see Edwards*, 540 U.S. at 389; investment packages to secure EB-5 visas*, see Feng*, 935 F.3d at 730-31; online ad services, *see SEC v. Scoville*, 913 F.3d 1204, 1219-22 (10th Cir. 2019); licenses to sell dental products, *see SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982); films*, see United States v. Leonard*, 529 F.3d 83, 87-91 (2d Cir. 2008); multi-level marketing, *see SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974); and chinchillas, *see Miller v. Cent. Cinchilla Grp., Inc.*, 494 F.2d 414, 416-18 (8th Cir. 1974).  Courts have applied the *Howey* test to new and unconventional investments. The First Circuit applied the term "investment contract" to "virtual shares in an enterprise

existing only in cyberspace" over 20 years ago. *See SG Ltd.*, 265 F.3d at 48 (If "the three-pronged *Howey* test is satisfied, the instrument must be classified as an investment contract . . . 'it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value.'").

Thus "the law regarding the definition of investment contract gives a reasonable opportunity to understand what conduct and devices it covers. *Howey* provides a clearly expressed test for determining what constitutes an investment contract, and an extensive body of case law provides guidance on how to apply that test …." *Kik Interactive Inc.*, 492 F. Supp. 3d at 183. A person of ordinary intelligence would have fair notice.

Nor can LBRY carry its affirmative-defense burden by arguing there is or was a lack of guidance about how the *Howey* test applies to crypto assets. A statute need not provide an exact blueprint of what it permits and prohibits. *Draper*, 827 F.3d at 4. And "[s]tatutes and regulations … are not impermissibly vague simply because it may be difficult to determine whether marginal cases fall within their scope." *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184 (2d Cir. 1984). "A statute is not rendered unconstitutionally vague merely because it 'requires a person to confirm his [or her] conduct to an imprecise but normative standard.'" *Frese v. MacDonald,* 512 F. Supp. 3d 273, 288 (D.N.H. 2021)(quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

### D.    The Securities Act Does Not Invite Arbitrary Enforcement

For the second part of the test, a statute does not authorize or encourage arbitrary enforcement if it either:  (1) "provides sufficiently clear standards to eliminate such a risk" or (2) "even in the absence of such standards … the conduct falls within the core of the statute's prohibition" so that enforcement did not result from "unfettered latitude" that the enforcers might have "in other hypothetical applications of the statute." *United States v. Farhane*, 634 F.3d 127,

139-40 (2d Cir. 2001).  LBRY's vagueness challenge fails for both reasons.

First, the *Howey* test, and the cases interpreting and applying it, "set forth the standards needed to cabin enforcement relative to investment contracts."  *Zaslavsky*, 2018 WL 4346339, at *9; *see also Kik Interactive*, 492 F. Supp. 3d at 183.  "Narrowing constructions" applied by courts can "add additional precision and guidance to prevent enforcement … in a generally arbitrary or discriminatory way."  *Frese*, 512 F. Supp. 3d at 293.  *Howey* and of the cases applying it provide that narrowing guidance.  The *Howey* test is designed to be flexible.  But that flexibility does not equal a lack of enforcement standards.

LBRY claims that the Commission has singled it out when thousands of other digital asset companies have not been charged.  Answer, Prelim Statement ¶¶2-3.  But, "the vagueness inquiry does not call for a factual investigation into whether a statute has led to arbitrary enforcement…."  *Kik Interactive*, 492 F. Supp. 3d at 183.  Nor does the selection of one or a few subjects for enforcement from a larger group of potential violators suggest that the statute invites arbitrary enforcement.  *See Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 603 (selecting targets of enforcement "by its nature" requires discretionary decisionmaking).  LBRY cannot show that the statute invites arbitrary enforcement.

Second, LBRY's actions fall into the core of the Securities Act provisions.  LBRY created an intangible and inherently worthless item, LBC, and sold it to make money to develop its business, while touting that LBC would increase in value based on its efforts to develop its product.  While crypto assets such as LBC come with new technologies and new jargon attached, they fit well within the Securities Act when they are offered in the way LBRY offered them.  LBRY's offer and sale of LBC to fund the operation and development of its business implicate "the statutory purpose [of the Securities Act] of compelling full and fair disclosure …."  *Howey*

*Co.*, 328 U.S. at 299.  LBRY cannot establish that its offer and sale of LBC falls outside the core of the Securities Act provisions, so its affirmative defense must fail.

LBRY cannot show that the Securities Act and *Howey* are constitutionally defective as applied to its circumstances.  The Court should reject LBRY's Fourth Affirmative Defense of Fair Notice, and grant the Commission summary judgment on that defense.

## V.    CONCLUSION

For these reasons, the Commission asks the Court to grant summary judgment in the Commission's favor on its sole count, Count I, and LBRY's Fourth Affirmative Defense.

Dated:  May 4, 2022                                    Respectfully submitted,

                                                      **SECURITIES AND EXCHANGE**
                                                      **COMMISSION**

                                                      By its Attorneys,

                                                      */s/ Marc Jones*
                                                      Marc Jones (Mass Bar No. 645910)
                                                      Eric A. Forni (Mass. Bar No. 669685)
                                                      Peter B. Moores (Mass Bar No. 658033)

                                                      Boston Regional Office
                                                      33 Arch Street
                                                      Boston, MA  02110
                                                      (617) 573-8947 (Jones direct)
                                                      jonesmarc@sec.gov

### CERTIFICATE OF SERVICE

I hereby certify that, on May 4, 2022, I caused true and correct copies of the foregoing to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

                                                      */s/ Marc Jones*
                                                      Marc Jones