**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | :     Civil Action No. 1:21-cv-00260-PB |
| | : |
| LBRY, INC., | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**LBRY, INC.'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT FACTUAL BACKGROUND ............................................................... 4

I.     LBRY Used Blockchain Technology to Create a Decentralized Digital
Content Marketplace .................................................................................... 4

II.    LBRY Developed and Launched the Functional LBRY Network Long
Before Selling any LBC ............................................................................... 5

III.   LBC is Used on the LBRY Network for Various Utility-Based Purposes ........................ 6

IV.   LBRY's Marketing Efforts Have Consistently Focused on Growing the
User Base of the LBRY Network by Emphasizing its Utility and
Functionality ............................................................................................... 7

V.    LBRY Has Refrained from Commenting on the Price or Value of LBC
and Has Discouraged Speculative Trading in the Token ................................... 9

VI.   LBRY Did Not Sell LBC Until After the Launch of the LBRY Network ...................... 10

ARGUMENT .......................................................................................................... 11

I.     LBRY Has Consistently Focused its Promotional Efforts on Growing the
LBRY Network and Has Marketed LBC for its Consumptive Use, and its
Sales of LBC Thus Cannot Constitute Investment Contracts Under Clearly
Established Case Law .................................................................................. 11

     A.    The *Howey* Test is a Fact and Transaction-Specific Test that
Requires a Thorough Examination of the Representations Made to
Purchasers ............................................................................................ 11

     B.    LBRY Did not Lead Purchasers to Expect Profits Solely Based on
the Essential Managerial and Entrepreneurial Efforts of Others ....................... 13

          1.   LBRY Has Consistently Promoted LBC for its
Consumptive Purposes in Connection with the Proper
Functioning of the LBRY Network ............................................................ 15

          2.   The Case Law Applying *Howey* in the Digital Asset
Context Supports a Finding that LBC is Not a Security ............................... 16

          3.   The LBRY Ecosystem with its Native Token Has Grown
Exponentially and is Currently Thriving .................................................. 22

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.    The Price of LBC is Not Driven by the Essential Entrepreneurial or Managerial Efforts of LBRY, but Rather by General Market Forces in the Cryptocurrency Market ............................................................................... 23

CONCLUSION ............................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

<small>**CASES**</small>

*Alumni v. Dev. Resources Group, LLC*,
  445 F. App'x 288 (11th Cir. 2011) ...................................................................14

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................11

*Barron v. Helbiz Inc.*,
  No. 20-cv-4703 (LLS), 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) ......................18

*Commodity Futures Trading Comm'n v. McDonnell*,
  287 F. Supp. 3d 213 (E.D.N.Y. 2018) ..............................................................24

*Diamond Fortress Technologies, Inc. v. EverID, Inc.*,
  2022 WL 1114528 (Del. Super. Ct. April 14, 2022) .............................................19

*Fedance v. Harris*,
  1 F.4th 1278 (11th Cir. 2021) ..........................................................................18

*Gordon v. Terry*,
  684 F.2d 736 (11th Cir. 1982) ..........................................................................24

*In re Coinflip, Inc.*,
  CFTC Dkt. No. 15-29, 2015 WL 5535736 (CFTC Sept. 17, 2015) ......................24

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
  439 U.S. 551 (1979)................................................................................11, 13, 25

*Marine Bank v. Weaver*,
  455 U.S. 551 (1982)................................................................................12, 25

*Noa v. Key Futures, Inc.*,
  638 F.2d 77 (9th Cir. 1980) ..........................................................................24

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994) ................................................................................12

*Rice v. Branigar Org., Inc.*,
  922 F.2d 788 (11th Cir. 1991) ................................................................13, 14, 16

*Rodriquez v. Banco Cent. Corp.*,
  990 F.2d 7 (1st Cir. 1993)................................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Scott v. Bluegreen Vacations Unlimited, Inc.*,
   19-CV-01807 (AWI) (JLT), 2020 WL 3296190 (ED Cal. June 18, 2020) ...........................14

*Scott v. Harris*,
   550 U.S. 372 (2007)........................................................................................................11

*SEC v. Aqua-Sonic Products Corp.*,
   687 F.2d 577 (2d Cir. 1982)...........................................................................................13

*SEC v. Belmont Reid & Co., Inc.*,
   794 F.2d 1388 (9th Cir. 1986) .......................................................................................24

*SEC v. C.M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943)........................................................................................................12

*SEC v. Kik Interactive Inc.*,
   492 F. Supp. 3d 169 (S.D.N.Y. 2020)........................................................................18, 20

*SEC v. NAC Found., LLC, et al.*,
   512 F. Supp. 3d 988 (N.D. Cal. 2021) .....................................................................16, 17, 20

*SEC v. SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001)......................................................................................13, 14, 15

*SEC v. Telegram Group Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020).......................................................................13, 17, 22

*SEC v. Texas Gulf Sulphur Co.*,
   446 F.2d 1301 (2d Cir. 1971)..........................................................................................13

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)....................................................................................................12, 23

*Solis v. Latium Network, Inc.*,
   No. 18-cv-10255 (SDW) (SCM), 2018 WL 6445543 (D.N.J. Dec. 10, 2018).....................19

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975)...............................................................................................11, 13, 14

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008)..............................................................................................12

*United States v. Zaslavskiy*,
   2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ...................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Wabash Valley Power Ass'n, Inc. v. Public Service Co. of In., Inc.*,
    678 F. Supp. 757 (S.D. In. 1988) ............................................................................................14

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) ......................................................................................12, 13

**STATUTES**

Securities Act of 1933 Section 5..................................................................................... passim

Securities Act of 1933 Section 2(a)(1)..........................................................................................11

**RULES**

Fed. R. Civ. P. 56(a) ..................................................................................................................11

Defendant LBRY, Inc. ("LBRY") respectfully submits this memorandum of law in support of its Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Through its action, the Securities and Exchange Commission (the "Commission") seeks to effectively halt the transfer of a native utility token, called LBRY Credits ("LBC"), that is indispensable to the proper functioning of the "LBRY Network"—a decentralized digital content marketplace used by millions of people that runs on innovative blockchain technology developed by LBRY. The Commission's misguided action against LBRY represents the first time that the agency has ever sought to enjoin a blockchain company from selling digital assets that (i) did not conduct an Initial Coin Offering ("ICO"); (ii) developed its blockchain network using traditional funding that did not involve the sale of any digital tokens, and did not sell any tokens until well *after* the blockchain was fully launched and operational; (iii) has not engaged in any fraudulent or deceptive conduct; and (iv) has built a network that functions through the use of a native utility token and whose user base has grown exponentially since the product's launch. The Commission's action relies on misconstrued facts and an expansive interpretation of Section 5 of the Securities Act of 1933 (the "Securities Act"); neither of which is supported by the text of the statute itself nor the judicial interpretations of the language. Moreover, this action represents a stunning and unprecedented overreach by the agency that will, if successful, stifle innovation and development in this burgeoning industry by suggesting that no token—even ones, like LBC, that are purchased and used by millions of people to engage in a functioning digital marketplace—is outside of the Commission's reach.

Unlike the Section 5 cases that the Commission has pursued in the digital asset context before, LBRY's blockchain-enabled file-sharing network was fully functional *before* LBRY ever issued any tokens. This conduct stands in stark contrast to the ICO cases that the Commission has

previously charged, in which an issuer raises funds from investors *to build* a blockchain network—typically through the release of a "Whitepaper" that lays out a *theoretical* discussion of a *yet-to-be-developed* blockchain architecture—through a public offering, similar to an IPO, where the issuer promises to deliver digital tokens at a future date when the blockchain project is completed. In that context—where no functional network or consumptive use for the token exists at the time of offering—it is logical to assume that purchasers are buying the tokens for profit, and not necessarily utility. Here, on the other hand, LBRY raised funds to build its blockchain technology through traditional fundraising sources (*i.e.*, its founders and later a venture capital firm) that did not involve the offer or sale of LBC. In fact, as the Commission itself acknowledges in the Complaint, LBRY did not sell any LBC on digital asset exchanges until July 2017—a *year* after it launched the LBRY Network and only after an independent marketplace had developed for the token. Compl. ¶¶ 17, 21.

Moreover, unlike earlier cases, it is undisputed that LBC, the native token of the LBRY Network's blockchain, serves a consumptive purpose and that it is used on the LBRY Network on a daily basis by millions of content creators and content consumers. Although the consumptive nature of LBC has existed since the date the LBRY Network launched, as the network has continued to grow, add new features and applications, and increase its user base, the usage of LBC on the content-sharing network has become undeniable. Indeed, the undisputed facts demonstrate that consumptive LBC transactions on the LBRY Network—which allow users to purchase content, tip creators, and "stake" LBC to boost the visibility of a particular channel, among other things—has surpassed "off-chain" activity (*i.e.*, transactions on digital asset exchanges) on average

since 2016.  *See* Ex. 2,[1] Expert Report of Dr. Richard ¶¶ 86–89; Ex. 3, Amended Expert Report of Dr. Richard ¶¶ 27–29.

LBRY's focus is, and always has been, on the development of a decentralized digital content marketplace built on blockchain technology that can serve as an alternative to centralized applications, such as YouTube, which have become increasingly autocratic in their censorship and demonetization policies and processes.  Not only has LBRY's marketing and outreach efforts focused primarily on the features and functionality of the network itself, but LBRY has actively avoided and dissuaded discussions of LBC in terms of its price or value.  Indeed, when discussing LBC in its marketing or outreach materials, LBRY has consistently described it in terms of its utility and native functionality to the LBRY Network.  And, when faced with questions or public commentary concerning the price of LBC or its value as an investment opportunity, LBRY has actively avoided engaging in such discussions; indeed, quite the opposite, it has made clear time and time again that LBC should not be purchased for speculative investment purposes.

LBRY developed a network built on innovative blockchain technology that has, and will continue to, reshape the way in which people access and consume videos and other digital content online.  The undisputed evidence makes clear that millions of people use this network, including its native digital token, on a daily basis and that it provides a meaningful alternative to YouTube and other centralized applications for both content consumers and creators alike.  The Commission's action is nothing more than a misguided overreach by an agency that has struggled to clearly define to this burgeoning industry the conduct and assets that fall within its jurisdiction.

---

[1]Unless otherwise noted, citations to exhibits ("Ex. __") refer to exhibits attached to the concurrently filed Declaration of John T. Dixon, dated May 4, 2022.

## RELEVANT FACTUAL BACKGROUND

I.    **LBRY Used Blockchain Technology to Create a Decentralized Digital Content Marketplace**

A blockchain is a distributed, decentralized ledger maintained by a network of independent participants.  Ex. 1, Kauffman Decl. ¶ 5.  When users transact on a blockchain, "validators"—otherwise known as "miners"—append the transactions to a single, unbroken chain of valid transactions.  *Id.* ¶ 6.  Once transactions are committed to a blockchain in a certain order, the transactions and their order cannot be deleted or changed.  *Id.* ¶ 7.  All public blockchains rely on native cryptographic assets ("crypto assets") to properly function.  *Id.* ¶ 9.  These crypto assets enable peer-to-peer transfers of value, various digital services, and payment for the cost of executing transactions.  *Id.*

In 2015, LBRY's founders, including now-CEO Jeremy Kauffman, began to develop the concept of using this emerging blockchain technology to improve upon the ways in which digital content is published and consumed on the Internet.  *Id.* ¶ 2.  LBRY's founders believed that both centralized and peer-to-peer protocols that were available at the time suffered from inherent problems.  *Id.*  For example, centralized hosts, like YouTube, take excessive profits from creators, censor content and enforce arbitrary rules that can harm content creators.  *Id.* ¶ 3.  Peer-to-peer networks, like BitTorrent, have their own flaws, including that they are disorganized, difficult to navigate and provide no incentives for users to participate.  *Id.*  LBRY thus set out to develop an open-source, censorship-resistant protocol using blockchain technology that would allow users to easily publish, share and search for digital content without any interference by a centralized intermediary.  *Id.* ¶ 4.  Thus, from the earliest days of its inception, the LBRY team has been singularly focused on achieving its ultimate goal—to "[c]reate a market for accessing and

publishing information that is global, decentralized, robust, optimal and complete." Ex. 4, LBRY PLN, at LBRY_000058.

## II.    LBRY Developed and Launched the Functional LBRY Network Long Before Selling any LBC

The founders of LBRY self-funded the initial development of the LBRY Network, as well as raised a small amount of funds from a number of angel investors. Ex. 1, Kauffman Decl. ¶ 23. These early funding arrangements did not provide for any allocation of LBC upon launch of the LBRY Network. *Id.* ¶ 24. Throughout the first half of 2016, LBRY personnel used these funds to complete development of the LBRY Network. *Id.* ¶ 25. After the LBRY Network launched in late June 2016, LBRY sought to raise additional funding from venture capital firms. *Id.* ¶ 28. On September 7, 2016, LBRY announced a $500,000 fundraising round led by Pillar VC, a Boston-based venture capital firm. *Id.* ¶ 29; Ex. 5, LBRY Press Release (Sept. 7, 2016). The Pillar investment similarly did not involve the promise or sale of LBC. Ex. 1, Kauffman Decl. ¶ 30.

On approximately June 23, 2016, LBRY launched the LBRY Network, along with the LBRY Desktop App—a desktop application that runs on top of the LBRY Network that allows users to publish and consume content on the LBRY Network. *Id.* ¶¶ 25–26. LBC—the crypto assets native to the LBRY Network—became available for the first time at the time of the launch and was immediately usable on the LBRY Network to, among other things, publish and purchase content. *Id.* ¶¶ 25–27. LBRY retained 400 million LBC at this time, which were separated into three buckets reserved for community, institutional and operational purposes, and approximately 600 million more LBC are to become available over the next twenty years pursuant to an algorithm as miners validate transactions and create new LBC. *Id.* ¶¶ 14–15.

Over time, like with any software, LBRY continued to improve upon the LBRY Network to add new tools and functionality. *Id.* ¶ 31. Both LBRY and third parties unaffiliated with LBRY

have created numerous applications that run on the LBRY Network. *Id.* ¶ 33.  For example, on January 31, 2020, LBRY launched the lbry.tv application, a web-based version of the LBRY Desktop application—i.e., an application that allows users to access the LBRY Network through a web browser rather than by downloading an application to their desktop. *Id.* ¶ 34.  The lbry.tv application has since been replaced by Odysee.com ("Odysee"), an application that improved on lbry.tv by providing a more user-friendly and streamlined experience. *Id.* ¶ 35.  In addition, as the code underlying the LBRY Network is open source, numerous third parties unaffiliated with LBRY have developed dozens of applications that also run on the LBRY Network. *Id.* ¶¶ 36–38.

### III.    LBC is Used on the LBRY Network for Various Utility-Based Purposes

LBC is critical to the proper functioning of the LBRY Network. *Id.* ¶ 17.First, blockchain technology relies on native crypto assets, like LBC, to function. *Id.* ¶ 9.  Moreover, LBC is required for various functions and transactions on the LBRY Network.  For example, users are required to pay a transaction fee in LBC in order to publish content to the LBRY Network. *Id.* ¶ 17(b).  LBC is also required to create a channel, which allows content on the LBRY Network to be clustered under a single pseudonym or identity. *Id.* ¶ 17(c).  LBC may also be used to "tip" content creators as a "thank you" for publishing content the user likes, or to purchase certain content that is not available for free. *Id.* ¶ 17(d).  Users may also use LBC to "stake," or commit LBC toward a channel or piece of content, which in turn "boosts" the channel or content in search results. *Id.* ¶ 17(f).  In order to boost a particular channel to achieve optimal visibility on the LBRY Network, a substantial amount of LBC is required. *Id.*

There are only a limited number of ways in which a user of the LBRY Network can acquire LBC.  First, miners can earn LBC through validating transactions on the LBRY Network. *Id.* ¶ 18(a).  Second, users can earn LBC in a number of ways on the LBRY Network, including for example, by selling content; receiving tips from other users; purchasing LBC from other users; or

receiving user rewards for certain activity, such as creating an account or completing certain accomplishments.  *Id.* ¶ 18(b)–(e).  Finally, users may purchase LBC on digital asset exchanges that list LBC.  *Id.* ¶ 18(f).  In addition, prior to the Commission's action against LBRY, users could also purchase LBC through integrated applications on the LBRY Network that allowed users to buy LBC without leaving the network.  *Id.* ¶ 18(g).  LBRY made these applications available on the LBRY Network in response to users' demands for easier access to LBC.  *Id.*; *see also* Ex. 6, "LBRY v0.19 Is Shifting Into High Gear."

In addition to providing LBRY users with an avenue for purchasing LBC to use on the LBRY Network, digital asset exchanges also allow users of the LBRY Network, as well as miners of the LBC token, to monetize their LBC earnings by exchanging their LBC for other digital assets or fiat currency. Ex. 1, Kauffman Decl. ¶ 22.  This makes it possible for content creators to earn money for their published content, much like publishers do on YouTube.  *Id.* Without the availability of secondary markets to sell the LBC they earn, LBRY users would have no way to monetize their earnings.  *Id.*

## IV.   LBRY's Marketing Efforts Have Consistently Focused on Growing the User Base of the LBRY Network by Emphasizing its Utility and Functionality

Since the inception of the company, LBRY's marketing efforts have steadfastly focused on promoting and encouraging the use of the LBRY Network and growing its user base by, among other things, emphasizing the network's features and functionality.  *Id.* ¶ 39–40.  The vast majority of LBRY's public announcements have related to updates regarding the LBRY Network, new features, and other news concerning the utility of the network.  *Id.* ¶ 40.  For example, in one of its first marketing posts, dated September 9, 2015, LBRY introduced the LBRY Network as "the first decentralized, open source, fully encrypted content distribution service built using the same blockchain technology that underlies Bitcoin" that will "improve the lives of any user who

produces or consumes content" and "may be the vehicle that takes blockchain tech to the masses." Ex. 7, "Introducing LBRY: The Bitcoin of Content."  The post refers to LBC as a "cryptocurrency native to the LBRY protocol" that is used to "compensate [creators] for publishing [their] work"; it does not discuss the value of LBC or suggest in any way that LBC should be purchased as a speculative investment opportunity.  *Id.*  When LBRY announced the launch of the LBRY Network and beta release of the Desktop Application soon thereafter, it similarly touted the functionality of the network, which it described as "a platform that no one controls, but everyone can access" that allows "content creators—be they filmmakers, musicians, writers, or software developers—… to set their own price and release their works to the world with a few clicks of the mouse" and provides consumers with "an alternative to the big media stores and murky world of BitTorrent."  Ex. 8, "LBRY Beta Goes Live!"  Here again, LBRY did not suggest any speculative investment value to LBC and mentioned the token only as a native currency that can be earned by users of the network.  *Id.*

As LBRY has continued to increase the functionality of the network and add new applications, its marketing efforts have continued to focus on the core mission of the company—the development and dissemination of a blockchain-based digital file-sharing network "that no one controls, but everyone can access"—with a goal toward recruiting new *users* of the network itself, rather than targeting speculative cryptocurrency investors to buy LBC.  *Id.*  For example, in announcing the launch of the lbry.tv application in January 2020, LBRY promoted the application as "a browser for the LBRY network" that allows users to "watch content from top creators, stream Hollywood films, and browse a quirky digital wonderland while earning a stake in a community-controlled protocol."  Ex. 9, "Introducing lbry.tv."  The only mention of LBC in this post is in its description as a native utility token that "is used to publish, tip creators, incentivize hosting, and

secure the network." *Id.* at 5.  Again, the lbry.tv announcement makes no mention of the price or value of LBC or the opportunity for users to purchase it for investment purposes. *See also* Ex. 10, "Development and Community Update"; Ex. 11, "Looking Back and Moving Forward: LBRY in 2019/2020"; Ex. 12, "Looking Back and Moving Forward: LBRY in 2018/2019."

Moreover, LBRY's marketing efforts have sought to reach a wide audience, not one limited to cryptocurrency investors, but rather, one focused on reaching as many potential users of the LBRY Network as possible.  Ex. 1, Kauffman Decl. ¶¶ 41–42; Ex. 14, Finger Depo. at 192:8–194:14.  In addition to posts on its website, LBRY has sought to spread the word about the LBRY Network through social media—including on Facebook, Twitter and Reddit, where it has approximately 30,000 followers, 82,500 followers, and 15,000 followers respectively—as well as through media appearances and interviews.  Ex. 1, Kauffman Decl. ¶ 41; Exs. 15–19 (various articles and interviews about LBRY).

## V.    LBRY Has Refrained from Commenting on the Price or Value of LBC and Has Discouraged Speculative Trading in the Token

As the posts described above demonstrate, to the extent that LBRY's public marketing campaign has addressed LBC, it has done so primarily as a means of explaining the relation to and utility of the token on the LBRY Network.  Ex. 1, Kauffman Decl. ¶ 42.  Far from encouraging people to speculate on the price of LBC, LBRY has actively avoided and dissuaded discussion of the price or value of LBC and has continuously discouraged speculative trading of the token.  *Id.* ¶¶ 42–44.  For example, shortly after the launch of the LBRY Network, LBRY issued a public post on July 15, 2016 in response to comments it observed discussing or speculating on the price of LBC and the valuation of LBRY.  In this post, entitled "$1.2B Market Cap and We Don't Care," LBRY acknowledged that the price of LBC had increased since the launch date, but explained that the movement in the price of LBC "really has little to do with our purpose here at LBRY."  Ex.

20, "$1.2B Market Cap and We Don't Care" (July 15, 2016).  Far from encouraging people to buy LBC as an investment, LBRY stated that it had adopted a "policy of neutrality toward the price," that "no one really knows" if the current price of LBC is "justified," and that LBRY's focus will continue to be on improving the network for its users.  *Id.*

Since that time, LBRY has continued to adhere to a policy of publicly avoiding discussion of the price or value of LBC and to focus its efforts on supporting and encouraging use of the LBRY Network itself.  Ex. 1, Kauffman Decl. ¶¶ 42–44.  Indeed, on LBRY's public channel on the social media platform Telegram—which has more than 4,000 followers—LBRY has frequently discouraged trading and speculation in LBC.  *See id.* ¶ 44.  In response to user comments regarding a decline in the price of LBC in October 2018, for example, a LBRY employee responded in the public chat, "Sorry you lost your money, but we won't put up with this type of attitude. We literally told people not to invest in lbry."  Ex. 21, Telegram Chat Excerpts.  As another example, on December 23, 2018, LBRY stated in its public Telegram chat, "We will never hype or pump lbry, and if you think that's what will bring real world success to our project, you are dead wrong"; and "[W]e'll continue building on [the LBRY Network], and not speculating or looking at the price. We went up and down with the rest of the crypto market which had nothing to do with where the product was."  Ex. 22, Telegram Chat Excerpts; *see also* Exs. 23–25.  LBRY also encouraged users to "use [their LBC] on the platform" rather than to sell it in the secondary market.  *See* Ex. 26, Telegram Chat Excerpt.

## VI.   **LBRY Did Not Sell LBC Until After the Launch of the LBRY Network**

LBRY did not sell any LBC before launching the LBRY Network in late June 2016.  Ex. 1, Kauffman Decl. ¶ 50.  Its first sale of LBC on a digital asset exchange was on July 5, 2017—a *year* after the LBRY Network launched and after an established marketplace existed for the token. *Id.* ¶ 51; *see also* Compl. ¶¶ 17, 21.  Notably, LBRY did not at that time—and at no time since—

encourage people to purchase LBC on the secondary market for purposes of speculating on its price. Ex. 1, Kauffman Decl. ¶ 42. To the contrary, LBRY has consistently informed users who have inquired as to how to obtain LBC to use on the network that it can be purchased on exchanges. *See* Ex. 25, Telegram Chat Excerpt; Ex. 13, "How can I buy LBC with a credit card?"

## ARGUMENT

Summary judgment is appropriate where the evidence shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To overcome a summary judgment motion, the non-moving party must show that there is more than a "scintilla of evidence" in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted).

**I.    LBRY Has Consistently Focused its Promotional Efforts on Growing the LBRY Network and Has Marketed LBC for its Consumptive Use, and its Sales of LBC Thus Cannot Constitute Investment Contracts Under Clearly Established Case Law**

**A.    The *Howey* Test is a Fact and Transaction-Specific Test that Requires a Thorough Examination of the Representations Made to Purchasers**

The Commission alleges that LBC constitutes an "investment contract" under the definition of a security in Section 2(a)(1) of the Securities Act. The Supreme Court has held that to qualify as an investment contract, and hence a security, an instrument must have "substantially the characteristics of a security." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel* ("*Daniel*"), 439 U.S. 551, 560 (1979); *see also Rodriquez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) ("investment contract" in the Securities Act is meant to "capture new arrangements comprising the essence of securities, however they may be named"); *cf. United*

*Hous. Found., Inc. v. Forman* ("*Forman*"), 421 U.S. 837, 851 (1975) (instrument not an "investment contract" because it did not possess "characteristics traditionally associated with stock," such as "voting rights" and "dividends contingent upon an apportionment of profits"). To determine whether an instrument qualifies as an "investment contract" under the Securities Act, courts apply the test set forth in *SEC v. W.J. Howey Co.* ("*Howey*"), 328 U.S. 293 (1946), which defines an investment contract as a "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *Id.* at 298-99. All three elements of the *Howey* test must be established for a scheme or transaction to qualify as an investment contract under the Securities Act. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

Whether a transaction qualifies as an investment contract is a highly fact-specific inquiry, especially where—as here—the instrument at issue is a "relatively new, hybrid vehicle," which requires "case-by-case analysis into the economic realities of the underlying transaction." *United States v. Leonard*, 529 F.3d 83, 89 (2d Cir. 2008); *see also United States v. Zaslavskiy*, 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018). Case law is clear that the *Howey* test requires an "objective inquiry into the character of the instrument or transaction based on what the purchasers were led to expect." *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009); *see also Marine Bank v. Weaver*, 455 U.S. 551, 561 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (analysis should focus on "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect").

Moreover, although not determinative, courts may look to the subjective intent of prospective and actual purchasers in connection with their "evaluation of the motivations of the hypothetical reasonable purchaser." *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1305 (2d Cir. 1971) (finding that the testimony of individual investors "was relevant to whether [a document] was misleading to the 'reasonable investor'"); *see Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir. 1991) ("We hold that the lots are not securities under the 1934 Act . . . The appellants have not offered any evidence to show that the majority or even a fair number of the buyers bought houses or lots as an investment."); *Warfield*, 569 F.3d at 1021 (noting that "the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts"); *SEC v. Telegram Group Inc.* ("*Telegram*"), 448 F. Supp. 3d 352, 374 (S.D.N.Y. 2020) (noting that "the stated intent of prospective and actual purchasers, though not considered for the truth of their content, may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser").

## B. LBRY Did not Lead Purchasers to Expect Profits Solely Based on the Essential Managerial and Entrepreneurial Efforts of Others

The Supreme Court has recognized an expectation of profits in two situations—namely, (1) capital appreciation from the original investment, and (2) participation in earnings resulting from the use of investors' funds. *SEC v. SG Ltd.* ("*SG Ltd.*"), 265 F.3d 42, 53 (1st Cir. 2001) (citing *Forman*, 421 U.S. at 852). Case law interpreting this element has suggested that to qualify as a security, the expectation of profits by purchasers must be the most significant element of an instrument's character. *See SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982) (assessing "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way"); *see also Daniel*, 439 U.S. at 560-61 (court

13

below erred by finding "an expectation of profit in the pension plan only by focusing on one of its less important aspects to the exclusion of its more significant elements") (citation omitted). Where, on the other hand, buyers are not led to purchase an instrument based on an expectation of profit, but rather, are attracted primarily by the prospect of using or consuming the item or instrument, then the securities laws do not apply. *SG Ltd.*, 265 F.3d at 53 (citing *Forman*, 421 U.S. at 858); *see also Rice*, 922 F.2d at 790 ("[W]here those who purchase something with the primary desire to use or consume it, the security laws do not apply.").

In determining whether the "expectation of profits" prong of the *Howey* test is satisfied, courts look both to "the motivations of the purchasers," as well as "the emphasis provided in the promotional material[s]." *Rice*, 922 F.2d at 790. Where the "overall emphasis" in the seller's promotional materials, oral assurances or contractual agreements is on the use or consumption of the item being sold, courts have held that such sales do not constitute sales of securities. *Id.* at 791. This is so even where the materials contain "passing reference" to the investment character of the item, so long as the primary focus of the materials is on the ability of purchasers to use or consume the item being sold. *Id.*; *see also Alumni v. Dev. Resources Group, LLC*, 445 F. App'x 288, 298 (11th Cir. 2011) (holding that real estate contract did not constitute an investment contract even where sellers made representations focused on the investment character of the condominium units); *Scott v. Bluegreen Vacations Unlimited, Inc.*, 19-CV-01807 (AWI) (JLT), 2020 WL 3296190, at *6 (ED Cal. June 18, 2020) (holding that timeshares were not a security based upon a finding that buyers purchased the shares to use them, notwithstanding that salespeople also told purchasers that the timeshare points "would increase in value over time" and "could be sold for a profit"); *Wabash Valley Power Ass'n, Inc. v. Public Service Co. of In., Inc.*, 678 F. Supp. 757, 766 (S.D. In. 1988) (finding that the seller's promotional efforts "provides little support for [plaintiff's]

14

assertion of an expectation of profits" where the promotional materials "contain some reference to the economic benefits," but was not the "primary focus" of the materials). The First Circuit has found, on the other hand, that where the promotional materials at issue contain "persistent representations of substantial pecuniary gains" that "play[] upon greed and fuel[] expectations of profit," such marketing materials constitute "economic inducement" sufficient to satisfy the "expectation of profits" prong of the *Howey* test. *SG, Ltd.*, 265 F.3d at 54.

### 1. LBRY Has Consistently Promoted LBC for its Consumptive Purposes in Connection with the Proper Functioning of the LBRY Network

The undisputed facts demonstrate that LBRY consistently touted the consumptive nature of LBC as a necessary element to the proper functioning of the LBRY ecosystem that would permit users to buy, sell, publish and stake digital content without the need for a centralized intermediary. From the time of its inception, the LBRY team has been singularly focused on developing a decentralized digital content sharing platform based on blockchain technology that, by its nature, requires the use of a utility token to function. LBRY has consistently promoted and emphasized this core tenet—the development of a functional and user-friendly LBRY Network—to a broad audience so as to attract as many potential users of the network as possible. *See, e.g.* Exs. 7–19. Thus, the "overall" or "primary" emphasis in LBRY's public statements and marketing materials has always been, and continues to be, on encouraging people to access and use the LBRY Network to share and consume content.

To the extent LBRY has addressed LBC in its promotional materials, it has done so not to promote or encourage the purchase of LBC for speculation, but rather, to explain the ways in which LBC is used on and interacts with the LBRY Network. Far from touting LBC as a "get-rich-quick" investment opportunity—as many cryptocurrency companies have done in the ICO context— LBRY consciously avoided discussing the price or value of LBC and, in fact, repeatedly

discouraged people from speculating on the price of the token.  Ex. 1, Kauffman Decl. ¶¶ 41–44; Exs. 21–26, Telegram Chat Excerpts. *See Rice*, 922 F.2d at 791 (holding that sale not an investment contract where seller "sent out letters to potential buyers explicitly instructing them, among other things, not to buy the [instruments] as investments").

        2.      **The Case Law Applying *Howey* in the Digital Asset Context Supports a Finding that LBC is Not a Security**

The undisputed facts in this case stand in stark contrast to the prior Section 5 enforcement actions that the Commission has brought against other digital asset companies, all of which have involved the sale of tokens through an ICO—which was accompanied by the release of a Whitepaper outlining a theoretical plan for a yet-to-be-developed blockchain architecture—prior to the launch of the blockchain, and thus before any potential consumptive use for the proposed token existed.  For example, in connection with an ICO of a proposed digital asset AML Bitcoin, the defendants in *SEC v. NAC Found., LLC, et al.* ("*NAC Found.*"), 512 F. Supp. 3d 988 (N.D. Cal. 2021), published a Whitepaper that stated, among other things, that (i) the blockchain upon which AML Bitcoin would operate was still under development, and thus ICO participants would be issued "stand-in" tokens that would later be exchanged on a one-for-one basis for AML Bitcoin once the blockchain was completed; otherwise, the "stand-in" tokens lacked any practical use; (ii) the "stand-in" token and its successor would be subject to "trade, [sale] and purchase…on participating exchanges and trading websites" and (iii) AML Bitcoin "can appreciate in value through speculative trading."  *Id.* at 992.  In denying the defendants' motion to dismiss, the court found that the Commission sufficiently alleged that "[w]ith the White Paper, ICO participants were 'led to expect'" profits through the appreciation in value of the stand-in token and AML Bitcoins. *Id.* at 997.  Significant to the court's finding was the fact that the Whitepaper "failed to apprise participants of *any* practical [stand-in] token use:  while they could be redeemed for AML Bitcoin

at some future point, they were, at the time of the transaction, solely objects for trading." *Id.* (emphasis added).

Similarly, in *Telegram*, the defendants conducted an ICO that entitled purchasers to receive an allotment of a new cryptocurrency, called Grams, that would become available only upon the successful launch of a proposed blockchain being developed by the issuer.  In holding that the issuance satisfied the "expectation of profits" prong, the court pointed to a number of characteristics of the ICO tending to show that early purchasers bought the token as an investment opportunity—namely, (i) the ICO sale prices were "set at a significant discount to…the expected market price in a post-launch public market"; (ii) the size and concentration of the token purchases—which involved the purchase of 58% of the total supply of tokens by only 175 initial purchasers—indicated an investment (rather than consumptive) intent; and (iii) the tokens were subject to a lockup period that prevented initial purchasers from selling the tokens until several months after the launch of the blockchain, "which tend[s] to negate the likelihood that a reasonable Round One Purchaser purchased Grams for consumptive use" since, "[s]imply put, a rational economic actor would not agree to freeze millions of dollars for up to 18 months (following a lengthy development period) if the purchaser's intent was to [use Grams as] a substitute for fiat currency." *Id.* at 372-73.  Moreover, the court noted that the initial purchasers targeted by the company would likely not be drawn to the tokens for their consumptive use.  In seeking purchasers in the ICO, Telegram "did not focus on cryptocurrency enthusiasts, specialty digital assets firms, or even mass market individuals who had a need for an alternative to fiat currency"; rather, Telegram targeted "sophisticated venture capital firms (and other similar entities) as well as high net worth individuals with an inherent preference…toward an investment intent rather than a consumptive use." *Id.* at 374.

17

In yet another Section 5 enforcement action, *SEC v. Kik Interactive Inc.* ("*Kik*"), 492 F. Supp. 3d 169 (S.D.N.Y. 2020), the defendant conducted an ICO of a proposed cryptocurrency, Kin.  In its Whitepaper announcing the ICO, the company stated that Kin would be tradable on the secondary market.  *Id.* at 179-80.  During the company's "roadshow" to promote the ICO, the CEO explained how people could make money from early purchases of Kin since the company was offering only a limited supply of the token, and thus as demand increased, so too would the value of the coin.  *Id.* at 174.  In holding that the defendant led purchasers to reasonably expect to profit through their early purchase of Kin, the court rejected the company's argument that Kin was marketed as a medium for consumptive use since "none of [Kin's] 'consumptive use' was available at the time of distribution"; rather, "[i]t would materialize only if the enterprise advertised by Kik turned out to be successful."  *Id.* at 180.

The handful of other courts that have applied the *Howey* test in the digital asset setting have similarly done so in the ICO context where the cryptocurrency ecosystem had not yet been developed and the token at issue would have no utility unless and until the successful launch of said ecosystem.  *See, e.g.*, *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021) (token sale satisfied "expectation of profits" element where issuers sold tokens pursuant to an ICO and the tokens had no utility at the time of sale—"any supposed *future* utility of the tokens on FLiK's 'end-to-end entertainment ecosystem' is beside the point") (emphasis in original); *Barron v. Helbiz Inc.*, No. 20-cv-4703 (LLS), 2021 WL 229609, at *3-*4 (S.D.N.Y. Jan. 22, 2021) (buyers purchased token based on expectation of profit where company conducted ICO and promoted token as an investment product; although company initially sold token as method of payment in addition to investment product, company repeatedly "stalled the integration of the token into its platform" and eventually "abandoned the notion that the [token] would be its exclusive payment

method," and court thus found that "[t]he token's admittedly trivial use…was dwarfed by its promotion") (vacated on other grounds); *Solis v. Latium Network, Inc.*, No. 18-cv-10255 (SDW) (SCM), 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (purchasers were led to expect profit in ICO where issuers' "promotional materials, advertising methods, and public statements stressed the limited supply of tokens, and referred to [the] ICO as a 'unique investment opportunity' that would 'generate better financial returns'" and where the tokens "had not been launched for public use" during the time of the ICO); *Diamond Fortress Technologies, Inc. v. EverID, Inc.*, 2022 WL 1114528, at *11 (Del. Super. Ct. April 14, 2022) (noting that tokens issued pursuant to an ICO have generally been found to constitute securities and finding that "expectation of profits" prong satisfied in ICO case where "Plaintiffs could not be reimbursed until after [the issuer's] initial ICO").

The factual scenarios underlying these holdings are markedly different from the undisputed facts at issue in this case. LBRY did not conduct an ICO to a small handful of individually targeted investors motivated by a desire to earn profit by buying LBC at a discounted price and subsequently selling it for profit in the open market. To the contrary, as the Commission itself admits in the Complaint, LBRY raised funds to build the LBRY Network entirely through traditional fundraising avenues that did not include the sale of LBC. As of the date of the launch of the LBRY Network, LBC was immediately usable on the network to, among other things, tip content creators and to purchase or stake content.

Moreover, unlike the cryptocurrency companies at issue in the cases cited above, LBRY did not issue a traditional Whitepaper with a theoretical description of its proposed blockchain ecosystem. To the contrary, LBRY first released its LBRY Protocol Specification ("LBRY Spec") in February 2019—over two-and-a-half years after the launch of the LBRY Network. Ex. 27,

"Introducing lbry.tech and the LBRY Spec."  Unlike a traditional Whitepaper, the LBRY Spec was "not a theoretical proposal, but a detailed description of a system in production usage."  *Id.*  The LBRY Spec provided a comprehensive, technical description of the LBRY Network, describing it as a means for users to "publish, host, find, download and pay for content" in a "permissionless and censorship-resistant" environment.  Ex. 28, LBRY Spec.  As of the date of the LBRY Spec, over 3.3 million pieces of digital content had been published via the LBRY Network.  *Id.*  Notably, the LBRY Spec does not tout LBC as an investment opportunity, refer to the price or value of LBC or mention the ability to trade LBC on exchanges.  To the contrary, it describes LBC only as a means of currency on the LBRY Network.  *Cf.  NAC Found.*, 512 F. Supp. at 992 (Whitepaper stated that token "can appreciate in value through speculative trading"); *Kik*, 492 F. Supp. 3d at 179-80 (Whitepaper indicated that token would be tradeable on the secondary market).

Moreover, unlike the sales at issue in the ICO context, LBRY sold its native token at prevailing market prices in an already-established secondary market.  Although the Commission would have this Court believe that the existence of a secondary market necessarily suggests that the LBC token must be a security, that is simply not the test.  Indeed, thousands of secondary market exchanges for fungible assets like LBC—such as Legos, Beanie Babies, gold, and crude oil, just to name a few—exist, and the Commission does not suggest that such commodities constitute securities merely because they are traded on a secondary market exchange.

Additionally, the ability of users to purchase LBC is necessary to the proper functioning of the LBRY Network.  Other than through receiving limited amounts of LBC as rewards or through mining, LBRY users have no other means of acquiring LBC except to purchase it on secondary market exchanges.  And, as the undisputed evidence demonstrates, users do, in fact, purchase LBC

on exchanges (or integrated purchasing applications on the LBRY Network) for purposes of using it on the network.  Indeed, as noted in the declarations appended to the declaration of Mr. Kauffman, approximately 300 people have attested that they did, in fact, purchase LBC on exchanges or integrated applications precisely to use it on the LBRY Network, rather than to speculate on its price in the secondary market.  Ex. 1, Kauffman Decl. ¶ 21 & Exhibit A thereto.

To help facilitate users' ability to purchase LBC on the network—a request that LBRY's users have made repeatedly over the years[2]—LBRY has attempted on multiple occasions to incorporate integrated applications into the LBRY Network that would allow users to purchase LBC in their LBRY wallet while using the LBRY Network, rather than having to purchase LBC on an exchange and then transfer it into their LBRY wallet.  For example, in December 2017, LBRY integrated a ShapeShift widget into its Desktop application "to allow users to easily convert popular cryptos into LBC without leaving the app."  Ex. 10, "Development and Community Update."  In April 2020, in further response to users' demands for easier access to LBC, LBRY again launched an integrated application on the LBRY Network, through a company called MoonPay, that allowed users to purchase LBC from LBRY using a credit card without leaving the network.  Ex. 13, "How can I buy LBC with a credit card?"  The application was ultimately removed after MoonPay terminated its relationship with LBRY when the SEC filed this lawsuit; however, over the 19 months that the application was live on the LBRY Network, it facilitated nearly 5,000 separate purchases of LBC from LBRY by users of the LBRY Network.Ex. 29, MoonPay Transaction Data.  Moreover, the LBC purchases consummated through the MoonPay application were relatively small in value—with a median and average transaction size of $40 and $146, respectively—and sold at market price, if not slightly higher, *see id.*; Ex. 30, Kauffman Tr.

---

[2]Ex. 6, "LBRY v0.19 Is Shifting Into High Gear." ("We've heard two requests from our community over and over again:  make it easier to get LBC, and let users subscribe to their favorite creators.").

at 167:4-22, thus clearly indicating that these individuals were purchasing LBC in order to use it on the LBRY Network, and not to speculate on its value. *Cf Telegram*, 448 F. Supp. 3d at 372-73 (large concentration of token ownership purchased at a discount by small number of purchasers indicated investment, rather than consumptive, intent).

Nor did LBRY's sales of LBC include any of the other characteristics that courts have pointed to in holding that ICOs of digital tokens constitute the sale of securities, including the existence of a "roadshow" or the inclusion of a lockup period following the sale of the token. *See id.* at 378. Moreover, unlike the sales at issue in the prior cases, LBRY's promotional and marketing materials did not target potential investors in LBC; to the contrary, since its inception, LBRY has focused its marketing efforts on targeting potential *users* of the network. *See* Ex. 14, Finger Dep. Tr. at 192:15-194:12. Simply put, the limited case law that exists applying the *Howey* test in the digital asset context—which involved token sales in the ICO context that had all the hallmarks of an investment contract—is wholly distinguishable from the facts at issue here, which involve the sale of native currency tokens to real users on an already functioning, usable network.

3. **The LBRY Ecosystem with its Native Token Has Grown Exponentially and is Currently Thriving**

The user base and published content on the LBRY Network has grown exponentially since the launch of the network in 2016—and, accordingly, so too has the use of its native digital currency, LBC. Ex. 1, Kauffman Decl. ¶¶ 52–58. Indeed, since January 1, 2017, the number of total published items and channels on the network has grown by over 90,000% and nearly 40,000%, respectively. *Id.* ¶¶ 53–54. Similarly, the number of distinct content purchases on the network and file views per day has seen enormous growth of nearly 3,700% and 200,000%, respectively, during this approximately five-year period. *Id.* ¶¶ 55–56. And, as a natural consequence of the growth in content production and user activity, the number of on-network

transactions using the LBC native currency has grown by nearly 4,000%, with nearly 220,000 transactions currently occurring daily on the network.  *Id.* ¶ 57.

As demonstrated by declarations of several of the LBRY Network's largest creators, Naomi Brockwell, Aaron Watson, John Dorvall, and David Jones, Exs. 31–34, as well as the sheer volume of activity on the LBRY Network, there can be no dispute that the LBRY Network and its native token provide a functional use for millions of users on a daily basis.  Indeed, a comparison of the on-network transaction volume versus the off-chain market trading volume for the period 2016 through 2021 shows that more people were using LBC on the LBRY Network than trading it in the off-chain secondary market.  Ex. 2, Expert Report of Dr. Richard ¶¶ 86–89; Ex. 3, Amended Expert Report of Dr. Richard ¶¶ 27–29.  Unlike the ICO cases that came before, there can be no doubt that the LBRY Network was fully usable as of the date it launched, and the consumptive nature of the LBRY Network and its native token has continually grown.

C.    **The Price of LBC is Not Driven by the Essential Entrepreneurial or Managerial Efforts of LBRY, but Rather by General Market Forces in the Cryptocurrency Market**

Even if the Commission were able to demonstrate that LBRY's promotional materials led buyers to primarily expect profits through their purchase of LBC—which it cannot—to prevail on its Section 5 claim, it must also establish that purchasers expected to profit "solely from the efforts of the promoter or a third party."  *See Howey*, 328 U.S. at 299.  Where, however—as here—the price of LBC is based on general cryptocurrency market forces unrelated to the ongoing managerial efforts of LBRY, the Commission cannot establish that any potential profits derived from purchasers speculating on the price of LBC are due to efforts of the LBRY team.  *See* Ex. 2, Expert Report of Dr. Richard ¶¶ 113-114.  Courts have consistently held that where the price of a fungible commodity fluctuates due to general market forces, and not based on the ongoing efforts of the defendants, the potential profits associated with the purchase and sale of such commodity is

insufficient to satisfy the *Howey* test.  *See SEC v. Belmont Reid & Co., Inc.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (transaction scheme that involved the sale of gold coins on a prepayment basis not an investment contract where purchasers "had as their primary purpose to profit from the anticipated increase in the world price of gold" and where "profits…did not come 'solely' from the efforts of others" but, rather, "fluctuations in the gold market"); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980) (sale of forward contract for silver bars did not constitute investment contract because "[o]nce the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [defendant]," the "decision to buy or sell was made by the owner of the silver," and "[t]here is a national market for silver which is not dependent upon [defendant]").  This is so because "[a]n investor who has the ability to control the profitability of his investment" by, for example, determining when to buy and sell a commodity in the open market, "is not dependent upon the managerial skills of others."  *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982).

Here, as with other commodities that courts have held are not securities subject to the Securities Act, any expectations of profit by purchasers will depend upon those purchasers' affirmative actions (of buying and selling in the secondary market) and fluctuations in the cryptocurrency market.  Such as precious metals or other fungible assets that are traded on secondary exchanges, LBC is more appropriately categorized as a commodity that is subject to the CFTC's regulatory regime.  *See* Press Release No. 8051-19, Heath P. Tarbert, Chairman, U.S. Commodity Futures Trading Comm'n (Oct. 10, 2019) (stating that Ether is a commodity that will be regulated under the Commodity Exchange Act); *see also Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) (holding that cryptocurrencies are commodities subject to the CFTC's jurisdiction); *In re Coinflip, Inc.*, CFTC Dkt. No. 15-29, 2015

24

WL 5535736, at *2 (CFTC Sept. 17, 2015) ("Bitcoin and other virtual currencies are . . . properly

defined as commodities."). That another federal regulatory scheme exists to protect investors—as

one does here under the Commodities Exchange Act, whose prohibitions on fraud and

manipulation are enforced by the CFTC—is a factor that the U.S. Supreme Court has held weighs

against the extension of the federal securities laws to a particular commodity. *See Marine Bank*,

455 U.S. at 558-59; *Daniel*, 439 U.S. at 569-70.

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendant LBRY respectfully requests that this Court grant its

motion for summary judgment and deny the Commission's application for a permanent injunction.

Dated: May 4, 2022                        Respectfully submitted,

                                          LBRY, INC.

                                          */s/ Timothy J. McLaughlin* (NH Bar # 19570)
                                          William E. Christie
                                          Timothy J. McLaughlin
                                          Shaheen & Gordon, P.A.
                                          107 Storrs Street
                                          P.O. Box 2703
                                          Concord, NH 03302
                                          (603) 819-4231
                                          wchristie@shaheengordon.com
                                          tmclaughlin@shaheengordon.com


                                          */s/ Keith W. Miller*
                                          Keith W. Miller (*pro hac vice*)
                                          Rachel S. Mechanic (*pro hac vice*)
                                          John T. Dixon (*pro hac vice*)
                                          Perkins Coie LLP
                                          1155 Avenue of the Americas, 22nd Floor
                                          New York, New York 10036-2711
                                          (212) 262-6900
                                          KeithMiller@perkinscoie.com
                                          Rmechanic@perkinscoie.com
                                          JohnDixon@perkinscoie.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  May 4, 2022                    */s/* Keith *W. Miller*
                                        Keith W. Miller

26