

**EXHIBIT**

**1**

21-cv-00260-PB

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE                    :
COMMISSION,
                                           :
            Plaintiff,
                                           :
    -against-                                   Civil Action No. 1:21-cv-00260-PB
                                           :
LBRY, INC.,
                                           :
            Defendant.
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## ANSWER

Defendant LBRY, Inc. ("LBRY"), by and through its undersigned counsel, hereby

answers and asserts affirmative defenses to Plaintiff Securities and Exchange Commission's

("SEC's") Complaint and reserves its rights to request dismissal of the Complaint on any and all

grounds.  Unless expressly admitted, all allegations set forth in the Complaint are denied.[1]

## PRELIMINARY STATEMENT

1.      In bringing this misguided action, the SEC takes concerted steps to stifle an

innovative blockchain company that has consistently endeavored to comply with the law despite

the SEC's failure to provide reasonable and clear guidance.  As described further below, for

years the SEC has issued varying statements about digital assets that have left the industry

guessing about whether a particular digital asset will be deemed a security and thus must be

registered with the SEC.

---

[1] To the extent the headings in the Complaint are intended to constitute factual allegations, LBRY denies each and
every such allegation.

4.      No reasonable explanation exists for the SEC's Javert-like pursuit of LBRY. After years of exhaustively investigating LBRY, a small New Hampshire-based start-up company, the SEC does not and cannot allege any intentional wrongdoing by anyone associated with LBRY.  Instead, the SEC contends only that LBRY's sales of its digital assets—which never involved an ICO—constitute unregistered offers and sales of securities.  LBRY's sales of LBC do not resemble securities in any meaningful way.  Indeed, LBC is intended for consumptive use on LBRY's blockchain-enabled network, as explained further below.  The Supreme Court's "investment contract" test for the definition of a "security" does not extend to situations where, like here, one "purchases a commodity for personal consumption"; rather, an investment contract exists "where one parts with his money in the hope of receiving profits from the efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975).  Instead of recognizing the reality of the new blockchain-based technology, the SEC attempts to squeeze a new technology into an outdated and vague definition of "security."  In doing so, the SEC stretches the federal securities laws in order to crush ground-breaking companies like LBRY. Left unchecked, the SEC's refusal to accept technological innovation in a modern economy—or even to provide any guidance to companies like LBRY on how they can operate without drawing the SEC's ire—will wreak havoc on the blockchain industry and drive cutting-edge companies out of the United States.

***The LBRY Protocol***

5.      In 2015, LBRY began developing a blockchain-enabled network (the "LBRY Protocol" or "Protocol") that would allow creators to publish digital content and consumers to explore and buy content using LBC.  Like many start-up companies, LBRY sought early funding from investors.  LBRY raised approximately $410,000 from venture capital firms and individual

-3-

accredited investors in the form of convertible promissory notes. This traditional fundraising did

not include the sale of LBC. LBRY used part of these funds to develop the LBRY Protocol.

6.  On July 4, 2016, LBRY launched the LBRY Protocol and for the first time made

LBC available to the public. At the time of launch, users could immediately begin using LBC on

the LBRY Protocol. The core idea behind the LBRY Protocol is to enable the distribution of

digital content so that no single person or entity can control the availability and storage of user

content. Rather, LBRY decided to create and support a decentralized community where anyone

could publish and host their content without the need of an intermediary authority. Such a

configuration prevents the abuses of power that LBRY's founders had observed among other

online distribution platforms. To that end, as described further below, LBRY designed the

LBRY Protocol so that it would rely on a decentralized community of users, not LBRY itself, in

order to continue to function after the LBRY Protocol launched.

7.  Users generally interact with the LBRY Protocol by installing the "LBRY

Application" on their computer or smartphone. Users can publish content and pay for other

users' content through the LBRY Application.

8.  The LBRY Protocol enables digital content storage and access without relying on

a centralized infrastructure. Content published using the LBRY Protocol is stored in a

distributed fashion among users of the LBRY Application. In other words, anyone who has

downloaded the LBRY Application participates in the storage of the content. New content that is

added to the LBRY Protocol is split into many smaller encrypted pieces. When a user wants to

purchase digital content, the user pays the content creator in LBC using the LBRY Application.

When payment is received, the LBRY Application works with the LBRY Protocol to collect the

4827-0874-6989, v. 1

encrypted segments of the requested digital content, put it back together, and deliver it to the user who purchased it.

9.      From the very beginning, LBRY was committed to transparency with its users. And while LBRY built the LBRY Protocol, once the LBRY Protocol was launched, it was a mature, fully functional network, and the software and its decentralized community of users did not rely upon LBRY to continue to exist or function.

10.      The LBRY Protocol has millions of active users.  The Protocol itself is available to the public for free, and LBRY encourages participation and contributions from a broad community of developers and creators.  The LBRY Protocol—like all software—is continually improved and updated with new tools and features making it more user-friendly and robust over time.  Indeed, hundreds of open-source developers who have no affiliation with LBRY have contributed thousands of lines of code to LBRY's code base over the years.  LBRY often gives away small amounts of LBC as "tips" for making helpful contributions to the Protocol.  In addition, a decentralized group of blockchain "miners" not affiliated with LBRY contributes computational resources required to process transactions and secure the LBRY Protocol.  Thus, if LBRY ceased to exist, the LBRY Protocol and LBC could continue to exist and function.

*LBRY Credits*

11.      Over time, approximately 1 billion LBC will become available on the LBRY Protocol.  At launch, LBRY retained 400 million LBC for its own use, and the remaining 600 million LBC will be distributed via mining over the course of 20 years according to an algorithmic schedule.

12.      The 400 million LBC that LBRY held in reserve are allocated into three pools. 200 million LBC are allocated to a "Community Fund," which is used for various activities that

4827-0874-6989, v. 1

support the LBRY Protocol and the community. For example, LBRY provides small in-application LBC rewards to teach new users how to use the Protocol. LBRY also rewards open-source developers for coding tasks. Approximately 100 million LBC are allocated to an "Institutional Fund." These tokens are used to support causes aligned with LBRY's mission and values. The remaining 100 million LBC are used by LBRY to fund ongoing operations and are thus allocated to an "Operational Fund."

13.    Consistent with its commitment to transparency, LBRY publishes quarterly reports on its website describing LBRY's use of LBC from each of the three pools of tokens.

14.    LBRY has never offered and sold LBC as an investment, and holders of LBC have no claim to the assets or profits of LBRY and have no ownership interest in LBRY.

### The SEC's Lack of Clear Guidance Regarding Digital Assets

15.    Since Bitcoin first launched in 2009, the SEC consistently has failed to provide clear guidance about how the federal securities laws apply to the blockchain industry. For years, the SEC's few statements addressing cryptocurrencies did not even address the securities-analysis question. On July 23, 2013, the SEC issued an "Investor Alert" warning of "fraudulent investment schemes that may involve Bitcoin and other virtual currencies," but did not comment on how to determine whether a given digital asset is a security.[3]

16.    On May 7, 2014, the SEC again issued an "Investor Alert" about the "potential risks of investments involving Bitcoin and other forms of virtual currency."[4] Again, the SEC did not provide guidance to blockchain companies, nor did it bring an enforcement action alleging Bitcoin to be a security.

---

[3] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-7.
[4] https://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html.

24.     The SEC staff even threatened to continue making investigatory demands upon LBRY so that LBRY might exhaust its resources in defending itself.  In this regard, the SEC staff understood that LBRY was a small company and that the turmoil and expense of an extended investigation and litigation would cause significant harm to the company.  Even as LBRY cooperated with the investigation and complied with subpoenas, SEC staff—knowing that LBRY did not have extensive resources to defend itself—threatened to seek even more voluminous materials through administrative subpoenas in order to bankrupt the company.

25.     The SEC has refused to articulate clear, practical standards by which companies like LBRY will be held under the federal securities laws.  Rather, the SEC has made a mishmash of vague and shifting statements over the years—<u>after</u> LBRY launched the LBRY Protocol and even <u>after</u> this action was filed—which leave LBRY and many other blockchain companies guessing as to whether the SEC will view them to be in compliance with the law despite their best efforts.  The SEC ultimately brought this lawsuit, and consequently LBRY is left to defend a lawsuit without having received any meaningful guidance from the SEC as to how to comply with the federal securities laws.

26.     The Complaint's overreaching allegations and claims have caused harm not only to LBRY, but also to millions of non-parties publishers and users of LBRY.

## ANSWER TO SPECIFIC ALLEGATIONS

1.     This case concerns LBRY's failure to register an offering of securities pursuant to the Securities Act of 1933 ("Securities Act"). From 2016 through the present, LBRY offered and sold millions of dollars' worth of unregistered securities to investors, in the form of a digital asset called LBRY Credits ("LBC"), which LBRY told investors was to be used to fund its business and build its product – a digital content marketplace or network offering video and audio recordings, images, and other information ("LBRY Network").

4827-0874-6989, v. 1

**ANSWER**: Paragraph 1 contains characterizations and legal conclusions to which no response is required. To the extent any response is necessary, LBRY denies the allegations, except LBRY admits that it sold LBC and that LBRY is a blockchain enabled-network that allows creators to publish digital content and consumers to explore and buy content using LBC.

2.      LBC were offered and sold as investment contracts and, therefore, securities. LBRY offered and sold the LBC in exchange for U.S. dollars, bitcoins, and other consideration such as non-monetary contributions to its enterprise. LBRY pooled the money it raised such that the successes (or failures) of the LBC holders were inextricably intertwined with other holders of LBC, the largest of whom was LBRY itself. And LBC holders reasonably would have expected a return on their investment based on the entrepreneurial or managerial efforts of LBRY.

**ANSWER**: Paragraph 2 contains characterizations and legal conclusions to which no response is required. To the extent any response is necessary, LBRY denies the allegations except LBRY admits that it sold LBC in exchange for fiat or other currencies.

3.      Beginning in mid-2016, LBRY offered and sold LBC to the public in exchange for contributions designed to allow LBRY to build the LBRY Network. Similarly, to pay for LBRY's construction and development of the LBRY Network, LBRY offered and sold LBC to investors. In particular, between 2016 and 2020, LBRY sold more than 13 million LBC to the general public through accounts it controlled at two online digital asset trading platforms (i.e., online platforms that allow buyers and sellers to trade a range of digital assets). LBRY sold the LBC on the digital asset trading platforms in exchange for bitcoin then valued at more than $5 million.

**ANSWER**: LBRY denies the allegations in paragraph 3.

-11-

of the securities, details about the terms of the securities offering, the proposed use of investor

proceeds, and an analysis of the risks and material trends that would affect the enterprise.

      **ANSWER**:  The allegations in paragraph 12 are legal conclusions to which no response

is required.  To the extent any response is necessary, LBRY refers the Court to the text of the

Securities Act, 15 U.S.C. § 77a *et seq*., and its implementing regulations.

      13.     Section 5(a) of the Securities Act provides that, unless a registration statement is

in effect as to a security, it is unlawful for any person, directly or indirectly, to sell securities in

interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against

offers to sell or offers to buy, unless a registration statement has been filed. Thus, Sections 5(a)

and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate

commerce.

      **ANSWER**:  The allegations in paragraph 13 are legal conclusions to which no response

is required.  To the extent any response is necessary, LBRY refers the Court to the text of the

Securities Act, 15 U.S.C. § 77a *et seq*., and its implementing regulations.

**FACTS**

**A.**     **Background.**

      14.     LBRY describes itself as a company founded to create a way to distribute and

purchase digital content that would be open to the public and would not involve an intermediary.

LBRY first targeted video distribution and sought to compete with YouTube, Amazon, and other

video entertainment platforms.

      **ANSWER**:  LBRY admits the allegations in paragraph 14.

      15.     To accomplish its business objectives, LBRY represented that it would use

blockchain-related technology (a blockchain is a an electronic distributed ledger or list of entries

-15-

4827-0874-6989, v. 1

maintained by various participants in a network of computers) as follows: (a) LBRY would

create a blockchain "protocol" (i.e., a set of rules or procedures that govern the transfer of data

between electronic devices); (b) LBRY would create a user application; (c) LBRY would create

the software that would enable the user application to use the LBRY protocol; (d) LBRY would

recruit creators and producers to publish their videos, shows, and movies to the LBRY protocol;

and (e) LBRY would publicize the protocol and application to attract consumers.

**ANSWER**: LBRY admits that it created a blockchain-enabled network that allows

creators to publish digital content and consumers to explore and buy content using LBC. LBRY

further admits that it created the software for the LBRY Application, which users may install

locally on their computers or smartphones. LBRY further admits that it encouraged creators and

producers to publish their content to the LBRY protocol and publicized the LBRY protocol so

that users would access and use the product LBRY built. LBRY otherwise denies the remaining

allegations in paragraph 15.

16.     To financially support its operations and promotional efforts, LBRY planned to

offer and sell LBC to investors. In March 2016, LBRY represented to the public on its website:

> In the early days of our protocol, LBRY Inc. will be making a concerted effort to
> deploy LBC in a non-neutral way. We will be incentivizing early adopters,
> amazing content publishers, and even nonprofits which share our vision of a free
> and open internet. We will be retaining a portion to finance the continued
> development of the ecosystem. LBRY Credits will work on behalf of
> development of the LBRY content distribution network, not the other way around.

**ANSWER**: LBRY denies the allegations in paragraph 16. To the extent paragraph 16

purports to quote or characterize LBRY's website, the website speaks for itself, and LBRY

respectfully refers the Court to the full text of the website for an accurate and complete record of

its contents.

17.     LBRY launched its protocol in June 2016. By its design, LBRY held the first 400 million LBC in its possession, representing 40% of the total allowable supply of LBC under the protocol. LBRY divided its LBC into three self-described "funds" and used the LBC in those funds to raise money and develop its network at various times.

**ANSWER**:  LBRY denies the allegations in paragraph 17, except LBRY admits that it held 400 million LBC in reserve out of a total of 1 billion LBC that would become available over time.  The 400 million LBC held in reserve were allocated among an Operational Fund, a Community Fund, and an Institutional Fund.

18.     In particular, LBRY divided the 400 million LBC that it held into accounts that it called the "Operational Fund," the "Community Fund," and the "Institutional Fund." LBRY used the LBC from each fund slightly differently in hopes of achieving its goals of building the Network, increasing the value of LBC, and profiting from selling LBC that had increased in value. LBRY explained the following on its publicly-available website:

  a.  "The Community Fund is [200 million] LBC reserved for spreading usage and adoption of the LBRY protocol. The more people that use and love LBRY, the stronger the LBRY network is . . . . this fund will be used for . . . . [s]eeding consumers with initial credits … [r]ecruiting producers to use LBRY… [r]ewarding community contributors."

  b.  "The Institutional Fund is [100 million] LBC reserved for the formation of institutional partnerships, and for grants, donations, and other ways of strengthening relationships with organizations of need or like-mindedness."

  c.  The Operational Fund exists "[t]o allow LBRY, Inc. to function and profit . . . LBRY Inc. has reserved [100 million LBC] to fund continued development and

-17-

provide profit for the founders. Since credits only gain value as the use of the

protocol grows, the company has an incentive to continue developing this

opensource project."

Because LBRY held such a large amount of LBC, its fortunes were inextricably intertwined with

those of other investors holding LBC.

ANSWER:  LBRY admits that it allocated the 400 million LBC it held in reserve among

an Operational Fund, a Community Fund, and an Institutional Fund.  To the extent paragraph 18

purports to quote or characterize LBRY's website, the document speaks for itself, and LBRY

respectfully refers the Court to the full text of the document for an accurate and complete record

of its contents.  LBRY otherwise denies the remaining allegations in paragraph 18.

**B.      LBRY Offered and Sold Securities.**

19.      Beginning in 2016, LBRY offered LBC derived from the Community Fund in

exchange for contributions to the network, including to software testers and developers.

ANSWER:  LBRY denies the allegations in paragraph 19, except LBRY admits that it

has periodically provided LBC from the Community Fund as rewards.

20.      Similarly, at various times in 2017 through 2020, LBRY offered and sold LBC

derived from the Operational Fund and the Institutional Fund to investors.

ANSWER:  LBRY denies the allegations in paragraph 20, except LBRY admits it has

periodically sold LBC from the Operational Fund and the Institutional Fund.

21.      For example, in July 2017, LBRY was running low on cash to pay for its

development of the network, so in July and August 2017 it sold 1 million LBC directly to

secondary market purchasers through two online digital asset trading platforms. Later, in

November 2017, the price of LBC on the digital asset trading platforms climbed after dipping in

October 2017. To profit from rising prices, LBRY continued to sell LBC on and after November

-18-

8, 2017 directly to secondary market purchasers through those trading platforms. As the price for

LBC continued to climb throughout November and December 2017, LBRY sold 5 million LBC

to investors generating more than $1.6 million in proceeds.

**ANSWER**: LBRY denies the allegations in paragraph 21, except LBRY admits that in

July and August 2017, it sold 1 million LBC on the open market, and in November and

December 2017, it sold 5 million LBC on the open market in exchange for approximately $1.6

million.

22.     In addition, on various dates in 2018, LBRY sold another 5 million LBC, from its

Operational Fund directly to investors through one or more digital asset trading platforms.

LBRY generated more than $3.4 million from these sales of LBC.

**ANSWER**: LBRY denies the allegations in paragraph 22, except LBRY admits that in

2018, it sold 5 million LBC on the open market from its Operational Fund in exchange for

approximately $3.4 million

23.     Starting in 2017, LBRY also issued LBC to LBRY employees as compensation

incentives in exchange for their labor and later issued LBC through an employee purchase

program in exchange for money. Many LBRY employees personally held LBC as an investment

and expressed satisfaction when LBC increased in value. LBRY's social media spokesperson

publicly identified himself as an "investor" in LBC and expressed on a social media site to LBC

traders, "I want the price [of LBC] to be higher just as much as anyone else…."

**ANSWER**: LBRY admits that it has periodically provided LBC to LBRY employees.

LBRY lacks sufficient knowledge to either admit or deny the allegations in the second sentence

of paragraph 23 and therefore denies them.  To the extent paragraph 23 purports to quote or

characterize a social media post by someone affiliated with LBRY, the document speaks for

itself, and LBRY respectfully refers the Court to the full text of the document for an accurate and

complete record of its contents.  LBRY otherwise denies the allegations in paragraph 23.

24.     Starting in June 2016 and continuing through the present, LBRY has engaged in

one continuous (or in the alternative, an integrated) offering of securities in the form of LBC to

institutional and retail investors. LBRY offered and sold investment contracts and, thus,

securities, when it offered and sold LBC. An investment contract (a type of security) exists when

individuals or entities (a) invest money or otherwise exchange value (including dollars, bitcoin,

and other consideration such as labor in the form of services to LBRY); (b) in a common

enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and

managerial efforts of others.

**ANSWER**:  Paragraph 24 contains characterizations and legal conclusions to which no

response is required.  To the extent any response is necessary, LBRY denies the allegations.

25.     Here, and as described in more detail below: individuals and entities purchased

LBC in exchange for United States currency, bitcoin, or other consideration such as their

services; the money, bitcoin, and other consideration raised by LBRY was pooled and investors,

whose collective fortunes were inextricably intertwined, shared in the profits and risks of the

enterprise as the value of LBC collectively rose and fell; and they made these purchases with a

reasonable expectation of profit in that the value of LBC (and the anticipated return on

investment) was predicated on the development, growth, and success of the LBRY Network due

to LBRY's efforts. Indeed, LBRY led investors to believe that the value of LBC would increase

if LBRY's business developed and was a success.

**ANSWER**:  Paragraph 25 contains characterizations and legal conclusions to which no

response is required.  To the extent any response is necessary, LBRY denies the allegations,

except LBRY admits that individuals and entities have purchased LBC in exchange for fiat and other currencies.

### 1. Investment Contract First Prong: LBC Holders Invested Money.

26.    From around June 2016 through the present, LBRY offered and sold LBC to institutional investors and retail investors in exchange for U.S. dollars, bitcoins, and other consideration, such as services that would help LBRY to develop its business. Over two years, from around July 2017 to July 2019, LBRY transferred the proceeds of LBC sales to its bank account, which was held in United States dollars. These transfers totaled about $6.17 million, and represented almost all of the money available to LBRY.

**ANSWER**:  LBRY denies the allegations in paragraph 26, except LBRY admits that it has sold LBC in exchange for fiat and other currencies and that from July 2017 to July 2019, LBRY transferred proceeds of LBC sales to its bank account totaling approximately $6.17 million.

### 2. Investment Contract Second Prong: LBC Holders Invested in a Common Enterprise.

27.    LBC holders invested in a common enterprise. The fortunes of LBC holders' investments were inextricably intertwined because LBRY pooled the assets it received from investors in exchange for LBC, and deployed those assets collectively to fund its business operations. The success of the enterprise depended on LBRY's build out of the network and the value of LBC rose and fell for each LBC holder in the same manner.

**ANSWER**:  Paragraph 27 contains characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, LBRY denies the allegations.

28.    Similarly, the fortunes of LBC holders' investments were also aligned with LBRY's success or failure. If the LBRY Network succeeded, the LBC holders and LBRY would

value to LBRY once LBRY scaled up its network, that is LBRY expected that the

price of LBC would increase as LBRY built out the network.

**ANSWER**: To the extent paragraph 31 purports to quote or characterize LBRY

documents, the documents speak for themselves, and LBRY respectfully refers the Court to the

full text of the documents for an accurate and complete record of their contents. LBRY

otherwise denies the remaining allegations in paragraph 31.

**C.     LBRY Continues to Offer and Sell LBC.**

32.     During the first half of 2020, LBRY sought additional capital because it again was

low on cash to pay for the development of the LBRY Network. Despite a relatively low price for

LBC in the digital market trading platforms, LBRY sold 10,000,000 LBC to retail investors to

raise capital. The total approximate value at the time of issuance of the LBC was between

$87,700 and $525,000.

**ANSWER**: LBRY denies the allegations in paragraph 32, except LBRY admits that

during the first half of 2020, it sold 10 million LBC.

33.     In June 2020, LBRY publicly announced in a video posted to its website that it

would begin offering and selling LBC from its Operational Fund directly through its applications

using a third-party vendor. LBRY also announced that it did not want to drain its Operational

Fund too fast. LBRY stated that if it sold more than 500,000 LBC per month through its

applications it would purchase LBC "on the market." LBRY's market purchases of LBC would

effectively prop up the price of LBC for other sellers on the trading platforms. LBRY's

statements about its Operational Fund conveyed to investors assurances that it would act to avoid

negative pressure on the LBC price and so investors would reasonably believe that LBRY was

working to make the enterprise profitable as it continued to develop the network. LBRY did not

want to reduce its Operational Fund when it expected LBC prices to rise. In June, LBRY sold

435,000 LBC through the third-party vendor.

ANSWER: To the extent paragraph 33 purports to quote, summarize, or characterize a

video posted on the LBRY website, the video speaks for itself, and LBRY respectfully refers the

Court to the full video for an accurate and complete record of its contents. LBRY otherwise

denies the remaining allegations in paragraph 33.

34. On June 29, 2020, LBRY announced that it was going to take action to stabilize

short-term prices of LBC and insulate the price of LBC from market volatility. In its

announcement, LBRY explained that it believed price volatility of LBC was hindering publisher

and user adoption of LBRY's network, and thereby the growth of the network. To mitigate the

problem, LBRY enlisted a vendor (the "Agent") to use 40 million LBC from its Institutional

Fund to act as its agent and a market maker. A market maker is an individual or entity that

operates as a middle party to buy and sell securities on a regular and continuous basis at

prevailing market prices. LBRY represented to investors that the Agent would place orders to

buy and sell LBC on the trading platforms at all times, to provide liquidity to the market at near

current prices. This conduct further led investors reasonably to believe that LBRY would take

steps to make the enterprise profitable.

ANSWER: To the extent paragraph 34 purports to summarize or characterize an

announcement by LBRY, the document speaks for itself, and LBRY respectfully refers the Court

to the full document for an accurate and complete record of its contents. LBRY admits it loaned

40 million LBC from the Institutional Fund to an independent market-making firm. LBRY

otherwise denies the remaining allegations in paragraph 34.

4827-0874-6989, v. 1

social media site tried to determine which recent development announcement by LBRY caused the price to go up. At the same time, LBRY continues to offer securities in the form of LBC to investors without an effective registration statement, and therefore, without disclosing to investors all of the business and financial information required to be disclosed in a registration statement. Consequently, investors continue to trade LBC between each other on digital asset trading platforms without the benefit of the disclosure information that LBRY is required to provide.

**ANSWER**: LBRY lacks sufficient knowledge or information to either admit or deny the allegations in the first two sentences in paragraph 40 and therefore denies them. LBRY denies the remaining allegations in paragraph 40.

**D.      LBRY Did Not Register its Offer and Sale of Securities.**

41.      LBRY did not register its offer and sale of LBC pursuant to Section 5 of the Securities Act. LBRY failed to file a registration statement under the Securities Act with respect to its offering of LBC.

**ANSWER**: LBRY admits that it did not file a registration statement for LBC with the SEC because no registration statement was required, as LBC is not a security. LBRY otherwise denies the remaining allegations in paragraph 41.

42.      LBRY deprived purchasers of LBC of the audited financial statements, auditor's opinion letter, business description, risk disclosures, and other information that are required to be disclosed in an effective registration statement.

**ANSWER**: The allegations in paragraph 44 are legal conclusions to which no response is required. To the extent any response is necessary, LBRY denies the allegations.

4827-0874-6989, v. 1