**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 21-cv-00260-PB |
| v. | ) ) | |
| LBRY, INC., | ) ) | |
| Defendant. | ) ) | |

**COMMISSION'S OPPOSITION**
**TO LBRY'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS .......................................................................................... 1

   A.  LBRY Offered and Sold LBC Before They Existed .......................................... 1

   B.  The Initial Status of the LBRY Network .......................................................... 2

   C.  LBRY Continued to Tell Buyers to Expect Long-Term Returns ...................... 3

   D.  LBRY Continued to Tell Buyers That the Company's Future Operation Depended on
       Selling LBC ...................................................................................................... 5

   E.  Purchasers of LBC Bought For Investment Purposes........................................ 7

   F.  Actual Usage of LBC on the LBRY Network Did Not Drive LBC Purchases ................. 9

II.  LEGAL ARGUMENT.......................................................................................... 12

   A.  Neither an Offering's Label nor an Asset's Utility Determine Whether It Was Offered
       and Sold as an Investment Contract.................................................................. 13

   B.  LBRY's Statements and Actions Led Purchasers to Expect LBC to Appreciate in Value
       over the Long-term .......................................................................................... 17

   C.  LBRY's Real Estate Cases Do Not Fit with the Facts Here ............................. 20

   D.  LBRY's User Declarations Are Not Material.................................................... 21

   E.  LBC Buyers Expected LBC to Appreciate Due to LBRY's Managerial Efforts ............ 22

III. CONCLUSION.................................................................................................... 25

LBRY is not entitled to summary judgment because the undisputed facts show that LBRY offered and sold investments contracts under the *Howey* test.  LBRY rests its counter-argument on only half of *Howey*'s third prong:  whether the reasonable purchaser would expect to profit from the purchase of LBRY Credits (LBC).  LBRY effectively concedes the first two prongs of *Howey*, and confirms it created and developed the LBRY Network and told everyone it was doing so.  LBRY's argument, however, mischaracterizes and ignores critical facts and relevant case law.  The Court should deny LBRY's Motion.

## I.    STATEMENT OF FACTS

For summary judgment, the Commission does not dispute the facts – as opposed to the many opinions – set forth by LBRY in the "Relevant Factual Background" in its Memorandum in support of summary judgment ("D. Mem."), except for those assertions of fact contradicted by the facts below or set forth in its Statement of Undisputed Material Facts (ECF No. 55-2).  Any facts disputed here are immaterial to the Commission's Motion for Summary Judgment.

### A.  LBRY Offered and Sold LBC Before They Existed

Founded in 2015, LBRY, Inc. is a business that sought to profit from the sale of LBC. [PXs 2 at 9, 30 at 5, 35, 36, 40, 59 at 14, 121, 123 at 12.][1]  LBRY created LBC when it launched the LBRY blockchain protocol in June 2016, but it offered and sold interests in LBC before then. By September 2015, LBRY offered LBC to LBRY founder Michael Finger (a/k/a Michael Vine) through his company Centinel Consulting, LLC.  [PX84 at 28:8-29:20 & errata sheet; PX115 at 2.]  In September 2015, the parties agreed Centinel could convert its equity interests in LBRY to LBC at Centinel's discretion.  [PX115 at 2.]  By mid-November 2015, LBRY publicly

---

[1] The Commission's exhibits through Exhibit 126 were previously filed in support of the Commission's Motion for Summary Judgment and are located at ECF Nos. 61-1 through 65-35.  Exhibits above 126 are filed herewith.  To avoid confusion between the Commission's previously filed exhibits and those filed by LBRY, the Commission refers to its exhibits as "PX" and LBRY's exhibits as "DX."

announced its business model, which included retaining tens of millions of LBC (which did not yet exist) for itself and issuing 275 million LBC to "early adopters, content creators, Bitcoin holders, and causes." [PX127 at 7.] By mid-November 2015, LBRY publicly offered 1,000 LBC (again which did not yet exist) in exchange for testing LBRY's software code. [*Id.* at 9.] Through May 2016, LBRY continued publicly to offer and sell LBC in exchange for services before it launched the LBRY Network. [PX110 at 1.]

### B. The Initial Status of the LBRY Network

LBRY launched the LBRY Network in June 2016 when it launched the LBRY blockchain protocol. At the time, LBRY had not released its desktop application and the LBRY Network lacked any user application. [PX129, DX8.] On June 29, 2016, in its first blog post following its launch of the LBRY protocol and blockchain, LBRY publicly announced that it had kept 400 million LBC, including 100 million "for operational costs as well as profit." [PX129 at 2.] In its post, LBRY offered LBC in exchange for software testing and development. [*Id.* at 3.]

On July 4, 2016, LBRY announced the private release of its desktop application. [DX8.] LBRY's only user application was "invite-only" and not generally available to the public for download. [*Id.* at 2.] It did not provide tools for a user to publish to the LBRY Network and was not a stand-alone graphical application. [PX126 at 1-3, PX130 at 1-3.] LBRY's desktop user application did not become generally available for the public to download from LBRY's website until over a year later (after LBRY had already begun selling LBC on trading platforms). [PX7 at 153:16-154:1, PX8 at 176:8-23, PX147 at 184:25-195:21, PX126 at 2.]

In an interview published on July 5, 2016, LBRY's Mike Finger stated, "The value of LBRY credits will be tied to the success of our media marketplace." [PX41 at 3.] The next day in its own blog post LBRY announced that LBC had started trading on Bittrex and publicly touted that LBC's market cap was "roughly $200 million," higher or on par with other well-

known crypto assets.  [PX131 at 1.]  In its post, LBRY stated that one-third of all outstanding LBC were traded on the first day LBC was listed on Bittrex.  [*Id.*]

About a week later, in the web post entitled "$1.2B Market Cap and We Don't Care," LBRY publicly acknowledged that people were buying LBC on trading platforms for investment purposes, "Sure, some people are just seeing a [LBC] price chart moving straight up and deciding to join the ride."  [DX20 at 2.]  LBRY stated that it did not know if then-current trading prices were justified, but that:  the "long-term proposition of LBRY is tremendous;" the long-term value was dependent upon LBRY, Inc. building the LBRY Network; LBRY had reserved LBC for itself; and over the long-term, the interests of LBC holders and LBRY were aligned. [*Id.* at 2-3.]  LBRY also wrote that "our *focus* now and henceforth will be on the long-term value of the LBRY protocol."  [*Id.* at 3 (emphasis added).]  So at inception (and before publishing tools were available through its invite-only non-graphical application), LBRY was touting LBC's market capitalization and the long-term appreciation of LBC.

### C.  LBRY Continued to Tell Buyers to Expect Long-Term Returns

As the creators of the LBRY Network, LBRY built its business plan around its expectation that LBC would increase in value.  LBRY's 2016 business plan stated:

> Each percentage of [LBC] can be thought of as having a value proportional to the sum of all information transacted through the network.  Given this situation, the most reasonable path to profit is to reserve a portion of the cryptocurrency. Early adopters of LBRY and LBRY itself deserve more compensation to compensate for their commensurate risk.

[PX2 at LBRY_000062.]  LBRY wrote that it could liquidate its LBC "at a return of 10-10,000x on any investment."  [*Id.* at LBRY_000063.]  LBRY's CEO Jeremy Kauffman later testified that, "I believe that credits gain value as the use of the protocol grows."  [PX7 at 186:18-19.]  And, in general, LBRY believed the traders on the platforms were speculators and investors.  [PX7 at 195:2-195:7; PX16 at 115:24-119:11, 163:17-164:3; PX52 at 7-18, PX102.]

LBRY's public statements to LBC investors echoed its own belief that the growth of the LBRY Network would lead to LBC increasing in value.  For instance:

- In September 2016 LBRY website post, LBRY addressed "How does the company behind LBRY make money?":

  "LBRY has reserved 10% of all LBRY credits to fund continued development and provide profit for the founders.  Since Credits only gain value as the use of the protocol grows, the company has an incentive to continue to developing this open-source project … Our goal is to increase the long-term value of the protocol, which if adopted globally will make our reserve [of LBC] many times more valuable than any short-term bubble.  We've already invested 10,000 working hours into this project, and it will take many more, but we're patient and focused on the future."

  [PX30 at 5.]  Most of this t**h**is statement appeared on LBRY's Frequently Asked Questions website, from 2016 through March 10, 2022.  [PX35 at 1, PX36 at 3-4, PX106, Resp. No. 28.]

- From 2016 to March 2022, LBRY's Frequently Asked Questions website section stated:

  LBRY Credits have already experienced a bubble…Our goal is to increase the long-term value of the protocol, which if adopted globally, will make our reserve many times more valuable than any short-term bubble.  We're patient and focused on the future.

  [PX20 at 170:10-172:17, PXs35-36, PX106, Response No. 28.]

- In a November 2016 LBRY website post [PX43 at 3], CEO Jeremy Kauffman stated:

  LBC will go up when we've built a product that is compelling enough to change people's habits.  A product that causes people to use it instead of YouTube, Gumroad, Amazon, or Streamable … We'll be focusing all of our efforts entirely on creating a product that people will love and getting that product in front of the people that will love it.

- In a December 2017 Reddit post, LBRY's community manager wrote,  "LBRY is still in its infancy in terms of a platform and content – personally, I think there is lots of room for improvement and growth, which would lead to higher utilization of LBRY credits and hopefully a higher value due to the network effect."  [PX44 at 2.]

- In a January 2018 LBRY website post [PX38 at 3], Kauffman stated that:

  > "[a] token has value in proportion to the usage and success of the network … This is a revolution in the incentives around protocol creation. It means that the people who discover and utilize a new protocol of network when it's just getting off the ground can reap substantial value by being there first…."

- LBRY's social media spokesperson publicly identified himself as an "investor" in LBC and expressed to LBC traders on a social media site, "I want the price [of LBC] to be higher just as much as anyone else…." [PX119 at 4.]

- In an October 2020 website post titled "The LBRY Economy," LBRY stated:

  > But the economy has stagnated: Despite increased usage, the amount of LBRY Credits being used to support content has held flat. If the economy and token design are working, this number should be growing as fast or faster than usage … Tokens are highly liquid and there are some seductive, possibly too-good-to-be-true, alternatives out there. This can make it appealing to 'come back' to LBRY later. But while the LBRY economy is impacted by external factors and cycles, the ability to create a compelling token economy centered around digital content exchange is imminently achievable. The demand for user-owned and controlled alternative to YouTube and big tech could not be more clear. We just need to make some tweaks.

  [PX46 at 2-3.] LBRY stated it would partner with and align long-term incentives with blockchain promoters and influencers. [*Id.* at 6.]

### D. LBRY Continued to Tell Buyers That the Company's Future Operation Depended on Selling LBC

LBRY was the largest holder of LBC, and it planned to sell LBC on the "markets" to pay operational expenses. [PX1, Answer ¶11, PX2 at LBRY_000063.] LBRY publicly announced its need to and efforts to sell LBC to sustain its operations and the growth of the LBRY Network:

- In March 2016, LBRY posted "Why Doesn't LBRY Just Use Bitcoin?" on its website [PX39 at 2], stating:

  > In the early days of our protocol, LBRY Inc. will be making a concerted effort to deploy LBC in a non-neutral way. We will be incentivizing early

> adopters, amazing content publishers, and even nonprofits which share our vision of a free and open Internet.  We will be retaining a portion to finance the continued development of the ecosystem.  LBRY credits will work on behalf of the LBRY content distribution network, not the other way around.

- In a January 2018 blog post [PX38 at 3-4], LBRY stated:

> [The token] provides a source of funding for the development of the protocol.  The creators can use the token to pay for the salaries and equipment required to get it started … For the first time ever, it's economically feasible for companies to compete to create the best technology instead of capture and then abuse their users. That's why we're building LBRY, and it's why we're open source.

- In a LBRY blog post titled "What is LBRY doing with non-mined Credits?" LBRY explained that it had divided the pre-mine into three funds.  The "Operational Fund" held 100 million LBC, and LBRY publicly represented that it was to "allow LBRY, Inc. to function and profit…." LBRY also stated, "no one believes in the LBRY protocol more or has more incentive for its success, than LBRY, Inc.  We believe LBRY can be a world-altering technology and as such, our intentions are to minimize the expenditure of these credits [from the Operational Fund] until we've achieved that goal."  [PX40 at 1-2.]

- LBRY publicly posted quarterly reports stating it was selling LBC in the market to improve financial positioning and capitalization.  [PXs132 at 2, 133 at 2, 134 at 1, 4.]

- In its 2017 fourth-quarter report, LBRY explained to the public that it sold more LBC than it had planned because it "was deemed a strong time to improve the capitalization of the company."  [PX134 at 1.]  The price of LBC tripled that quarter.  [PX60 at 19-22.]

- In contrast, LBRY reported that it did not anticipate selling LBC on trading platforms during the second quarter of 2018 "due to both market conditions and our favorable cash position.  However, should market conditions or our needs change, we reserve the right to

move Credits to market as needed."  [PX135 at 2.]  The price of LBC had declined by

about 75% by the end of the first quarter of 2018.  [PX60 at 16-19.]

- In general, LBRY stated publicly that it would only sell LBC on trading platforms if

  market conditions were favorable.  [PXs 136 at 3, 137 at 3, 138 at 3.]

### E.  Purchasers of LBC Bought For Investment Purposes

Reflecting LBRY's public statements, LBC buyers publicly discussed on messaging

boards and social media their expectation that the price of LBC would appreciate and they would

profit from their investments.  [PX52 at 7, PX16 at 197:7-198:17, PX44, PX101, PX105.]

During June 2017, the price of LBC more than tripled.  [PX60 at 25-26.]  LBRY noticed

and began selling LBC on trading platforms in July 2017.  [PX8 at 194:25-195:21, PX57.]  LBC

buyers also noticed the rise in the price of LBC.  A buyer tweeted, "Oh look! Seems like $LBC

is back and doing interesting moves.  One of the few projects with 100% scalability for real

world."  [PX139.]  The buyer explained that she was "long in $LBC," $LBC was one of her

"biggest bags across all the exchanges," and there were "[r]easons enough to trust in a [sic] easy

5x from here without day trading headaches."  [*Id.*]  People responded to the tweets and agreed

in the long-term outlook for LBC, including one user who responded: "I really have no good

guess on where it could price top out at because it is such an obvious good use case and client.

$LBC."  [*Id.*]  Others tweeted that they saw profits in short-term trading: "it looks like this coin

is better to trade with not just hodl…" [*Id.*; *see also* PX160 (buyers discussing investing in LBC

because of LBRY Network's potential growth).][2]

---

[2] In the cryptocurrency market, the acronym "HODL" (literally "hold on for dear life") means to hold a digital asset
for long-term gains.  *Zakinov v. Ripple Labs, Inc.*, 2020 WL 5877864, at *11 (N.D. Cal. Oct. 2, 2020) (reporting
uncontested assertion of meaning of term); www.investopedia.com/terms/hodl.asp (last visited Jun. 3, 2021).

Those who acquired LBC from LBRY through its rewards programs also publicly shared that they thought of their LBC as an investment.  For example, in 2020, two participants of LBRY's YouTube sync program posted on Reddit their expectations and hopes that their "investment" in LBC would become profitable.  [PX140.]  One explained that the LBC he received from LBRY was essentially a "portfolio of this digital currency.  So, my Lbry account can be thought of as an investment account…"  [*Id.* at 1-2.]  He wrote that he realized that:

> these are early days and user base is increasing by a lot…I'm leaving my Lbry coins where they are and treating them like an investment.  I don't know what they'll be worth in the future but I'm ok to take the risk and see where this goes. If the growth of the platform and the currency are correlated, then we'll know pretty soon…So, I'm gonna hold.  Treat it like an investment account.

[*Id.* at 2.]

Similarly, in 2021, a "user" of the LBRY Network responded to a post on Reddit titled, "Well this is a very good start for the new year for LBRY – Someone out there knows LBC potential – this is going to get HUGE as we gain higher grounds with BTC ratio."  [PX141 at 1.] The post depicted a price chart for LBC showing a rapid increase.  [*Id.*] The LBC holder wrote that they really regretted "not buying some LBC while they were just 1-2 pennys.  Have made 1200+ LBC just using the platform for a few months at least.  Maybe [LBC] will hit a dollar or more again eventually."  The original poster responded, including with "ENJOY THE UPCOMING PROFITING!  A pattern is forming in LBC – THIS YEAR WILL BE BIG pricewise."  [*Id.*]  Another person posted that he acquired 750 LBC from LBRY through LBRY's rewards programs when he logged in to watch videos.  [*Id.* at 1-2.]  He wrote that there was not "much need for me to use the platform," but that he liked the LBC, wanted to receive more LBC from LBRY, and was "pretty happy with this Lbc spike."  [*Id.* at 2.]

The media and analysts also portrayed LBC as an investment similar to other crypto assets.  *See, e.g.*, PX116.  A July 2016 article noted:

> As [LBRY's] Vine points out, companies that might not charge for subscriptions, like Youtube, still make consumers pay with their time by making them watch ads.  LBRY has taken a different approach to making money:  It holds 10 percent of the credits to cover operational expenses and profits, essentially meaning it holds an equity stake in the protocol and only incentivizing the LBRY [sic] to increase the network's value for consumers.

[PX121 at 1.]

### F.  Actual Usage of LBC on the LBRY Network Did Not Drive LBC Purchases

The only time a user *must* use LBC is to reserve a name to publish content.  [PX142 at 3.]  According to LBRY CEO Kauffman, in 2019, the average cost to publish content to the LBRY Network was around 1/100 of an LBC.  [PX153 at 107:9-109:3.]  Until 2019, the cost to publish was stable, meaning from 2016 through 2019 a content creator could publish 100 videos to the LBRY Network for 1 LBC.  [*Id.*]  As of December 31, 2017, only about 150,000 pieces of content were available on the LBRY Network (at least tens of thousands of which were published by LBRY).  [PX126 at 3.]  Publishing that content would have required around 1,500 LBC.  In comparison, on December 31, 2017, traders bought and sold more than 5 million LBC on trading platforms.  [PX60 at 19.]  In December 2017, LBRY itself sold more than 4 million LBC on trading platforms.  [PX71.]

Assuming the cost to publish has remained steady since 2019, the total cost of publishing every piece of content currently on the LBRY Network (~18,970,000 publishes) has been less than 200,000 LBC.  [PX152.]  By comparison, LBRY sold more than 9.8 million LBC with MoonPay's assistance from May 2020 through November 2021.  [PX104 at 1.]  Using just a small amount of money, a purchaser could purchase enough LBC to publish tens of thousands of videos.  For example, on June 4, 2020, a buyer spent $50 to purchase about 1,415 LBC using the LBRY-MoonPay integrated application on the LBRY Network.  [DX29 at 1.]  Using 0.01 LBC as the cost to publish, the 1,415 LBC would be enough to publish about 141,500 videos.  [PX153

at 107:9-109:3.]  According to his affidavit submitted in support of LBRY's summary judgment

motion, David Jones is the 13th largest individual creator on the LBRY Network with about

1,400 videos.  [DX34 ¶5.]  If an LBC purchaser wanted to publish 1,400 videos on the LBRY

Network on June 4, 2020, they would have spent ~$0.50 to buy about 14 LBC.  At current

prices, the total cost to re-publish everything now on the LBRY Network would be less than

$3,000.  [PX146, PX152.]  David Jones and the thousands of other content creators that

authorized LBRY to copy their YouTube videos to the LBRY Network, however, did not need to

purchase LBC to publish.  LBRY pays the publishing costs for the copious content copied to the

LBRY Network by its YouTube sync program.  [PX6 at 185:4-20.]

LBRY also made all videos it published through its YouTube sync program free for users

to watch.  [PX6 at 218:14-17.]  In fact, LBRY users generally need not purchase LBC to watch

videos, because most of the LBRY Network content is free to watch.  [PX147 at 225:20-24.]

When LBRY introduced paid content to its web-based application LBRY.tv in May 2020, LBRY

did not intend paid content to replace or supplant free content.  [PX143 at 6.]  In fact, LBRY

expected and *recommended* to content creators that they keep publishing content free to users, in

part because of how many LBC LBRY was offering to content creators in exchange for

publishing videos.  [*Id.*, PX95 at 1-2.]

While it was technically possible for content creators using LBRY's applications to

require a user to pay LBC for watching content, from inception through the date the Commission

filed its complaint, users purchased content fewer than 5,350 times, or fewer than four

transactions per day on average.  [PX148 at 218:8-220:3, PX154]  The few transactions for paid

content did not cause the reasonable purchaser to buy LBC from LBRY on trading platforms or

elsewhere, especially when LBRY provided millions of LBC to "users" in exchange for watching free videos as part of their rewards programs.  [PX20 at 105:3-11, PXs 136-138.]

Tipping, the voluntary transfer of LBC from consumers to content creators, also did not drive LBC purchases because it was not always available or exclusively LBC-based on user applications.  For example, tipping only became available on LBRY's desktop application in September 2017.  [PX144 at 2.]  In 2021, users of LBRY's Odysee platform did not need LBC to tip, because LBRY added the capacity to tip a content creator with a credit card.  [PX157.] Lastly, any reported volume of tipping on the LBRY Network is inflated by LBRY's own sales to content creators through its rewards programs, as LBRY used the tipping function to transfer millions of LBC to content creators in exchange for publishing to the LBRY Network and other services.  [PX95, PX96, PX159.]

LBRY incorrectly states that it is undisputed, based on the opinion of its expert Dr. Richard, that the volume of "consumptive LBC transactions on the LBRY Network" ("on-chain") has surpassed transactions on digital exchanges ("off-chain").  To the contrary, Richard's calculations of "on-chain" transactions are flawed and unreliable, as he admits in his Amended Report.[3]  [*E.g.*, DX3 ¶20 (admitting his method counts the entire amount of LBC contained in a digital wallet address, instead of the actual amount of the transaction), ¶¶24-26 (introducing new methodology to "mitigate"—but not fix—the impact of the error); PX150 at 244:16-246:25.] Nor is there support for his contention that "on-chain" volume accurately measures users using LBC for tips, supports, and publishing content.  Richard's method counts as "on-chain" volume any time LBC moves from one wallet address to another, not just when it is "spent" on the

---

[3] The Commission will, in the next few days, move to strike Dr. Richard's Amended Report as untimely and not a supplement under Rule 26, and to preclude the use of Dr. Richard's opinions and original and amended reports as unreliable and not relevant under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Richard's findings and opinions are not undisputed.

LBRY network.  [PX150 at 193:15-197:13.]  LBRY purports to have records of LBC spending, but instead relies on Richard's unreliable proxy.  [PX6 at 220:24-224:5, PX20 at 147:25-148:3, PX148 at 220:24-222:5.]  LBRY cannot rely on this flawed analysis to support its motion.[4]

In sum, the undisputed facts show that LBRY offered and sold investments contracts under the *Howey* test, and particularly that the reasonable purchaser bought LBC with the expectation of profits from LBRY's efforts.  LBRY has failed to address or acknowledge the key facts above, and thus has not carried its summary judgment burden.

## II.    LEGAL ARGUMENT

LBRY's offering meets the third prong of the *Howey* test, that the investment come with a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *United Hous. Found. v. Forman*, 421 U.S. 837, 852 (1975).  "Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'"  *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)(quoting *SEC v. W. J. Howey Co*., 328 U.S. 293, 298-99 (1946)).  A purchaser may expect profits from "capital appreciation from the original investment"; here the increase in the value of LBC.  *SEC v. SG Ltd.*, 265 F.3d 42, 53 (1st Cir. 2001); *SEC v. Edwards*, 540 U.S. 389, 394 (2004)(profits include "the increased value of the investment").  The record is filled with LBRY's statements leading purchasers to believe LBC would appreciate over the long term.

Yet LBRY argues that purchasers bought LBC only to use it on the LBRY Network and not because they expected to profit from its rise in value.  To advance its erroneous argument,

---

[4] LBRY's brief also misrepresents the results of Richard's work.  LBRY states "a comparison of the on-network transaction volume versus the off-chain market trading volume for the period 2016 through 2021 shows that more people were using LBC on the LBRY Network than trading it on the off-chain secondary market." [D. Mem. at 23.] Richard's unreliable and revised flawed analysis only shows the on-chain volume exceeding off-chain volume in 2016 (before tokens became widely available on exchanges) and 2020.  In every other year, off-chain significantly exceeds on-chain volume.  In addition, Richard says nothing about the number of people using one over the other; and is analyzing only LBC volume, contrary to LBRY's erroneous representation.

LBRY (a) takes a formalistic position that does not look to the economic realities of its offering; (b) ignores its own statements to investors promising the rise of LBC prices; (c) relies on dissimilar case law and immaterial declarations; and (d) misconstrues a weak correlation between the price of LBC and the price of Bitcoin.

### A. Neither an Offering's Label nor an Asset's Utility Determine Whether It Was Offered and Sold as an Investment Contract

LBRY's main argument is that it could not have offered an investment contract because it did not issue a "whitepaper" and conduct an "ICO" or initial coin offering. *See* D. Mem. at 16-22. In support of its argument, LBRY cites several successful litigations against issuers of crypto assets and argues they all involved an ICO. *Id.* LBRY's argument is incorrectly premised on the notion that, once a blockchain has been launched and a crypto asset has minimal utility, buyers can no longer expect to earn profits from the seller's efforts.

LBRY also advocates for a formalistic approach to the definition of "security" that the Supreme Court has directed courts to reject. *Howey*, 328 U.S. at 299 (test "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."). Under the Securities Act, substance and not form governs, and the Court should eschew labels, like "ICO," and look to the economic realities of LBRY's offering. *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967); *Forman*, 415 U.S. at 848-49.

LBRY claims that because certain Section 5 cases against crypto asset companies use facts about an ICO or whitepaper to establish the third *Howey* prong, the *Howey* test can only be satisfied if the defendant conducted an ICO and issued a white paper. This flawed argument reduces to: *A* can be used to prove *B*, so without *A*, one can't prove *B*—a logical fallacy. Not surprisingly, in LBRY's cited cases, the courts did not find the existence of an ICO or the

13

issuance of whitepaper to be essential to a violation.  Instead, those courts focused on the

representations made by each defendant during its unregistered offerings to determine whether

those representations created the expectation of profits from the management efforts of others,

not on whether they appeared in a "whitepaper" or formal offering document.  In *Telegram*, the

court did not (as LBRY suggests) focus on the use of an ICO to issue the crypto asset.  *SEC v.*

*Telegram*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).  Rather, the *Telegram* court analyzed the

economic terms of the offer of the crypto asset including the size, concentration, and lockup

periods of the purchases—as the Commission has argued here in its Motion for Summary

Judgment (P. Mem. (ECF No. 55-1), at 18.)  The court stressed that it was analyzing the

"economic reality of Telegram's course of conduct" not ticking off a checklist of formal offering

structures or required marketing materials.  448 F. Supp. 3d at 367 (court emphasizing that it was

analyzing "the series of understandings, transactions, and undertakings").

In *SEC v. Kik Interactive, Inc.*, the court again focused on the representations made by

management about the future profitability of the crypto asset, and rejected Kik's argument that,

because it had "characterized Kin as a medium for consumptive use," there was no investment

contract.  492 F. Supp. 3d 169, 179-80 (S.D.N.Y. 2020) (analyzing Kik's "public statements"

and "public events" to determine whether an expectation of profits was created).

While LBRY may characterize the cited cases as "in the ICO context" (D. Mem. at 18),

the courts did not find that either an ICO or a whitepaper was required for a Section 5 violation.

*See SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 997-98 (N.D. Cal. 2021) ("courts have

frequently examined promotional materials associated with an instrument or transaction in

determining whether an investment contract is present"); *Solis v. Latium Network*, 18-cv-10255,

2018 WL 6445543, at * 3 (D.N.J. Dec. 10, 2018) (evaluating "Defendants' promotional

materials, advertising methods, and public statements" and not just ICO materials or the

whitepaper); *Diamond Fortress Tech., Inc. v. EverID, Inc.*, 2022 WL 1114528 (Del. Super. Ct.

Apr. 14, 2022) (considering "the economic reality of the parties' entire transaction").[5]  What

mattered in these cases was the economic reality of the transaction.  And here LBRY told

purchasers that even though LBRY did not conduct an ICO, they could still profit from the future

rise in the price of LBC, "LBRY did not run an ICO, but instead allocated credits for various

purposes.  The only way those credits are worth something in the future is if LBRY delivers on

their promises to create a revolutionary way to share and monetize content."  [PX42 at 2.]

Nor did the decisions hinge on whether the crypto asset had utility.  Under *Howey*, it is

"immaterial" whether there is a sale of property with or without intrinsic value or whether the

issuer depicts its enterprise as a serious commercial venture.  *SG Ltd.*, 265 F.3d at 48 (citing

*Howey*, 328 U.S. at 301 ("If that test be satisfied, it is immaterial whether the enterprise is

speculative or non-speculative….").  Indeed, *Howey* involved orange groves with obvious

underlying utility.  Likewise, video games have entertainment utility.  *SG Ltd.*, 265 F.3d at 53

(rejecting argument buyers paid money to acquire an entertainment commodity and not an

investment contract).  Casks of whiskey have utility.  *Glen-Arden Commodities, Inc. v.

Costantino*, 493 F.2d 1027 (2d Cir. 1974) (rejecting argument whiskey was a commodity and not

an investment contract).  South American rodents have utility.  *Miller v. Cent. Chinchilla Grp.,*

---

[5] LBRY cites *Fedance v. Harris*, 1 F.4th 1278 (11th Cir. 2021), a decision on whether equitable tolling applied to a
private unregistered securities claim.  While the 11th Circuit discusses the expectation of profits prong of the *Howey*
test, it does so to see *when* the facts for this prong were available to the plaintiff, not to require ICOs or whitepapers
in Section 5 cases involving crypto assets.  *Id.* at 1288-89.

LBRY also cites *Barron v. Helbiz, Inc.*, 20-cv-4703 (LLS), 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021), which was
vacated and remanded by the 2d Circuit in October 2021.  As much as the vacated decision cited has any persuasive
authority, the court there looked at representations in the ICO whitepaper, but also at the defendant's efforts to get
the token listed on cryptocurrency exchanges and its representations and actions after the ICO.  *Id.* at *2-4.

*Inc.*, 494 F.2d 414, 416-18 (8th Cir. 1974) (finding plaintiffs properly alleged offer and sale of chinchillas constituted investment contracts).

It is the economic realities of LBRY's offering that matters and not whether the underlying asset has utility. So by focusing in its brief only on its sales through trading platforms, LBRY tries to hide the unhelpful realities of many of its sales and avoid the truth that the purchasers did not buy LBC for consumptive purposes. For example, in 2015, LBRY offered and sold LBC both to Centinel Consulting LLC and the public long before LBRY launched the blockchain protocol in 2016. Centinel negotiated the right to convert its equity to LBC as a backstop to its equity investment, not to use LBC on the LBRY Network. [PX158 at 24:3-21.] Centinel did not have consumptive intent. Relatedly, in 2015 and early 2016 when LBRY offered and sold LBC in exchange for software testing, it was only offering interests in LBC because LBC and the LBRY Network did not yet exist. [PX129.]

The size and concentration of the LBC investment contracts LBRY sold to investment clubs, digital asset platforms, its market maker, and its venture capital investor—each of which LBRY is silent about in its brief—all demonstrate that those purchasers were not acquiring LBC with consumptive intent. *See* Pl. Memo. in Support of Summary Judgment ("P. Mem.") (ECF No. 55-1) at 10-12, 18-19. LBRY's sales of LBC to institutions and employees were in amounts far in excess of normal usage on the LBRY platform. LBRY sold 500,000 LBC to the trading platform CoinEx. CoinEx could have published 50 million videos with 500,000 LBC. [PX63, PX85.] It is unreasonable to think the company CoinEx bought 500,000 LBC to watch videos on the LBRY Network. The same is true for LBRY's sales to trading platform Shapeshift (100,000 LBC), investment company Flipside Crypto (1,103,229 LBC), and venture capitalist Pillar (2,000,000 LBC). [PX81, PX145, PXs 77-79.] LBRY's sold 1,103,229 LBC to FlipSide

Crypto's funds at a 5% discount from market prices, knowing the LBC would be put in "cold storage." [PX69 at 4; PX76 at 159:22-24; PXs 77-79.][6]  As discussed in the Commission's motion for summary judgment, the terms of these sales, including lock-up periods and discounts, also evidence the buyer's investment purpose. *See* P. Mem. at 18-19.

The same is true for small dollar purchases of LBC, like a LBRY employee's single biweekly purchase of $50 in LBC. [PX148 at 270:20-273:1.]  Fifty dollars in LBC would provide a purchaser with the LBRY employee sufficient LBC to publish thousands of videos on the LBRY Network.  And because most content on the LBRY Network is free to consume, LBRY employees (and most users of the LBRY Network) do not need to use LBC at all.  Yet, LBRY sold more than 1.4 million LBC through its employee purchase program. [PX20 at 67:5-68:18; PXs62-64, PX72, PXs 86-91.]  LBRY CEO Jeremy Kauffman and CFO Alex Grintsvayg have never used on the LBRY Network any of the LBC they purchased through the employee purchase program.  Instead, they are holding on to their LBC as an investment. [PX148 at 270:20-273:1, PX155 at 363:11-364:10.]

### B.  LBRY's Statements and Actions Led Purchasers to Expect LBC to Appreciate in Value over the Long-term

LBRY's motion categorically ignores the statements LBRY made promising that the value of LBC will increase.  It does not dispute them.  It does not try to explain them.  It does not even mention them.  The same is true for the numerous LBRY actions that would lead a reasonable buyer of LBC to expect the value of LBC to rise due to LBRY's effort.  Under *Howey*, these are the facts that establish the economic reality of LBRY's offering.  These

---

[6] In addition to the facts already listed in the motion, LBRY publicized that its sale of 100,000 LBC to Shapeshift included a 3-month lock-up period.  [PX145 at 1.]

undisputed facts establish that purchasers were led to believe that LBC would increase in value over the long term.

First, LBRY never explains why the reasonable purchaser would think differently than LBRY itself.  LBRY adopted its business model and held LBC from inception because it believed the increasing value of LBC would provide it with future profits and be worth "billions."  [PXs 47, 48, 49, 50, 51, 123.]  As Kauffman testified in June 2019, "I believe that if we achieve the long-term potential of this project, the credits would be more valuable than they've ever been worth."  [PX7 at 188:7-188:11.]  If LBRY's view was reasonable, then the reasonable purchaser would likewise expect to profit from the increasing value of LBC.

Second, in its motion, LBRY failed to address the permanent public notices on its website that LBC will "gain value as the use of the protocol grows…" and that LBRY's "goal" was to "increase the long-term value of the protocol," which would make LBC more valuable.  [PX35 at 1.]  These notices and LBRY's other numerous statements about the long-term value of LBC and the LBRY Network, *see supra* pp. 3-7, were at the core of LBRY's messaging and have remained on LBRY's website to the present.  LBRY' messaging was unambiguous, with statements like: a "token has value in proportion to the usage and success of the network…the people who discover and utilize a new protocol or network when it's just getting off the ground can reap substantial value by being there first."  [PX38 at 3.].  Similarly, at a time in 2020 when LBC traded at less than $0.03, LBRY touted that "1 LBC could be worth $100 or more if LBRY becomes protocol of choice for media distribution."  [PX156 at LBRY_SEC00035367.]

Like many publicly-traded companies, LBRY may have downplayed the possibility of *short-term* returns for investors buying its securities, but LBRY persistently trumpeted the likelihood of *long-term* returns for LBC holders, like itself.  LBRY's CEO acknowledged in a

blog post that he was asked "every single day" about the price of LBC by impatient LBC purchasers focused on the short-term. [PX43 at 1.] In response, he provided LBRY's "canonical answer" to which LBRY repeatedly pointed when dealing with LBC purchasers complaining about the price of LBC. [*Id.* at 2-4, PX149 at 127:13-130:2, 209:13-211:14.] He wrote that LBRY launched the LBRY Network as the "barest, minimum proof-of-concept possible" and that investors looking to make a "quick buck" may be disappointed. [PX43 at 2-4.] Instead, he promised that "LBC will go up when we've built a product that is compelling enough to change people's habits. A product that causes people to use it instead of YouTube, Gumroad, Amazon, or Streamable…" [*Id.*] Contrary to LBRY's argument, LBRY did not eliminate a purchaser's profit expectation by telling them that buying LBC is not a "get-quick-rich" scheme, because, in its next breath, LBRY told everyone to expect long-term returns. An expectation of long-term profit satisfies the *Howey* test's third-prong. *See Warfield*, 569 F.3d at 1022 (advertisement of "long-term income production potential" contributed to finding investment contract).

Third, in its brief, LBRY ignores the message sent by LBRY's reliance upon LBC to fund its operations and its efforts to preserve its LBC. LBRY publicly handled its LBC reserve like it expected the price to rise significantly. LBRY informed the public that it would sell its 100 million LBC Operational Fund for profit and to operate and develop the LBRY Network. [PX129 at 2.] Over time, LBRY publicly sold when "market conditions," i.e. the price, were good, stopped selling when conditions fell, and only sold when necessary. [PXs 132-38.] A reasonable purchaser would infer from LBRY's statements and selling patterns that LBRY was holding LBC until LBC rose in value as LBRY expected it would, and that LBRY had considerable incentive to cause the price of LBC to rise through its development efforts.

LBRY argues incorrectly that its numerous announcements promoting the development of a functional and user-friendly network eliminated the profit motivation of the reasonable purchaser.  Viewed against the backdrop of LBRY's promises that when it grew the LBRY Network, then LBC would become more valuable, LBRY's technical updates actually affirmed purchasers' expectations that they would sell LBC at a higher price in the future.  To a reasonable purchaser, LBRY appeared to be executing on its promise to grow the LBRY Network and increase the long-term value of LBC.

### C.  LBRY's Real Estate Cases Do Not Fit with the Facts Here

LBRY inaptly likens the present case to a string of real estate cases that do not provide guidance here.  In *Alunni v. Development Resources Group, LLC,* the court focused on the plaintiff's ability to control the profitability of the investment in condominium units to find that the *Howey* test was not satisfied—here buyers have no practical control over LBC's value.  445 F. App'x 288, 296-98 (11th Cir. 2011) (finding transaction was not more than a fee simple interest in land with management services).  In *Rice v. Branigar Org., Inc.*, the court found that people buy houses to live in and identified only one "passing reference" to buying a property as an investment.  922 F.2d 788, 790-91 (11th Cir. 1991).  Contrast LBRY's repeated statements about the value of the LBRY Network and intangible LBC, and LBC buyers questioning: "When will the price of LBC rise?"  [PX43 at 3-4.]  In *Scott v. Bluegreen Vacations Unlimited, Inc.*, because plaintiffs alleged that the underlying timeshare assets were non-transferable and would not increase in value, they could not establish any expectation of profits.  2020 WL 3296190, at *6 (E.D. Cal. June 18, 2020).  But the present case is not one in which the seller restricted the ability to profit from the asset—quite the opposite.  LBRY claimed LBC would increase in value.  It helped create a secondary market by getting LBC listed on trading platforms.  And it

placed no restrictions on the transferability of LBC it sold.  LBRY's cases do not undercut the Commission's case that LBRY created an expectation of profits from its statements and efforts.

### D.  LBRY's User Declarations Are Not Material

LBRY also relies on declarations of "users," solicited via the internet and unverified.  It holds up these fill-in-the-blank form declarations to suggest that users were motivated only by consumptive intent, implicitly and incorrectly suggesting that a buyer can not possess more than one motivation for purchasing LBC.  *See SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019) (finding the requisite expectation of profit even when this investment intent was secondary to a motive unrelated to profit); *Telegram Grp.*, 448 F. Supp. 3d at 371.  Missing from the declarations are any statements that the purchasers did not expect to profit when acquiring LBC. So these declaration do not provide material facts or help the Court apply the *Howey* test.

Indeed, several of LBRY's declarants were large traders on Bittrex.  [PX151.]  Five declarants each traded more than 12,000 LBC on Bittrex; and two of those each traded more than 475,000 LBC.  [*Id.*]  As referenced above, these amounts are inconsistent with LBC usage on the LBRY Network because videos were mostly free to watch and publishing averaged 0.01 LBC per video.  [PX153 at 107:9-109:3.]  The declarants trading patterns also differ from small simple acquisitions to buy LBC to use on the LBRY Network.  Therefore, whether a declarant acquired LBC to use on the LBRY Network does not resolve whether the same declarant expected to profit from the rise in price of LBC.

Similarly, using the LBRY Network is not mutually exclusive with buying LBC for investment purposes.  For example, David Jones wrote in his declaration that he participated in LBRY's YouTube sync program, had been the 5th largest individual creator on the LBRY Network, and received LBC rewards from LBRY and LBC tips from others.  *See* DX34, ¶¶4-5,

7.  He wrote that in June 2021 he restarted buying LBC because he believed in the "benefit of the LBRY Network."  *Id.* ¶13.  In his declaration, Jones could not swear he did not purchase LBC for investment because he was.  In March 2021 on his blog, Jones told another LBC investor that he had invested in LBC:

> I did actually sell [LBC] at 17c and bank the cash a couple of months back, basically got my original investment back, so I'm essentially free running the rest now.  But I have enough to retire on if it hits $1.5 again…So its either take profits on the way up as needed, or just HODL.  My plan at this stage is to take some profits as needed or if any big boosts happen.

[PX128 at 2.]  In his blog, Jones ascribed an increase in the price of LBC to LBRY's launch of Odysee, its web-based application.  [*Id.*]  Therefore, even though Jones was one of the LBRY Network's largest creators, he was simultaneously buying LBC on trading platforms for investment purposes, attributing the increase in value of his investment to LBRY's managerial efforts, and promoting LBC as an investment vehicle to others, including in a video he created called "LBC Library Credits – My Top Cryptocurrency Pick for 2020."  [*Id.*]

### E.  LBC Buyers Expected LBC to Appreciate Due to LBRY's Managerial Efforts

 As a last ditch effort, LBRY claims that "the price of LBC is based on general cryptocurrency market forces unrelated to the ongoing managerial efforts of LBRY."  From this it argues that reasonable purchasers could not expect their profits to come from LBRY's efforts.  D. Mem. at 23-24.  On top of LBRY's ignoring of its five-year pattern of telling LBC purchasers that its efforts were the very thing that *would* increase the long-term value of LBC (as explored above), LBRY's argument suffers from significant factual and logical flaws.

First, the *Howey* test asks whether the objective buyer reasonably expected profits resulting from the efforts of others.  Purchasers formed their reasonable expectations from LBRY's design of the LBRY Network and repeated public statements that it would be the engine

that caused a rise in the price of LBC.  *See, e.g.*, DX16 at 2 ("It will be up to us to make the strategic decisions that see user adoption grow exponentially and make the network a viable competitor to centralized services like Netflix or iTunes."); PX 34 ("[w]e hope to keep improving the app, protocol and continue our content acquisition process.  Our goal is to create value for the LBC token and we hope our current path does so organically.").  Indeed, LBRY tried to differentiate itself from Bitcoin.  *See, e.g.,* DX18 at 4 ("So we're not trying to compete with Bitcoin as a form of money.  The value of LBRY credits will be tied to the success of our media marketplace.").

Second, the only "fact" that LBRY relies on for its argument comes from its expert Dr. Richard's report.  At the threshold, this "fact" about the supposed connection between the price of LBC and the price of Bitcoin is really a weak opinion unsupported by the record.  The Commission questioned Richard at length about this point.  Richard conceded that, for various points in time, his model showed that the change in the price of Bitcoin "did explain very little of the LBC price token performances" [PX150 at 308:11-17], explaining as little as 1-2% of the change in LBC price.  [*Id.* at 307:19-308:10.]  He also admitted that, under his model, if the change in Bitcoin price explained 2% of the change in LBC price on a particular day, something else explained the other 98%.  [*Id.* at 308:18-24.]  And Richard agreed that during certain periods, when Bitcoin increased in price, his model predicted that LBC price would decrease, while at other times, the prices would move in the same direction.  [*Id.* at 332:17-25.]  Richard also found that the correlation between Bitcoin and LBC varied widely, between 0.6 and 1.61, meaning sometimes LBC went up 1.61 times more than Bitcoin went up, and sometimes only 0.6 times as much.  [DX2 at 55-56.]  Given Richard's testimony, LBRY's contention that the price

of LBC is "based on general cryptocurrency market forces" (and apparently only on those forces) mischaracterizes both what Richard says in his report and his answers to questioning about it.

Third, Richard shows only a correlation (and a weak one at that for many periods he studies) between Bitcoin prices and LBC prices. But LBRY falls for the fallacy: assuming that correlation means causation. LBC prices may move along with other cryptocurrency prices, just as the price of a pharmaceutical company stock correlates with the prices of other pharmaceutical companies. In fact, that's why companies are often compared to the performance of a basket of stocks in their sector to see if they have over or underperformed that part of the market. But no one thinks that the price of Pfizer is controlled by the price of Moderna because those prices often move in the same direction. The "market forces" that LBRY points to (D. Mem. at 23) are called that because they affect the market broadly; their presence doesn't preclude a finding that something is offered as an investment contract.

And fourth, this part of LBRY's argument assumes the conclusion: that LBC is a commodity. LBRY launches into this premise at the start of this argument with the phrase "where the price of a commodity fluctuates due to general market forces…." D. Mem. at 23. LBRY then talks about commodities cases involving gold coins and silver bars. The courts in those cases found that any expectation of profits came from anticipated increases in the global market prices for gold or silver. *SEC v. Belmont Reid*, 794 F.2d 1388, 1391 (9th Cir. 1986); *Noa v. Key Futures*, 638 F.2d 77, 79-80 (9th Cir. 1980). Unlike this case, neither of those courts found that the sellers made statements about their abilities to effect the global price of gold or silver. *Belmont Reid*, 794 F.2d at 1391; *Noa*, 638 F.2d at 79-80. In fact, the Ninth Circuit has limited *Belmont* in ways LBRY fails to mention. *See SEC v. R.G. Reynolds Enterprises, Inc*., 952 F.2d 1125, 1135 (9th Cir. 1991) (finding in *Reynolds* that there was no evidence that

24

investors were depending on the increase in the price of gold and that "our decision

in *Belmont* was based on the unique fact that … that investors had as their primary purpose to

profit from the anticipated increase in the world price of gold").  And in *Noa*, the court rejected

the claim that the defendants had breached an investment contract by failing to deliver the silver

bars after they became insolvent because there was national market for silver bars.  *Noa*, 638

F.2d at 79-80.  None of those facts apply here, and the application of this argument (and its

reliance on *Noa*) to crypto assets was rejected in *Balestra v. ABTCOIN LLC*, 380 F. Supp. 3d

340, 356-57 (S.D.N.Y. 2019) ("the opposite is true here … which clearly distinguishes the

[crypto] coins from the precious metals to which Defendants attempt to analogize them").

In the end, LBRY makes an underdeveloped policy argument that digital assets like LBC

should be considered commodities.  LBRY gives this Court no reason, and points to no authority,

to override the *Howey* test, and the argument gives no reason to grant summary judgment.

## III.    CONCLUSION

LBRY's motion ignores the most relevant facts, misapplies the remaining facts to the

case law, and suffers from several logical flaws.  As a result, the Commission asks the Court to

deny LBRY's Motion for Summary Judgment.


Dated:  June 3, 2022                                     Respectfully submitted,

                                                         **SECURITIES AND EXCHANGE
                                                         COMMISSION**

                                                         By its Attorneys,

                                                         */s/ Peter B. Moores*
                                                         Peter B. Moores (Mass Bar No. 658033)
                                                         Marc Jones (Mass Bar No. 645910)
                                                         Boston Regional Office
                                                         33 Arch Street
                                                         Boston, MA  02110
                                                         (617) 573-4576
                                                         mooresp@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 3, 2022, I caused true and correct copies of the foregoing to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

*/s/ Peter B. Moores*
Peter B. Moores

26