**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-cv-00260-PB |
| LBRY, INC., Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO STRIKE**
**OR PRECLUDE USE OF AMENDED REPORT OF LBRY'S EXPERT**

The Commission moves to strike or preclude LBRY's use of the Amended Report of its expert, Dr. Boris Richard. LBRY served the Amended Report ("A.R.," attached as Ex. A) to the Commission a full month after the deadline for the supplementation of reports agreed to by the parties (and the close of discovery), and three business days before summary judgment briefs were due. Even if LBRY had served the Amended Report before the supplementation deadline, it does not qualify as a "supplement." The Amended Report is a new analysis with new methods and new data, all of which was available months before LBRY served Richard's original report ("O.R.," attached as Ex. B). LBRY is not trying to supplement Richard's original report, it is trying to correct the defects in Richard's report exposed in his deposition. Richard, in candor, admits this. *See* A.R. ¶1 ("The purpose of this report is to amend certain qualitative analyses … in light of certain questions asked during my deposition…."). Finally, the Amended Report does not make the disclosures required by Fed. R. Civ. P. 26(a)(2)(B). For all of these reasons, under Fed. R. Civ. P. 26(a)(2)(B) and 37(c)(1), the Amended Report should be struck or LBRY should be precluded from using it in support of its summary judgment motion, in opposition to the Commission's summary judgment motion, or at trial.

# I. FACTS RELATED TO THE AMENDED REPORT

## A. Timing of Reports; the Amended Report Is Not Timely

Under the Court's original scheduling order, expert reports were due February 4, 2022. That day, LBRY served Richard's original report. It had two main opinions: (1) LBC were primarily used for digital content uses because transactions involving LBRY Credits ("LBC") recorded on the blockchain ("on-chain transactions") were more numerous in certain years than transactions on crypto exchanges that are not recorded on the block chain (off-chain transactions); and (2) LBC price was not driven by LBRY's announcements, based on an event study. O.R. ¶¶14-15. As part of Richard's analysis, he tried to remove on-chain transactions conducted by LBRY so that the remaining on-chain transactions reflected, in his view, usage of LBC by users on the LBRY Network. Richard's report did not detail his methodology for identifying or deleting LBRY's on-chain transactions.

On March 21, 2022, LBRY's CEO Kauffman testified that LBRY controlled, held, and transferred LBC from "thousands" of LBC digital wallet addresses. He testified that often when LBRY transferred an amount of LBC from one LBRY address to another (including its own addresses) the software facilitating the transaction would create a new address to route the remainder or "change" instead or routing the change back to the original address. *See* Kauffman Depo. 144:10-145:23 (attached as Ex. C). Over time, this exponentially increased the number of digital wallet addresses in which LBRY held LBC.

Kauffman's testimony about LBRY's wallet addresses substantially deviated from LBRY's interrogatory answers. Four months earlier (Nov. 19, 2021), LBRY had answered the Commission's first set of interrogatories. In Interrogatory No. 6, the Commission asked LBRY to "identify any LBRY address corresponding with any virtual location that LBRY has used to hold or store LBRY's Pre-mine." LBRY's Pre-mine is the 400 million LBC LBRY created for

itself for the development of the LBRY Network and for its profit. In response to Interrogatory No. 6, LBRY identified only *six* wallet addresses.

On March 30, 2022, the Commission deposed Richard and asked him to explain his method to identify LBRY's wallet addresses and remove those LBC transactions from his analysis (as his report did not disclose his methodology). Richard testified that LBRY provided him with *twelve* wallet addresses and that his team identified *six* others. Richard testified that his team deleted LBC transactions from those *eighteen* addresses when determining the on-chain volume. When confronted with Kauffman's testimony, Richard stated that he was unaware that, in fact, LBRY used "thousands" of wallet addresses. *See* Richard Tr. at 254:15-255:5 (Ex. D).

Shortly after Richard's deposition, on April 5, 2022, LBRY served an amended response to Interrogatory No. 6. It lists around 2,460 wallet addresses that LBRY used.

On Friday, April 29—about one month after Richard's deposition—LBRY served Richard's amended report at 6 pm. Its arrival was a surprise: first because LBRY had given no notice it was preparing an amended report, and second because it was weeks beyond the parties' agreed-to supplementation date and three business days before summary judgment briefs were due. The Rule 26(e) supplementation date was April 3, 2022 (though the parties agreed to extend to April 5 to avoid a weekend deadline). *See* ECF No. 52 (endorsed by the Court on Mar. 15). The supplementation date was important, as each party expected to move for summary judgment and realized that the expert report could be an important point in those motions[1] and a complete discovery record was necessary.[2]

---

[1] As it is in LBRY's summary judgment memorandum, which cites several times either to the original or amended reports for key points in LBRY's argument.

[2] Throughout this case, the supplementation date has always been about one month before the summary judgment filing date. *See* ECF No. 34 (Sept. 7, 2021)(setting previous deadline for 26(e) supplements on March 4, and Motions for Summary Judgment on April 4, 2022).

**B. The Amended Report Incorporates New Data, Analysis, and Methods**

The "Amended Report" is not really amended at all. It is a second report. It contains new analysis, methods, data, and opinions not in the original. And Richard declares that its "purpose" is to "amend certain quantitative analyses … in light of certain questions asked during my deposition, and new information and data of which I was unaware and did not have access." A.R. ¶1. Richard also states that the report, "make[s] certain corrections to some quantitative results and related exhibits." A.R. ¶1.

**1. LBRY Possessed the "New" Data When It Served Richard's Original Report**

Richard says he uses "new information and data." But that information is not new; LBRY had it in its possession all along, and could have made it available to Richard for his original report. LBRY just failed to provide it to him. Richard states, "subsequent to the submission of my original report, I was provided with an additional 2,508 cryptocurrency addresses affiliated with LBRY. These addresses were not initially provided to me because LBRY lacked the necessary resources and personnel to complete the complicated and time-consuming task of tracking each address by the submission date of my original report." A.R. ¶18. In other words, it is not that LBRY did not have the information at the time of the original report (when they provided just 12 addresses to Richard)[3], they just did not collect or provide it. LBRY did not tell the SEC, or Richard apparently, that there were 2,500 more addresses from which LBRY transferred its LBC. Instead, LBRY left it to the Commission to discover that information during the deposition of its CEO.[4] Now LBRY seeks to cover up those omissions

[3] The number of addresses LBRY provided to Richard *still* differs from the number in LBRY's amended interrogatory answers.

[4] CEO Kauffman, whose testimony led to the Commission discovering this information, also verified LBRY's response to Interrogatory No. 6 that included the erroneous information.

with Richard's new report.  LBRY had months to prepare for expert reports and could have assembled the information in time.[5]  It just failed to do so.

Richard's representation about LBRY lacking the resources to complete the data task in time for the original report also appears to be false.  The list of wallet addresses used by LBRY was requested by the Commission in an interrogatory and due on November 19, 2021—three months before the Original Report was served.  When it became clear through the March 21st Kauffman testimony that the interrogatory answer was drastically incomplete (disclosing six wallet addresses instead of more than 2,500), LBRY managed to amend its answer in two weeks (April 5).  If LBRY was trying to get all of its wallet addresses to Richard for his original report, but lacked the time to do so, LBRY should have sought an extension from the Court in January 2022 and disclosed that its interrogatory response was incomplete.  If, after Kauffman's testimony, LBRY was still trying to identify for Richard all of its digital wallet addresses, LBRY should have notified the Commission and perhaps then sought relief from this Court.  Instead, LBRY kept silent and waited to see if the Commission would figure it out.  The explanation in the Amended Report—no doubt provided to Richard by LBRY—appears to be pretext.  LBRY just failed to disclose the real information to Richard.  And Richard had such a limited understanding of LBRY's activity on the blockchain and how to analyze it, that he did not realize LBRY's massive under-disclosure.

---

[5] When the Commission requested an extension of the case schedule (based on LBRY's failure to produce certain documents, including expert-related documents), LBRY's counsel suggested that it was *the Commission* trying to make a ploy for more expert time.  "THE COURT: …you've left me with the impression that what you think is going on here is that the SEC was caught flatfooted by your expert disclosure, and what it's really trying to do here is bargain for more time to find a last-minute expert and make a report.  Am I reading too much into your remarks?  Mr. Miller:  I think that's correct, your Honor."  Hearing Tr. (Feb. 23, 2022) 41:23-42:3.  If LBRY "lacked the necessary resources and personnel to complete the complicated and time-consuming task" of properly providing key data to their expert, as Richard writes in its report, certainly that was the time to say it.

**2. New Methods, Analysis, and Opinions in Event Study**

Richard's Amended Report does not correct minor errors such as wrongly entered data or mismeasurement; it substantively changes the analyses he performed. In Richard's event study analysis, where he had previously included in his calculations the day before and the day after each event studied in his regression, he now excludes those days. He states, "since the return event window for a historical analysis date is computed over three days, the calendar dates preceding and following a historical announcement date should also have been removed from the sample." A.R. ¶7. This change to methodology was not a minor one discovered later by Richard, it was the subject of extensive questioning at Richard's deposition and led him to conclude that his analysis could be faulty. *See* Richard Tr. at 313:4-13 (days before and after should be removed from analysis); 315:22-316:11 (if analysis did not remove days, analysis may be miscalculated depending on the data); 318:12-18 (Richard: "it's unclear whether there – many of the – many of the statistical significance results that I received may have and will likely remain intact. Without testing, I cannot say one way or the other.").

In the new report, Richard changes his analysis to exclude the days he admitted at deposition should have been excluded. A.R. ¶8. He admits he did this because of the faulty analysis in his original report being exposed at deposition. *See id.* ("To correct for the potential bias in estimated regression coefficients due to such inclusion – *an issue that was raised at my deposition* – in my amended analysis, I also remove…" the two additional days.).

At deposition, Richard then speculated that his error might not be significant if he had done a 180-day analysis. *See* Richard Tr. at 319:3-12 (including extra 2 days less likely to affect analysis if you look at longer period). So now he adds one. In his original report, he had done only a 30- and 90-day analysis. That lack of a 180-day analysis had been a topic at his deposition. *See* Richard Tr. at 298:12-299:1. Now, Richard's Amended Report includes a new

regression analysis with a 180-day estimation period. A.R. ¶12. Richard admits that he added this new analysis to his report because it "was another issue raised at my deposition." *Id.*

The Amended Report also includes new observations presumably based on the new data. For instance, Richard attempts narrative explanations of anomalous results in his data based on a new analysis of new documents (which were available at the time of the original report). *See* A.R. ¶¶13-14 (citing new documents and making conclusions about data anomalies not discussed or explained in original report). Nor are these explanations based on any disclosed expert methodology or analysis; they appear to be speculative.

**3. New Methods, Analysis, and Opinions in Transaction Volume Study**

The second part of Richard's amended analysis involves his use of "on-chain" transaction volume supposedly to measure use of LBC as a "native currency." A.R., §III. Richard's original analysis was subject to considerable questioning during deposition, which exposed at least two major problems with his analysis. Now, Richard seeks to fix both those problems retroactively (but, unlike above, Richard does not admit that the new analysis resulted from this questioning).

Problem 1: Richard disclosed at deposition that he had used 12 digital wallet addresses provided to him by LBRY (and 6 more that were not disclosed to him by LBRY that he and his team discovered) to try to deduct LBRY's own LBC-related activity from his analysis. *See* Richard Tr. 147:2-24. Richard's original report failed to disclose anything about his methodology or the documents he relied on to do so. In fact, it was silent about digital wallets. *See* O.R. ¶68, n.76 (claiming that transaction are removed using LBRY's credit reports (not a list of LBRY wallet addresses); Richard Tr. 153:23-155:11 (discussing failure to disclose documents or methodology), 155:12-157:9 (admitting expert work cannot be recreated without those disclosures). When confronted with testimony by LBRY's CEO that LBRY potentially had more than a thousand digital wallets from which LBC were transacted (compared to the 18

Richard knew about), he admitted that he did not have that information but was unconcerned about it. *See* Richard Tr. at 254:15-255:5. The Amended Report, however, admits that "LBRY wallets have the largest LBC balances, and they are therefore also more likely to inflate true on-chain economic activity…." A.R. ¶23. Now, as discussed above, Richard does a new analysis by deducting the 2,508 wallet addresses described above.

Problem 2: During Richard's deposition it became obvious that his method for analyzing "on-chain transactions"—the center point of his analysis of use of the token as a "native currency"—had a significant flaw because it significantly overrepresented "usage" on the LBRY Network. When Richard measured on-chain transaction volume, he was including the total amount of the digital wallet address in the transaction, instead of the amount of the transaction itself. In real world terms, if someone had $100 in their wallet and bought a $5 ice cream cone, Richard counted that transaction as $100, not $5. Richard admits this error in paragraph 20 of his Amended Report ("Although the net amount of this transaction is 20 LBC … the amount of the transaction would be recorded on the blockchain as 100 LBC."). But the error was originally exposed during his testimony. Richard Tr. 244:16-246:25 ("Q: … you need your on-chain transaction volume to record the amount of transaction not the total amount of the wallet, correct? … A: I definitely — not the amount — not — not the balance of the wallet").

Richard's Amended Report does not fix this problem. But he changes his analysis in significant ways to argue that the problem is "ultimately mitigated" (though the extent of the mitigation is unclear). A.R. ¶22. First, he argues that there are "optimization algorithms" that "mitigate" the "potential inflation bias" that are part of the "Unspent Transaction Output" ("UTXO") algorithm. A.R. ¶¶19, 22. This argument appears to be new, because, Richard did not mention UTXO or algorithmic optimization when questioned at deposition. Richard Tr.

228:14-229:8 (blockchain doesn't know who controls what wallet addresses, so transactions recorded at full amount of wallet address).

Second, Richard tries a new methodology: deducting "transactions associated with the known wallets for entities that received LBC tokens from LBRY-affiliated addresses related to its Operational and Institutional funds and which were LBRY's partners for purposes of trading and liquidity provision … or community and strategic development, such as the LBRY Foundation and Anti-Media." A.R. ¶24. There are several problems with this. First, it is entirely new. Second, there is no discussion of whether Richard deducted the LBRY-affiliated transactions related to the Community Fund, the third of LBRY's funds holding its pre-mine of 400 million LBC. Richard leaves us to guess whether they were fully deducted in his last report, deducted here but without mentioning that fact, or not deducted at all. Third, there is no explanation why Richard's new analysis might solve any problems associated with on-chain transaction volumes being recorded as the entire amount of the wallet address used to make the payment. And fourth, Richard provides no sources for the data used in this new analysis or for the new spreadsheet provided by LBRY counsel.[6]

Richard then changes his methodology *again*, now choosing certain dates on which he simply removes some of the large transactions from his analysis. A.R., ¶26. This too is entirely new, with a new unsourced spreadsheet but no explanation of how this fixes the problem.

This stab in the dark transforms Richard's results. For instance, in 2021, Richard originally calculated the "on-chain transaction volume" to be 27.4 billion LBC. Under his new approach, he gets 10.9 billion, a 60% decrease. The 2021 on-chain to off-chain volume ratio on

[6] Richard's footnote suggests that he deducted transactions from seven addresses. A.R. n.8. But it strains credulity to think deducting seven addresses fixes an analysis flawed by the fact that, for each transaction he is measuring, the entire wallet address amount is recorded as "on-chain transaction volume" when the transaction may only be a small fraction of that amount. The "cure" doesn't relate to the sickness.

which Richard bases his opinion about the consumptive use of LBC swings from 1.71 in the original report to 0.68 under the new method. In other words, Richard originally said that, in 2021, 1.7 LBC were transacted on the LBRY blockchain for every 1 LBC transacted on a digital exchange). His new methodology says that 0.68 LBC were transacted on the LBC blockchain for every 1 LBC transacted on an exchange. And yet Richard declares that his opinion about the use of LBC is unchanged under this new method. A.R. ¶2 & Ex. 8B; O.R. Ex. 8.

### C. The Amended Report Does Not Comply with Rule 26(a)(2)

Richard's Amended Report also violates Rule 26's disclosure requirements. First, it contains no "Documents Relied On" list or other way of determining on what he has relied. He states that he is analyzing "new information and data" (A.R. ¶1) but doesn't source that information or data anywhere. He states that he is working from a new list of LBRY digital asset wallet addresses, but does not provide that list or give a source for it either.[7]

Nor are the documents relied on for the Amended Report obvious from its text. For instance, A.R. ¶14 states, "My review of publicly available information shows that the early release of the Odysee application did not get a positive receptions from a large portion of LBRY users…." Richard's footnote to this paragraph lists user comments on three webpages as "for example[s]." The Commission is left to guess if this is all of what Richard relied on (opening him up to cross-examination on the dearth of sources for this generalization) or if there are many more to be revealed when the Commission asks about this at trial. Also, the "public" nature of that information does not obviate LBRY's need to disclose them. "Rule 26(a)(2)(B)(iii) does not exempt publicly available documents from those that an expert is required to include in an expert

[7] The Commission could assume that it is the list of wallet addresses that LBRY put in its amended interrogatory responses. But, given LBRY's history of disclosures described above that may not be a safe assumption. Plus, the Commission count of the number of addresses in LBRY's revised interrogatory answer deviates significantly from the number that Richard says he received for his new analysis.

report." *Torres v. Johnson & Johnson*, No. 3:18-CV-10566-MGM, 2021 WL 2209870, at *2 (D. Mass. Jun. 1, 2021)(rejecting contention that availability on the web obviates necessity to produce documents relied on by an expert).

Similarly, A.R. ¶24 describes the removal of "transactions associated with the known wallets for entities that received LBC tokens from LBRY-affiliated addresses…." Richard provides no list and no data source for the removed transactions, the wallets associated with those transactions, or the LBRY-affiliated wallets referenced. The excel file provided by LBRY counsel on this topic (but not referenced in the Amended Report) does not have any disclosures on this point. The Commission has no way of knowing the source of the data or the method used to remove those transactions. In other words, LBRY has failed to provide the Commission with the information required by Rule 26 to check the methodology and results of its expert.

Nor does the Amended Report disclose the compensation LBRY paid for it, as required by Rule 26(a)(2)(B)(vi). It is unclear whether Richard charged the same hourly rate as he disclosed in his Original Report, or perhaps offered a discounted rate (or no charge at all) based on the many errors in his analysis exposed at deposition and attempted to be addressed in the Amended Report. Nor is it clear whether there were others that helped him (none are disclosed, but at least 4 others helped on the Original Report without disclosure by Richard or LBRY). And no information is provided on the total cost of the Amended Report.

Disclosure of compensation has been an on-going issue with LBRY. LBRY refuses to disclose what it paid for either expert report, construing its obligations under Rule 26(a) to end at disclosure of the expert's hourly rate, and not the hourly rates of the others who worked on the report (the four or more subordinates who did much of the work) or the number of hours of either Richard or his subordinates (or anyone else who may have worked on the engagement), or the

total amount of compensation paid. In fact, LBRY counsel instructed Richard not to answer questions on compensation during his deposition. Richard Tr. 40:8-43:4.

## II. THE COURT SHOULD STRIKE/PRECLUDE USE OF THE AMENDED REPORT

Fed. R. Civ. P. 37(c)(1) provides that a party that ignores the Rule 26(e) requirements is not allowed "to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." The Court should strike LBRY's new report because LBRY's untimely disclosure is neither justified nor harmless.

### A. LBRY Has Violated Rule 26's Requirements

#### 1. The Amended Report is Not Timely

The Amended Report is not timely. It was served as a surprise, almost a month after the parties' agreed-to R. 26(e) supplementation date and right before summary judgment briefs were due. That alone warrants preclusion or striking. *See Macaulay v. Anas*, 321 F.3d 45, 50-52 (1st Cir. 2003)(affirming preclusion of expert testimony on supplemental report produced a month after deadline); *Marine Polymer Tech. v. HemCom, Inc.*, No. 06-CV-100-JD, 2010 WL 1427549 (D.N.H. Apr. 2, 2010)(precluding supplemental expert report for late disclosure).

#### 2. The Amended Report Is Not a Supplement, So It Cannot Be Served Now

The Amended Report is not a "supplement" under Fed. R. Civ. P. 26. Richard admits that it contains new analysis and new methods that go far beyond Rule 26(e)'s supplement provisions. So even if had been served by the Rule 26(e) deadline, it would be improper.

Rule 26(e)(2) "is not a license to freely amend expert reports to bolster a party's position." *In re Zofran (Ondansetron) Prod. Liab. Litig.*, No. 15-MD-2657-FDS, 2019 WL 5423907, at *3 (D. Mass. Oct. 23, 2019)(quotation omitted). It "does not grant a license to supplement a previously filed expert report because a party wants to…." *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003)(quoted in *Presstek, Inc. v. Creo, Inc.*, No. 05-CV-65-PB, 2007 WL

983820, at *4 (D.N.H. Mar. 30, 2007)(Barbadoro, J.)). An expert can "fill gaps in initial reports when they later learn of the missing information," but may not "add new analyses, opinions, or theories under the guise of supplementation." *Zofran*, at *3 (quotation omitted)*; see also Southern v. Bishoff*, 675 Fed. App'x 239, 249 (4th Cir. 2017)("courts … repeatedly reject[] attempts to avert summary judgment by 'supplementing' with a 'new and improved' expert report")(internal citation omitted). "[A]n expert may not 'fix' analytical or methodological flaws in its expert's original report by way of a supposed 'supplement.'" *Providence Piers, LLC v. SMM New England, Inc.*, No. CV12-532S, 2016 WL 705259, at *3 (D.R.I. Feb. 2, 2016), report and rec. adopted, 2016 WL 727165 (D.R.I. Feb. 23, 2016)(citing cases). Nor can a party "use a supplemental report to disclose information that should have been disclosed in the initial expert report, thereby circumventing the requirement for a timely and complete expert report." *Marine Polymer Techs.,* 2010 WL 1427549, at *4 (quoting 6 *Moore's Federal Practice* § 26.131[2]).

This Court held in *Presstek* that "new work that attempts to bolster [the expert's] previously disclosed opinions and immunize them from attack by" the opposing party fall outside the ambit of Rule 26(e)(2). *Presstek*, 2007 WL 983820, at *5 ("Rule 26(e) cannot reasonably be read to encompass expert disclosures that merely serve to bolster previously disclosed opinions….Rule 26(e) exists to protect recipients of information. It is not designed to give producing parties a way to avoid agreed-upon discovery deadlines."). When a report exceeds the proper scope of a supplement, it is construed as an initial disclosure of a new expert opinion; "if the deadline for such disclosures has passed, then the report is untimely." *Zofran*, 2019 WL 5423907, at *3. LBRY's Amended Report does not constitute a supplement and LBRY needed to serve it by the parties' original expert disclosure date. LBRY's amended report should be struck as untimely.

**3. LBRY's Other R. 26 Failures Also Justify Striking the Amended Report**

Rule 26(a)(2) requires an expert report to include "the facts and data considered by the witness in forming" his opinions and the compensation for the report. "The requirement is self-executing and does not countenance selective disclosure." *Torres v. Johnson & Johnson*, No. 18-CV-10566-MGM, 2021 WL 256954, at *3 (Jan. 26, 2021)(internal quotations omitted). "Failure to comply with this rule may preclude using that information or witness to supply evidence …." *Barrett v. Badger Ladder, LLC*, No. 15-CV-339-JL, 2017 WL 462511, at *5 (D.N.H. Feb. 3, 2017)(quoting Fed. R. Civ. P. 37(c)(1)). Rule 26(a)(2) requirements serve, in part, "to prevent an ambush" by the expert-proffering party. *Ortiz-Lopez v. Sociedad Espanola de Auxillio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001)(discussing preventing an ambush at trial, and affirming exclusion of expert for Rule 26 violation). LBRY has set up that ambush by serving an incomplete amended report after the deadline, after the close of discovery, and then relying on it in its summary judgment papers.

**B. LBRY's Failure to Comply Is Not Substantially Justified**

LBRY's failure to comply with Rule 26 is not substantially justified. The only justifications that Richard gives for the supplementation are "to amend certain quantitative analyses … in light of certain questions asked during my "deposition, and new information and data of which I was unaware and did not have access." A.R. ¶1. Neither the desire to amend faulty methodology or to include data available at the time of the original report justifies a report served a month late and three business days before the summary judgment deadline.

**C. LBRY's Failure to Comply Is Not Harmless**

LBRY's late disclosure is prejudicial. LBRY cites the Amended Report as undisputed facts in their Motion for Summary Judgment. ECF No. 61-1 at 3, 21, 23. That is, LBRY produced a new expert report a month after the supplementation date and the close of discovery

and in admitted response to the holes in the first report exposed by the Commission's deposition questioning. And then, LBRY cites that new report for its purportedly undisputed facts on summary judgment. If those "facts" in Richard's new report are not yet controverted, it is because LBRY deprived the Commission of the opportunity to do so by not following discovery and expert disclosure rules. LBRY should not be permitted such a gambit. Its late production of the Amended Report prejudices the Commission, which has had no chance to challenge any of the new representations or to produce any rebuttal. *See Presstek,* 2007 WL 983820, at *7 (granting motion to strike late-filed supplemental expert disclosures because, in part, party "attained significant tactical advantage by failing to make the supplemental disclosure until after summary judgment briefing was near complete, and where there was no good explanation why the new analysis had not been performed before the initial report"). LBRY should not be able to end-run the agreed-to supplementation date, their disclosure obligations, and the requirement to produce a complete and accurate report the first time.

## III. CONCLUSION

LBRY's late production of an Amended Report that is not fairly considered a supplement and does not include the required disclosures has no justification and prejudicial to the Commission. Pursuant to Fed. R. Civ. P. 26 and 37, and for the reasons stated above, the Commission asks Court to strike the Amended Report or preclude LBRY's use of it.

Dated: June 8, 2022

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

*/s/ Marc Jones*
Marc Jones (Mass Bar No. 645910)
Peter B. Moores (Mass Bar No. 658033)

Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-8947 (Jones direct)
jonesmarc@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 8, 2022, I caused true and correct copies of the foregoing to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

*/s/ Marc Jones*
Marc Jones