CONFIDENTIAL



EXHIBIT
D

1       UNITED STATES DISTRICT COURT

2        DISTRICT OF NEW HAMPSHIRE

3

4  SECURITIES AND EXCHANGE      ) Civil Action No.
   COMMISSION,                  ) 1:21-cv-00260-PB
5                               )
                 Plaintiff,     )
6                               ) VOLUME 1
      vs.                       ) (Pages 1 to 339)
7                               )
   LBRY, INC.,                  )
8                               )
                 Defendant.     )
9  _____)

10

11

12        CONFIDENTIAL DEPOSITION OF

13          DR. BORIS RICHARD

14       VIA WEBEX VIDEOCONFERENCE

15        Wednesday, March 30, 2022

16

17

18

19

20

21

22

23  REPORTED BY:

24  ELBIA BAIRES

25  JOB NO. 220330LHR

1

CONFIDENTIAL

1      A.    That is correct.

2      Q.    And how many matters have you worked

3  with Perkins Coie -- on how many matters have

4  you worked with Perkins Coie?

5      A.    To the best of my recollection, this

6  would be the second one.

7      Q.    Okay.

8            In your expert report, which is

9  Exhibit 137, do you disclose that you had

10  had -- you had the assistance of four other FTI

11  Consulting employees to prepare your report?

12            MS. MECHANIC:   Objection.

13      A.    Let me review --

14            MS. MECHANIC:   Marc, we have a hard

15  copy, clean copy of this -- of his report.

16            MR. JONES:   Rachel, if you -- if you

17  are suggesting that you could put it in front

18  of him, it could move things along, I'm happy

19  to have you do that.

20            MS. MECHANIC:   I'll give Dr. Richard

21  the option.

22            Whatever you prefer.

23      A.    In paragraph seven, I say that

24  "Staff at FTI Consulting have assisted me by

25  performing work at my direction."

40

CONFIDENTIAL

1        Q.    Okay.   And can you tell me the
2  billing rates of those four staff?
3              MS. MECHANIC:   Objection.
4              MR. JONES:   What's the objection?
5              MS. MECHANIC:   The objection is that
6  you are not entitled to the billing rates of
7  consulting experts.
8              MR. JONES:   Okay.   We don't debate
9  that now.   But yes, we are.
10             MS. MECHANIC:   Well --
11       Q.    Let me ask you this, Dr. Richard.
12             Did the work of those four people go
13  into your production of this report that is
14  Exhibit 137?
15       A.    They contributed.
16       Q.    Did those four people -- did those
17  four people produce work that you relied on in
18  forming your expert report?
19       A.    Yes.
20       Q.    Okay.   Give me the billing rates of
21  those four individuals, please.
22             MS. MECHANIC:   Objection.   You are
23  not entitled to the billing rates of non -- of
24  non-testifying experts.
25             MR. JONES:   Your objection is noted.

41

CONFIDENTIAL

1              MS. MECHANIC:  You can ask Dr. --

2     you can ask Dr. Richard his billing rate.  If

3     he knows it sitting here today.

4              MR. JONES:  Rachel, I'm going to ask

5     the question I asked.  And if you are going to

6     instruct him not to answer, we can bring it up

7     later.

8              MS. MECHANIC:  Okay.

9              MR. JONES:  Are you instructing him

10    not to answer?

11             MS. MECHANIC:  Yes.

12             MR. JONES:  On what grounds?

13             MS. MECHANIC:  On the ground that

14    you are not entitled to -- that's not a

15    required disclosure.

16             MR. JONES:  It is required under

17    Rule 26.  We've talked about this before.

18             MS. MECHANIC:  Well, you've said

19    that before.  I don't think we've ever agreed

20    to that.  Our understanding is that what you

21    are entitled to is the -- the -- the -- the

22    compensation that Dr. Richard received in

23    connection with his work.

24             I'm not aware of any principle or

25    law that requires us to give underlying hourly

42

CONFIDENTIAL

1   rates of his team.
2          But -- you know, so yes, we are
3   going to instruct him not to answer because --
4   we can talk about it later.
5       Q.    Dr. Richard, consistent with --
6   consistent with Federal Rule of Procedure 26,
7   would you please tell us the compensation that
8   was paid for this study.
9       A.    Is that a question to me?
10      Q.    Yes, it is.
11      A.    Can you clarify your question?  What
12  do you mean by "compensation paid for this" --
13      Q.    How much was -- how much was FTI
14  paid in total for the report and its exhibits
15  that you have in front of you as Exhibit 140 --
16  excuse me, 137?
17      A.    I was not handling the invoices in
18  this particular matter.  All I can remember is
19  it's probably in -- in the vicinity of 160,
20  $150,000 dollars.
21      Q.    Okay.  And how much of that is
22  billing for your work specifically?
23          MS. MECHANIC:  To the best of your
24  recollection.
25      A.    It would be a fraction of that total

43

CONFIDENTIAL

1           MS. MECHANIC:  Objection.

2      A.      To the best of my knowledge, based

3  on what we were given, we were given 12

4  addresses.  And in addition to that, we looked

5  at the history of the -- of the activities by

6  those three funds.  We identified additional

7  six addresses that are affiliated with LBRY.

8              So the sum of those two numbers are

9  18 addresses.  So based on the information that

10  we have, this is what we based -- this is what

11  I based my analysis on.

12      Q.      So you were able to identify LBRY

13  wallet addresses that LBRY itself did not

14  identify to you?

15              MS. MECHANIC:  Objection.

16      A.      I -- you know, based on -- based on

17  what I understand, we were given the original

18  list of 12 addresses.  And we identified

19  additional six from -- from the fund -- funds

20  transfer records.

21      Q.      So yes?

22      A.      So the -- the ultimate list of

23  addresses was slightly greater compared to the

24  original list that was given to us.

25      Q.      Dr. Richard, show me in Exhibit 1 --

147

CONFIDENTIAL

1  everybody to be equivalent to removing certain

2  transactions stored on a blockchain.

3       Q.    So your testimony --

4       A.    I'm just rephrasing the removal of

5  transactional records, by relabeling it and

6  calling it on-chain activity in footnote 76.

7       Q.    Let me see if I understand your

8  testimony, Dr. Richard.

9            Are you telling me that you did not

10 need to mention this part of your methodology

11 because it was generally understood that that's

12 what you were doing?

13           MS. MECHANIC:  Objection.

14      A.    I included footnote 76 to focus and

15 to show the source which we used to identify

16 the activity to be removed.  I did not intend

17 footnote 76 as an additional alternative

18 description of the methodology that was used to

19 remove certain on-chain activity.

20           It was designed specifically to

21 refer the reader to the sources that we used to

22 identify that activity to be removed.

23      Q.    But, Dr. Richard, one of the sources

24 that you used for your report is a list of

25 wallets that you received from LBRY, correct?

                                            153

CONFIDENTIAL

1          A.     That is correct.

2          Q.     And you do not disclose that list of

3     wallets anywhere, correct?

4               MS. MECHANIC:   Objection.

5          A.     Yeah, it appears not to be disclosed

6     in the report.

7          Q.     Okay.  Was it -- was that list of

8     wallet addresses key to the analysis that you

9     did in your report?

10               MS. MECHANIC:   Objection.

11          A.     The address the -- the addresses

12     that we know to be affiliated with LBRY is used

13     to identify the -- the list of transactions to

14     be removed from the on-chain activity to

15     capture the user related on-chain activity.

16               So I would put it this way, we did

17     more than just removing the operational

18     activity of the three premine funds.  We -- I

19     was more conservative in this approach.  So

20     therefore, in addition -- effectively in

21     addition to removing all the on-chain

22     activities of the three premine funds by the

23     LBRY, we also removed additional transactions

24     that were somehow in any way affiliated or

25     associated with the LBRY addresses.

154

CONFIDENTIAL

1          So we did a double-check --

2   double-check and we wanted to remove and be

3   conservative in estimating the non-affiliated

4   economic activity on-chain for the LBRY

5   network.

6      Q.    So, Dr. Richard, am I understanding

7   you right that you removed more than you said

8   you removed in paragraph 68?

9          MS. MECHANIC:   Objection.

10     A.    Yes.  We removed -- we removed a

11  large amount of activity.  That's correct.

12     Q.    Okay.  And if I wanted to recreate

13  your methodology based on your description of

14  how you determined on-chain transaction

15  activity, how would I do that?

16     A.    There are two ways -- there are two

17  ways that you could do it.  The first one, the

18  transaction records provided by LBRY as they

19  pertain to the three premine fund, those

20  records, they have transaction hashes.  So you

21  can go directly to the blockchain explorer and

22  identify those transactions.

23          In fact, the tokens -- the number of

24  tokens transferred and the purpose of that

25  transfer is -- is listed in -- in those records

155

CONFIDENTIAL

1    anyway.

2              In addition, you can identify

3    transactions to be removed on-chain if you have

4    a list of addresses.  You just -- you go to

5    the -- if you don't want to use

6    sequel-structured approach the way we use it,

7    you can go to the LBRY blockchain explorer,

8    type in an address and it will give you the

9    history of transactions associated with that

10   address.

11             Including the tokens.  Including the

12   dates.  Including the destination address.  So

13   you just remove that from the -- from the

14   on-chain activity.

15       Q.    Dr. Richard, you can't do that

16   unless somebody tells you that that particular

17   wallet address is associated or controlled by

18   LBRY, correct?

19             MS. MECHANIC:  Objection.

20       A.    You need to know if -- if the

21   LBRY -- if -- if a particular address is -- is

22   affiliated with LBRY, Inc.  Yes.

23       Q.    So without the list of wallet

24   addresses that you deducted, I cannot reproduce

25   your results, correct?

                                                    156

**CONFIDENTIAL**

1              MS. MECHANIC:   Objection.

2         A.       You can -- you can reproduce -- you

3    can reproduce a large portion of it.   Because

4    those transaction hashes that are -- are in the

5    -- call it credit reports, you don't need to

6    know addresses for those.   But it's addition

7    transactions that are affiliated with another

8    12 addresses, yes, you do these those 12

9    addresses.

10        Q.    Were the addresses that you received

11   from LBRY prior addresses that LBRY used for

12   the three funds or just the ones it was

13   currently using?

14        A.    I cannot --

15              MS. MECHANIC:   Can you repeat that?

16   Our audio cut out.

17              MR. JONES:   I'm sorry.   Sometimes if

18   I look away for a minute, the audio might be a

19   problem.   Or maybe it's on your end.   But let

20   me try it again.

21        Q.    Were the wallet addresses that you

22   received from LBRY prior addresses that LBRY

23   used for the three funds or just the current

24   addresses they were using for the three funds?

25              MS. MECHANIC:   If you know.

                                                      157

CONFIDENTIAL

```
 1   destination of where one of the output goes
 2   into.
 3        Q.    And in here, there's two
 4   destinations.
 5        A.    For this -- yeah, there are two
 6   destinations.
 7        Q.    So the 159 million LBC go into two
 8   wallets, one ending in 7WC and one ending in
 9   JA, correct?
10        A.    They go to two addresses.
11        Q.    Okay.  Too small to see?
12        A.    Yes.  I'm not sure if they're a part
13   of the same wallet or not.
14        Q.    Does -- does the blockchain know
15   whether it's the same wallet?
16              MS. MECHANIC:  Objection.
17        A.    The blockchain -- the blockchain
18   does not know it.
19        Q.    All right.  So if the blockchain
20   does not know it's the same wallet, the
21   blockchain can't be doing any sort of deduction
22   from the transaction amount based on affiliated
23   wallets, correct?
24              MS. MECHANIC:  Objection.
25        A.    In principle -- yeah, in principle,
```

228

CONFIDENTIAL

1   blockchain does not know it.

2       Q.      Right.

3               So here, if it doesn't know it,

4   basically what the blockchain is recording is

5   159 million going to two places.

6               MS. MECHANIC:  Objection.

7       Q.      Correct?

8       A.      Correct.

9       Q.      All right.  And it's recording that

10  as can be seen in the amount box on Exhibit 149

11  as 159 million LBC transaction, correct?

12      A.      Well, it shows 159 as an input.

13      Q.      I'm asking you, Dr. Richard, about

14  the amount box.

15              What does the amount box say on

16  Exhibit 149?

17      A.      The balance?

18              MS. MECHANIC:  You want him to read

19  the document --

20              MR. JONES:  I do.

21              MS. MECHANIC:  -- back to you?

22              MR. JONES:  Yes.

23              MS. MECHANIC:  Okay.

24      A.      Okay.  Amount LBCs, that's the

25  amount -- that's amount of this particular

                                                    229

CONFIDENTIAL

1           MS. MECHANIC:  Objection.

2      A.    If -- can you repeat the question

3 again?  I'm sorry.

4      Q.    Sure.

5           If Exhibit 147, the on-chain

6 transaction data, does not deduct all of the

7 LBRY wallet activity, would that introduce

8 error into the results of your reporting in

9 Exhibits 5A, 5B, 6, 7A and 7B?

10          MS. MECHANIC:  Objection.

11     A.    If -- if we missed some of the LBRY

12 related activity, that's correct.

13     Q.    Okay.

14     A.    It could -- it could introduce some

15 error.

16     Q.    And does the -- the concept that the

17 whole wallet amount is transacted on-chain,

18 does that throw off your on-chain transaction

19 volume estimations for 5A, 5B, 6, 7A and 7B?

20          MS. MECHANIC:  Objection.

21     A.    In principle, it might.  But I don't

22 know the quantification of that particular

23 impact.

24     Q.    Well, you -- you want your on-chain

25 transaction volume to be measuring user

                                              244

CONFIDENTIAL

1    activity, right?

2         A.    I'm doing the best effort to do

3    that, yes.

4         Q.    Right.

5              If a user tips one LBC to a content

6    creator, you want that to register as one LBC

7    of volume, correct?

8              MS. MECHANIC:   Objection.

9         A.    That's -- that's correct.  Yes.

10        Q.    So if -- if the transaction volume

11   that the block is recording is actually a

12   thousand LBC for that transaction because

13   there's a thousand LBC in that user's wallet,

14   your on-chain transaction volume for that

15   transaction is off, correct?

16             MS. MECHANIC:   Objection.

17        A.    Well, it depends if it goes back to

18   the change address or not.  If it's a full

19   amount, then there is no error.  If there is a

20   change address related, then one LBC recorded,

21   that would be fair representation of the -- of

22   the actual activity that happened.

23        Q.    Right.

24             For that transaction, at least as

25   you are saying, if it goes to a different

245

CONFIDENTIAL

1    address, that's a thousand times off what you

2    would want it to be?

3              MS. MECHANIC:  Objection.

4        A.    I'm not sure.  I have to look at

5    some specific examples of -- of the

6    transactional activity related to particular

7    users.

8        Q.    But you would want it to be one?  A

9    tip of one should be one on-chain transaction.

10       A.    Ideally, yes.

11       Q.    Okay.  Well, ideally, and in order

12   to make the assumption that on-chain

13   transaction volume is representative of user

14   activity, correct?

15       A.    I want to represent the user

16   activity, yeah, to the best possible way.

17   Correct.

18       Q.    Right.

19             And to do that, you need your

20   on-chain transaction volume to record the

21   amount of transaction not the total amount of

22   the wallet, correct?

23             MS. MECHANIC:  Objection.

24       A.    I definitely -- not the amount --

25   not -- not the balance of the wallet.

                                               246

CONFIDENTIAL

```
 1        Q.    Okay.  Can I direct you to -- one
 2   second.
 3              Can I direct you to page 144,
 4   starting on line ten.
 5        A.    Line ten --
 6        Q.    It's one that says 1218, then ten.
 7        A.    I see line ten.
 8        Q.    Can I have you read there to the end
 9   of the page.
10        A.    Yup.
11                        (At this time, the witness
12                        perused the aforementioned
13                        item.)
14        A.    Okay.  I'm done reading.
15        Q.    Okay.  And do you see there that --
16   that Mr. Kauffman is testifying, in fact, that
17   he -- he -- he is asked whether there could
18   potentially be more than a thousand wallet
19   addresses associated with LBRY.
20              And he says, "You can end up with a
21   large amount of addresses with really small
22   amounts of LBC in them," correct?
23        A.    Yes.  I have read that.
24        Q.    All right.  And so does the fact
25   that there was potentially a large amount of
```

254

**CONFIDENTIAL**

1  LBRY wallets a concern to you when you were
2  doing your analysis of the number of wallet
3  addresses?
4          MS. MECHANIC:  Objection.
5      A.      It is not a concern on my part.
6  Because, again, the -- the quantification and
7  the timeline of the address -- cumulative
8  number of addresses is -- is -- only should be
9  taken in the context together with the analysis
10  that I performed later to show that the address
11  creation is -- is correlated and tracks in a
12  positive way the additional functionality and
13  additional utility features that are available
14  to the users on the LBRY -- on the LBRY
15  blockchain.
16          So secondly, I would also say that
17  if you look at the first exhibit, one of my
18  exhibits tracks the number of addresses with
19  non-zero balances of LBRY credits.  And by the
20  end of the period, the number of those
21  addresses is about 12 million.
22          And from -- from researching the
23  data, I do know that the number of users, let's
24  say by -- by December 2020, when the Odysee was
25  released, it was about 9 million.  So the

255

CONFIDENTIAL

1          Q.     Let me know when you've done that.

2          A.     I have -- I have done that.

3          Q.     Okay.  And so columns E, F and G are

4     for the 30-day estimation window, correct?

5          A.     Correct.

6          Q.     And columns H, I and J are for a

7     90-day estimation window?

8          A.     Correct.

9          Q.     And columns K, L and M are for a

10    180-day estimation window, correct?

11         A.     Correct.

12         Q.     Why did you not include the 180-day

13    estimation result in your report?

14         A.     I -- I did this just to check and to

15    confirm if I expand my sample period from

16    90-day to 180 days I will get similar results.

17    So it was in some sense a test of robustness of

18    the sample period that I chose -- that I chose

19    to use.

20         Q.     And sometimes you do get the same

21    result with 180-day test, correct?

22         A.     Yes.

23         Q.     And sometimes you don't?  Correct?

24         A.     I don't recall, you know,

25    day-by-day, the comparison between different --

298

CONFIDENTIAL

1    between different sample periods.

2         Q.    Well, so if we look at that sheet,

3    you can see at least here, in row 56 -- excuse

4    me, not 56, 55, your 180-day test is showing

5    that that is not statistically significant at

6    the 180-day estimation window, correct?

7         A.    Not at a five percent significance

8    level.

9         Q.    Right.  And, in fact, for that same

10   line, it's not significant for the 30-day

11   estimation window at the five percent

12   significance level as well, correct?

13        A.    That is correct.  The -- it's 1.39.

14        Q.    It's only for the 90-day that it's

15   statistically significant for the 95 percent

16   confidence integral, correct?

17        A.    That is correct.

18        Q.    Okay.  And yet, in the last column

19   when you say it's statistically significant,

20   you just indicate that it is without

21   designating that it is for one and not for the

22   other, correct?

23             MS. MECHANIC:  Objection.

24        A.    I said 30 or 90 days.  So I fully

25   disclose which of -- which set of the sample

299

CONFIDENTIAL

```
 1        Q.    Doctor, I'm asking, I think, a
 2   different question.  And let me try to put it
 3   to you another way.  See if I can get at it.
 4              Should your model remove the T minus
 5   one day, the T day, and the T plus one day from
 6   the estimation window in order to remove the
 7   effect of the announcement from the results in
 8   the estimation window?
 9              MS. MECHANIC:  Objection.
10        Q.    Do you know, Doctor?
11        A.    Yes.
12        Q.    Did you say yes?
13        A.    I said yes.  Yes.  Yes.  Yes.
14        Q.    So if you look down column G as in
15   George, V as in Victor, and you look down to
16   column -- row 45, you see 12/12/2019?
17        A.    Which tab are we looking at?
18        Q.    The regression prep tab.
19        A.    Okay.
20        Q.    All right.  So you see that in line
21   45 GV as in Victor 45, it has 12/12/2019?
22        A.    Yes, I do.
23        Q.    And then the next row has
24   12/14/2019?
25        A.    Yes.
```

313

CONFIDENTIAL

```
1        Q.    So does that tell you that when you
2   made this model, you and your team only removed
3   the day of the event and not the day before or
4   after?
5              MS. MECHANIC:  Objection.
6        A.    I'm not -- I'm not sure sitting and
7   looking at this right now because I see other
8   entries where two days were reviewed.  So -- I
9   have --
10       Q.    Two days seeing reviewed.
11       A.    Well, for example, 12/18/2019, and
12  then the next one is 12/21/2019.
13       Q.    Okay.  So --
14       A.    There are two observations are
15  removed here.  So sitting in this chair right
16  now, I can not tell you exactly why -- you
17  know, if -- if it was a three-day period
18  removed from this particular set up.
19       Q.    You have your exhibits in front of
20  you, sir?
21              Actually, you don't even need
22  that --
23       A.    I just switched to --
24       Q.    Can you go to the announcements
25  worksheet in the same Exhibit 143?
```

314

CONFIDENTIAL

1        A.    Yes.  Okay.

2        Q.    And you see here looking at in rows

3   61 and 62 the reason that -- there are two

4   events, one on 12/19/19 and 12/20/2019, that

5   you are analyzing?

6        A.    I do see that.  Yes, I do see that.

7        Q.    Right.

8              And so does that explain why there

9   are two days removed in -- in -- in the time

10  period we were just looking at in the

11  regression prep worksheet?

12       A.    No.  I'm not sure.  I cannot -- I'm

13  not prepared to answer this question.  As to

14  whether this particular event is related to the

15  fact that one observation was removed.

16       Q.    So you don't know whether or not one

17  day was removed or three days was removed?

18             MS. MECHANIC:  Objection.

19       A.    Looking at this spreadsheet now, no,

20  I do not.  My instruction that I gave was very

21  clear.

22       Q.    But three days should have been

23  removed, correct?  That was the clear

24  instruction that you gave?

25       A.    I believe so, yes.

315

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL

1        Q.     And if you have not -- if your
2    team -- let's put it on your team now, I guess.
3               If your team has not removed
4    three days, then your estimation windows are
5    miscalculating what is needed for the abnormal
6    return, correct?
7               MS. MECHANIC:  Objection.
8        A.     They may or they may or may not.  So
9    depending on the -- depending on the size of
10   the sample -- depending on the size of the
11   sample period.
12       Q.     Well, your sample periods are
13   30 days and 90 days, correct?
14       A.     That is correct.
15       Q.     So in either sample, you are
16   including two days that the news that you are
17   analyzing is effecting in trying to establish
18   the baseline against which you are judging it.
19              MS. MECHANIC:  Objection.
20       A.     I'm sorry.  Can you repeat again?
21       Q.     Well, in your estimation windows,
22   you are including two days where you say that
23   the news affects the price or potentially
24   affects the price.
25       A.     Three days.

316

CONFIDENTIAL

1        Q.    Right.

2              But you eliminate one and you leave

3   two.

4              MS. MECHANIC:  Objection.  What's

5   the question?  Is there a question?

6              MR. JONES:  Yes.

7        Q.    Are you including two days in which

8   there is a price effect from the news in the

9   estimation window that you are detailing here

10  in the regression prep worksheet?

11             MS. MECHANIC:  In that one example

12  we just looked at?

13             MR. JONES:  No.  Across the

14  spreadsheet.

15             MS. MECHANIC:  Objection.

16       A.    I think I said before that the

17  sample period does not include -- the

18  estimation period for -- to estimate the

19  coefficient on the Bitcoin does not include the

20  measurement T minus one T plus one period over

21  which I'm measuring the abnormal return.

22       Q.    It does not or should not include

23  that period?

24             MS. MECHANIC:  Objection.

25       A.    It should not.

                                              317

CONFIDENTIAL

```
 1        Q.    Okay.  But you don't know whether or
 2   not it does?
 3             MS. MECHANIC:  Objection.
 4        A.    The instruction was done to -- to
 5   the team member specifically to do that.
 6        Q.    Right.
 7             And if the instructions were not
 8   carried out properly and that some of those
 9   days remain in the estimation window, then your
10   results are off?
11             MS. MECHANIC:  Objection.
12        A.    Not necessarily.  It's -- it needs
13   to be tested.  But it's unclear whether
14   there -- many of the -- many of the statistical
15   significance results that I received may have
16   and will likely remain in tact.
17             Well, without testing -- without
18   testing, I can not say one way or the other.
19        Q.    Does it undermine your confidence
20   and the opinion that you've rendered based on
21   this data?
22             MS. MECHANIC:  Objection.
23        A.    My opinion -- my opinion is -- is
24   the same because I know that the statistical
25   significance results carry over to longer
```

318

CONFIDENTIAL

1  sample periods, like 90 days.  And as you have

2  seen yourself, in the 180 days.

3            So therefore, not removing,

4  hypothetically, two observations out of 180, is

5  unlikely to change the results in the

6  statistical significance.

7       Q.    What's your basis for saying that?

8  Is it just two is not very much -- two is not a

9  high percentage of 180?

10            MS. MECHANIC:  Objection.

11       A.    It's a very small percentage of a

12  sample, that's correct.

13       Q.    But if the -- if the results -- if

14  the price change is abnormal for those days, it

15  could abnormally throw it off even though it

16  may only be a small percentage of the days,

17  correct?

18            MS. MECHANIC:  Objection.  Asked and

19  answered.  A few times.

20       A.    Again, my answer is that, if this --

21  if -- if there's certain days where it's

22  included where they should not have been

23  included, sitting here, I'm not prepared to

24  argue or make any statements that would change

25  the results or my opinion.

319