**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

```
------------------------------------- X
SECURITIES AND EXCHANGE                :
COMMISSION,
                                       :
            Plaintiff,
                                       :
     -against-                            Civil Action No. 1:21-cv-00260-PB
                                       :
LBRY, INC.,
                                       :
            Defendant.                 :
------------------------------------- X
```

**LBRY, INC.'S REPLY IN FURTHER SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT...........................................................................................................................2

I.      The Economic Realities of LBRY's LBC Sales are Indisputably Distinguishable from the Sales at Issue in the Commission's Prior Section 5 Cases ....................................................................................................................2

II.     The Evidence and Sworn Declarations Submitted by LBRY Demonstrate that Thousands of People Use LBC to Transact on the LBRY Network on a Daily Basis .........................................................................................................4

III.    The Commission Cannot Dispute that LBRY Users Bought LBC for its Utility Purpose.................................................................................................7

CONCLUSION.......................................................................................................................10

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*SEC v. Feng,*
935 F.3d 721 (9th Cir. 2019) ................................................................................. 8, 9, 10

*Solis v. Latium Network, Inc.,*
No. 18-10255 (SDW) (SCM), 2018 WL 6445543 (D.N.J. Dec. 10, 2018)............................4

*SEC v. Telegram Group Inc.,*
448 F. Supp. 3d 352 (S.D.N.Y. 2020)................................................................................3, 8

## PRELIMINARY STATEMENT

The Commission attempts to divert attention from the crux of this case—LBRY's sales of LBC on digital asset exchanges which indisputably occurred *long after* the LBRY ecosystem was functional and its native token became usable on the Network—by, among other things, scouring the record for purported early offers or sales of LBC (including ones not alleged in the Complaint),[1] attempting to undermine the consumptive uses of LBC on the Network and imputing investment intent to undisputed users of the LBRY Network.  But none of the Commission's arguments or newly introduced evidence does anything to change the undeniable fact that the LBRY Network—which runs on blockchain technology that *requires* the use of a token which, in turn, *depends* on a secondary market for the ecosystem to properly function—has grown exponentially since its inception six years ago, that the Network and its native token are used by *millions* of users on a daily basis and that it is rapidly becoming a true alternative to centralized video sharing applications.

The Commission's argument appears to rely on the faulty premise that because LBRY and users of the LBRY Network had an interest in seeing LBC appreciate in value—a natural desire of anyone who owns an asset or commodity—and because a secondary market for LBC existed, the token must constitute a security.  That, however, is not the test for determining whether a transaction constitutes an investment contract, which must be analyzed on a transaction-by-transaction basis, and which looks to whether the seller's marketing and promotional materials primarily led purchasers to expect to profit from their investment or whether those materials

---

[1]   The Commission argues that in September 2015, LBRY offered LBC as a security when LBRY and one of its founders, Michael Finger, through his company Centinel Consulting, LLC, agreed that Centinel could convert its equity interest in LBRY to LBC.  Opp. at 1. The Commission cites no authority for the proposition that merely having the ability to cash out equity in exchange for usable tokens (not the other way around) constitutes a securities offering. And the 1,000 LBC incentive announced in November 2015 for early software testers (Opp'n at 2) cannot possibly constitute a securities offering, as this simply rewarded anyone who tested LBRY code—the very people most likely to be interested in *using* the LBRY Network—with LBC they can in turn use on the Network.

primarily promoted the instrument as a means of consumption. Where, as here, the overwhelming majority of LBRY's public messages do not even mention LBC but, instead, focus on the actual product LBRY was marketing—the LBRY Network—it is plain that the "primary focus" of the company's marketing campaign was not on the promotion of LBC as an investment opportunity, but on the consumptive nature of the LBRY Network and its native token.

## ARGUMENT

### I.  The Economic Realities of LBRY's LBC Sales are Indisputably Distinguishable from the Sales at Issue in the Commission's Prior Section 5 Cases

The Commission devotes several pages of its Opposition to attacking a strawman that relies on a misinterpretation of LBRY's argument distinguishing LBRY's sales of LBC from the sales at issue in the Commission's prior Section 5 cases. Ignoring the substance of LBRY's brief, the Commission characterizes LBRY's argument as a "formalistic approach" that looks only to whether "the defendant conducted an ICO and issued a white paper." Opp'n at 13. But LBRY does not suggest that the non-existence of an ICO necessarily means that a particular sale of a digital asset cannot constitute an investment contract. Rather, LBRY distinguishes its sales of LBC from the sales at issue in prior Section 5 cases involving digital assets that were found to be securities (all of which happened to be in the ICO context) based on the very same factors the Commission insists are relevant to the *Howey* analysis, including (i) the substance and context of the defendant's representations; (ii) the timing of the sales vis-à-vis the utility of the token; (iii) the target audience of the defendant's representations; (iv) the pricing of the token sales; (v) the size and concentration of the sales; and (vi) the existence (or non-existence) of a lockup period. *See* LBRY MSJ Br. at 16–22.

The fact patterns in the handful of cases applying *Howey* in the digital asset context simply present a fundamentally different economic reality as compared to LBRY's sales of LBC. For

example, the blockchain technology had not yet been developed at the time of the token sales in the prior cases, meaning that the tokens had no possible utility unless and until such time that the ecosystem was developed. *See* LBRY Mot. at 16–19. Here, on the other hand—although the Commission stretches in its opposition to find offers and sales that pre-date the launch of the LBRY Network—the vast majority of LBRY's sales of LBC occurred long after the launch of the LBRY Network, and thus at a time when it is undisputed that the token had a consumptive use.

Similarly, contrary to the Commission's contention, LBRY does not suggest that simply because it did not issue a Whitepaper, that necessarily means that its token sales cannot constitute investment contracts. Rather, that LBRY did not issue a Whitepaper is part and parcel of its argument that its sales on digital asset exchanges are completely distinguishable from the token sales at issue in the Commission's prior Section 5 cases. All prior Section 5 cases in the digital asset context have involved the release of a Whitepaper describing a theoretical discussion of a yet-to-be-developed blockchain architecture to a limited, pre-selected group of sophisticated investors, such as "venture capital firms (and other similar entities) as well as high net worth individuals with an inherent preference…toward an investment intent rather than a consumptive use." *SEC v. Telegram Group Inc.* ("*Telegram*"), 448 F. Supp. 3d 352, 374 (S.D.N.Y. 2020). These Whitepapers typically also expressly emphasized the potential for purchasers to profit from speculative trading of the token. *See* LBRY Mot. at 16–18. Here, on the other hand, LBRY did not issue a Whitepaper or any other offering document to a select group of potential investors prior to launching the LBRY Network or at any time thereafter, nor has it ever encouraged speculative trading in the token.

At bottom, the sales at issue in the prior Section 5 cases in the digital asset context and, indeed, *all* the Section 5 cases cited by the Commission in its opposition brief, are distinguishable

from the vast majority of LBRY's sales on the secondary market in that they involve a concerted

effort to *market and sell* the instrument at issue to targeted groups of potential investors. This

effort was consummated through the release of sales and marketing documents, such as a

Whitepaper or a private placement memorandum, to potential purchasers during specific sales

events promoted by the defendants including, for example, a "private presale" followed by a wider

"general sale." *Solis v. Latium Network, Inc.*, No. 18-10255 (SDW) (SCM), 2018 WL 6445543,

at *1 (D.N.J. Dec. 10, 2018). Here, on the other hand, the Commission has scoured LBRY's

thousands of public posts and messages on its website and various social media accounts to find

any and all messages it can identify discussing or referring to the LBRY native token and its

potential value proposition.[2]   Even assuming those posts stand for the proposition for which the

Commission cites them, which LBRY vigorously contests, they are wholly distinguishable from

the promotional and sales materials at issue in every other Section 5 case cited in the parties' briefs,

in that the "primary focus" of those materials was indisputably on the opportunity for profit given

that they were issued and distributed to potential investors specifically in connection with the

issuer's attempts to sell the instrument at issue to those investors. LBRY, on the other hand, has

repeatedly targeted a wide audience of potential LBRY Network users for the purpose of

promoting the Network itself, which relies on LBC in order to properly function.

II.     **The Evidence and Sworn Declarations Submitted by LBRY Demonstrate that Thousands of People Use LBC to Transact on the LBRY Network on a Daily Basis**

The Commission's desperate attempt to suggest that there is minimal utility value to LBC

in connection with its use on the Network is unsupported by both the evidence and the data.

Indeed, the Commission does not even acknowledge the multiple sworn declarations submitted by

---

[2] As the Commission continues to cite in its opposition brief the same cherry-picked set of posts and messages that it relies on in support of its Motion for Summary Judgment, LBRY will respond substantively to that aspect of the Commission's argument in its opposition brief.

LBRY providing uncontroverted evidence as to the volume of on-Network LBC transactions and the usage of LBC by actual Network users.  For example, while baldly suggesting that usage of LBC could not have driven users to purchase the token due to the purported minimal utility of LBC on the Network, the Commission flatly ignores the declaration submitted by Jeremy Kauffman, co-founder and CEO of LBRY, stating that as of April 12, 2022, there were nearly 220,000 *daily* on-network transactions using LBC.  LBRY Ex. 1 (Kauffman Decl.) ¶ 57.

The crux of the Commission's argument attempting to minimize the consumptive value of LBC appears to be based on the Commission's incorrect suggestion that the only use for LBC on the Network is to "reserve a name to publish content."  Opp'n at 9.  In so stating, the Commission relies exclusively on an outdated LBRY post that was published *months* before the LBRY Network went live or any LBC were sold and which, notably, the Commission never questioned any witnesses on during depositions.  *See* PX Ex. 142.  Relying on this outdated statement, the Commission continues that, because of the low cost to publish content to the network, usage of LBC could not possibly "drive LBC purchases."  Opp'n at 9.  Not only does the Commission's "conclusion" as to the motivation behind buyers' purchase of LBC rely on rank speculation, but it is also based on the completely faulty premise that the only way users use LBC on the Network is to publish content.  As LBRY explained in its opening brief (which the Commission seemingly ignores in its Opposition), in addition to purchasing content, LBC is also used to create a channel (or an "identity"), tip content creators, edit published content and boost a channel or content through "staking."  *See* LBRY's Mot. at 6; *see also* LBRY Ex. 1 (Kauffman Decl.) ¶ 17.  Although a user may not be *required* to use LBC when engaging with the Network, that does not suggest—as the Commission baldly claims without any evidentiary support—that users do not, in fact, voluntarily use LBC on the Network for a variety of purposes.

For example, the Commission suggests (again without any evidentiary support) that David Jones, one of LBRY's top publishers, could not have had any conceivable use for LBC beyond the amount that would have been required to publish the 1,400 videos he has published to his LBRY channel. *See* Opp'n at 10. Such a suggestion inexplicably ignores Mr. Jones' sworn statement that he has used LBC "to help promote and enhance the visibility of [his] content on the platform" by keeping his LBC "tied" to his videos. LBRY Ex. 34 (Jones Decl.) ¶ 8. Mr. Jones also states—in direct contravention of the Commission's argument—that, like the nearly 300 other declarants that LBRY cited in its opening brief, he has purchased LBC on the open market specifically for the purpose of using it on the network, in his case "to further enhance the visibility of my content." *Id.* ¶ 9. Mr. Jones' use of his LBC to "stake" his content on the Network has clearly paid off, as he is currently the 13th largest creator on the LBRY Network, where he has 68,000 followers and which, he believes, "provides the best alternative to YouTube for content creators." *Id.* ¶¶ 5, 14.

The Commission continues its rank speculation by suggesting that users could not have purchased LBC to buy content on the LBRY Network because many of the videos on the Network are available to be viewed for free. Opp'n at 10. In support of this assertion, the Commission cites to three days' worth of "purchase history data" from a third-party data source not maintained or controlled by LBRY and suggests that this three days' worth of data (from April 15 through 17, 2021) somehow accounts for *all* purchases on the LBRY Network for the entirety of its existence. *See* PX 154. The sworn declaration of Mr. Kauffman, however, directly contradicts the Commission's purported evidence, stating that the total number of distinct content purchases on the LBRY Network amounted to *418,742* transactions as of April 12, 2022. Kauffman Decl. ¶ 55. In addition, the Commission baldly asserts that tipping could not have driven LBC purchases merely because it "was not always available" and because, in 2021, users were given the ability to

6

tip content creators with a credit card.  Opp'n at 11.  Here, again, the Commission relies on mere

speculation in support of its baseless "conclusion" as to the motivation of LBC purchasers, without

citation to any data or evidence supporting its purported assertion that tips do not constitute a

significant portion of total on-chain transactions.   Indeed, the sworn declarations of several of

LBRY's largest content creators specifically state that they have received a "significant" amount

of tips from their "followers and other community members."  LBRY Ex. 34 (Jones Decl.) ¶ 7; *see*

*also* LBRY Exs. 32 (Watson Decl.) ¶ 7 ("vast majority of the LBC I have earned has come from

tips"); 31 (Brockwell Decl.) ¶ 7 ("I have earned a total of approximately 261,500 LBC…in various

ways, including through user tips…."); 33 (Dorval Decl.) ¶ 9 ("I have earned a total of

approximately 67,000 LBC in various ways, including through user rewards and tips….").[3]

## III.     The Commission Cannot Dispute that LBRY Users Bought LBC for its Utility Purpose

The Commission next tries to undermine LBRY's argument by suggesting that because

certain users of the LBRY Network traded LBC on secondary exchanges, they must necessarily

have an intent to profit from their acquisition of LBC.  *See* Opp'n at 21.  But this argument relies

on the false premise that simple participation in the secondary market necessarily suggests that an

LBC holder has an investment motive.  As LBRY explained in its opening brief, the availability

of secondary trading exchanges is necessary and essential to the proper functioning of the LBRY

Network, as it provides users with a marketplace to both purchase LBC for its use on the Network,

---

[3] LBRY will address the Commission's attempts to undermine the opinion of LBRY's expert, Dr. Boris Richard, in response to the Commission's Motion to Strike or Preclude the Use of Amended Report of LBRY's Expert, Doc. No. 71, filed on June 8, 2022.  Needless to say, the Commission's suggestion in its Opposition that Dr. Richard *admits* in this Amended Report that his calculations of on-chain transactions are "flawed and unreliable" is a gross mischaracterization of Dr. Richard's Amended Report.  *See* LBRY Ex. 3 (Amended Report) ¶¶ 1–2 (noting that the Amended Report "amend[s] certain quantitative analyses…in light of certain questions asked during [Dr. Richard's] deposition, and new information and data" and stating that "none of the amendments contained in [the] Amended Report change [Dr. Richard's] original expert conclusions").  Even assuming that the Commission is correct that Dr. Richard's initial report is "flawed and unreliable," the Commission does not suggest that the *Amended* Report—to which LBRY cites in its summary judgment motion—suffers from the same purported flaws.

as well as to sell LBC earned on the Network.  The Commission suggests that several of LBRY's declarants traded in amounts "inconsistent with LBC usage" based, again, on the false premise that users only use LBC to publish on the Network.  *See* Opp'n at 21.  Moreover, although the Commission suggests that the declarants' trading patterns "differ from small simple acquisitions to buy LBC to use on the LBRY Network," it ignores the undisputed evidence that users can, in fact, earn and accumulate a substantial amount of LBC on the LBRY Network.  *See, e.g.*, LBRY Exs. 31 (Brockwell Decl.) ¶ 7 (261,500 LBCs); 32 (Watson Decl.) ¶ 7 (12,000 LBCs); 33 (Dorval Decl.) ¶ 9 (67,000 LBCs); 34 (Jones Decl.) ¶ 7 (250,000 LBCs).

Finally, while conceding that LBRY users do, in fact, buy LBC to use on the LBRY Network, the Commission states that if those same users also have an investment intent (i.e., a dual motivation), that must necessarily mean that LBC is a security.  In support of this proposition, the Commission cites to a sole out-of-circuit case,[4] decided outside the digital asset context, that involves facts wholly distinguishable from those at issue here.  *SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019), involved investments in EB-5 programs, which provide legal permanent residency status to foreign nationals who invest in U.S.-based projects that meet certain criteria.  *Id.* at 725. The investors in *Feng* entered into private placement memoranda ("PPM") with "regional centers," i.e., enterprises that offer specific EB-5-eligible projects to investors and manage pooled investments.  *Id.* at 726.  The investments were structured as limited partnerships and many of the PPMs referred to the investments as "securities."  *Id.* at 727.  Additionally, the regional centers promised investors in the PPM a fixed, annual return on investment.  *Id.*

---

[4] Although the Commission also includes a citation to *Telegram*, that decision does not actually support the Commission's argument.  The court in *Telegram* did not have to deal with the "dual motivation" issue since it found that the purchasers of the token did not have a consumptive intent.  *See Telegram*, 448 F. Supp. 3d at 374 ("Consumptive uses for Grams were not features that could reasonably be expected to appeal to the Initial Purchasers targeted by Telegram.").  Rather, it appears that the Commission cited the *Telegram* decision merely because the decision cites *Feng*.  *See id.* at 371.

In holding that the EB-5 investments constituted investment contracts, the court noted that the PPMs referred to the investments as "securities" and explained that the offerings were made pursuant to the U.S. securities laws. *Id.* at 729. Although the court noted that the name given to an instrument is not dispositive, "most instruments bearing the traditional titles associated with securities are likely to be covered by the statutes," particularly because "the use of a traditional name such as 'stocks' or 'bonds' may lead a purchaser justifiably to assume that the federal securities laws apply." *Id.* (internal brackets and citation omitted). Moreover, the court found that the transactions "embod[ied] some of the significant characteristics typically associated with" a security. *Id.* Specifically, the EB-5 transactions were structured as investments in limited partnerships, which "generally constitute investment contracts," and the investments came with a promise of a fixed annual return, which "falls within the broad definition of 'profits.'" *Id.* (internal citations omitted). Accordingly, the "PPMs' identification of the investments as securities, the form of the investment entity as a limited partnership, and the promise of a fixed rate of return all indicate that the EB-5 transactions were securities." *Id.* at 730.

Upon finding that the transactions constituted investment contracts, the court went on to reject the defendants' argument that—"whatever the form of the investment and the rate of return"—they did not qualify as securities because the investors were motivated to enter the transaction by a desire to gain U.S. visas. *Id.* at 730–31. In so holding, the court was moved by the fact that the investors' "interest in a visa [was] inextricably tied to the financial success of the regional center's project" because the "EB5 program by design links the success of the investment to the investor's success in obtaining a visa." *Id.* at 731. Specifically, to qualify for a visa, an EB-5 applicant must prove that the investment was a "*successful* investment" by showing that it "in fact led to the creation of at least ten full-time jobs." *Id.* The court also pointed to testimony from

9

certain investors that they "sought EB-5 projects with higher rates of return." *Id.*

The sales in question here bear none of the traditional characteristics of securities at issue in the *Feng* case that led the court to find that an investment contract existed before ever even addressing the issue of motivation. Moreover, unlike the EB-5 investments in *Feng*, there is no inherent connection between the utility of the token on the Network and the value of the token in the secondary market. That is, while the EB-5 investments are *only* useful to an investor as a means to obtain a visa *if* the investment is profitable (thus making every investment in an EB-5 project inherently dual-motivated), LBC has pure utility on the Network completely away and apart from the potential to sell the token for a profit on the secondary market.

Finally, while LBRY submitted undisputed evidence demonstrating that users did, in fact, purchase LBC specifically to use it on the LBRY Network, the Commission has introduced no testimony from investors indicating that they bought the token for investment purposes. Although the Commission cites to a total of three threads by a small handful of individuals posted in public forums discussing the price of LBC, and refers without any basis to one of the posters as a "buyer" of LBC, none of the posts actually indicate that any of the posters bought LBC from LBRY. Indeed, several of the messages are clearly written by LBRY content creators who earn LBC (including through tips) on the platform. *See* PX 140 and 141. That these individuals earn LBC through posting videos to the LBRY Network—just as content creators earn money on YouTube—and have an interest in seeing the price of LBC—an asset that they own—appreciate in value, does not suggest, as the Commission contends, that the asset constitutes a security.

## CONCLUSION

For the foregoing reasons, Defendant LBRY respectfully requests that this Court grant its motion for summary judgment and deny the Commission's application for a permanent injunction.

Dated: June 10, 2022                        Respectfully submitted,

                                            LBRY, INC.

                                            */s/  Timothy J. McLaughlin*  (NH Bar # 19570)
                                            William E. Christie
                                            Timothy J. McLaughlin
                                            Shaheen & Gordon, P.A.
                                            107 Storrs Street
                                            P.O. Box 2703
                                            Concord, NH 03302
                                            (603) 819-4231
                                            wchristie@shaheengordon.com
                                            tmclaughlin@shaheengordon.com


                                            */s/  Keith W. Miller*
                                            Keith W. Miller (*pro hac vice*)
                                            Rachel S. Mechanic (*pro hac vice*)
                                            John T. Dixon (*pro hac vice*)
                                            Perkins Coie LLP
                                            1155 Avenue of the Americas, 22nd Floor
                                            New York, New York 10036-2711
                                            (212) 262-6900
                                            KeithMiller@perkinscoie.com
                                            RMechanic@perkinscoie.com
                                            JohnDixon@perkinscoie.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  June 10, 2022                         */s/ Keith W. Miller*
                                              Keith W. Miller