## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

     -against-

LBRY, INC.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

:
:
:
:
:
:

Civil Action No. 1:21-cv-00260-PB

## LBRY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT......................................................................................................................3

    I.      LBRY's Sales of LBC on the Open Market Do Not Constitute Investment
            Contracts under the Securities Act.......................................................................3

            a.     Courts Look to the "Overall Emphasis" in the Seller's Promotional
                    Materials—as Well as the Class of Persons to Whom the Item was
                    Promoted—in Determining whether Howey's "Expectation of Profits"
                    Prong is Met..................................................................................3

            b.     The Commission Cites to a Tiny Fraction of LBRY's Public Posts and
                    Messages in Purported Support of its Argument that LBRY Promoted
                      LBC for its Investment Potential..................................................4

            c.     The Commission Relies on Cherry-Picked, Stray References from a
                    Handful of LBRY's Posts ..............................................................6

            d.     Statements of Fundamental Principles of Economics by LBRY Cannot
                    Constitute Economic Inducement Sufficient to Satisfy the *Howey* Test...10

            e.     The Commission has Offered no Evidence that Individuals Purchased
                    LBC for Investment Purposes .................................................13

    II.     LBRY's Early Sales of LBC ............................................................................15

    III.    The *Howey* Test is Transaction-Specific and an Instrument can Evolve from a
            Security to a Non-Security ................................................................................18

            a.     The Commission Cannot Show a Likelihood of Future Violations..........20

    IV.    If the Court Finds that Disputed Facts Exist as to the Reasonable Expectation of
            Purchasers and Use of the Token on the Network, then the Court Should Allow
            the Issue of the Application of the *Howey* Test to go to a Jury............................21

    V.     Disputed Issues of Material Fact Exist Precluding Summary Judgment on
            LBRY's Fair Notice Defense. .............................................................................22

157122318.3

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Balestra v. ATBCOIN LLC,*
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...................................................................................11

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2016).......................................................................................................22

*Fourth v. U.S. Akar, Inc. v. Cohen,*
    No. 89-1319-N, 1990 WL 138945 (D. Mass. Aug. 27, 1990)..............................................22

*Gen. Elec. Co. v. EPA,*
    53 F.3d 1324 (D.C. Cir. 1995)..............................................................................................23

*Marine Bank v. Weaver,*
    455 U.S. 551 (1982) ..............................................................................................................18

*Pinter v. Dahl,*
    486 U.S. 622 (1998)................................................................................................................3

*Rice v. Branigar Org., Inc.,*
    922 F.2d 788 (11th Cir. 1991) ...........................................................................................3, 4

*SEC v. Sargent,*
    329 F.3d 34 (1st Cir. 2003)...................................................................................................20

*SEC v. Edwards,*
    540 U.S. 389 (2004) ..............................................................................................................12

*SEC v. Feng,*
    935 F.3d 721 (9th Cir. 2019) ...............................................................................................12

*SEC v. Kik Interactive Inc.,*
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..............................................................................2, 11

*SEC v. Levin,*
    849 F.3d 995 (11th Cir. 2017) .............................................................................................17

*SEC v. NAC Found., LLC,*
    512 F. Supp. 3d 988 (N.D. Cal. 2021)..................................................................................11

*SEC v. SG Ltd.,*
    265 F.3d 42 (1st Cir. 2001).......................................................................................3, 11, 21

*SEC v. Telegram Grp. Inc.,*
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................................................11, 12

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946). Case ................................................................................. passim

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975) ....................................................................................................21

*United States v. Craigue*,
    No. 19-CR-142-LM, 2020 WL 1027818 (D.N.H. Mar. 3, 2020) .........................................22

*United States v. Zhen Zhou Wu*,
    711 F.3d 1 (1st Cir. 2013)............................................................................................22

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) ..................................................................................... 23, 24

*Wabash Valley Power Ass'n, Inc. v. Public Service Co. of In., Inc.*,
    678 F. Supp. 757 (S.D. In. 1988) ................................................................................4

**OTHER AUTHORITIES**

17 C.F.R. § 230.500(a) ....................................................................................................16

17 C.F.R. § 230.502 ........................................................................................................17

17 C.F.R. § 230.503 ........................................................................................................17

17 C.F.R. § 230.506 ........................................................................................................17

17 C.F.R. § 230.508 ........................................................................................................17

17 C.F.R. § 506(c), Regulation D [???] ...............................................................................16

William Hinman, Dir. Sec. Exch. Comm'n Div. Corp. Fin., When Howey Met
    Gary (Plastic) (June 14, 2018) ............................................................................ 19, 24

Strategic Hub for Innovation and Financial Technology, *Framework for
    "Investment Contract" Analysis of Digital Assets (*Apr. 3, 2019)........................................19

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act
    of 1934: The DAO Exchange Act Release No. 81207 (July 25, 2017) ...............................24

Nikhilesh De & Mahishan Gnanaseharen, *SEC Chief Touts Benefits of Crypto
    Regulation*, CoinDesk (Apr. 6, 2018, 4:16 PM) ...................................................................19

Jay Clayton, Fmr. Sec. Exch. Comm'n Chairman, Statement on Cryptocurrencies
    and Initial Coin Offerings (Dec. 11, 2017)...........................................................................24

Defendant LBRY, Inc. ("LBRY") respectfully submits this memorandum of law in opposition to the Securities and Exchange Commission's ("Commission") Motion for Summary Judgment (ECF Doc. No. 55).

## PRELIMINARY STATEMENT

The crux of the Commission's argument in support of its Motion for Summary Judgment appears to be that because LBRY pre-mined 400 million tokens (only 100 million of which is allocated to LBRY for operational purposes), the tokens must *ipso facto* constitute an "investment contract" under the Securities Act.  This is not the test, however.  Rather, as relevant to this case, the applicable question is not how *LBRY* viewed the tokens it retained or why it chose to do so, but whether the "overall emphasis" in LBRY's promotional materials and statements to potential purchasers of the token was on the investment characteristics of the token versus its consumptive functionality.  Moreover, contrary to the Commission's suggestion, just because LBRY or any other holder of the token may have an inherent interest in seeing LBC increase in value does not necessarily suggest that the token must be a security.  This fundamental principle of economics is true of any company that sells a commodity or of any person that owns an asset.

In support of its position that LBRY purportedly led purchasers to expect to profit from the potential appreciation in value of LBC, the Commission can point to only a handful of posts out of the *thousands* that LBRY has published since its inception.  Notably, the Commission repeatedly cites throughout its memorandum in support of its Motion for Summary Judgment to the exact same posts without acknowledgement of their duplicity, apparently trying to create the appearance that more posts and statements exist in purported support of its position than actually do.  *See, e.g.*, SEC Memorandum of Law in Support of Its Motion for Summary Judgment ("SEC MOL") (ECF Doc. No. 55-1) at 3, 4, 6, 8, 15, 17 (citing the post quoted in ¶ 30 of the SEC's

Statement of Facts); SEC MOL at 4, 7, 8, 17 (citing the post quoted in ¶ 32 of the SEC's

Statement of Facts); SEC MOL at 5, 8, 13-14, 15, 17 (citing the post quoted in ¶ 37 of the SEC's

Statement of Facts).  Moreover, several of the posts and messages cited by the Commission are

internal and/or non-public, and thus have no conceivable relevance to the central issue of what

purchasers of LBC on the open market were led to expect.  And, with respect to the few publicly

available posts and messages that *are* arguably relevant to the "reasonable expectation of profits"

prong of the *Howey* test, the Commission has merely cherry-picked stray references in those

posts in purported support of its narrative while completely ignoring the overall context of the

posts themselves, which—in most cases—actually support *LBRY's* position in that they are

focused on promoting the LBRY Network itself and any mention of the token is in connection

with its utility on the LBRY Network.

Finally, the Commission makes a significant admission in its memorandum, conceding

that the native LBRY token could be used "on the LBRY Network for video-related purposes . . .

during most of the offering."  SEC's MOL at 17.  This fact stands in stark contrast to the prior

Section 5 enforcement actions that the Commission has brought against other digital asset

companies, all of which involved the sale of tokens through an Initial Coin Offering ("ICO")

prior to the launch of the blockchain, and thus before any possible consumptive use existed for

the proposed tokens.  Here, on the other hand—and as the Commission itself admits—LBC did,

in fact, have a consumptive purpose on the LBRY Network during most of the time in which it

was offered and sold, thereby clearly distinguishing it from the tokens purchased by initial

investors in the Commission's prior Section 5 cases, where "none of [the token's] 'consumptive

use' was available at the time of distribution" and "would materialize only if the enterprise

advertised by [the issuer] turned out to be successful."  *See SEC v. Kik Interactive Inc.*, 492 F.

Supp. 3d 169, 180 (S.D.N.Y. 2020).  The hundreds declarations of users of the LBRY Network affixed to LBRY's Motion for Summary Judgment make clear that—unlike the tokens at issue in the Section 5 digital asset cases that the Commission has previously charged—not only did LBC have consumptive functionality at the time that a majority of the purchases at issue occurred, but purchasers undisputedly did, in fact, purchase the token precisely for its consumptive use.

## ARGUMENT[1]

I.  **LBRY'S SALES OF LBC ON THE OPEN MARKET DO NOT CONSTITUTE INVESTMENT CONTRACTS UNDER THE SECURITIES ACT**

   a.  **Courts Look to the "Overall Emphasis" in the Seller's Promotional Materials—as Well as the Class of Persons to Whom the Item was Promoted—in Determining whether Howey's "Expectation of Profits" Prong is Met**

The offer or sale of an instrument or product qualifies as an "investment contract" subject to the Securities Act only where the purchaser was "led to expect profits solely from the efforts of the promoter or a third party."  *SEC v. W.J. Howey Co.* ("*Howey*"), 328 U.S. 293, 298-99 (1946).  Case law is clear that where purchasers are primarily led to purchase a product for its consumptive use—rather than based on an expectation of profit—the transaction does not satisfy the "expectation of profits" prong under *Howey* and its progeny, and the securities laws thus do not apply.  *SEC v. SG Ltd.* ("*SG Ltd.*"), 265 F.3d 42, 53 (1st Cir. 2001); *see also Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790 (11th Cir. 1991) ("[W]here those who purchase something with the primary desire to use or consume it, the security laws do not apply.").  This is so because the securities laws were designed to protect *investors*—rather than merely consumers. *See Pinter v. Dahl*, 486 U.S. 622, 638 (1998) ("The primary purpose of the Securities Act is to

---

[1] LBRY responds separately to the Commission's Statement of Undisputed Facts in Support of its Motion for Summary Judgment, ECF Doc. No. 55-2, in a document entitled LBRY, Inc.'s Response to Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment.

protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

In determining whether purchasers were primarily led to purchase an item or instrument for its consumptive use, courts look to the "overall emphasis" or "primary focus" of the seller's promotional materials. *Rice*, 922 F.2d at 791; *Wabash Valley Power Ass'n, Inc. v. Public Service Co. of In., Inc.*, 678 F. Supp. 757, 766 (S.D. In. 1988). Accordingly, under this test, stray references or mere mentions of the possibility that an item could increase in value or that a purchaser could profit does not necessarily transform a transaction into an investment contract. *See Wabash*, 678 F. Supp. at 766 (finding that the seller's promotional efforts "provides little support for [plaintiff's] assertion of an expectation of profits" where the promotional materials "contain some reference to the economic benefits," but was not the "primary focus" of the materials). In addition to the content of the seller's promotional materials, courts also consider to whom the item is marketed, and whether the target audience was identified by the seller because of its potential interest in the utility of the item versus its interest in a potential investment opportunity. *See, e.g., Howey,* 328 U.S. at 300–01 (considering class of persons to whom investment opportunity was offered in reaching determination that investment contract was present).

### b. The Commission Cites to a Tiny Fraction of LBRY's Public Posts and Messages in Purported Support of its Argument that LBRY Promoted LBC for its Investment Potential

In support of its argument that LBRY primarily promoted LBC as an investment opportunity, the Commission points to a handful of LBRY's posts and messages—plucking from those posts cherry-picked sentences or phrases that it believes support its position—while ignoring the overall context and meaning of the posts as a whole. Specifically, as detailed in

-4-

Exhibit A, the Commission cites to a total of 35 posts and messages in purported support of its contention that LBRY promoted LBC for its investment value, rather than for its utility on the LBRY Network.  Even assuming all 35 posts and messages cited by the Commission actually support its position, which they do not, as explained *infra*, what the Commission utterly ignores is the *thousands* of posts and messages published by LBRY on its website and social media accounts since the inception of the company.  Indeed, as detailed in the accompanying declaration of LBRY's CEO, Jeremy Kauffman, LBRY has published (i) a total of 655 posts on its website and on LBRY's applications; (ii) 1,101 posts on Facebook; (iii) 8,805 tweets on its Twitter account; (v) 3,075 posts and comments on Reddit; and (vi) over 300 mass email blasts to its millions of subscribers.  *See* Declaration of Jeremy Kauffman ("Kauffman Decl.") ¶ 2.  Thus, the mere 35 posts and messages that the SEC relies upon represent a fraction—specifically **0.25%**—of the total number of posts and messages the company has published since its inception.  These sheer numbers on their face undermine the Commission's position:  far from the "primary focus" of its promotional materials, the purportedly problematic posts that form the basis of the Commission's argument account for a mere fraction of LBRY's overall marketing campaign.

Moreover, several of the 35 messages to which the Commission cites cannot, under any reasonable interpretation, support an argument that they led purchasers to buy LBC for the purpose of "profiting" because the messages are internal and/or non-public communications and were thus not available to purchasers of the token.  For example, the Commission points to several internal chat messages between LBRY employees in purported support of its position that LBRY's promotional materials led purchasers to buy LBC for its investment potential.  *See* SEC Exs. 52-54.  Not only are LBRY employees' subjective beliefs about the status of the token

irrelevant to the question of its status under the securities laws, but such communications could not possibly have led buyers on the open market to expect to profit from their purchase of LBC given that such communications were not available to anyone other than the few employees involved in the discussion.  Similarly, the Commission cites to several non-public pitch decks and emails to institutional and sophisticated investors that discuss the potential value of LBRY's pre-mine.  *See* SEC Exs. 48-51, 57, 59, 123.  As an initial matter, these pitch decks do not constitute the offer or sale of LBC, as LBRY sought only traditional equity funding in connection with its discussions with these investors.  *See* Dixon Decl., Ex. 41 (Kauffman Dep. Tr.) at 210:22-211:4.  LBRY was thus not attempting to sell LBC to these investors.  And, the pitch decks are private, non-public communications, and thus could not have led purchasers in the open market to buy LBC for profit purposes.  Stripping away these internal and/or non-public communications and pitch decks, the Commission is left with a mere 22 posts in apparent support of its position, constituting only **<u>0.16%</u>** of the total volume of posts and messages LBRY has published over the past five-plus years.

### c.  The Commission Relies on Cherry-Picked, Stray References from a Handful of LBRY's Posts

With respect to the handful of publicly released documents that the Commission cites, an objective review of them makes clear that the Commission has merely cherry-picked self-serving snippets from those posts, while conveniently ignoring portions of the same posts that distinctly undermine its position, as well as failing to appreciate the general context and theme of the post as a whole.  For example, the Commission cites to a Reddit post by LBRY employee Tom Zrebczan, in which he states to another Reddit user that "[LBRY's] goal is to create value for the token and we hope our current path does so organically."  SEC Ex. 34.  Notably missing from the Commission's reference to this post is the context in which Mr. Zarebczan made the

157122318.3

statement as to the value of LBC.  Significantly, Mr. Zarebczan's message was in response to a question by a *miner* of LBC about *selling* the LBC that he had acquired through mining the token.  *Id.* ("I'm dual mining Eth and lbry.  I normally hold all of my coins, but I have been selling LBRY for BTC.").  The miner asks if the recent increase in the price for LBC was due to something LBRY-specific or "just a general increase due to almost all coins going up." *Id.* Another Reddit user responds, "I think its [sic] due to all alt coins going up recently, as well as being a good idea."  *Id.*  Thus, the "stray reference" by Mr. Zarebczan to the value of LBC cherry-picked by the Commission and cited in its motion was not made in the context of LBRY inducing a potential purchaser to *buy* LBC, but rather a response to a question by a miner concerning the *sale* of LBC.  Indeed, the post actually *supports* the principle that LBRY has consistently made in its briefing that a secondary market is crucial and necessary to the proper functioning of the LBRY Network because it provides miners and content creators with a marketplace to sell LBCs earned or mined on the Network.

Similarly, although the Commission suggests that LBRY's hiring of Altonomy, a market maker, demonstrates that LBRY was promoting speculative investment in the token by "establish[ing] and stabiliz[ing] the markets for LBC," SEC MOL at 18, the post to which the Commission cites, in which LBRY announces its partnership with Altonomy, makes clear that the purpose of engaging a market maker was to ensure a "healthy market" that "allows *users* to buy and sell LBRY credits in varying amounts without severely affecting the price."  SEC Ex. 97 (emphasis added).  Having a healthy market for LBC is essential to allowing users to buy and sell the LBRY token at stable prices.  Simply put, the mere fact that a trading market existed does not support the Commission's conclusion that purchasers were buying the token for profit.

The Commission also cites to a post authored by LBRY's CEO, Jeremy Kauffman,

157122318.3

entitled "Blockchain is Love, Blockchain is Life," in which Mr. Kauffman explains that a theoretical token (not LBC) "provides a source of funding for the development of the [theoretical] protocol," and that due to the advent of Blockchain technology, "[f]or the first time ever, it's economically feasible for *companies* to compete to create the best technology instead of capture and then abuse their users."  SEC Ex. 38 at 4 (emphasis added).  The Commission focuses on this cherry-picked statement from Mr. Kauffman's four-page blog post in purported support of its argument that LBRY "told people that LBRY's profits would come from the increase in the value of LBC generated by the increased functionality (and use) of the LBRY Network."  SEC's MOL at 8.

Notwithstanding that the statement that the Commission plucks from the post—which references the benefits of a *hypothetical* token to a *hypothetical* company—does not even support the proposition for which the Commission cites it, the Commission also completely fails to acknowledge the overall thesis of the post, which is focused, not on the value of LBC or its potential as an investment opportunity, but on the general principle that "blockchain [technology] will improve the world [through] the development of open standards and protocols, and consequently more user-friendly technology."  SEC Ex. 38 at 1.  Mr. Kauffman explains that while open-source protocols have been technologically possible for decades, there have been historical "barriers of economics and incentives that discourage[d] people" from developing them, namely the lack of "funding or capital to drive the creation of [protocols]."  *Id.* at 2-3.  He opines that the advent of Blockchain technology and a related Blockchain token "solves the incentive problems" for open-source developers and "provides a source of funding for the development of the protocol," allowing companies "[f]or the first time ever . . . to compete to create the best technology instead of capture and then abuse their users."  *Id.* at 3-4.  Mr.

Kauffman explains that this is "why we're building LBRY, and it's why we're open source." *Id.* at 4.

Similarly, the Commission misinterprets an October 2020 post entitled "The LBRY Economy," SEC Ex. 46, suggesting that in this post, LBRY outlined "its plans to 'tweak' the 'LBRY economy' to make it more compelling to buy LBC than to buy tokens from other companies." SEC's MOL at 8-9. Contrary to the Commission's contention, however, the post does not suggest that LBRY intended to somehow tweak the LBRY ecosystem to encourage people to speculate by buying LBC. Rather, the post addresses the situation as of October 2020 where usage of the LBRY Network was continuing to surge (with almost 5 million users as of the prior month), but the amount of LBC being used on the Network to support (or stake) content "ha[d] held flat." SEC Ex. 46 at 2. LBRY posits that "[i]f the economy and token design are working, this number should be growing as fast or faster than usage." *Id.* In response to this plateau in the number of tokens being used *on the LBRY Network* to support content and channels, LBRY proposed certain "tweaks" to the protocol to encourage "a compelling token economy centered around content exchange," such as granting user rewards to content creators that "driv[e] engagement on LBRY"; restoring in-Network LBC features and functionality; making staking (i.e., using LBC to boost your own or another creator's content) more social and visible; providing rewards to users who use their LBC to stake content and channels on the Network; and rolling out a "Blockchain ambassador program" whereby LBRY will partner with creators of Blockchain-related content in order to "learn from these experts how [LBRY] can build a better network and help align long-term incentives with these influential voices." *Id.* at 3, 6. The post concludes by stating that while LBRY is "building exceptional software," "the key metric for creating engaging application is *retention*[;] [a]fter signing up, how many users come

back day-after-day?"  *Id.* at 8 (emphasis added).  The post thus in no way stands for the proposition that the Commission suggests (*i.e.*, that LBRY was pursuing ways to encourage crypto purchasers "to buy LBC than to buy tokens from other companies").  SEC's MOL at 8-9. Far from it:  a fair interpretation of the post and LBRY's proposed "tweaks" to the Network was to increase use of the LBC token *on the LBRY Network*.

Finally, in purported support for its position that LBRY led purchasers to reasonably expect to profit from buying LBC, the Commission cites to a statement by Mr. Zarebczan in a Reddit thread stating that, as a holder of LBC, he "want[s] the price to be higher just as much as anyone else."  SEC Ex. 119 at 4.  As an initial matter, that a LBRY employee and owner of LBRY credits would like to see LBC—an asset—appreciate in value, does not suggest that LBC is a security.  In addition, as with the other statements to which it points, the Commission plucks that one statement from a four-page thread in which Mr. Zarebczan makes several comments completely contradictory to the Commission's argument.  For example, in another part of the thread, Mr. Zarebczan states that "[t]he credits [LBRY is] distributing [as user rewards] are meant for users and community members."  *Id.* at 2.  He goes on to explain that LBRY's "stance has always been not to worry about the price, but instead focus on the product and community. LBC went from 1 penny, to 1 dollar last year.  Then to 13 cents.  Then back up to 1.30.  All these fluctuations were in line with crypto hype and other altcoin runs."  *Id.* at 4.

### d.  Statements of Fundamental Principles of Economics by LBRY Cannot Constitute Economic Inducement Sufficient to Satisfy the *Howey* Test

The other publicly available posts that the Commission relies upon suffer from the same defects as the examples discussed above in that they fail to acknowledge the overall context of the post and omit other statements from the same post that undermine or contradict the Commission's argument.  In addition, the Commission cites to many of the 35 posts for the mere

-10-

proposition that LBRY informed the public and members of the LBRY community that it had retained a small percentage of LBC for operational and profit purposes and that it therefore had an interest in seeing the value of LBC increase. *See, e.g.*, SEC Exs. 2, 39, 60, 129, 132, 133, 134, 135, 136, 137, 138. That a company has an interest in seeing an asset or product that it holds and/or sells increase in value is a basic principle of economics that in no way suggests that the asset or product constitutes a security under the Securities Act—even if there is a secondary market for that asset or product, as is the case with LBC, as well as many other commodities.

Moreover, such statements of fundamental economic principles cannot possibly rise to the level of "persistent representations of substantial pecuniary gains" that "play[] upon greed and fuel[] expectations of profit" that the First Circuit has held constitute "economic inducement" sufficient to satisfy the "expectation of profits" prong of the *Howey* test. *See SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001). Indeed, all the cases cited by the Commission—and, in fact, all prior Section 5 cases against digital token companies—involve statements directly aimed at inducing potential purchasers to invest based on clear representations and, oftentimes, promises of pecuniary gain. *See, e.g.*, *Kik*, 492 F. Supp. 3d at 179-80 (representations made during ICO "extolled [the token's] profit-making potential" by explaining how early purchasers would profit); *SEC v. Telegram*, 448 F. Supp. 3d 352, 373 (S.D.N.Y. 2020) (offering materials issued during ICO targeted buyers with investment intent and "highlighted the opportunity for profit" by "highlight[ing] the large discount, compared to the Reference Price . . . as well as to the anticipated market price . . . at which Initial Purchasers could obtain [the tokens]"); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 992 (N.D. Cal. 2021) (White Paper issued in ICO stated that token "lacked any practical use," "would be subject to trade, sale and purchase . . . on participating exchanges and trading websites" and "can appreciate in value through speculative

-11-

trading") (internal quotation marks and brackets omitted); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 347 (S.D.N.Y. 2019) (defendants issued a "range of promotional materials touting the [token] as an investment opportunity" during ICO that included statements such as "Invest in the cryptocurrency of the future, while the project offers the most favorable terms!" and "Grab the chance to invest in a very prospective project and change your life by filling it with new financial opportunities!"); *see also SEC v. Edwards*, 540 U.S. 389, 392 (2004) (marketing materials "trumpeted the incomparable pay phone as an exciting business opportunity, in which recent deregulation had opened the door for profits") (internal quotation marks and brackets omitted); *SEC v. Feng*, 935 F.3d 721, 727 (9th Cir. 2019) (private placement memoranda referred to investments as "securities" and promised investors fixed, annual returns on investment).

These marketing materials directly and intentionally promoting the purchase of a token or instrument for its potential profit opportunity stand in stark contrast to the handful of general statements (or, in some instances, messages buried deep within a larger thread on a social media site) by LBRY or its employees as to the company's ownership of LBC or the value of LBC. Moreover, unlike the sellers in the above-cited cases, LBRY did not target its promotional materials toward a small group of potential investors of LBC through the issuance of a White Paper or private placement memoranda.  To the contrary, LBRY intentionally published its marketing materials, which consistently focused on promoting the LBRY Network, *see* Dixon Decl., Exs. 43-47 (various LBRY posts), to as broad of an audience as possible through its website and social media accounts.  *See* Dixon Decl., Ex. 35 (M. Finger Dep. Tr.) at 192-194; *cf. Telegram*, 448 F. Supp. 3d at 374 ("Telegram did not focus on cryptocurrency enthusiasts, specialty digital asset firms, or even mass market individuals. . . .  Instead, Telegram selected

-12-

sophisticated venture capital firms (and other similar entities) as well as high net worth individuals with an inherent preference (i.e., their business model) toward an investment intent rather than a consumptive use.").

### e. The Commission has Offered no Evidence that Individuals Purchased LBC for Investment Purposes

The Commission contends, without citation to any documentary or testimonial evidence from a single purchaser, that purchasers bought LBC on the secondary market for speculation or as an investment.  In so arguing, the Commission relies upon (i) unsubstantiated and unreliable LBC trading volume data from third-party websites and entities unaffiliated with LBRY; and (ii) a small handful of posts on social media discussing the price of LBC, at least one of which clearly involves individuals who are users of the Network and members of the LBRY community.  *See* SEC Ex. 105 ("There [sic] are coming [out with] many new updates to LBRY this year, and while I'm waiting, I'm trying to get involved in the community.  Like the LBRY Discord chat.").  As explained in the Declaration of Jeremy Kauffman, the Commission relies on faulty and unreliable trading volume data in its motion, pulled from a third-party source that has been publicly criticized for (and, in fact, admitted to) including fake and non-economic trading data in its reported volume figures.  *See* SEC MOL at 9; SEC Exs. 66, 67.  In fact, the LBC historical trading volume reported on a different third-party volume aggregator for the exact same dates cited by the Commission is a *fraction* of the volume cited by the Commission.  *See* Kauffman Decl. ¶ 13.  Indeed, as explained in Mr. Kauffman's Declaration, the trading data cited by the Commission for December 31, 2020 is *over 2,500%* greater than the volume reported by a different third-party trading volume aggregator.[2]  *Id.*  Accordingly, far from being an undisputed

---

[2] Similarly, the document relied upon by the Commission in support of its assertion that LBRY "bought and sold more than 7.4 billion LBC on the trading platforms" from June 2020 through March 2021 does not appear to stand for the proposition for which the Commission cites it.  *See* SEC MOL at 11, SEC Ex. 107.  The Commission cites to

fact, the question of the ratio between on-Network transactions and secondary trading in LBC is a hotly contested issue and one that cannot be determined on summary judgment.

In addition to the dispute as to the true volume of LBC secondary trading and on-network activity, LBRY has also submitted the expert report of Dr. Boris Richard that directly contradicts the Commission's bald assertion, based on unverified and unexplained screenshots from unsubstantiated third-party websites, that the trading volume on the secondary market outpaced the on-chain usage of the token by LBRY Network users. *See* SEC MOL at 9.  To the contrary, Dr. Richard plainly concluded after a lengthy and detailed analysis that the LBC on-chain activity is "substantially (1.91 times) higher than the secondary market trading activity in the LBC token between 2016 and 2021."  Dixon Decl., Ex. 36 (Amended Expert Report) ¶ 25.

Moreover, as explained in detail in its Reply in Support of its Motion for Summary Judgment (ECF Doc. No. 72) ("LBRY Reply"), even assuming certain users of the LBRY Network purchased LBC both to use it on the Network and with the hopes that it might appreciate in value, that does not suggest, as the Commission baldly proclaims, that the token must constitute a security.  Indeed, the only case to which the Commission can cite for its erroneous proposition that the intention to use LBC on the Network "does not negate the expectation of profits by a reasonable LBC purchaser," SEC MOL at 17, is a sole out-of-circuit case, decided outside the digital asset context, that involves facts wholly distinguishable from those at issue here.  *See* LBRY Reply at 8.  The Commission simply cannot find any support in the case law for the proposition that where users purchase LBC for a dual utility and investment purpose, such purchases must *ipso facto* constitute investment contracts under the securities laws.

---

a PDF of a spreadsheet apparently produced by Bittrex—much of which is redacted—that is entirely unclear as to what information is contained and what the spreadsheet purports to demonstrate.

## II.   LBRY'S EARLY SALES OF LBC

Although the main crux of the Commission's case clearly focuses on LBRY's sales of LBC in the secondary market, in an attempt to find a hook for liability under Section 5 of the Securities Act, the Commission also points to certain early offers or sales of LBC to a limited number of institutions and individuals.  As explained *infra*, the Commission makes absolutely no showing that such sales were made to purchasers reasonably expecting to profit from their purchase, and thus cannot satisfy *Howey*'s three-prong test.

For example, the Commission suggests that LBRY's sale of a small number of tokens to Shapeshift in 2016 constitutes an investment contract under the securities laws.  As the Commission itself admits, however, the purpose of LBRY's sale of LBC to Shapeshift was to allow *users* of the LBRY Network to "convert between different forms of digital assets."  SEC MOL at 12.  The Commission cites to absolutely no evidence suggesting that Shapeshift, a digital asset trading platform, reasonably expected to profit from its purchase of LBC.  To the contrary, the evidence shows that the purpose of LBRY's sale of LBC to Shapeshift was to "make it easy to convert LBRY Credits to Bitcoin and back" to allow people to easily use LBC as a "payment option on the LBRY app."[3]  Dixon Decl., Ex. 39 ("The Appcoin Revolution"); Ex. 35 (Finger Dep. Tr.) at 145 (explaining that "when LBC got listed [on Shapeshift], that they needed to have some coins in accord to make the exchange process work").

Similarly, the Commission cites to LBRY's sales of tokens through the Moonpay application as purported examples of additional sales constituting investment contracts under the Securities Act.  *See* SEC MOL at 12.  As explained in detail in LBRY's Motion for Summary

---

[3] LBRY's sale of LBC to CoinEx in 2020, cited by the Commission as another example of a purported investment contract, *see* MOL at 12, similarly was consummated at or near market price in order to allow users to purchase LBC on the open marketplace.  *See* Dixon Decl., Ex. 37 (Kauffman 30(b)(6) Tr.) at 42-45, 52.

Judgment, however, LBRY launched an integrated application on the LBRY Network through Moonpay—in direct response to users' demands for easier access to LBC—which allowed users to purchase LBC from LBRY using a credit card without leaving the Network.  LBRY's MOL (ECF Doc. No. 61-1) at 21.  Moreover, as detailed in LBRY's motion papers, the size of the transactions consummated through the Moonpay application, which were all sold at market value, clearly indicate that the purchases were consummated by individuals who intended to use the token on the LBRY Network.  *Id.*

The Commission next cites to several discrete sales of LBC by LBRY to a "cryptocurrency club" called Flipside Crypto, whose founder *approached LBRY* about selling a small amount of LBC to the club.  *See* Dixon Decl., Ex. 38 (Balter Dep. Tr.) at 19:11-14, 72:24-73:1.  That is to say, LBRY did not market or promote the purchase of LBC to Flipside or approach it about making a purchase; to the contrary, the founder of Flipside reached out to LBRY and specifically noted that the club's "algorithms . . . identified LBC as a crypto we'd like to acquire."  Dixon Decl., Ex. 48 (Email from D. Balter to J. Finer dated Oct. 17, 2017).  And, in making the sale, LBRY confirmed that the tokens "are intended for use on the LBRY network and LBRY app," that they "are not intended as an investment" and that LBRY has "no idea if they will go up or down in value."  *Id.*

Similarly, the Commission's reliance on an unconsummated token option agreement between LBRY and a highly sophisticated institutional investor, Pillar—which initially invested in LBRY in 2016 and was intimately aware of LBRY's business and operations—is another transparent attempt by the Commission to bring additional transactions within the Commission's jurisdiction.  As an initial matter, Pillar has never taken possession of the tokens, which remain in LBRY's possession to this day.  *See* Dixon Decl., Ex. 42 (Goldstein Dep. Tr.) at 43-44; Ex. 37

-16-

(Kauffman 30(b)(6) Tr.) at 23-26.  Moreover, even assuming the token option agreement would qualify as an investment contract at some time in the future if and when Pillar, in fact, takes possession of the LBC—such a transaction would be exempt from the registration requirement under Regulation D.  *See* 17 C.F.R. § 230.500(a).  Specifically, Rule 506(c) of Regulation D provides for an exemption from registration for sales to accredited investors if, among other things, the issuer takes "reasonable steps" to ensure that participants are accredited investors.  17 C.F.R. § 230.506; *see also* 17 C.F.R. § 230.502; 17 C.F.R. § 230.503.  Even if such requirements are not strictly adhered to, the exemption is not necessarily lost so long as the seller makes a "good faith" and "reasonable" attempt to comply.  17 C.F.R. § 230.508; *see also SEC v. Levin*, 849 F.3d 995, 1004–05 (11th Cir. 2017) (explaining that Rule 508(a) "preserves the safe harbor for certain insignificant deviations in private actions").

Finally, the Commission cites to LBRY's transfer of LBC to employees and LBRY "users, software testers, and software developers" as purported examples of additional investment contracts.[4]  *See* SEC MOL at 12.  LBRY's transfer of nominal amounts of LBC to early testers ("Alpha testers") of the LBRY Network—the very people *most likely* to be interested in *using* the LBRY Network—cannot possibly constitute investment contracts, particularly considering that the Commission has offered absolutely no evidence as to how the incentive program was marketed and how the program participants viewed their participation in the program.  Similarly, there is absolutely no basis to suggest that LBRY's provision of LBC to

---

[4] The Commission's suggestion that LBRY "promised and issued more than 142 million LBC" in connection with programs aimed at rewarding "users, software testers and software developers in exchange for their time, labor, and services" is completely baseless and devoid of any evidentiary support.  SEC MOL at 12.  In support of this contention, the Commission cites to LBRY's Interrogatory Response showing that LBRY has spent approximately 143 million LBC from its Community Fund as of November 19, 2021.  *See* SEC Ex. 68.  This fund, which was established to spread usage and adoption of the LRY Protocol through various user rewards programs, was not limited to the LBC transferred in connection with LBRY's limited time incentive program to reward Alpha Testers with a nominal amount of LBRY credits.  *See* SEC Exs. 109, 110 (referencing LBRY's reward program for early Alpha testers of the Network).

its employees and contractors in connection with an employee purchase program constitute investment contracts regulated by the securities laws.  Not only is it reasonable to assume that LBRY's employees are exactly the type of persons most likely to use the Network, but the mere provision of an asset of a company (which, in and of itself, holds value) to its employees cannot, under any stretch of the imagination, constitute an investment contract.

### III.   THE *HOWEY* TEST IS TRANSACTION-SPECIFIC AND AN INSTRUMENT CAN EVOLVE FROM A SECURITY TO A NON-SECURITY

Even assuming *arguendo* that this Court finds that certain early offers or sales of LBC by LBRY constitute an investment contract, the undisputed evidence submitted by LBRY in support of its Motion for Summary Judgment clearly demonstrates that millions of people currently use LBRY's native token for its intended use on the LBRY Network.  That LBRY may have violated Section 5 of the Securities Act in connection with certain early sales of LBC—which LBRY strongly disputes—does not suggest that all later and future sales of LBC (by LBRY or any other party) constitute sales of securities.

As both the Supreme Court and the Commission itself has recognized, the *Howey* test is *transaction-specific* and the determination that an instrument is a security at one point in time does not dictate that the instrument will constitute a security for all eternity if circumstances surrounding the offer or sale of the instrument change.  Indeed, as William Hinman, the former Director of the Division of Corporation Finance of the Commission, recognized, "the analysis of whether something is a security is not static and does not strictly inhere to the instrument" and, accordingly, an instrument that may have constituted an investment contract at one time "may no longer represent a security offering" if circumstances surrounding the digital asset, the network

on which it functions or the sale itself change.[5]  *See also Marine Bank v. Weaver*, 455 U.S. 551,

560, n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the contents

of the instruments in question, the purposes intended to be served, and the factual setting as a

whole.").

This message has been echoed by the former Chairman of the Commission, Jay Clayton,

who has recognized that digital assets "can evolve toward or away from a security" and thus,

"[j]ust because [a digital asset is] a security today doesn't mean it'll be a security tomorrow, and

vice versa."[6]  And, further demonstrating the Commission's own recognition that digital assets

can morph from securities to non-securities, the Strategic Hub for Innovation and Financial

Technology's 2019 *Framework for "Investment Contract" Analysis of Digital Assets* recognizes

the need to "reevaluate[] . . . later offers or sales" of such assets to determine whether they

continue to qualify as investment contracts under the *Howey* test.[7]  Specifically as it relates to the

"reasonable expectation of profits" prong of the *Howey* analysis, the Framework states that in

reevaluating a digital asset "at the time of later offers or sales," additional considerations should

be given to such questions as whether "[t]he value of the digital asset has shown a direct and

stable correlation to the value of the good or service for which it may be exchanged or

redeemed"; "[t]he trading volume for the digital asset corresponds to the level of demand for the

good or service for which it may be exchanged or redeemed"; "holders are then able to use the

digital asset for its intended functionality, such as to acquire goods and services on or through

the network or platform"; and "any economic benefit that may be derived from appreciation in

---

[5] William Hinman, Dir. Sec. Exch. Comm'n Div. Corp. Fin., Digital Asset Transactions:  When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.
[6] Nikhilesh De & Mahishan Gnanaseharen, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018, 4:16 PM), https://www.coindesk.com/sec-chief-not-icos-bad/.
[7] Strategic Hub for Innovation and Financial Technology, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_edn1.

the value of the digital asset is incidental to obtaining the right to use it for its intended functionality." *Id.*

### a. The Commission Cannot Show a Likelihood of Future Violations

Even assuming the Commission can establish a past violation of the Securities Act through one of LBRY's early offers or sales of LBC, the Commission cannot make a proper showing to support the imposition of permanent injunctive relief unless it demonstrates that there is a "reasonable likelihood," absent the issue of an injunction, "of future violations" of the same law. *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003). It is undisputed that millions of people are currently using LBC on the LBRY Network—a platform that has grown exponentially since its launch nearly six years ago. The existence and availability of a secondary trading market does not mean that LBC is a security; rather, such a market is essential to the proper functioning of this active and dynamic network, as it provides users with a marketplace to buy LBC to use on the network, as well as to monetize the LBC that they have earned on the Network. Indeed, the Commission itself recognized as much in its *Framework for "Investment Contract" Analysis of Digital Assets* when it noted that the trading volume for the digital asset is a relevant factor in determining whether "a digital asset previously sold as a security should be reevaluated at the time of later offers or sales." As the expert report of Dr. Richard concludes, the total LBRY on-chain activity is "substantially . . . higher than the secondary market trading activity in the LBC token" for the 2016 through 2021 period, and the analysis shows that the volume of on-chain transactions has grown exponentially since the launch of the Network in 2016 and, in more recent years, has surpassed trading on the secondary market. Dixon Decl., Ex. 36 (Amended Expert Report) ¶¶ 25, 29; 40 (Exhibits to Amended Expert Report) at 13.[8]

---

[8] Although Dr. Richard's most conservative analysis, reflected in Exhibit 8B, reflects a slight dip in the ratio between on-chain and off-chain transactions for the year 2021, his results still indicate that substantially more

As the Supreme Court has made clear, where, as the facts demonstrate here, buyers purchase an instrument with the primary "desire to use or consume" it, "the securities laws do not apply." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 853 (1975). As the Commission itself has acknowledged, instruments that may be deemed a security at one time are not bound by that designation forevermore, and each transaction must be analyzed at the time of the sale based on the facts then-existing. Thus, even if this Court were to find that LBRY committed securities violations through certain of its early sales of LBC, there can be no doubt that as of today, and as explained in LBRY's Moton for Summary Judgment, millions of people are using LBC in connection with its intended use on the LBRY Network.

**IV. IF THE COURT FINDS THAT DISPUTED FACTS EXIST AS TO THE REASONABLE EXPECTATION OF PURCHASERS AND USE OF THE TOKEN ON THE NETWORK, THEN THE COURT SHOULD ALLOW THE ISSUE OF THE APPLICATION OF THE *HOWEY* TEST TO GO TO A JURY**

If the Court finds that disputed issues of fact exist as to whether purchasers of LBC were primarily led to purchase the token due to an expectation of profit—including how a reasonable purchaser would view LBRY's marketing materials; whether the "primary focus" in LBRY's marketing materials was on the investment properties of LBC versus its utility on the Network; whether the data suggests that purchasers were buying and using LBC primarily for use on the Network versus trading on the secondary market; and how actual purchasers were using the LBC that they purchased, among other issues—case law, including from the First Circuit, makes clear that such questions are appropriate to send to a finder of fact for a factual determination after a full trial on the evidence. *See SG Ltd.*, 265 F.3d at 54 (holding that Commission sufficiently alleged expectation of profits prong, but noting that "SG has a plausible argument, forcefully

---

transactions occurred on-chain than in secondary markets for the year 2020 and that the total on-chain activity in LBC substantially exceeded secondary market trading activity in the token for the period 2016 through 2021. *See* Dixon Decl., Ex. 40 (Exhibits to Amended Expert Report) at 14.

advanced by able counsel, that no participant in his or her right mind should have expected guaranteed profits from purchases of privileged company shares.  But this argument, though plausible, is not inevitable.  In the end, it merely gives rise to an issue of fact (or, perhaps, multiple issues of fact) regarding whether SG's representations satisfy *Howey*'s expectation-of-profit requirement."); *see also Fourth v. U.S. Akar, Inc. v. Cohen*, No. 89-1319-N, 1990 WL 138945, at *7 (D. Mass. Aug. 27, 1990) ("[I]n the vast majority of the cases upon which the parties rely, the issues raised [as to the expectation of profits prong of the *Howey* analysis] were resolved not on the pleadings, but after a full consideration of the facts either in the context of a motion for summary judgment *or after a trial on the merits*.  This phenomenon can perhaps best be explained because the inquiry as to whether there was 'an expectation of profits solely from the efforts of individuals other than the investor' involves, for the most part, an analysis of factual considerations.") (emphasis added) (internal citations omitted).

Accordingly, under clear and controlling case law, if this Court determines that disputed issues of material fact remain as to whether the reasonable expectation of profits prong of the *Howey* test is satisfied, the Court should deny the parties' cross motions for summary judgment and allow the case to be determined by a trier of fact after a trial is held on the merits.

## V.   DISPUTED ISSUES OF MATERIAL FACT EXIST PRECLUDING SUMMARY JUDGMENT ON LBRY'S FAIR NOTICE DEFENSE.

Contrary to the Commission's arguments, prior case law considering a fair notice defense in the context of the application of the Securities Act to digital assets does not control the issue of whether LBRY had fair notice that the Securities Act applies to LBC—a token that, unlike all prior Section 5 cases charged by the Commission, was not sold in an ICO prior to the development of the related Blockchain ecosystem.  First Circuit case law is clear that an as-applied fair notice defense like LBRY's requires courts to assess "whether a statute is vague *as*

*applied to the particular facts at issue.*"  *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir.

2013); *see also Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *United States v. Craigue*, No.

19-CR-142-LM, 2020 WL 1027818, at \*3 (D.N.H. Mar. 3, 2020).  Under the facts and

circumstances here, "substantial uncertainty" about the securities laws' application to *LBC*

deprived LBRY and other market participants of fair notice of the law.  *See Upton v. SEC*, 75

F.3d 92, 98 (2d Cir. 1996) ("The Commission may not sanction Upton pursuant to a substantial

change in its enforcement policy that was not reasonably communicated to the public."); *see also*

*Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332-34 (D.C. Cir. 1995), *as corrected* (June 19, 1995)

(holding that "where the agency itself struggles to provide a definitive reading of the regulatory

requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the

regulations, and may not be punished," and that "it is unlikely that regulations provide adequate

notice when different divisions of the enforcing agency disagree about their meaning").

     As detailed in LBRY's Motion for Summary Judgment, LBRY's sales of LBC are readily

distinguishable from the token sales at issue in all prior Section 5 actions charged by the

Commission, as well as substantially different from all the guidance published by the

Commission in connection with its proposed regulation of the cryptocurrency market, which has

focused exclusively on tokens issued in the context of an ICO.  Indeed, it was not until July 25,

2017—a year *after* LBRY launched its Network—that the Commission first issued meaningful

guidance concerning the application of the federal securities laws to tokens when it released the

"DAO Report," which was issued in the context of an ICO and advised that the "facts and

circumstances" of an individual ICO would determine whether the virtual coin at issue

constituted a security.[9]  Subsequent statements by Commission executives and guidance issued by the Commission continued to reiterate the agency's focus on ICOs.[10]

Contrary to the Commission's contention, LBRY does not suggest that it lacked fair notice as to the application of "how the *Howey* test applies to crypto assets."  SEC MOL at 23. Rather, as with the defendant in *Upton*, LBRY lacked fair notice of the Commission's "substantial change in its enforcement policy that was not reasonably communicated to the public."  *Upton*, 75 F.3d at 98.  That is, the Commission historically and consistently focused its guidance, as well as its enforcement efforts, exclusively on the issuance of digital assets in the context of an ICO.  Apparently, the Commission changed course and determined at some unknown point in time that native tokens, like LBC, issued after a fully functional Blockchain ecosystem had been established, were also subject to the Commission's jurisdiction.  Simply put, like the defendant in *Upton*, LBRY had no notice that the Commission had determined, without alerting the public, that LBRY's token sales consummated outside of an ICO could constitute investment contracts under the Securities Act.

---

[9] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO Exchange Act Release No. 81207, at 17-18 (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf.

[10] *See, e.g.,* William Hinman, Dir. Sec. Exch. Comm'n Div. Corp. Fin., When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 (stating that tokens may constitute securities when companies seek to raise money in an ICO, and that "conduct[ing] the initial funding through a . . . debt offering and, once the network is up and running, distribut[ing] or offer[ing] blockchain-based tokens or coins to participants who need the functionality the network and the digital assets offer" allows the tokens "to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise"); Jay Clayton, Fmr. Sec. Exch. Comm'n Chairman, Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (stating that "companies and individuals increasingly have been using initial coin offerings to raise capital for their businesses and projects" and that "[b]y large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities").

## **CONCLUSION**

For the foregoing reasons, Defendant LBRY respectfully requests that this Court deny the Commission's motion for summary judgment on its sole count, Count I, and LBRY's Fourth Affirmative Defense.

Dated: June 17, 2022

Respectfully submitted,

LBRY, INC.

*/s/  Timothy J. McLaughlin*  (NH Bar # 19570)
William E. Christie
Timothy J. McLaughlin
Shaheen & Gordon, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302
(603) 819-4231
wchristie@shaheengordon.com
tmclaughlin@shaheengordon.com


*/s/  Keith W. Miller*
Keith W. Miller (*pro hac vice*)
Rachel S. Mechanic (*pro hac vice*)
John T. Dixon (*pro hac vice*)
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
(212) 262-6900
KeithMiller@perkinscoie.com
Rmechanic@perkinscoie.com
JohnDixon@perkinscoie.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  June 17, 2022                         <u>*/s/ Keith W. Miller*                          </u>
                                              Keith W. Miller

157122318.3