UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| -against- | :    Civil Action No. 1:21-cv-00260-PB |
| LBRY, INC., | : |
| Defendant. | : |

---

**LBRY, INC.'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant LBRY, Inc. ("LBRY") respectfully submits this response to Plaintiff Securities and Exchange Commission's (the "Commission") statement of undisputed facts in support of the Commission's Motion for Summary Judgment, without admitting that any of the Commission's statements are material or admissible evidence.

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. LBRY does not dispute that it has created some user applications, but states that other third parties have used LBRY's open-source code to develop and create their own applications that run

on the LBRY platform. LBRY did not create, nor does it control, such third-party applications. [Dkt. No. 61-3, Kauffman Decl. ("Kauffman 5/3/22 Decl.") ¶¶ 36–38.]

9. Undisputed.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Disputed. LBRY does not control editorial rights to all of the software operating on the LBRY Network, as numerous third parties have used LBRY's open-source code to develop their own applications. LBRY did not create, nor does it control, such third-party applications. [Kauffman 5/3/22 Decl. ¶¶ 36–38.]

17. Undisputed.

18. Disputed. LBRY did not draft the code change for the hard fork of the LBRY Network (HF1807). [SEC Ex. 6 at 147:13-15.]

19. Disputed. LBRY emailed only those who chose to join a mailing list regarding hard forks. [SEC Ex. 6 at 148:19-149:3.]

20. Undisputed.

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Undisputed.

25. Undisputed.

26. Undisputed.

27. The documents, which should be read in their entirety, speak for themselves.

28. The document, which should be read in its entirety, speaks for itself.

29. Undisputed.

30. Disputed. The quoted text is taken out of context, and the post as a whole does not support the propositions for which the Commission cites it. Further, this post is just one of the thousands of posts LBRY has published on its website, LBRY applications and its social media accounts. [Kauffman 6/17/22 Decl. ¶ 2.] LBRY further states that the document, which should be read in its entirety, speaks for itself.

31. Disputed. The quoted text is taken out of context and is only one of more than 3,000 posts and comments LBRY has made on Reddit over the years. [Kauffman 6/17/22 Decl. ¶ 2.] LBRY further states that the document, which should be read in its entirety, speaks for itself.

32. The document, which should be read in its entirety, speaks for itself.

33. Undisputed that the document appeared on LBRY's website for the cited time period. LBRY further states that the document, which should be read in its entirety, speaks for itself.

34. Undisputed that the document appeared on LBRY's website for the cited time period. LBRY further states that the document, which should be read in its entirety, speaks for itself.

35. Disputed. LBRY does not dispute that the quoted text appeared in the article, but LBRY did not exclusively "develop[] and manag[e] the LBRY Network." Hundreds of developers unaffiliated with LBRY have contributed thousands of lines of code to LBRY's open-source code base of the LBRY Network over the years, and third parties have developed applications that run

on the LBRY Blockchain. [Kauffman 5/3/22 Decl. ¶¶ 32–33, 36–38.] LBRY further states that the document, which should be read in its entirety, speaks for itself.

36. The document, which should be read in its entirety, speaks for itself.

37. Disputed. LBRY does not dispute that the quoted text appears in the cited post, but the quote itself is taken out of context from a four-page blog post whose primary theme was that "blockchain [technology] will improve the world [through] the development of open standards and protocols, and consequently more user-friendly technology." [SEC Ex. 38.] LBRY further states that the document, which should be read in its entirety, speaks for itself.

38. Undisputed.

39. Undisputed.

40. Disputed. LBRY does not dispute that the four examples the Commission cites are transactions that can be made on the LBRY Network, however, such transactions are not the sole transaction that can be made on the LBRY Network. In addition to these four examples, there are other possible types of LBC transactions. For example, miners are paid in LBC as a reward for securing the LBRY Network, publishers pay a transaction fee in LBC in order to publish content to the LBRY Network, and changes to published content, such as renaming or changing a description, also require users to pay LBC. [Kauffman 5/3/22 Decl. ¶¶ 32–33, 36–38.]

41. Undisputed.

42. The document, which should be read in its entirety, speaks for itself.

43. The document, which should be read in its entirety, speaks for itself.

44. Undisputed.

45. The document, which should be read in its entirety, speaks for itself.

46. Disputed. Several digital asset trading platforms approached LBRY about listing LBC. [Dixon Decl.,[1] Ex. 37 (LBRY 30(b)(6) Dep. Tr.) at 150:25-151:3.]

47. Disputed. LBRY hired Altonomy to "allow users to buy and sell LBRY credits in varying amounts without severely affecting price. As larger publishers and users utilize the network, they have a need to both acquire and liquidate credits. Publishers use LBC to publish and promote content, but also sometimes need to sell credits to fund their business. Depending on the day, our current market can see a lot or a little activity, and price can change drastically. This is not user friendly, and compounds the existing user-experience issues with exchanges. . . . We expect that this partnership will result in a stronger LBRY network and a friendlier LBRY experience for everyone." [SEC Ex. 97.]

48. The document, which should be read in its entirety, speaks for itself.

49. Disputed. The quoted text is taken out of context and is only one of more than 3,000 posts and comments LBRY has made on Reddit over the years. [Kauffman 6/17/22 Decl. ¶ 2.] The document, which should be read in its entirety, speaks for itself.

50. Disputed. The quoted text is taken out of context and ignores the central thesis of the article that "blockchain [technology] will improve the world [through] the development of open standards and protocols, and consequently more user-friendly technology." LBRY further states that the document, which should be read in its entirety, speaks for itself.

51. The document, which should be read in its entirety, speaks for itself.

52. The document, which should be read in its entirety, speaks for itself.

53. Disputed. The quoted text is taken out of context and is only one of more than 3,000 posts and comments LBRY has made on Reddit over the years. [Kauffman 6/17/22 Decl. ¶ 2.]

---

[1] Citations to the "Dixon Decl." herein refer to the concurrently filed Declaration of John T. Dixon, dated June 17, 2022.

5

54. Disputed. The language on the website states that "Credits only gain value as the use of the protocol grows." LBRY further states that the document, which should be read in its entirety, speaks for itself.

55. Disputed. The quoted text is taken out of context and ignores the central thesis of the article, which is focused on proposed "tweaks" to the Network designed to increase use of LBC on the LBRY Network. LBRY further states that the document, which should be read in its entirety, speaks for itself.

56. The document, which should be read in its entirety, speaks for itself. The LBRY Plan outlines LBRY's Business Model and Projects and does not speak to the company's or any individual's "belief."

57. The documents, which should be read in their entirety, speak for themselves. As LBRY's CEO has testified, the company "believes that as long as its software is being used by millions or ideally billions . . . of people that there will always be ways for us to make money." [Dixon Decl., Ex. 41 (Kauffman Dep. Tr.) at 109:22-25.]

58. The deposition transcript, which should be considered in its entirety, speaks for itself.

59. The deposition transcript, which should be considered in its entirety, speaks for itself.

60. Disputed. Mr. Kauffman did not use these words, which were stated by the *Commission* during its questions to Mr. Kauffman at his deposition. [SEC Ex. 7 at 186:18-23.]

61. Disputed. LBRY disputes that its employees considered themselves investors in LBC. The only support the Commission cites for this assertion is one ambiguous statement by one employee, Mr. Zarebczan, on a Reddit thread, and it is not even clear that Mr. Zarebczan was stating that he

6

considered *himself* an investor or if he was describing what type of information a generic "investor" might be interested in. [SEC Ex. 55.]

62. Disputed. The cited testimony states only that the price of LBC was discussed in a Slack channel, not that a Slack channel was created for the purpose of discussing the price of LBC. [SEC Ex. 16 at 191:24-192:10.]

63. The cited email, which should be considered in its entirety, speaks for itself.

64. Disputed. LBRY sold LBC at various times in order to generate working capital for the company, but not "[w]hen prices rose and LBRY needed cash." [SEC Ex. 8 at 198:2-8.]

65. Disputed. LBRY disputes the Commission's conclusion that the recipient of the message was an "investor." LBRY further states that the document, which should be read in its entirety, speaks for itself.

66. The non-public pitch deck, which should be considered in its entirety, speaks for itself.

67. LBRY disputes this assertion, which the Commission's cited evidence does not support. The "pronouncements" it appears to refer to are two non-public documents: (1) a private e-mail sent to a single individual (¶ 65) and (2) a pitch deck used for potential venture capital investors (¶ 66). The Commission does not cite any "pronouncements" to the public, much less any evidence to establish a causal link between any statements by LBRY and the summary of LBC trading cited in Exhibits 60 and 61.

68. Disputed. LBRY did not "limit[] access to its application" to a set number of individuals. [SEC Ex. 33.]

69. Disputed. As explained in the accompanying Declaration of Jeremy Kauffman, LBRY disputes the accuracy of the trading volume data relied upon by the Commission, which is pulled from an unreliable, unsubstantiated and untested third-party website, as well as the on-network

7

volume cited by the Commission, which is pulled from a third-party website unaffiliated with or controlled by LBRY.

70. Disputed.  The Commission's citations do not support its assertion.  Moreover, the cited pages of SEC Ex. 6 (216:3-217:2) do not appear in the record.

71. Disputed.  As explained in the accompanying Declaration of Jeremy Kauffman, LBRY disputes the accuracy of the trading volume data relied upon by the Commission, which is pulled from an unreliable, unsubstantiated and untested third-party website, as well as the on-network volume cited by the Commission, which is pulled from a third-party website unaffiliated with or controlled by LBRY.

72. Disputed. As explained in the accompanying Declaration of Jeremy Kauffman, LBRY disputes the accuracy of the trading volume data relied upon by the Commission, which is pulled from an unreliable, unsubstantiated and untested third-party website, as well as the on-network volume cited by the Commission, which is pulled from a third-party website unaffiliated with or controlled by LBRY.

73. Disputed.  As explained in the accompanying Declaration of Jeremy Kauffman, LBRY disputes the accuracy of the trading volume data relied upon by the Commission, which is pulled from an unreliable, unsubstantiated and untested third-party website, as well as the on-network volume cited by the Commission, which is pulled from a third-party website unaffiliated with or controlled by LBRY.

74. Disputed.  As explained in the accompanying Declaration of Jeremy Kauffman, LBRY disputes the accuracy of the trading volume data relied upon by the Commission, which is pulled from an unreliable, unsubstantiated and untested third-party website, as well as the on-network

volume cited by the Commission, which is pulled from a third-party website unaffiliated with or controlled by LBRY.

75. Disputed. The cited documents, which should be read in their entirety, speak for themselves.

76. Disputed. LBRY does not dispute that the individuals on the social media site discussed price changes to LBC (among numerous other posts), but the users did not necessarily attribute the price changes to a recent development announcement. [SEC Ex. 101.]

77. Disputed. LBRY never targeted its marketing toward cryptocurrency investors or others who might have only been interested in LBC for speculative investment purposes. Indeed, LBRY has actively discouraged speculative trading and instead encouraged users to use LBC on the LBRY Network. [Kauffman 5/3/22 Decl. ¶¶ 42–44; Exs. 21–26.] Moreover, the cited deposition testimony does not support the proposition for which it is cited.

78. Disputed. To the extent the Commission's use of the terms "offered and sold" refer to offers and sales of securities, LBRY disputes that it offered and sold securities.

79. Disputed. To the extent the Commission's use of the term "offering" refers to an offering of securities, LBRY disputes that it offered securities.

80. Undisputed.

81. Undisputed.

82. Disputed. At various times during the period July 2017 through July 2021, LBRY has sold LBC on digital asset trading platforms.

83. Undisputed. At various times during the period July 2017 through July 2021, LBRY has sold LBC on digital asset trading platforms.

84. Undisputed.

85. Undisputed.

86. Undisputed. LBRY further notes that sales of LBC through Moonpay were transacted on the LBRY Network and that the average size of the transactions consummated through Moonpay indicate that the purchasers of the LBC intended to use the token on the Network.

87. Undisputed. LBRY further notes that sales of LBC through Moonpay were transacted on the LBRY Network and that the average size of the transactions consummated through Moonpay indicate that the purchasers of the LBC intended to use the token on the Network.

88. Disputed. LBRY disputes that it "sold" LBCs to its employees or contractors.

89. Disputed. LBRY never targeted its marketing toward cryptocurrency investors or others who might have only been interested in LBC for speculative investment purposes. Indeed, LBRY has actively discouraged speculative trading and instead encouraged users to use LBC on the LBRY Network. [Kauffman 5/3/22 Decl. ¶¶ 42–44; Exs. 21–26.] Moreover, the evidence the Commissions cites does not support its assertion. The cited deposition testimony acknowledged only that it was possible that some people traded speculatively.

90. Undisputed.

91. Disputed. LBRY hired Altonomy to "allow users to buy and sell LBRY credits in varying amounts without severely affecting price. As larger publishers and users utilize the network, they have a need to both acquire and liquidate credits. Publishers use LBC to publish and promote content, but also sometimes need to sell credits to fund their business. Depending on the day, our current market can see a lot or a little activity, and price can change drastically. This is not user friendly, and compounds the existing user-experience issues with exchanges. . . . We expect that this partnership will result in a stronger LBRY network and a friendlier LBRY experience for everyone." [SEC Ex. 97.]

92. Undisputed.

93. Undisputed.

94. Disputed. This assertion does not accurately describe Altonomy's market making efforts. As a market maker, Altonomy ensured that sufficient LBC was available to buy or sell at a given market price level so that large transactions would not have a short-term outsized effect on price. [Dixon Decl., Ex. 41 (Kauffman Dep. Tr.) at 74:20-76:23.] Moreover, the document relied upon by the Commission in support of its assertion that LBRY "bought and sold more than 7.4 billion LBC on the trading platforms" from June 2020 through March 2021 does not appear to stand for the proposition for which the Commission cites it. The Commission cites to a PDF of a spreadsheet apparently produced by Bittrex—much of which is redacted—that is entirely unclear as to what information is contained and what the spreadsheet purports to demonstrate.

95. Disputed. The evidence the Commission cites does not support this assertion because the Request for Admission cited relates to exchanges, not to Altonomy or market making. In addition, LBRY *lost* money as a result of Altonomy's market making activities. LBRY transferred 40 million LBC to Altonomy in order for Altonomy to engage in market making activities, and at the end of Altonomy's engagement, Altonomy transferred back to LBRY less than 40 million worth of LBC. [Dixon Decl., Ex. 37 (LBRY 30(b)(6) Dep. Tr. at 222:19-224:5.]

*96.* Disputed. LBRY disputes that it "sold" LBC to Pillar, as LBC was never transferred to Pillar and is still in LBRY's possession. [Dixon Decl., Ex. 42 (Goldstein Dep. Tr.) at 43-44; Ex. 37 (LBRY 30(b)(6) Dep. Tr.) at 23-26.] LBRY also disputes that its sales of LBC to Flipside Crypto were sales to "institutional investors." David Balter, who organized the Flipside Crypto clubs, testified that the purpose of the clubs was "to help create an education environment" regarding the "purpose of cryptocurrencies." [Dixon Decl., Ex. 38 (Balter Dep. Tr.) at 82:8-13.]

Moreover, Flipside Crypto *approached LBRY* about selling LBC to the club; LBRY did not market or promote the purchase of LBC to Flipside or approach it about making a purchase. [Dixon Decl., Ex. 48 (Email from J. Finer dated Oct. 2, 2017).] In addition, when LBRY sold LBC to Flipside Crypto, LBRY emphasized that the purpose of the sales was for consumptive use and were "not intended as an investment." *Id.*

97. Disputed. LBRY disputes that the Flipside Crypto "clubs" for were investment purposes. David Balter, who organized the Flipside Crypto clubs, testified that the purpose of the clubs was "to help create an education environment" regarding the "purpose of cryptocurrencies." [Dixon Decl., Ex. 38 (Balter Dep. Tr.) at 82:8-13.] Moreover, Flipside Crypto *approached LBRY* about selling LBC to the club; LBRY did not market or promote the purchase of LBC to Flipside or approach it about making a purchase. [Dixon Decl., Ex. 48 (Email from J. Finer dated Oct. 2, 2017).] In addition, when LBRY sold LBC to Flipside Crypto, LBRY emphasized that the purpose of the sales was for consumptive use and were "not intended as an investment." *Id.*

98. Undisputed.

99. Undisputed. Flipside Crytpo received a slightly discounted price from the market price of LBC.

100. Disputed to the extent the Commission suggests that LBRY was engaged in a continuous sale of LBC over a several months-long period. To the contrary, LBRY made four discrete sales of LBC to Flipside Crypto.

101. Undisputed.

102. Undisputed.

103. Disputed. LBRY does not dispute that it executed an agreement to transfer two million LBC to Pillar in exchange for an extension of the maturity date of the indebtedness owed by LBRY

to Pillar, but LBRY never transferred the two million LBC to Pillar, nor did Pillar ever ask for or take possession of the LBC. [Dixon Decl., Ex. 37 (LBRY 30(b)(6) Dep. Tr.) at 26:10-16; Ex. 42 (Goldstein Dep. Tr.) at 43:18-44:4.] Accordingly, LBRY disputes that it sold LBC to Pillar.

104. Disputed. As stated above, LBRY never transferred two million LBC to Pillar, nor did Pillar ever ask for or take possession of the LBC. [Dixon Decl., Ex. 37 (LBRY 30(b)(6) Dep. Tr.) at 26:10-16; Ex. 42 (Goldstein Dep. Tr.) at 43:18-44:4.]

105. Undisputed. The document speaks for itself.

106. Undisputed. The document speaks for itself.

107. Disputed. The cited exhibits do not support the assertion that LBRY sold LBC to Shapeshift at a discount to the market price at the time.

108. Undisputed.

109. Disputed that LBRY "sold" LBC to any of its employees or contractors.

110. Undisputed.

111. Undisputed.

112. Disputed. LBRY disputes that it paid the employee, Tom Zarebczan, entirely in LBC. In the testimony the cited by the Commission, Mr. Zarebczan stated that he was paid in LBC for only the first six months of his employment. [SEC Ex. 16 at 59:14-18.] LBRY also disputes that Mr. Zarebczan identified himself as an "investor" in the cited post, in which Mr. Zarebczan made an ambiguous statement where it is not even clear that he was stating that he considered *himself* an investor or if he was describing what type of information a generic "investor" might be interested in. [SEC Ex. 55.]

113. Disputed that LBRY "sold" any LBC to its employees.

114. Disputed that LBRY "sold" any LBC to its employees.

13

115. Disputed that any LBC employees "purchased" LBC.

116. Disputed. To the extent the Commission's use of the terms "offered and sold" refer to offers and sales of securities, LBRY disputes that it offered or sold securities. LBRY further disputes that it "sold" LBC to users, software testers, and software developers.

117. Disputed. To the extent the Commission's use of the term "issued" refers to the issuance of securities, that term is a legal conclusion that LBRY disputes.

118. Undisputed.

119. Disputed. The LBC LBRY retained has numerous other potential uses. [*See, e.g.*, Kauffman 5/4/22 Decl. ¶ 14.]

120. Undisputed.

121. Undisputed.

122. Disputed. The "pooling" of assets under the *Howey* analysis is a legal conclusion that LBRY disputes.

123. Undisputed.

124. Disputed. The documents cited speak for themselves. As LBRY's CEO has testified, the company "believes that as long as its software is being used by millions or ideally billions . . . of people that there will always be ways for us to make money." [Dixon Decl., Ex. 41 (Kauffman Dep. Tr.) at 109:22-25.]

125. Disputed. LBRY self-funded and raised funds from angel investors for the initial development of the LBRY Network, subsequently raised more venture capital funding, and did not solely rely on sales of LBC to operate its business. [Kauffman 5/4/22 Decl. ¶¶ 23-24, 28-30.]

126. Undisputed.

127. The document, which should be read in its entirety, speaks for itself.

128. The document, which should be read in its entirety, speaks for itself.

129. The document, which should be read in its entirety, speaks for itself.

130. Disputed. The LBRY employee, Mr. Zarebczan, does not identify himself as an "investor" in the cited post. To the extent that the Commission refers to the ambiguous statement in a Reddit thread by Mr. Zarebczan in SEC Exhibit 55, it is not even clear that Mr. Zarebczan was stating that he considered *himself* an investor or if he was describing what type of information a generic "investor" might be interested in. [SEC Ex. 55.]

131. The document, which should be read in its entirety, speaks for itself.

132. The document, which should be read in its entirety, speaks for itself.

133. The document, which should be read in its entirety, speaks for itself.

134. Disputed. The Commission points to no evidence that the pitch deck or statements therein were shared with the public. LBRY further states that the document, which should be read in its entirety, speaks for itself.

135. Disputed. The Commission points to no evidence that the pitch deck or statements therein were shared with the public. LBRY further states that the document, which should be read in its entirety, speaks for itself.

136. Disputed. The Commission points to no evidence that the pitch deck or statements therein were shared with the public. LBRY disputes that any recipients of the pitch deck were "investors," as the Commission cites no evidence that any actual investments resulted from these pitches. LBRY further states that the document, which should be read in its entirety, speaks for itself.

137. The document, which should be read in its entirety, speaks for itself.

138. The document, which should be read in its entirety, speaks for itself.

139. The document, which should be read in its entirety, speaks for itself.

140.   Undisputed.

141.   Undisputed.

Dated: June 17, 2022                                                  Respectfully submitted,

                                                                                     LBRY, INC.

                                                                                     */s/ Timothy J. McLaughlin*
                                                                                     William E. Christie
                                                                                     Timothy J. McLaughlin
                                                                                     Shaheen & Gordon, P.A.
                                                                                     107 Storrs Street
                                                                                     P.O. Box 2703
                                                                                     Concord, NH 03302
                                                                                     (603) 819-4231
                                                                                     wchristie@shaheengordon.com
                                                                                     tmclaughlin@shaheengordon.com


                                                                                     */s/ Keith W. Miller*
                                                                                     Keith W. Miller (*pro hac vice*)
                                                                                     Rachel S. Mechanic (*pro hac vice*)
                                                                                     John T. Dixon (*pro hac vice*)
                                                                                     Perkins Coie LLP
                                                                                     1155 Avenue of the Americas, 22nd Floor
                                                                                     New York, New York 10036-2711
                                                                                     (212) 262-6900
                                                                                     KeithMiller@perkinscoie.com
                                                                                     Rmechanic@perkinscoie.com
                                                                                     JohnDixon@perkinscoie.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  June 17, 2022                                  */s/ Keith W. Miller*
                                                                    Keith W. Miller