UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LBRY, INC.,<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)　Civil Action No. 21-cv-00260<br>)<br>)<br>)<br>)<br>) |

**REPLY TO LBRY'S OPPOSITION
TO COMMISSION'S SUMMARY JUDGMENT MOTION**

I.   LBRY's Arguments Fail to Overcome the Undisputed Evidence Showing a Reasonable LBC Purchaser Would Have an Expectation of Profits .............................. 2

　　A.   LBRY Has the Wrong Focus for the "Overall Emphasis" of its Promotional Materials ................................................................................................................ 2

　　B.   LBRY's Statements Admit the Economic Realities of LBC Purchases ................ 3

II.  LBRY Admits Its Secondary Market Sales are to LBC Investors, Not Users ............... 4

III. The *Howey* Test is Offering Specific; LBRY Will Likely Violate Section 5 in the Future ............................................................................................................................. 5

IV.  LBRY Cannot Avoid Summary Judgment by Claiming Unproven and Immaterial Disputes .......................................................................................................................... 6

V.   LBRY's Fair Notice Argument Rests on an Untenable Premise .................................... 9

LBRY has conceded two-and-a-half of the *Howey* test's three prongs. One, LBRY does not dispute that purchasers paid money, digital assets, and services for LBC, satisfying the first prong of *Howey*. Two, LBRY does not dispute horizontal commonality and the common enterprise prong.[1] And two-and-a-half, although LBRY maintains that LBC purchasers *primarily* bought LBC for video watching and thus did not have an expectation of profits, it does not argue that those who bought with an expectation of profits thought those profits were coming from the efforts of LBRY and other third parties.

LBRY only contests the first half of *Howey*'s third prong, arguing that the reasonable purchaser did not expect to profit from an increase in value of LBC. LBRY's failure to contest (or to offer evidence refuting) the first two prongs of the *Howey* test and the "efforts of others" portion of the third prong means that the Court should enter summary judgment for the Commission on those elements of the Section 5 claim.

As to the final piece—the "expectation of profits"—LBRY has merely drawn a conclusion unsupported by the undisputed material facts. Neither side disputes what LBRY said. LBRY just ignores purchasers' rational response to its widely disseminated statements touting the long-term value proposition for LBC, its development efforts to fulfill that proposition, and its incentive to do so because of its massive LBC reserve. [*See*, *e.g.*, PX35.][2] LBRY cannot now bury what it said and what purchasers expected to happen by piling the "thousands" of technical messages and posts it made on top of its LBC-related statements. As LBRY pitched an investor, the "opportunity is obvious…." [PX 58.] The Court should grant summary judgment.

---

[1] LBRY also does not contest that the facts show vertical commonality, as the fortunes of investors are tied to the fortunes of the promoter.

[2] The Commission designates its exhibits as "PX" and LBRY's as "DX." The Commission also refers to its Statement of Facts (ECF No. 55-2) as "SOF." Commission exhibits PX161 and above are filed herewith.

I.  **LBRY's Arguments Fail to Overcome the Undisputed Evidence Showing a Reasonable LBC Purchaser Would Have an Expectation of Profits**

   A.  **LBRY Has the Wrong Focus for the "Overall Emphasis" of its Promotional Materials**

In its brief, LBRY dodges the impact of its statements about LBC, and how they created an expectation of profits in the reasonable LBC purchaser. Instead, LBRY argues that it and its employees made lots of statements other than those the Commission cites. Of course they did. Over the five-year period covered in the Complaint, LBRY and LBRY employees talked about lots of things. But, in its statements *about LBC*, LBRY plainly told purchasers that LBC would become more valuable as LBRY developed the LBRY Network.

LBRY argues that the Commission's motion *only* points to *thirty-five* posts and messages (and often multiple parts of those) to show that the statements of LBRY and its employees helped create the expectation of profits. Opp. at 4-6. It then totals up every LBRY post, tweet, and email it ever made about *anything*, to argue only a fraction of its statements concerned LBC. In other words, LBRY's primary argument is that it said lots of things about lots of topics so its sales of LBC were not investment contracts.

LBRY's approach leads to an odd conclusion: that the "expectation of profits" prong of the *Howey* test should turn on how verbose or reticent a seller is. LBRY and its executives make *lots* of statements—but it does not follow that its comments *unrelated to* LBC make LBC less likely to be a securities contract. Under LBRY's approach, a seller could dilute their statements about the putative security with unrelated statements and avoid liability. There is no reason the *Howey* test should work that way. The expectation of profits can be created by the "promotional materials" *about the putative security*, not everything anyone connected to the Defendant has ever said. In both cases cited by LBRY, the court focused on the "promotional material" related to the sale, not all statements made by the defendants throughout their business dealings. *See*

2

*Rice v. Branigar Org.*, 922 F.2d 788, 791 (11th Cir. 1991)(marketing items from nonprofit company for beachside houses and lots); *Wabash Valley Power Ass'n, v. Public Serv. Co. of In.*, 678 F. Supp. 757, 766 (S.D. Ind. 1988)("very little in the record relating to [defendant's] promotional activities" and analyzing "only three letters" concerning plaintiff's participation). Here, the Commission's evidence proves that when LBRY talked about LBC, it highlighted the potential long-term increase in LBC value. *See*, *e.g.*, PX33 (discussing "long-term value proposition"; "the interest of LBRY and the holders of Credits are aligned"); PX34 ("Our goal is to create value for the LBC token…."); PX35-36 (long-term value of protocol will increase value of LBC reserve); PX38 ("token has value in proportion to the usage and success of the network … people … can reap substantial value by being there first").

**B. LBRY's Statements Admit the Economic Realities of LBC Purchases**

LBRY downplays statements about LBC in "pitch decks" to investors and internal statements by its employees because those statements were not made to a large audience. LBRY made these pitch deck statements to multiple external parties who were potentially interested in investing in a company that held crypto tokens. These statements contributed to investors' expectations (such as LBRY's equity investor Pillar, which obtained 2 million LBC)[3] that LBC holders, *including LBRY*, would make a profit on LBC as LBRY developed the LBRY Network. And these statements (both internal and in the pitch decks) are admissions by LBRY and its agents about the economic realities of LBC transactions: that they would increase in value as LBRY built the network and that sales of LBC would fund LBRY's continued operations and development. As the *Howey* inquiry focuses on the economic realities of the offer and sale of the putative security, the evidence about that inquiry should properly go beyond public statements

---

[3] LBRY now calls its agreement with Pillar an option contract. That distinction, though incorrect, is immaterial under *Howey*. Moreover, when LBRY communicated with Pillar's auditor, it confirmed the sale. [PX170, PX171.]

3

into non-public admissions by the offeror-seller about those economic realities.

LBRY also argues that its statements about LBC increasing in price are merely reflections of the "fundamental principles of economics" that a company has an "interest in seeing an asset or product that it holds and/or sell increase in value." Opp. at 11. With this argument, LBRY concedes that it made statements to the public that it wanted and expected LBC to go up in value. LBRY attributes no *Howey*-related significance to that concession. But that is exactly the kind of evidence contemplated by *Howey* in the third prong's requirement that a reasonable purchase would expect the asset to go up in value. *SG Ltd.*, 265 F.3d at 53; *SEC v. Edwards*, 540 U.S. 389, 394 (2004)(profits include "the increased value of the investment"). In fact, courts consider alignment of the interests of the offeror with the purchaser in the increase in value of the token a key piece of evidence in finding investment contracts. *See, e.g.*, *SEC v. Telegram Grp.*, 448 F. Supp. 3d 352, 370 (S.D.N.Y. 2020).

## II. LBRY Admits Its Secondary Market Sales are to LBC Investors, Not Users

LBRY tries to pigeon hole the Commission's case by claiming that the crux of the case is LBRY's sales on the secondary market. Not so. The Commission's case includes all of LBRY's offer and sales, including those outside the secondary market. LBRY's focus on its sales on the trading platforms is also myopic because its expert, Dr. Richard, opines that traders in the secondary market did not buy LBC for consumptive use. [DX2, ¶¶14, 68.] Meaning market traders are buying for investment. Richard states, "trading volume of LBC token on secondary market trading/exchange platforms … reflects holders' need to access liquidity, express views on expected token price performance, or other reasons likely not related to publishing, purchasing and sharing digital content on the LBRY platform." [DX2, ¶68.] LBRY adopts this statement by relying on Richard's reports (and his statements about on-chain versus secondary market trading) in their summary judgment and opposition papers. LBRY itself sold more than more

4

than 44 million LBC on the secondary market directly to purchasers [SOF ¶¶84-85] and transacted more than 7.4 billion LBC in LBRY's accounts through its market maker agent [SOF ¶94]. So if sales on the secondary markets are sales to investors, then LBRY's *own* sales of LBC on the secondary markets were to purchasers buying for investment purposes, and not for use for video sharing.[4]

### III.  The *Howey* Test is Offering Specific; LBRY Will Likely Violate Section 5 in the Future

LBRY claims it is unlikely to violate Section 5 in the future because LBC now have utility. The *Howey* test, however, focuses on how a token was offered, not on its utility. Orange groves had utility; if the lack of utility was an investment contract prerequisite then *Howey* would have come out differently. The investment contracts LBRY has already sold are securities and subject to the mandates of the federal securities laws.

The staff guidance LBRY cites is about *new* offerings. Here, there is no *new* offering. LBRY offers and sells LBC just as it has always has. LBRY retains over 100 million LBC, most of which LBRY earmarked for growing the LBRY Network and for profit. [SOF ¶¶33, 43, 79.] LBRY is still trying to build and grow the LBRY Network from the proceeds of LBC sales. [*Id.* ¶¶79-84.] LBRY still cannot sustain its efforts without selling LBC. [*Id.* ¶125.] There is every reason to believe LBRY will continue selling investment contracts in violation of Section 5.

LBRY can point to no significant change in how it is offering LBC that will remove purchasers' expectations of profit or changed any of the other *Howey* prongs. The economic realities of LBC purchases from LBRY remain the same: LBRY has created an asset of limited supply and is intentionally driving demand to increase its value. LBRY is not offering LBC at a fixed price commensurate with the cost of watching videos. LBRY is not offering LBC in a

---

[4] And LBRY knew that those sales were to investors and speculators. [SOF ¶77.]

closed system requiring purchasers to use LBC on the LBRY Network or restricting them from resale at a profit. So LBRY will likely continue to offer LBC based on the same economics and in the same manner, and reasonable purchasers will continue to expect the value of LBC to increase, whether or not LBC *can* be used on the LBRY Network.

The Court also should not be misled by LBRY's factual sleight of hand. LBRY claims "millions" of people "use" LBC on the LBRY Network. Opp. at 20. But LBRY has not supported this assertion with any evidence. While more than 1 million people may have interacted with the LBRY Network in some way, there is no evidence that "millions" of people have *used LBC they purchased* for a content-related transaction on the LBRY Network. Most content is free to watch and LBRY pays to publish all YouTube Sync Program content. Given the lack of LBC used on the LBRY Network, it appears that most Network participants never *use* LBC, which is likely why, as LBRY pointed out in October 2020, the LBC "economy" was stagnant. In addition, LBRY quietly acknowledges its expert's conclusion that during 2021 more people traded LBC as investments on trading platforms than transferred LBC on-chain. Opp. at 20 n.8. So by the logic of LBRY's expert, even after the Commission filed suit, buyers acquired LBC primarily as an investment, meaning future purchasers will likely buy expecting to profit.[5]

## IV. LBRY Cannot Avoid Summary Judgment by Claiming Unproven and Immaterial Disputes

LBRY tries to fabricate factual disputes to thwart summary judgment. But, since LBRY's supposed factual disputes lack evidentiary support or materiality, the Court should ignore them. *Velazquez-Perez v. Devs. Diversified Realty Corp.*, 753 F.3d 265, 270 (1st Cir. 2014)("Conclusory allegations, improbable inferences, and unsupported speculation, are

---

[5] In general, the opinion of LBRY's expert fails to satisfy the *Daubert* standard and Fed. R. Evid. 702, and the Commission will be moving to exclude his opinions and testimony.

insufficient to establish a genuine dispute of fact."); Local Rule 56.1 (requiring "appropriate record citations" to maintain disputes of fact). For example, LBRY disputes it "sold" LBC to its employees. [ECF No. 74-25, ¶¶88, 109, 113-14.] Yet, LBRY cites *no* evidence for its position. The Commission, on the other hand, has submitted several exhibits showing that LBRY transferred LBC to employees and contractors in exchange for money and services. [SOF, ¶¶ 88, 109, 113, 114.] Several more paragraphs contain no record citations at all to dispute the Commission's facts, so should be considered undisputed.[6] Fed. R. Civ. P. 56.1(e). In addition, LBRY's Local Rule 56.1 response (ECF No. 74-25) habitually states only, "The document, which should be read in its entirety, speaks for itself" or even, "The deposition transcript, which should be considered in its entirety, speaks for itself" without any reference to a record citation evidencing contrary information. These facts should be considered undisputed as well.[7]

Similarly, LBRY relies on Kauffman's declarations to create disputes with the factual record. Fed. R. Civ. P. 56(c) requires that declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Kauffman's do not. When he baldly asserts purported facts he couldn't have "personal knowledge" about, those assertions should be disregarded, and do not create disputes of fact.[8] Fed. R. Civ. P. 56(e).

Lastly, LBRY tries to create a fact dispute about the volume of LBC trading on trading platforms. But any dispute is immaterial, and actually between LBRY and its own expert. LBRY holds out its CEO as an expert on trading platforms and their reported volumes. Yet

---

[6] ECF No. 74-25, ¶¶50, 54-56, 65, 78-79, 88, 109, 116-17, 122, 134-36.

[7] ECF No. 74-25, ¶¶27, 28, 32, 33, 34, 36, 42, 43, 45, 48, 50-52, 55-59, 63, 66, 105-06, 127-29, 131-33, 137-39.

[8] *See, e.g.*, DX1, ¶53 (declaring, without a source, that 20,265 items were published to the LBRY Network on a certain day five years ago), ¶¶54-57 (declaring, again with no source, LBRY usage statistics); Kauffman Decl. (ECF 74-17), ¶2 (exact number of tweets, emails, and web posts), ¶16 (unsourced declaration of amount of LBC transacted on the LBRY Network on a given day).

7

Kauffman testified that he is not "particularly knowledgeable about the trading side." [PX161 at 272:7-23.] Now he submits a declaration swearing that the website Messari.io more accurately reports LBC's trading volume than the popular reporting site Coinmarketcap.com, relied on by the Commission.[9] LBRY's own putative expert, Dr. Richard, did not rely on Messari.io, but used the reporting site CryptoCompare.com because "there are no providers [of trade data] that would be better in quality or more reputable than cryptocompare.com." The difference between Kauffman's numbers and LBRY's expert's is large. For December 31, 2020, CryptoCompare reports 303.6 million LBC were traded on exchanges while Messari has 37.2 million. [PX162 at 35, PX163.] But the difference is immaterial, because the amount of LBC "used" for supports, claims, and payments equaled less than 2.1 million LBC that day. [PX168 at 4.][10] Thus, even using Kauffman's new numbers, the "usage" of LBC on the LBRY Network was less than 6% of the trading volume on December 31, 2020. Nor is December 31, 2020 a "cherry-picked" statistical outlier. Messari shows that daily trade volume averaged around 26 million LBC per day during December 2020. [PX163.][11] Meanwhile, LBRYnomics.com (which LBRY calls an independent (i.e., non-biased) site), shows "usage" on the LBRY Network averaged less than 2.1

---

[9] "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000). This is precisely what Kauffman attempts here.

[10] This includes the LBC LBRY sold to content creators recorded on the LBRY Network as a tip or type of support. [PX95, PX96, PX159.]

[11] While Kauffman may prefer Messari, it appears not to include many of LBRY's own trades in its volume. During 2020 and 2021, LBRY traded on trading platforms CoinEx and Hotbit. [SOF ¶83.] Messari *does not currently include* trades on those platforms in its "real volume," which LBRY cites. [PX165 at 7-8, PX166.] Messari also does not include all of LBRY's trades on Bittrex. According to Messari, around 810 million LBC was traded on trading platforms during December 2020. [PX163.] At the same time, LBRY itself traded more than 1.2 billion LBC on Bittrex, including 607.8 million LBC through an account in Kauffman's name. [PX167 at 21.]

LBRY questions the Commission's use of excerpts for the Bittrex trade data that were redacted to remove personal identifying information. The Commission produced in discovery the full spreadsheets of Bittrex LBC trade data in digital format, so there should be no confusion. A print out of LBRY's trade data for just December 2020 would run to thousands of pages, so the Commission has used an excerpt/summary.

million LBC during that period.[12] [PX164 at 21.]

## V. LBRY's Fair Notice Argument Rests on an Untenable Premise

The Court should dismiss LBRY's affirmative defense because LBRY has not met its burden. LBRY has not provided grounds a jury could reasonably accept that Section 5 of the Securities Act and the *Howey* test fail to provide a person fair notice of what is prohibited. Indeed, LBRY concedes that it "does not suggest that it lacked fair notice as to the application of how the *Howey* test applies to crypto assets." Opp. at 24 (quotation omitted).

LBRY at first declares that "disputed issues of material fact exist" for its fair notice affirmative defense. Opp at 22. LBRY then fails to identify a single disputed factual issue for their defense. Thus, LBRY's fair notice defense is ripe for decision by summary judgment.

Conceding the *Howey* test provided it with sufficient notice, LBRY then casts about for a different argument: that Section 5 is unconstitutionally vague because the Commission has not previously announced it would sue an issuer who did not conduct an "ICO." But the Constitution does not require press releases. *See*, *e.g.*, *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010) (fair notice inquiry concerned whether the law provided sufficient notice, "not whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.").

The case LBRY cites, *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996), provides it no help. *Upton* concerned a regulation the Commission authored and the Commission's interpretation of that regulation, not a Congressional statute construed by the Supreme Court. When Congress has

---

[12] The Commission's SOF states that 470,000 LBC were recorded on the blockchain as claims, supports/tips, or payments on December 31, 2019. [SOF ¶83.] This represents additional demand/possible usage that day. Because, in part, the movement of LBC in claims and supports within the LBRY Network (including from LBRY rewards) are also recorded on the blockchain, the total LBC recorded as claims, supports/tips, or payments that day is 2.7 million LBC. [PX169 at 4.] This does not represent additional demand for LBC and, even this larger number, equals a fraction of the market trading volume per Messari.

provided the necessary definition, "agency inaction … is irrelevant." *United States v. Coscia*, 866 F.3d 782, 792–93 (7th Cir. 2017) (distinguishing between statute and regulation, and highlighting that in *Upton* "defendant had technically complied with the requirements of a rule"); *see also SEC v. Druffner*, 353 F. Supp. 2d 141, 151 (D. Mass. 2005) (distinguishing *Upton* because the Commission was interpreting its own rule and because the *Upton* defendant complied with the literal terms of the Rule at all times); *Rock of Ages Corp. v. Sec'y of Lab.*, 170 F.3d 148, 156 (2d Cir. 1999)(recognizing factual limitations of *Upton*).  The court in *SEC v. Kik Interactive Inc.* rejected the same *Upton*-based argument LBRY makes here, adding, "the law does not require the Government to reach out and warn all potential violators on an individual or industry level."  492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020).  Statements that ICOs may constitute securities offerings do not insulate non-ICO offerings from the application of the law. The Court should dismiss LBRY's fair notice defense on summary judgment.

For the reasons above, and those in the Commission's Memorandum in support of its Motion, the Commission asks this Court to grant summary judgment in its favor on its Section 5 claim and on LBRY's Fourth Defense.

Dated:  June 24, 2022                                           Respectfully submitted,

                                          **SECURITIES AND EXCHANGE COMMISSION**

                                          By its Attorneys,

                                          */s/ Marc Jones*
                                          Marc Jones (Mass Bar No. 645910)
                                          Peter B. Moores (Mass Bar No. 658033)
                                          Boston Regional Office
                                          33 Arch Street
                                          Boston, MA  02110
                                          (617) 573-8947 (Jones direct)
                                          jonesmarc@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on June 24, 2022, I caused true and correct copies of the foregoing to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

*/s/ Marc Jones*
Marc Jones
