**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 10-31-2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
U.S. SECURITIES AND EXCHANGE      *
COMMISSION                        *    21-cv-260-PB
                                  *    July 20, 2022
            v.                    *    1:00 p.m.
                                  *
      LBRY, INC.                  *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Plaintiff:          Marc Jonathan Jones, Esq.
                            Amy Burkart, Esq.
                            Securities and Exchange Commission




For the Defendant:          Keith Miller, Esq.
                            Emily Drinkwater, Esq.
                            Perkins Coie, LLP

                            Timothy John McLaughlin, Esq.
                            Shaheen & Gordon




Court Reporter:             Susan M. Bateman, RPR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, NH 03301
                            (603) 225-1453

1                    P R O C E E D I N G S

2              THE CLERK:  This Court is in session and has for

3     consideration a motion hearing in civil matter 21-cv-260-PB,

4     U.S. Securities and Exchange Commission versus LBRY, Inc.

5              THE COURT:  All right.  First, I would like to just

6     take a minute and thank the parties for their briefs and

7     compliment you.  I mean, I really feel the briefs are very

8     well done and were quite helpful to me, the briefs on both

9     sides.

10             Let me explain to you how I would like to proceed.

11    The SEC has filed a motion to strike a limited supplemental

12    disclosure by one of the defendant's experts.  That motion is

13    serious, and I recognize there's a real potential for unfair

14    prejudice if I were to allow the motion to be -- excuse me --

15    allow the supplemental disclosure to be included in the

16    materials that I would consider in ruling on the parties'

17    cross-motions for summary judgment, but I think that LBRY has

18    proposed the outlines of the solution, at least an interim

19    solution to that problem.

20             As I understand LBRY's disclosure, response to the

21    motion to strike, you're saying, hey, Judge, if there's a --

22    if you have a significant concern of unfair prejudice, just

23    don't include the supplemental disclosure on these briefs and

24    we'll live to fight another day about whether the disclosure

25    can be used in some subsequent proceeding like a trial.

1             That would address my most -- my most immediate

2    concern is I think it would be unfairly prejudicial to the SEC

3    to allow you to just add to the record on summary judgment

4    something like that so late in the process under these

5    circumstances.

6             But I understand your argument that if we get

7    beyond this, the prejudice is obviously lessened and there are

8    other remedies that I might use, like reopen discovery, allow

9    supplemental depositions, things like that, and that's at

10   least a viable alternative.

11            So it would seem to me the best thing to do would

12   be to simply proceed without consideration of the supplemental

13   disclosure in ruling on the parties' cross-motions because as

14   LBRY has pointed out, you don't rely extensively on the

15   supplemental disclosure.  You argue that you can prevail

16   regardless of whether I can consider it, and you appear to be

17   willing to allow me to rule on the motions without considering

18   it.

19            And since there's a danger of unfair prejudice it's

20   very prevalent to me if I were to consider it now, I would

21   propose that we simply agree that it will not be considered on

22   these motions.  I will rule on these motions as if it had not

23   been filed and deny the motion without -- deny the motion to

24   strike without prejudice to the SEC's right to renew it.

25   Subsequently, in light of that agreement, the immediate

1   concern for unfair prejudice could be in my mind

2   satisfactorily addressed.

3         So let me first ask for the LBRY's -- whether I've

4   read enough into your response that what I'm suggesting to you

5   would be acceptable to you.  Would you let me know whether

6   that is?

7         MR. MILLER:  Yes, your Honor.  That's agreeable and

8   acceptable.

9         THE COURT:  All right.

10        So I understand your argument.  It's fully

11   preserved with respect to supplemental if the case survives

12   summary judgment.

13        I don't see how it's unfair to you in any way given

14   their agreement that I'll act as if it doesn't exist for

15   purposes of these motions.  So I would assume that's

16   acceptable to the SEC.

17        MR. JONES:  It is, of course, your Honor, more than

18   fair.  I would ask -- we would preserve that if in fact we

19   proceed beyond this.

20        The other thing is that the amended report concedes

21   substantial methodological and factual errors that are in the

22   original report.  So I would ask your Honor to at least take

23   that into account if your Honor is still going to consider the

24   original report.

25        THE COURT:  It's sort of in for a penny, in for a

1    pound kind of thing.  It would raise complications.  So I'm

2    not inclined to do that.  Of course you can raise those issues

3    at a later time.

4           You have an argument which you say is entirely

5    sufficient based on the state of the record as it existed

6    before the supplemental disclosure.  LBRY is willing to have

7    these motions decided on the record as it existed before the

8    supplemental disclosure.  I think that's the best way to

9    proceed.  So I understand your point.  I'm not willing to

10   grant all that you ask for.

11          So I will deny the motion to strike without

12   prejudice given LBRY's concession that I can decide the

13   current motions without regard to the supplemental disclosure.

14   All right?

15          So that takes care of that, which is good because I

16   want to focus on serious substantive arguments that the

17   parties are presenting here today.

18          Now, there are cross-motions for summary judgment.

19   So a question arises, who should go first, okay, and I know

20   the SEC might want to go first, but from my mind the clearer

21   way to proceed is to give LBRY a chance to go first and

22   explain why the SEC is not entitled to summary judgment and

23   while making that argument to simultaneously claim that you're

24   entitled to summary judgment, and then to give the SEC an

25   opportunity to respond to that.  Because at least -- and I'll

1   ask the parties if they agree with me on this.  I found quite

2   helpful the fact that LBRY did not choose a scattershot

3   approach to responding to the summary judgment motion.

4           In the SEC's opening brief they seek summary

5   judgment on the entire claim and lay out why this meets the

6   test for a security under all of its elements and notes that

7   essentially the other requirements of a failure to register

8   claim are not in dispute.

9           I think, again, LBRY has helpfully and in a focused

10  way presented a developed serious argument that this doesn't

11  meet the definition of security because of the third element

12  in the definition as refined by the First Circuit's <u>SG</u>

13  decision, and I would -- I assume that's the only -- I

14  understand you to make a fair notice defense argument which we

15  can engage with after we deal with the principal argument, but

16  in terms of the other elements of the SEC's case, I understand

17  you do not base either your opposition to their motion or your

18  own motion on some contention that there's a problem with the

19  other elements of a federal failure to register claim here.

20          You're attacking this on the grounds that, wait a

21  minute, under the third element of the definition of security

22  this simply doesn't meet it and therefore they can't get

23  summary judgment and in fact we're entitled to summary

24  judgment.  Then I understand you to also press a fair notice

25  argument that even if we're wrong about that, there's at least

1     a triable issue on our fair notice affirmative defense.

2            So I see your argument as being quite focused and

3     developed and serious and I want to deal with those things,

4     and I don't want to deal with the other aspects of the SEC's

5     motion because I don't understand you to dispute them for

6     purposes of the current motions.

7            Is that fair?  Is that a fair way to view your

8     arguments?

9            MR. MILLER:  I think it is.

10           THE COURT:  Okay.  So we will accept that as true,

11     and I will not waste anyone's time with other issues.

12           So let's get right to it then and let's address

13     your arguments.  You can speak first and explain to me why

14     this doesn't satisfy the third element of the <u>Howey</u> test as

15     refined in the First Circuit case.

16           And I will just -- to let the parties know about my

17     thinking, I am a judge who has a strong theory of precedent.

18     I believe I have to be a faithful lieutenant to the holdings

19     of the Supreme Court and the First Circuit Court of Appeals.

20     I find Judge Selya's decision in the <u>SG</u> case to be the

21     controlling precedent that I have to respect and I will --

22     unless someone convinces me that there's something about it

23     that's wrong, I'm going to follow his analytical method and

24     view both parties' arguments through the lens of what I think

25     the <u>SG</u> opinion teaches.

1          So just so you know, if you're going to take on SG,

2     you better do it directly and early because I'm thinking I'm

3     going to faithfully apply SG, okay?

4          All right.  So that said, say whatever you want to

5     say on the issue of whether this qualifies under the

6     definition of security, and then I'll hear LBRY's response,

7     and then I'll let you say what you want to say on fair

8     notice -- the SEC's response.  Then I'll hear what LBRY wants

9     to say on fair notice and hear the SEC's response to that,

10    okay?

11         With that said, I guess one other thing.  Again, I

12    found your briefs quite helpful and I think I understand what

13    you're saying.  You have several arguments to present, but one

14    of them that's important, as I understand it, is we're very

15    different from the other SEC enforcement actions.  We're not

16    an ICO.  The fact that we're not an ICO puts us in a very

17    different position from the other proceedings that the SEC has

18    commenced against others, and I'm interested in hearing what

19    you have to say about that.

20         Your principal argument, as I see it, focuses on

21    your contention that there is a consumptive use -- what I

22    think the parties call consumptive use.  I might call it

23    utility use or -- but there is a use for this token and a

24    reason why people are acquiring it that has nothing to do with

25    investment potential.  It has the -- it is used or consumed in

1    engaging with the LBRY app on the LBRY protocol, and because
2    of that you don't believe that it can meet the third element
3    of the Howey test.
4              I also understand you to make an argument that to
5    the extent that the value of LBC fluctuates independently of
6    any actions that the company is taking with respect to the
7    LBRY app, instead may have some correlation with the
8    cryptocurrency market generally, that that suggests that if
9    there is any expectation of profit it isn't because of the
10   actions of the developer or a third party and, therefore, we
11   don't think there's any evidence that this is principally an
12   asset that is being offered based on an expectation of profit
13   and we don't understand, even if it is, that it's an
14   expectation of profit based principally on the work of the
15   company, and for those reasons it doesn't meet the test.
16             That's what I understand your principal set of
17   arguments to be.  Address them in whatever order you want and
18   add any others, but that's what I understand you to be saying.
19             MR. MILLER:  Thank you, your Honor.  That's very
20   helpful.
21             Before we proceed, my name is Keith Miller.  With
22   me is my colleague Emily Drinkwater, my client Mr. Jeremy
23   Kauffman, and local counsel Tim McLaughlin from the Shaheen &
24   Gordon firm.
25             Thank you, your Honor, for holding this hearing.  I

1    think it's an important case, a case that the crypto industry

2    is looking at very closely because it is a unique issue here.

3            This isn't <u>SEC versus Telegram</u>.  It's not <u>SEC</u>

4    <u>versus Kik</u> where there were ICOs, where there were private

5    placement memorandums, where there were agreements whereby

6    people invested money, obtained tokens after.

7            There's something called a simple agreement for

8    future tokens.  People entered into that arrangement and said

9    once the platform is built -- this is the <u>Telegram</u> case.  Once

10   the platform is built -- we'll pay you now.  Once the platform

11   is built, we'll get tokens.  Now, why were they doing that?

12   Not to use those tokens, arguably.  What they were doing, and

13   I think it's a fair and reasonable interpretation, was they

14   were purchasing the tokens for investment, and that's what --

15           THE COURT:  So I think it is entirely relevant

16   whether something is an ICO or not, but isn't that more a

17   matter of degree rather than kind?  So, for example, there's a

18   contention here, as I understand it, that at a time in which

19   there were only four videos for operation that LBRY had a

20   market cap of 1 point something billion dollars based

21   principally on its holdings of LBC, and so how is that

22   radically different from an ICO?  You actually have the thing

23   up and running, but there's no real belief that anybody who's

24   acquiring LBC as of that date is doing it because of an

25   immediate plan to access one of those four videos.  It's

1    because they believe that they will be a successful platform

2    in the future in the same way that an ICO purchaser would

3    believe that that application would be successful in the

4    future.

5              So it's relevant, but it's a difference in-kind

6    rather than -- a difference in degree rather than in-kind.

7    I'm seeing it that way.  Is that right or wrong and why?

8              MR. MILLER:  I think it's partially right, your

9    Honor, and I say I think it's partially right because what the

10   courts have said from United Housing versus Forman, a Supreme

11   Court case, to SG is the Court needs to look at the

12   promotional materials.

13             THE COURT:  Right.

14             MR. MILLER:  Right.  And you need to look at the

15   promotional materials here.  In SG, the SG case, there were

16   persistent representations --

17             THE COURT:  I don't see your case as having as much

18   efforts at promoting an investment as SG.  At least as

19   outlined by Judge Selya, there were very, very substantial

20   investment promotion efforts made in connection with that case

21   that seem to be more significant than the ones that occurred

22   here according to the SEC.

23             MR. MILLER:  And I analogize this closer to the

24   Forman case, frankly, your Honor.  In United Housing the

25   Supreme Court said --

1          THE COURT:  But there are analogies -- you've got

2    to be careful with the analogy to Forman because in Forman the

3    certificates were capped.  You couldn't increase the value of

4    it.  And that's -- I mean, if you were Pocketful of Quarters,

5    you would be no action.  And Pocketful of Quarters is like

6    Forman in that there are restrictions on the ability of the

7    token to grow in value.

8          And so I think you have to be careful of Forman.  I

9    think Forman is a case where the Court was quite clear that

10   there was no investment potential there.  People were buying

11   the -- I believe it was apartments, wasn't it?

12         MR. MILLER:  Co-ops.

13         THE COURT:  Because they wanted to buy apartments,

14   and that's different and it's more like Pocketful of Quarters.

15   I'm sure you know what that case is.

16         MR. MILLER:  Yes, your Honor.

17         THE COURT:  It isn't cited in the briefs, but it's

18   a no-action letter from the SEC.

19         MR. MILLER:  Right.

20         THE COURT:  In that case -- if you were Pocketful

21   of Quarters, we wouldn't be here.

22         MR. MILLER:  Right.  But I will say that under

23   Forman there's a dual purpose -- there was an argument of dual

24   purpose.

25         One purpose was people were buying these co-ops for

1    investment.  They were going to flip them.  They were going to

2    rent them.  They were going to do certain things as an

3    investment.  And the Court said let's look at the promotional,

4    let's look at the information bulletin, and that will guide

5    us.

6         And I think when you look at the promotional

7    materials, what the SEC has identified as promotional

8    materials, there aren't solicitations.  They're not

9    invitations to purchase LBRY credits and you'll get a 10

10   percent profit.  This isn't like SG in that regard where there

11   was a sale based on solicitation.

12        THE COURT:  I think Forman -- I think the way to

13   look at this, why I think this case is interesting, I'll see

14   what the SEC says, but there is a -- there does appear to be,

15   according to the record, and I might be misreading it, a

16   consumptive use for LBC.  There appears to be a consumptive

17   use for LBC.  The SEC says there's a non-consumptive use.

18   Forman is a case where the Supreme Court says where there is

19   no non-consumptive use or investment use, there is no security

20   at stake.

21        Howey says where the use of it is for investment,

22   it is -- it meets that element of expectation of profit.

23        This case might be different from both Forman and

24   Howey, at least this would be I think something you're saying,

25   is what happens in a what we would call in another context a

1    mixed motive case where there is both an objective -- and let

2    me just ask this to make sure that I'm on the right track

3    here.  Do you agree that the perspective that I should be

4    looking at is from the perspective of a reasonable acquirer of

5    the LBC?

6              MR. MILLER:  I think that's the main test, but I do

7    also think you can look at the subjective intent.

8              THE COURT:  All right.  So it can play a role, but

9    ultimately in helping me see what an objective investor would

10   be -- we wouldn't call it an investor.  An objective acquirer.

11   Do we agree on that?

12             MR. MILLER:  Yes.

13             THE COURT:  Okay.  So I'm thinking that to the

14   extent this case can be helpful to people in this world that

15   your client lives in is to provide -- at least my take on what

16   you do in a case where there is a consumptive acquirer and

17   arguably some people who are not acquiring for consumptive

18   purposes, how does that fit under the third element of the

19   Howey test?

20             And I think you argue that there's a legal question

21   and a factual question.

22             I understand your brief to argue that the test

23   should be unless it is principally for investment we should

24   not treat it as satisfying the third element of the Howey

25   test.  Is that the position you take at least on the law that

1    I would use?

2              MR. MILLER:  Yes.

3              THE COURT:  Okay.

4              MR. MILLER:  I think the law is that what the Court

5    needs to look at is the principal motivation of the purchaser.

6    If the motivation --

7              THE COURT:  Based on the totality of circumstances,

8    not on a characterization or label that anyone gives to it.

9              MR. MILLER:  Right.  The overall emphasis.  What

10   was the overall emphasis.  The Court uses this language.

11             THE COURT:  Judge Selya doesn't use the word

12   principally in SG with respect to the first element of the --

13   first component of the third element of the SG test.  He uses

14   different language.  So I'm inclined to just use his language.

15   Do you think that language requires any different

16   interpretation than the principal motivation?  Because what

17   you cite as far as I can see -- do you understand my point

18   that there are -- with respect to the third element of Howey

19   there are two components.  One is expectation of profit and

20   the other is from the action of the --

21             MR. MILLER:  Of others.

22             THE COURT:  Okay.  Action of others.

23             The cases you cite for the proposition using the

24   principal motivation case all deal with the second component

25   of the third element.  I went back and tried to read them all,

 1   and they don't -- I didn't find any case that uses that

 2   language principally with respect to the first component of

 3   the third element.  Have I missed something?

 4               MR. MILLER:  I would have to -- and I apologize.  I

 5   believe that -- or I thought that the Forman case, and that's

 6   where I was getting it from, used the word principally or

 7   primarily.  I know obviously the word overall emphasis has

 8   been used.

 9               THE COURT:  Yeah, I just looked at -- I mean, I'll

10   get out Judge Selya's language.  You can tell me if that's

11   wrong or not from your perspective.

12               So this issue arose -- of course you know this.

13   I'm just making it clear on the record.  This issue arose

14   because Howey when talking about the efforts of others used

15   the word solely.  And in every circuit that has considered

16   that after Howey said, oh, yeah, he used that word but they

17   don't really mean that word, they mean something else.  And

18   Judge Selya endorses that view as well when talking about the

19   efforts of third parties or others, efforts of others, and

20   then he cites a variety of cases.

21               But when talking about expectation of profits -- so

22   he cites to Forman, you're right.  "Based on its determination

23   that investors were attracted solely by the prospect of

24   acquiring a place to live and not by financial returns",

25   Forman used that for the different proposition of in a case in

1   which it is solely, because they wanted to acquire a place to

2   live, that in that case it doesn't meet the test of security.

3   And Howey uses solely in a different way, I believe, and

4   that's what courts are rejecting.  But when talking about the

5   first component of the third element of the Howey test, he

6   seems to say that --

7            MR. MILLER:  I believe there's one paragraph, your

8   Honor, in that section where the Court is talking about --

9            THE COURT:  Yeah, I love when -- he does a great

10  job of comparing Forman and Joiner.

11           MR. MILLER:  Right.

12           THE COURT:  And Forman was a case in which it was

13  solely for they want to live there, not for investment.  And

14  Joiner was a case where most of their value and all of their

15  lure was investment, and the leasehold interests were no more

16  than an incidental consideration to the transaction.

17           So he seems to be -- I'm inclined to take that as

18  my model when analyzing this issue.  Is that right or wrong?

19           MR. MILLER:  I think the first sentence of that

20  paragraph is instructive.  The way in which these cases fit

21  together is instructive.

22           In Forman the apartment was the principal

23  attraction for prospective buyers.  Principal.  He's using the

24  idea of principal.  And then he goes into Joiner and says

25  incidental.  So I think those two words, principal versus

1    incidental, is what the Court needs to weigh.  And that's why

2    I think the overall emphasis of the materials, the promotional

3    materials, was it principally to speculate, to have people

4    buy, to speculate, or was it principally to consume or use the

5    tokens.

6              THE COURT:  Okay.  I get your point.  I'll be

7    interested when the SEC speaks to know do you agree that

8    that's the right way to read SG or not.  You need to explain

9    why not if you think that.

10             All right.  So let's set aside the question of the

11   legal test, which is not, you know, there isn't a super clear

12   statement of what the legal test is, but why factually do you

13   think in this case the SEC is wrong in contending it's

14   entitled to judgment, that the evidence construed in the light

15   most favorable to you could only cause a reasonable factfinder

16   to conclude that the expectation of profit component has been

17   satisfied here?

18             MR. MILLER:  Factually there's no solicitation.

19             THE COURT:  Well, there is some solicitation and

20   there is in fact some private deals for the acquisition of

21   LBC.  We can't pretend those don't exist.

22             MR. MILLER:  Well, there is one e-mail from one of

23   the employees to a quote-unquote prospective investor, and

24   they say you may want to buy because two or three years from

25   now it could be worth a lot of money.

 1          THE COURT:  But he actually sold LBC, and maybe I

 2   got that wrong, I thought to a crypto club, a buying club, and

 3   to this other entity.  I can't remember the name of it.  Your

 4   client sold significant quantities of LBC to people and in

 5   connection with those things certain things were said, right?

 6          MR. MILLER:  Right.  Let me take one at a time.

 7          So in connection with the club, club members were

 8   buying crypto, different types of crypto, different tokens,

 9   okay, and the testimony elicited from them is they wanted to

10   check out LBC and see how it could be used.

11          So there is a situation where a club -- there's no

12   evidence to suggest that the club members were specifically

13   buying it for speculation.  Other ones, market makers, why

14   were they buying it?  Were they buying it for investment

15   or were they buying it --

16          THE COURT:  What do I glean from the fact that when

17   there were four videos available on your site you had a market

18   cap of 1.2 billion or 1 point whatever billion which was based

19   principally on the value of the company's holdings of LBC?

20          MR. MILLER:  But that's an asset.  It's an asset of

21   the company.

22          THE COURT:  Right.  But it says that the asset had

23   been bid up to a price that was extraordinarily high when

24   there was almost no current use.  It wasn't an ICO, I agree

25   with you, but there was almost no current consumptive use that

1    would justify that market cap valuation.

2              MR. MILLER:  Just like any other commodity -- and

3    we maintain that LBC is a commodity.  Just like any other

4    commodity -- and I think we identified an analogy, I don't

5    know if it's a great analogy, but Beanie Babies, LEGOs, would

6    people argue that those are securities because the value in a

7    market -- and there's markets out there.  Go on a website and

8    you can say I want to buy --

9              THE COURT:  Well, if you were selling investment

10   contracts in a Beanie Baby consortium of -- we've cornered the

11   market on Beanie Babies and we're going to release them like

12   the diamond companies release diamonds and we're going to

13   control the rate at which Beanie Babies get into the market,

14   that would look like a security to me.  I mean that would

15   definitely be --

16             MR. MILLER:  I don't think -- well, as I said, just

17   like any other commodity.  We think it's a commodity here.

18   And just because the price increased at some point in time

19   doesn't mean it's a security.  It's a commodity and we will

20   argue it's a commodity because the courts have said you need

21   to look at how it's being promoted.  How are you promoting it

22   and why are people interested in buying it?  What's the

23   motivation?

24             THE COURT:  Right.  That's why I think a very high

25   market valuation for -- and I want to get terminology that to

1   your company is acceptable.  I've been calling it digital

2   asset.  Is that acceptable?

3            MR. MILLER:  That's acceptable, yes.

4            THE COURT:  All right.  So when a digital asset has

5   a very, very high valuation and there is no current use for

6   it, doesn't that tell you that they are anticipating that you

7   will make the business succeed to the point that there will be

8   a substantial current use for it, and, therefore, people are

9   investing in the hope that you make the company and the app

10  much more profitable?

11           MR. MILLER:  I still don't believe that that's

12  solicitation.  It's not an invitation to buy.  That's why I

13  think what's instructive here is these other cases the SEC has

14  brought.  They involve private place memorandums.  They

15  involve SAC agreements.  They involve white papers.

16           THE COURT:  Is there any evidence that the crypto

17  club guys wanted to use your site as opposed to -- usually

18  investment clubs make investments in a pool and in a basket of

19  things that they are trying to invest in, not that, oh, we're

20  all going to want to use LBRY.

21           Doesn't that suggest that at least with respect to

22  that purchaser that they were motivated by investment

23  potential?

24           MR. MILLER:  I think there is that argument, yes.

25           THE COURT:  Yeah.  Okay.

1              All right.  But you do make an argument, and I'm

2    interested in understanding this argument, about on-chain and

3    off-chain uses, and, you know, we're going to set aside the

4    supplemental disclosure, but help me understand a couple of

5    things about this.

6              So, first, can you give me a brief description of

7    what LBRY's business model is?  How does LBRY succeed

8    businesswise?

9              MR. MILLER:  Well, it's all based on users.  Today

10   they have 1.5 million users visiting the site and using the

11   blockchain.  1.5 million users.

12             THE COURT:  So YouTube succeeds by an advertising

13   model.  You're not doing an advertising model, right?

14             MR. MILLER:  They are not.

15             THE COURT:  And your people who post on LBRY have a

16   great potential to reap very large rewards if they produce

17   very valuable content for which people are willing to tip or

18   pay with LBC, right?  I see how those people profit.

19             How does your company profit and grow financially?

20   I understand to the extent LBC appreciates in value and you're

21   a store of LBC, the company prospers, but apart from that how

22   does it make money other than the fact it holds LBC?

23             MR. MILLER:  As in a lot of startups, the purpose

24   of the startup is not necessarily to make money immediately.

25   It is to look at opportunities.

1          THE COURT:  What's the business model?  Eventually

2   FaceBook would make money on an advertising model.  That's how

3   they started and why people wanted to invest in them.  I'm

4   just trying to figure out -- and they weren't making money in

5   the beginning, you know, and I assume all of these things like

6   YouTube didn't make money in the beginning, but they had a

7   plan to make money in the long run.  I just -- I needed to --

8   like, does your -- and please excuse my ignorance.

9          When someone posts something to the blockchain on

10  LBRY, on the LBRY app, right, or they basically want to have a

11  video or something, right, so there has to be an entry on the

12  blockchain for that, right?  Right.  Okay.  And when they do

13  that, is there a transaction fee in LBC that the poster has to

14  pay?

15          MR. MILLER:  So let me try to distinguish between

16  two things.  One is the LBRY blockchain.

17          THE COURT:  Right.

18          MR. MILLER:  That's open-source software --

19          THE COURT:  Okay.

20          MR. MILLER:  -- that has been adopted by known

21  operators, computers, everybody that's in the system, and they

22  get a chance -- and that's where the LBRY credits are derived

23  from, from the blockchain, right?

24          THE COURT:  Right.

25          MR. MILLER:  You can get a credit, a LBRY credit,

1    mostly from mining, right?  There is pre-mined, and then now

2    going forward somebody who validates a transaction on a

3    blockchain gets rewarded a token.

4                    THE COURT:  Right.

5                    MR. MILLER:  And that's how new tokens get minted.

6                    THE COURT:  Now, you said something that I need to

7    understand.  I've always recognized that there's a separation

8    between the LBRY application and the LBRY -- what would you

9    call it?

10                   MR. MILLER:  Blockchain.

11                   THE COURT:  It would include the blockchain.

12                   MR. MILLER:  Yes.

13                   THE COURT:  And so I understand that the LBRY

14   blockchain is open-source like Ethereum is, for example.  So

15   people can use Ethereum for whole varieties of things, and

16   you're saying they can use the LBRY blockchains for a whole

17   variety of things as well.

18                   MR. MILLER:  Right.

19                   THE COURT:  And when a block is verified, there is

20   a -- the miner earns some sort of LBC credit, right?

21                   MR. MILLER:  That's correct.

22                   THE COURT:  And the LBRY app is just one thing that

23   sits on the blockchain.

24                   MR. MILLER:  That's right.

25                   THE COURT:  Okay.  And what I'm asking is, is there

1    a transaction fee that somehow your company benefits from when

2    somebody uses the blockchain?

3            MR. MILLER:  Yeah.  So right now I believe, and it

4    was in Mr. Kauffman's declaration, there are some 35 different

5    applications that run on the LBRY -- so each application could

6    be unique, could be different.

7            THE COURT:  Right.  I get that.

8            MR. MILLER:  With respect to Odysee, which is the

9    LBRY-owned subsidiary that is now the application that people

10   are using, right, I do not believe there's a transaction fee.

11   That could be something in the future that is -- or it could

12   be that they decide to go down an advertising route, but with

13   most of these companies it's getting users to come to the

14   site, it's getting people to use the business, and that's the

15   first step.

16           THE COURT:  I understand you want to build a user

17   base, but there needs to be a business model.  I'm just trying

18   to understand what it is.

19           I understand part of the model is if we hold a

20   gigantic amount of LBC, that's going to become way more

21   valuable and we're going to be all wealthy because of it, and

22   people who own shares of our company are going to be

23   multimillionaires.  That's great.

24           Apart from that, what's the business model?

25           MR. MILLER:  I don't think they've figured out how

1    to definitively monetize that at this point in time.

2              THE COURT:  Is it fair to say as it currently

3    stands the business case for making money that we identify is

4    growing the value of LBC?

5              MR. MILLER:  I don't think that's a fair

6    interpretation.

7              THE COURT:  Then what is it?

8              MR. MILLER:  I think it's growing the network of

9    users.

10             THE COURT:  Right.  Growing the network of users

11   might be a very good public benefit, but you've got to make

12   money, and I'm just asking how do you make money.  If you are

13   pitching me -- think I'm the venture capitalist who wants to

14   give you a couple million bucks.  Tell me how I'm going to

15   make money within the next ten years.  Answer the question for

16   me.  Tell me.  I'm your venture capitalist.

17             MR. MILLER:  There are different ways to monetize

18   it.  One's advertising, which is like YouTube.  YouTube is all

19   advertising fees.

20             THE COURT:  But you distinguish yourself from

21   YouTube in that you're not an advertising model, and you don't

22   have an algorithm that you need if you're going to have an

23   advertising model, and you have nonintrusive limited content

24   moderation, and those are things that distinguish you from

25   YouTube.  To the extent you want to just be YouTube on a

1    blockchain, that is not what I understand you to be aspiring

2    to.

3            MR. MILLER:  No, not necessarily, but that doesn't

4    mean they can't change if they need to get monetized, right?

5    Another way is transaction fees, like you said.  I do not

6    believe neither of those things are --

7            THE COURT:  But there's nothing going to them now?

8            MR. MILLER:  Right, but -- yes, it's an asset.

9    LBRY credits are an asset.  So you can't ignore that.  A

10   venture capital company coming in would certainly look at that

11   and say how many credits do you have and what's the market

12   value of it.  Certainly.

13           THE COURT:  Could your company choose to run its

14   business like Pocketful of Quarters and use a digital asset

15   that has limitations on its ability to grow in value which

16   could still be used at a designated fixed rate to compensate

17   miners and to perform other functions but that would not have

18   any -- it would be like Forman, not having any investment

19   potential?

20           MR. MILLER:  It could.  It could, but I would go

21   back to why was this developed.  This was developed as an

22   alternative to other -- it's to allow publishers --

23           THE COURT:  I fully get how -- you know, just

24   saying LBRY is YouTube on a blockchain says a lot because a

25   blockchain operates very differently from a company like

1    YouTube.  So we don't want to diminish that.  I agree it's a

2    very different kind of enterprise.  I'm just trying to figure

3    out -- the concern I have is to the extent that LBRY is -- its

4    business model is grow the value of LBC, and you grow the

5    value of LBC by building uses on the blockchain that make LBC

6    more valuable to users, other people who acquire LBC not for

7    they want to use it on LBC but they are bolstered in their

8    desire to buy LBC as an investment because, like the company,

9    they think LBC is going to grow in value because LBC is going

10   to do stuff to help it grow in value and LBC is incentivized

11   to do stuff to help it grow in value.

12          That's my concern and that looks a lot like

13   expectation of profit.

14          MR. MILLER:  Well, but I think what <u>Forman</u> and <u>SG</u>

15   say is you need to look at the promotional material, not

16   ultimately how could --

17          THE COURT:  Not just the promotional material, but

18   you do look at the promotional material.  I agree.

19          MR. MILLER:  Right.  That's where I think we have a

20   difference of opinion with the SEC.  There is no solicitation.

21   I think -- you know, Section 5 is the offer or sale, and

22   typically in all the cases, including, you know, <u>SG</u>, even <u>SEC</u>

23   <u>versus Smith</u> which SEC cites in their brief, there are offers.

24   Somebody offers, says this is a great deal, you're going to

25   make 10 percent.

1          The language -- when you look at the language here

2     that they've identified --

3          THE COURT:  And you've pointed out there are

4     disclaimers, you know, don't buy it for -- you know, we have a

5     one billion plus valuation, but that doesn't matter.

6          MR. MILLER:  Focus on the -- ultimately, focus on

7     this network.

8          THE COURT:  There are a number of those kinds of

9     statements in the record.  As well, I have to take issue with

10    you because -- and LBRY -- excuse me, SEC when it has its

11    turn -- its brief does identify a number of things that they

12    think are solicitation materials that touts the investment

13    value of it.  So, I mean, we shouldn't pretend that the SEC

14    doesn't cite anything.  What they cite you say may be

15    insufficient when you look at it considering the total mix of

16    available information about LBC that the company is putting

17    out, but they did make -- your company did make sales of LBC

18    and they did make statements about the growth in value of the

19    LBC asset.  Maybe that's not enough, but it is there.

20         MR. MILLER:  I don't think it's enough, and I think

21    I would direct the Court to Rice versus Branigar.  It is an

22    Eleventh Circuit case, but in that case the Court said passing

23    references or mere mentions of the possibility that an item

24    could increase in value do not necessarily transform a

25    transaction into an investment company.

1          THE COURT:  I agree with that.

2          MR. MILLER:  And that's our point here.  If you

3    look at what these statements are, LBRY is not out there

4    saying, hey, everyone, buy LBRY credit.  That's not -- you

5    need to take the overall emphasis of the promotional material.

6    And what's principally or significantly here, not incidental,

7    what's principally and significantly being mentioned?  And

8    it's not focused on buy LBRY you're going to make money.  It's

9    use the network.  Because just like Naomi -- the declarants,

10   we had five declarants along with 300 others.  Brockwell.

11   That's it.  Naomi Brockwell.  Just like she said, I've made a

12   business out of this.  And the same thing with the other four

13   declarants.  I've made a business out of this.  On YouTube I

14   wasn't getting any advertising money.  Why?  Because I didn't

15   have enough views.  I've gone to LBRY and now I'm getting

16   tipped.  I'm getting people purchasing.  And that's what LBRY

17   wanted to accomplish.

18          THE COURT:  I think this record does contain

19   evidence that there are consumptive uses for LBC.  I think

20   that's undeniable, you know, and it's a question of looking at

21   the total mix of available information, looking at the

22   economic reality of the situation, and trying to consider no

23   one piece of evidence as dispositive here and looking at it to

24   see whether the standard for summary judgment is met.

25          Can I ask you about -- again, this is an

1    opportunity for me to kind of clarify gaps in my knowledge

2    here.  When we talk -- both of you talk about on-chain and

3    off-chain uses and you seem to talk as if something is an

4    on-chain transaction, that that is necessarily a consumptive

5    transaction, and I don't understand that to be the case.  I

6    understand you can definitely have off-chain transactions

7    which are not likely to be consumptive transactions, and I

8    understand you have on-chain transactions, but I don't know

9    why you can't have on-chain transactions which are both just

10   as much investment transactions.

11              If I want to buy the LBC in your wallet and instead

12   of having an off-chain side contract I believe in blockchain

13   and I want to have that asset in my wallet, we would do an

14   on-chain transaction for me to make my investment.  So I don't

15   know that the proxy that the two of you are using between

16   on-chain and off-chain really is as perfect as you seem to

17   suggest it is.

18              Now, maybe that's a misunderstanding on my part.

19   Is it a misunderstanding on my part?

20              MR. MILLER:  No, your Honor.  On-chain transactions

21   can include transactions for consumption and it can include

22   transactions that an exchange, for example, has put on it.

23              THE COURT:  Am I safe in assuming, because

24   otherwise the SEC would have produced it, that your company

25   has no way of identifying precisely which LBC transactions are

1   consumptive and which ones are not?

2          MR. MILLER:  The only way you would be able to do

3   that is to have the wallet addresses of all the exchanges and

4   to be able -- so when someone does a transaction on exchange,

5   for the most part they don't automatically hit the blockchain.

6   Why?  Because they have an internal ledger.  It's internal.

7   They have LBRY credits.  One person wants to buy.  One wants

8   to --

9          THE COURT:  You say internal to the two of them?

10          MR. MILLER:  No.  Internal to the exchange.  The

11   exchange says I've got a thousand LBRY credits.  Someone wants

12   to buy ten of them.  Okay.  I'll take --

13          THE COURT:  When you say the word exchange, what

14   are you referring to?

15          MR. MILLER:  An asset exchange.

16          THE COURT:  Oh.  Coinbase or something?

17          MR. MILLER:  Coinbase.  Exactly.

18          THE COURT:  So you're saying that Coinbase has a

19   giant wallet of LBC and it's just assigning certain LBC in its

20   giant wallet from this person to that person?

21          MR. MILLER:  Right.  In their ledger.

22          THE COURT:  Yeah.

23          MR. MILLER:  But there are obviously times where it

24   may be a big purchase, right, where they have to come and --

25          THE COURT:  If you buy LBC at Coinbase, right,

1   you're telling me, and I think that's what I've understood,

2   there isn't an entry on the LBRY blockchain of Barbadoro has

3   just bought four LBC.

4           MR. MILLER:  That's right.

5           THE COURT:  And there's no entry on the blockchain

6   except ultimately the wallet that Coinbase has on the chain

7   has a number of LBC in it, and then Coinbase either with an

8   internal ledger or a contract between the parties or something

9   engages in an off-chain transaction, right?

10          MR. MILLER:  That's correct.

11          THE COURT:  Okay.  And if I want to use my LBC to

12  tip somebody, don't I need it in my wallet?

13          MR. MILLER:  Yes.

14          THE COURT:  In my LBRY wallet?

15          MR. MILLER:  Right.

16          THE COURT:  Okay.  So tipping would necessarily be

17  an on-chain transaction.

18          MR. MILLER:  That's correct.

19          THE COURT:  Paying somebody, at least if I'm using

20  the blockchain -- I could go to a side transaction, I suppose,

21  and say, oh, you know, my law clerk is posting something on

22  LBC and I really want to view the private part of it, I want

23  to pay his ten LBC credits, I can call him up on the phone and

24  say, look, can I just send you a check and will you let me in,

25  and they probably could, couldn't they?

 1                    MR. MILLER:  Sure.

 2                    THE COURT:  It's possible to have an off-chain,

 3      but, generally speaking, I would assume that to the extent

 4      things are on-chain -- that if you want to do a consumptive

 5      use, the ordinary use would be an on-chain use, right?

 6                    MR. MILLER:  That's correct.

 7                    THE COURT:  Okay.  And off-chain uses are not

 8      directly ordinarily tied to consumptive uses.  Do you agree

 9      with that?

10                    MR. MILLER:  Well, except for in the

11      situation which if you wanted to, you have to --

12                    THE COURT:  But that's not the way it's designed to

13      work.  I mean, if you're a blockchain person, you don't want

14      to be running your life with individual private ledgers with

15      people.  You believe in blockchain.

16                    MR. MILLER:  Yes.

17                    THE COURT:  And blockchain is a public ledger, this

18      one is, and this public ledger is what you would use for your

19      on-chain transaction in the ordinary course.

20                    MR. MILLER:  That's correct.

21                    THE COURT:  Fair to say?

22                    MR. MILLER:  Yes.

23                    THE COURT:  So it's not a complete, perfect

24      substitute but is a rough indicator perhaps of the ratio of

25      on-chain to off-chain uses?  Does that make sense?

1          MR. MILLER:  I think it's fair, yes.

2          THE COURT:  All right.  Good.

3          Sorry to interrupt.  Say anything else you want to

4   say.  This has been very helpful in educating me.

5          MR. MILLER:  We also think -- besides the objective

6   analysis of what a reasonable investor would believe, we also

7   believe that some of the case law allows subjective, and for

8   that reason we would argue that the 300 or so declarations --

9   and those declarations, what did they say?  Look at them.

10  They said I purchased on exchanges not as an investment.  For

11  use.  I needed LBRY credits.  Where do you get LBRY credits?

12  Well, you can mine them or you can buy them.  So that's

13  important.  That's important.

14          So the theory of, gee, people are buying them on

15  exchanges and therefore they're speculators --

16          THE COURT:  You can't -- I've never looked at the

17  LBRY app because I believe I need to make my decision based on

18  what you people tell me.

19          MR. MILLER:  Right.

20          THE COURT:  But I don't think you can tip somebody

21  off-chain, can you?

22          MR. MILLER:  No, you have to -- the point here is

23  when you buy --

24          THE COURT:  Am I right, though?  To tip you've got

25  to be on-chain?

1          MR. MILLER:  Yes.

2          THE COURT:  To buy on the app itself, to buy

3   access, you've got to be on-chain.

4          So you buy your Coinbase LBC.  Unless you instruct

5   Coinbase I want an on-chain transaction from your wallet --

6   the off-chain transactions can't be used to tip or to buy

7   unless you've tried to do kind of a workaround, an off-chain

8   workaround, which isn't the way the app is designed to work,

9   right?

10          MR. MILLER:  Right.  Your LBRY wallet is where you

11   tip from, okay, where you purchase from.

12          THE COURT:  Right.  So if you buy your LBRY at

13   Coinbase and there's an internal transfer in the Coinbase

14   ledger, you can't use that LBC to tip.

15          MR. MILLER:  Unless you transfer to your LBRY

16   wallet.

17          THE COURT:  Right.  And then it's an on-chain

18   transaction.

19          MR. MILLER:  Right.

20          THE COURT:  Okay.

21          MR. MILLER:  So the point here is the SEC argues

22   that there's all this exchange activity, right, and therefore

23   that's speculative.  People are buying -- and I think it's a

24   faulty premise.  People are buying on these exchanges,

25   Coinbase, all the exchanges, for speculation, and our

1   declarations prove the opposite.  That's not true.  There's no
2   evidence that the SEC has presented to show that people were
3   buying on exchanges for speculation.
4            Now, is it logical?  Yes.  But there's no evidence
5   in the record that says -- we don't have one affidavit from an
6   investor to say --
7            THE COURT:  I haven't scrutinized these affidavits
8   yet.  Do your LBC uses for business people, do they say that I
9   acquire LBC in an off-chain transaction, or do they say I buy
10  on Coinbase and tell them I need the actual LBRY in my wallet
11  because otherwise I can't use my, you know, I can't use my
12  LBRY?
13           MR. MILLER:  They don't go into that type of
14  detail, but they say I bought on an exchange and then
15  subsequently have used it on LBRY to tip, to stake.
16           THE COURT:  But we've just agreed mechanically,
17  except in an extraordinarily unusual circumstance, it would
18  have to involve an on-chain transaction to do that.
19           MR. MILLER:  Right.
20           THE COURT:  Okay.
21           MR. MILLER:  I will correct one thing that my
22  client has told me, and that is the Odysee entity, subsidiary,
23  the new entity that is the app that is running makes money
24  through advertising and credit card processing.  So there is
25  money being generated by Odysee through advertising --

1           THE COURT:  Okay.

2           MR. MILLER:  -- and through credit card processing.

3           THE COURT:  But the LBRY app doesn't do

4      advertising, right?  I thought one of the things you

5      differentiate yourself from YouTube is you don't do

6      advertising.

7           MR. MILLER:  We didn't, but now the -- and that was

8      when LBRY.com or LBRY TV, okay, at that point in time during

9      the generation as it expanded, it did not.  I'm being told now

10     that the new entity Odysee that is the app that everyone is

11     using is charging a processing fee for credit cards, okay, and

12     is doing advertising.

13          THE COURT:  Okay.  All right.  That's helpful.

14          MR. MILLER:  So I just wanted to clarify that.

15          THE COURT:  Okay.  Good.  I appreciate that.

16          How about the -- unless you have something more to

17     say about the first component, you also have an argument on

18     the second component, based on the effort of others, and your

19     argument -- it's one that I haven't seen in the case law

20     anywhere else, but your argument is LBC fluctuates in value

21     for reasons unrelated to LBRY's activities in building the

22     site.  If we did a -- oh, like if you had to do a loss

23     causation argument in an SEC fraud case like I've had to do in

24     several cases, you would have to separate out market

25     fluctuations from movements in the individual stock for

1    reasons that aren't ordinary market fluctuations.

2           It's very common for all kinds of investments to

3    tend to move as groups, and I think what the SEC is saying to

4    you is that doesn't mean a thing.  That doesn't in any way

5    support your argument.  It still is bought for investment

6    because they want it to go up for reasons other than the labor

7    of the person that has the LBC.  And when they talk about

8    efforts of others, in order for LBC to be viable as a currency

9    the LBRY blockchain has to continue to function and LBRY has

10   to make that LBRY blockchain continue to function.  And,

11   therefore, it's the efforts of LBRY that allow for

12   cryptocurrency movements of LBC to be coordinated with Bitcoin

13   and Ethereum and a bunch of others, and that doesn't in any

14   way undermine their claim that this is being marketed and sold

15   for the investment potential based on the work of others.

16          That's what I understand the SEC to be saying to

17   you why your argument fails.  What's your response?

18          MR. MILLER:  So efforts of others.  The efforts of

19   others in a blockchain is all the note operators.  Everyone

20   has a say.  Everyone can do things.

21          And we said -- in Mr. Kauffman's declaration he

22   identifies how many times --

23          THE COURT:  Is the LBRY blockchain like the Bitcoin

24   blockchain?  There's nobody running the Bitcoin blockchain.

25          MR. MILLER:  Exactly.  And just like Ethereum.

1          THE COURT:  And you're saying there's no one

2     running the LBRY blockchain?

3          MR. MILLER:  That's right.  Now, certainly --

4          THE COURT:  Your client doesn't do anything except

5     promote it?

6          MR. MILLER:  No.  No, I wouldn't say that.  They

7     certainly do do things on the blockchain.  Tweak it, right?

8     They talk to other members, the LBRY Foundation.

9          THE COURT:  I mean, they could go out of business

10    today and the LBRY blockchain would continue in perpetuity

11    just like the Bitcoin blockchain.

12         MR. MILLER:  Absolutely.  And anyone could offer

13    some software code adjustments.  And if it's adopted by all

14    the members, it takes off.

15         THE COURT:  Okay.  All right.  So that's your --

16    that would be your point.  LBC's viability only depends on the

17    LBRY blockchain continuing to function.  To the extent it

18    fluctuates in price, it's based on speculation because of

19    people who are speculating based on cryptocurrency values,

20    cryptocurrency as a sector of a market, say for example, and

21    that isn't efforts of others as meant by Howey.

22         MR. MILLER:  That's correct.  That's correct.

23         THE COURT:  Okay.  Anything else you want to say

24    about that?

25         MR. MILLER:  Just, again, there are approximately

1     35 applications that are running on top of -- if Odysee

2     decides to go poof, it doesn't matter.  Those other

3     applications are still going to be running on the LBRY

4     blockchain, and LBRY, Inc. has no control over that.

5                    THE COURT:  Okay.  Good.  Thank you.

6                    MR. MILLER:  Thank you.

7                    THE COURT:  Let me hear from the SEC and your

8     response to what you've heard.

9                    MR. JONES:  Thank you, your Honor.  Give me a

10    moment to carry all my stuff over here.

11                   Your Honor, just for the record, Marc Jones for the

12    Securities and Exchange Commission.

13                   If I can pick it up right there where we left off

14    on efforts of others.

15                   THE COURT:  All right.

16                   MR. JONES:  LBRY did not run an ICO but instead

17    allocated credits for various purposes.  The only way those

18    credits are worth something in the future is if LBRY delivers

19    on their promises to create a revolutionary way to share and

20    monetize content.  That's Exhibit 49, Plaintiff's Exhibit 49.

21                   It's not credible and it's not true that there is

22    no expectation of profits based on the efforts of LBRY.  LBRY

23    told people again and again that LBRY credits would go up when

24    they developed the network and that they were spending tens of

25    thousands of hours to develop that network.

1          Now, that's the factual point there.  The efforts

2   of others are absolutely -- LBRY said again and again, we are

3   developing this network.  We are solely focused on it.  We are

4   in it for the long term.  Don't look at the short-term price

5   of LBC because in the long term it's going to go up.  In the

6   long term, as we develop this network, us.

7          In fact, they said you don't get a very good

8   product -- you don't get a very good software product when you

9   leave it to the masses.  You have to have somebody focused on

10  doing it.

11          THE COURT:  Well, it is open-source.  People can

12  contribute to its development.

13          MR. JONES:  Absolutely, your Honor, and legally

14  that's fine.  It doesn't actually have to be the efforts of

15  LBRY solely.  It has to be the efforts of someone other than

16  the purchaser.

17          That's the point in the Howey test.  If you buy

18  something and you're gonna -- you know, if you buy a

19  fixer-upper house and you're gonna fix it up and make it worth

20  more, that's not the efforts of others.

21          If you buy something from LBRY because you think

22  Odysee, their wholly owned subsidiary, is going to make it go

23  up in value, that's okay.

24          THE COURT:  I mean, I think the principal concern

25  underlying the efforts of others requirement is to deal with

1    situations in which the person acquiring the asset is also

2    involved in some significant way in the decision-making and

3    functioning of the business.

4              MR. JONES:  As a partner.

5              THE COURT:  That would be the clearest example.

6              MR. JONES:  Right.

7              THE COURT:  But say, for example, you had a LLC

8    where someone was a non-working member, just an investor

9    member or something like that.  Then you would have questions.

10   If they don't have any voting rights in the company, if they

11   don't have any decision-making responsibility, then they are

12   purely an investor and whatever money they make on it comes

13   from the return on their capital invested in the business.

14   That's an example of where you have a business with a bunch of

15   people undertaking effort in someone who's not -- who is a

16   member of the organization, they've contributed capital, but

17   they've signed away their vote and they have agreed not to be

18   involved in the business in any way.  Sales of those kinds of

19   interests would be investment contracts I would suspect.

20             MR. JONES:  They can be, your Honor, yes.

21             And on this point, on the point that your Honor was

22   making about the price of LBC can fluctuate based on the

23   overall market or competitors in the market just like any

24   other security, and in fact it is defendant's expert who puts

25   the falsity to the way that Mr. Miller was putting it because

1    defendant's expert actually says, well, when LBRY makes an

2    announcement about its team or about an idea or puts out a

3    general blog post, no price change.  And we take some issues

4    with that event study and the soundness of it.  You got 20

5    pages from us on that earlier this week, unfortunately.

6           But what the expert from LBRY, Exhibit 2, says is,

7    "When LBRY announces new functionality, you do see some

8    statistically significant price changes," which you would

9    expect because LBRY has told everyone, as I just quoted to the

10   Court, that when we develop this network, as we develop it, as

11   it becomes more useful, as it becomes more desirable for

12   users, LBC is going to go up.  Expect the profit from our

13   efforts.

14          THE COURT:  So let me ask you though -- let me

15   pursue the opposite extreme case.  So I understand you're

16   saying, well, there's plenty of evidence here to suggest that

17   there's an expectation of profit because of LBRY, but what if

18   they're trying to just ride a tulip bulb frenzy case and they

19   say the way you get into this crypto market is you create a

20   new digital asset and people are buying it up without any

21   prospect of its future performance just because they are --

22   and you get into it and try to sell it on the grounds that,

23   look, we're not going to do anything to develop this product,

24   but once we issue this coin, you can buy it, and like all

25   crypto coins they're going to go up in value tremendously.

1          That would be okay with you?  That would not be a

2    security if you were trying to sell your coin under that

3    theory?  We won't do anything, but the market will take care

4    of it.  Because I think there are a lot of skeptical people

5    about cryptocurrency that suggest that's really why it goes up

6    in value, not because of any good work or bad work that any

7    company does.

8          MR. JONES:  Your Honor, absolutely there are

9    certainly lots of cases of fraudulent coins out there but --

10          THE COURT:  I'm not even saying fraudulent.  Just

11    direct upfront.  We're not doing anything to increase the

12    intrinsic value of this coin.  The market will take care of

13    it.  You decide.  But look at what's happened to all these

14    other coins.  And you get in and you buy a few thousand

15    dollars of it, and you know a bunch of other people are going

16    to jump on it and buy a few thousand, and it's going to go up

17    as long as I can dump it quickly.  The company hasn't engaged

18    in any fraud.  They said right upfront what they're doing.

19    Would that not be a security?

20          MR. JONES:  Your Honor, I may have to think about

21    that.  I've never seen an instance solely like that.

22          THE COURT:  Yeah.  Well, I mean they -- the crypto

23    people themselves don't believe that the whole thing is a

24    tulip bulb frenzy.

25          MR. JONES:  No, your Honor.  Certainly.  And

 1   certainly even things that have been created as, you know,

 2   joke coins have become valuable I think largely through the

 3   promotions of the people who create them in the first place

 4   and the people who hold a lot of them, and that's the

 5   situation we have here.  It's not a joke coin.  It does have

 6   some utility, but they created it.  They created an intangible

 7   item called an LBC.  They did it for the express purpose of

 8   funding the building of their business.  They told everyone

 9   that's what they're doing.  That's what they did.

10          They held onto 400 million of them.  They've gotten

11   rid of about half of that now, but they still have a

12   substantial amount.  They told everybody, and particularly

13   people who wanted to invest in the business, we think when we

14   become the platform of choice this will be worth a billion

15   dollars or more.  You should get in with us.

16          THE COURT:  You cited your strongest piece of

17   evidence about why this is based on -- expectation of profits

18   based on the activities of LBRY.  Is there any other evidence

19   you want to point out on that particular component of the test

20   other than what you've just referred to?

21          MR. JONES:  On the efforts of, your Honor?

22          THE COURT:  Efforts of others.

23          MR. JONES:  I think on page 8 of our original

24   brief, and then again in the original reply, we've cited a

25   bunch of different statements by LBRY.  You know, the token

1    has value in proportion to the usage --

2            THE COURT:  And most of those are expectation of

3    profit but not specifically due to the activities of LBRY, and

4    I want to get to those because that's important.

5            MR. JONES:  Yes, your Honor.  Sure.

6            We've actually made two lists in the brief.  The

7    list here on page 8 is actually LBRY talking about its own

8    efforts.

9            So, for instance, here in Exhibit 52 LBRY says,

10   "LBC will go up when we've (LBRY) built a product that is

11   compelling enough to change people's habits.  We'll be

12   focusing all our efforts entirely on creating a product that

13   people will love."

14           There are several of those statements.  They're all

15   in the brief.  I don't need to read them all.

16           THE COURT:  Okay.  I just want to be sure we review

17   them carefully when we evaluate your argument.

18           MR. JONES:  Yes, your Honor.

19           And the way that it is -- and there are two prongs

20   of the third prong test, but they do overlap.

21           The way that LBRY has set up this whole system,

22   there is expectation of profits from LBRY's efforts.  Just --

23   and I'll sort of shade into the first part of the prong.

24           THE COURT:  Do you concede that there is what I

25   think LBRY is calling a consumptive use for LBC?

1          MR. JONES:  We do, your Honor.

2          THE COURT:  Okay.

3          MR. JONES:  Not for the entire time of the

4    offering.  The offering starts in 2015.  People are promised

5    LBC for services.  People are paid in LBC or executives make

6    agreements that, you know, their companies that are providing

7    efforts to LBRY are going to get LBCs later, but through most

8    of it --

9          THE COURT:  When would you say is the first

10   offering to the public of LBC?

11         MR. JONES:  Well, so in July -- I think it's the

12   end of June of 2016 the LBRY blockchain goes live.  On July 4,

13   2016, LBRY makes an announcement.  It's a symbolic day.

14   Freedom at last.  LBC is available for you to get.  It's being

15   mined.  You can get it.  In 2017 and 2018 the LBRY starts

16   selling on those digital asset platforms, the exchanges.

17         THE COURT:  At one point it was selling on its own

18   on the LBRY app, wasn't it?  Couldn't you buy --

19         MR. JONES:  Yes, your Honor.  LBRY did in fact

20   engage a third party service provider called MoonPay in 2020

21   and 2021 to allow people to come with their credit cards or

22   Bitcoin or whatever and get on the app LBC.  That was very

23   late in the game, not so long before this case was filed, but

24   there were eventually abilities to buy on the app.  But from

25   2015 on LBRY was in one way or another continuously offering

1    LBRY through user reward programs, through employee

2    compensation, through employee purchase programs, through

3    digital platform sales, through its --

4            THE COURT:  When does something that has a

5    consumptive use and that LBRY would say is a commodity shade

6    over into a security?

7            MR. JONES:  Well, your Honor, I first would say you

8    don't start with the presumption that something is a

9    commodity.  You apply the _Howey_ test in the first instance.

10           THE COURT:  Right.

11           MR. JONES:  You should look at it.  And in this

12   case from the first instance with LBC there are promises made

13   and a reasonable expectation on the part of a purchaser that

14   they can buy this thing.  In fact, there were what we see in

15   these cases a fair amount, you know, get in early while the

16   price is low when we're building this thing and it's going to

17   go up.  There were representations made that there were going

18   to be profits and that LBRY was going to -- there was going to

19   be a rise in value of LBC.  I don't want to say the word

20   profit was used, but there would be a rise in value in LBC

21   based on LBRY building this network that it was building, and

22   in fact those representations were made before even the

23   blockchain and therefore the LBRY service went live.

24           THE COURT:  What's your take -- so I think LBRY's

25   counsel did a good job of drawing my attention to Judge

1    Selya's discussion of <u>Forman</u> and <u>Joiner</u>, and they cite in

2    their brief cases that deal with their expectation of other

3    cases, but they talk about you don't have to prove it solely

4    for investment purposes.

5            So if you don't have to prove it solely, what is

6    the test, and what does the SEC say is the test for

7    expectation of profit?  It's not solely.  You would I'm sure

8    agree it's not solely because Judge Selya says it's not

9    solely.

10           Do you agree that it's principally?  Do you agree

11   that -- do you have a view that there's some other test?  What

12   is it that you say is the legal refinement of <u>Howey</u> and <u>Joiner</u>

13   and <u>Forman</u>?

14           MR. JONES:  Your Honor, I think I would start by

15   saying that the test does not turn on the intent of the

16   purchaser alone.  All of the cases that deal with <u>Howey</u> talk

17   about looking at the economic realities of the transaction.

18           THE COURT:  I agree with that.  So we don't use

19   labels.  We don't use any one factor.  We focus on the

20   economic realities.  But we're asking, I thought given the

21   economic realities, would a reasonable acquirer of this be

22   acquiring it principally, not incidentally, whatever your

23   test, as an investment.  And that would be -- you would view

24   it from the eyes of a reasonable acquirer given the total mix

25   of information and the economic realities of what is going on.

1    But then you still have to ask in a mixed motive case if some

2    acquirers are acquiring for purely consumptive and others are

3    acquiring purely for investment, what is the test by which a

4    judge evaluates that kind of a case, which I don't think any

5    of the cases I've seen have really evaluated in detail those

6    kinds of -- that kind of problem, and that's what we seem to

7    have here.

8              I think it's undeniable that people are acquiring

9    LBC for investment reasons.  I think it's undeniable that

10   people are acquiring LBC for consumptive reasons.  How do I

11   determine in a case like that whether something is acquired --

12   a reasonable investor considering the total mix and not

13   looking at any one factor determine -- where some investors

14   are acquiring for consumptive and some investors are acquiring

15   for investment, how do I determine whether in that case it

16   meets the first component of the third element of the <u>Howey</u>

17   test?

18             MR. JONES:  Your Honor, I agree it is a tricky

19   problem not fully addressed by the law.  And, in fact, there's

20   a third possibility, which is what if someone buys a thousand

21   LBC wanting to spend 10 and hold onto 990.

22             But I think part of the way to solve this

23   conundrum, your Honor, is to take a step back and to realize

24   that neither utility nor subjective intent --

25             THE COURT:  They're not dispositive.  Are you

        1    saying they're irrelevant?

        2              MR. JONES:  I'm not saying they're irrelevant.

        3              THE COURT:  Okay.

        4              MR. JONES:  I'm saying they're not -- that they do

        5    not --

        6              THE COURT:  They're not dispositive.  They're not

        7    irrelevant.

        8              See, judges -- you know, maybe it's a fault.

        9    Judges like to have standards against which to analyze things.

       10    Otherwise, it looks like we're just making it up as we go

       11    along.

       12              I'm trying to have you help me --

       13              MR. JONES:  Yes, your Honor.

       14              THE COURT:  -- formulate the correct standard in

       15    what you might call a mixed case where investors are acquiring

       16    -- or people are acquiring the digital asset some for

       17    consumptive reasons, some for investment reasons, some mixed

       18    investment and consumptive reasons.  At what point does the

       19    expectation of profits test justify a conclusion that that

       20    component of the test is satisfied?  What formulation?  What

       21    language do you think I ought to use to describe that

       22    component of the test?

       23              MR. JONES:  Your Honor, let me put where I think it

       24    comes out, and then let me take a step back and try to justify

       25    that.

1          THE COURT:  All right.

2          MR. JONES:  I think it comes out can a reasonable

3  purchaser expect to profit.  It's not do they.  It's can they.

4          THE COURT:  I agree it's not do they.  I agree it's

5  can.

6          MR. JONES:  Can.

7          THE COURT:  But if a reasonable acquirer -- let's

8  say it came out that 70 percent of the people that bought

9  LBC -- we actually dragged every LBC purchaser into court, put

10  them under oath, asked them, why did you buy it, what's your

11  evidence, or we had definitive -- apparently there is no

12  evidence that definitively shows which are consumptive uses,

13  but if we had all of that and we could nail down absolutely

14  and the conclusion I came to at the end is 75 percent of LBCs

15  were used and bought for consumptive purposes, people realized

16  that there are also promotion of this for investment, and 25

17  percent were buying because of investment, would that make it

18  expectation of profits?

19          MR. JONES:  Your Honor, I want to suggest to the

20  Court that that would be a tough test to both implement and --

21          THE COURT:  What if we flipped it and it was 25

22  percent wanted to use it for consumptive uses and 75 percent

23  didn't?  Would that be a -- they wanted to use it for

24  investment first.  Would that be a security, meet the

25  component of that test?

1          MR. JONES:  Your Honor, I think in neither case

2    does the ratio actually help the Court or a securities issuer

3    to determine whether it is a security or not.  That is why the

4    economic reality -- and it's not just labels have to be issued

5    and all that.  Part of the economic realities test is what's

6    really going on with this thing.  When you buy it, when it is

7    a transaction in commerce, what's happening?

8          What's happening here is you can buy this thing.

9    You can wait.  LBRY can continue to develop its network and it

10   will be more.  According to them and according to some other

11   evidence that I'm sure you want me to get to, it will go up.

12   And, therefore, whether or not I want to take part of it and

13   spend it on my cat videos, it's still an expectation of

14   profits if I am a reasonable purchaser.

15         Now, let me take a step back and try to justify

16   that in the case law a little bit.

17         THE COURT:  I don't want anybody to think I'm

18   confused about this.  I don't think subjective intentions is

19   the determining factor here.

20         MR. JONES:  No, our Honor.

21         THE COURT:  I just don't read the cases to say

22   that, but I don't think the cases provide a good answer right

23   now, a clear-cut line drawing kind of answer between -- that

24   you use to address cases in which there is a viable

25   consumptive use.  I mean, SG -- there might be a consumptive

1   use in SG as well if you think about it.  They don't really

2   discuss that in -- this case doesn't discuss it in detail.  It

3   focuses primarily on things like how is it promoted, how was

4   it -- in connection with where it was sold, what was going on,

5   and the economic reality of that situation looked at in a kind

6   of holistic, practical way, is it being sold in such a way

7   that people are -- a reasonable investor given the total mix

8   of available information and the economic realities of really

9   what is going on buying that non-incidentally for investment

10  purposes.

11          I think that seems to be the way I would take the

12  test, and maybe it doesn't matter whether you use the word

13  principally or not incidentally, but that's the kind of thing

14  of which Supreme Court decisions are made, and I don't like to

15  make decisions that are going to be resolved by the Supreme

16  Court.  I like to decide things so that at my level that's the

17  end of it.  People just agree that it's right.  So it may not

18  matter, but I am just giving you your chance now to tell me if

19  you think there's a -- LBRY has suggested the language for the

20  legal test.  You haven't.  So if you've got any language,

21  now's your time.

22          MR. JONES:  Your Honor, I would go to what I just

23  said.  Can a reasonable purchaser expect profits as opposed to

24  what is the reasonable purchaser's intent.  What is 65 percent

25  versus 35 percent?  Can they expect profit?

1          THE COURT:  You don't have a case that says that.

2          MR. JONES:  So this is interesting, your Honor.

3     This is where I want to talk about SG and Forman.

4          In SG -- let's start with Forman.

5          The Court actually goes through, okay, you can't

6     sell this thing for a profit, you're prohibited, but let's go

7     through -- you know, clever plaintiffs with a financial

8     interest came up with a few possible profits, and the Court

9     actually exhausts each one of those and says, no, that is not

10    expectation of profits, that is not expectation of profits,

11    that is not expectation of profits, those are profits, and it

12    exhausts the whole thing.  And that suggests that the Court at

13    least in Forman and in the subsequent cases where they're

14    looking at mostly housing, some of these EB-5 visa cases, but

15    mostly housing, is there anything there beyond you just want

16    to consume it.  And if there is, then maybe the Court was

17    wrong to dismiss or wrong to give summary judgment, but is

18    there anything there.

19          And here SG confronts this question squarely in my

20    opinion, your Honor, because the principal defense in SG was

21    this is a game.  This thing you're buying from us, you're

22    playing a game.  And, yeah, you may make some money from it,

23    but you're playing.  You're getting the utility of the game.

24          And Judge Selya says that doesn't matter.  In fact,

25    that's how the lower court had decided and said it's a game.

1    It's not a transaction in commerce.  It doesn't look like a

2    securities transaction.  And Judge Selya comes along and says,

3    no, what's actually going on here, there actually is a profit

4    motive here.  Although he doesn't deny that there's a game

5    aspect to it and that some people may be playing because

6    there's a game.  He simply looks at it and says it doesn't

7    matter that it's a game.  It doesn't matter that there's a

8    utility.  Because there was a utility in the oranges and the

9    whisky casks and the chinchillas and all the other cases that

10   come along in the <u>Howey</u> chain.  The utility doesn't matter.

11          Judge Selya says the fact that it's a game doesn't

12   matter both in disqualifying it as a securities transaction

13   and in whether or not there's a reasonable expectation of

14   profits.  Because that's what the <u>SG</u> defendants said.  They

15   said this was a game.  How could anybody have expected

16   profits?  And Judge Selya said, well, pretty much because you

17   told them to expect profits, and that's what LBRY did here.

18          THE COURT:  Okay.  And you will look at your brief

19   to see the specific instances.

20          Can you just refresh my memory?  I'm remembering

21   from the briefs that in fact there were several instances in

22   which LBRY did make substantial sales of LBCs.  I mentioned

23   the investment club was one of them.  There were others

24   according to you, right?

25          MR. JONES:  Yes, your Honor.

1          So the investment club sales -- there are several

2    of those sales.  I believe there are four.  I could be wrong

3    and there's five.  I think there's four.  They were two

4    different investment clubs run by the same investment house, a

5    place called Flipside Crypto.  Overall 1.1 million LBC, for a

6    value of around that time $260,000, were sold to what was

7    advertised as a small group of influential people.

8          It is not credible in the -- and this is what the

9    cases say, too.  Look at the actual transaction to see what

10   the economic realities are.  Part of the economic realities

11   are how many, how much, and what would it have taken you to

12   actually consume those millions and millions of videos.

13         First of all, your Honor, most of the videos are

14   free to watch.  Most of them cost a tenth of an LBC to publish

15   unless you're publishing it from YouTube, in which case LBRY

16   pays it for you.  Tipping is optional.  And this process of

17   what's called staking, which is supporting a channel by

18   putting down your LBC, is a nonconsumptive use.  You can take

19   all your LBC back.  It's not even really something we need to

20   worry about.

21         So when Flipside Crypto comes along in 2017 and

22   2018 and buys 1.1 million of these, says they're going to put

23   them in cold storage, which right there you know is not going

24   to be a consumptive use because --

25             THE COURT:  Sorry.  The names are mixing up.  Who

1   is that?

2           MR. JONES:  That's Flipside Crypto.  They are the

3   investment clubs.

4           THE COURT:  They were the investment clubs?

5           MR. JONES:  Yes, your Honor.

6           Right there when they say we're going to put them

7   in cold storage, cases like Telegram say, well, that's part of

8   the economic reality you look at.  The fact that you're buying

9   it to put in cold storage means that -- no one would buy

10  something that they wanted to use and then voluntarily agree

11  to put it away for a year for no reason.  They're putting it

12  in cold storage.

13          The same thing with Pillar.  Pillar is the venture

14  capital investor that originally just gives money.  They are

15  purely a venture capital investor at the beginning, and then

16  as time goes on, it's 2018, they say we've done a lot of other

17  valuable things for you.  We want to negotiate that you give

18  us LBC for them.  They make a contract.  A million LBC is

19  promised in that contract.  It's got a lock-up period.

20          THE COURT:  I wanted to ask you -- so there is a

21  lock-up period?

22          MR. JONES:  There is on that, your Honor.

23          THE COURT:  Okay.

24          MR. JONES:  Now, my friends at LBRY say, well, they

25  never took possession of them.

1          THE COURT:  What does that mean, they never took

2  possession of them?

3          MR. JONES:  Apparently, they never transferred them

4  from LBRY's wallet to their own wallet.

5          THE COURT:  Did they give -- so what did they --

6  what was their consideration for the transaction?

7          MR. JONES:  In the agreement it's specifically

8  cited as a change in loan terms essentially, a change in debt

9  terms.

10          THE COURT:  So there's some kind of debt security

11  that evidences the Pillar contribution?

12          MR. JONES:  I think -- the second part, absolutely,

13  your Honor, the tokens were to recognize the Pillar

14  contribution.  The testimony states that.  I don't even know

15  if you have that testimony, your Honor, but the testimony does

16  state that.

17          The first part was -- I don't want to say it was

18  for debt.  It was in consideration of changing the terms of

19  prior debt --

20          THE COURT:  Okay.

21          MR. JONES:  -- is my understanding.  But the

22  testimony is also the LBRY folks and the Pillar folks both

23  thought that it was also coming from the fact that Pillar had

24  contributed services and advice and things like that.  Now,

25  that's not specified in the agreement as we've put into the

1      record, but that's what the testimony is.

2              THE COURT:  But Pillar -- whatever this agreement

3      was, there never was an actual transfer from the LBC -- or the

4      LBRY wallet to the Pillar wallet?

5              MR. JONES:  Let me answer that in two ways, your

6      Honor.

7              As far as we know, there was never an electronic

8      transfer from one wallet to the other.

9              On the other hand, Pillar gets audited.  The

10     auditor says to LBRY, confirm that there are 2 million LBC

11     that are possessed by Pillar that you owe to them.  LBRY says

12     yes.  Pillar says yes.  It goes in their audit.  It's listed

13     as an asset on their books.

14             THE COURT:  It could be an off-chain transaction.

15             MR. JONES:  Well, your Honor --

16             THE COURT:  There's a right to recover that

17     remains, right?  So Pillar could sue LBRY and say you've

18     agreed to give me -- in exchange for agreements about debt or

19     so forth, we had some kind of a contract, and they could

20     execute on it you're saying.

21             MR. JONES:  And I don't think either side disputes

22     the fact that if Pillar said an hour from now I'm taking my

23     LBC now, that LBRY wouldn't absolutely just give it to them.

24     I think they're willing to give it to them, I think they know

25     they have to give it to them, and they've stated on the audit

1     that they are Pillar's LBC that they're holding onto -- that

2     LBRY is holding onto for them.

3            I think the details of that are less significant

4     than the economic reality of that transaction, which is 2

5     million LBC sold, you know, for valuable consideration and put

6     into a lock-up period, which means that absolutely it was not

7     for consumptive intent.

8            There are others, your Honor.  The sales on the

9     platform go from 2017 through 2021 with a little break in the

10    middle.  There's also market making during that time, and we

11    think the market making is significant.  Why?  Because in

12    addition to what LBRY has said is going to happen with these,

13    they are actually taking affirmative steps and paying for

14    services to create and stabilize a market in LBC.

15           Now, if you're buying four LBC to watch some

16    videos, you're not destabilizing a market.  If you're buying

17    or selling 10,000, 100,000, a million, there's market making

18    that can stabilize a market in that point.

19           And in fact we know those are the levels because

20    there were two accounts that the market maker controlled, one

21    in the name of Mr. Kauffman and one in the name of another

22    executive, and those accounts together traded 7.4 billion LBC

23    over the time period June 2020 to March --

24           THE COURT:  Let me just make sure I understand your

25    argument.

1            MR. JONES:  Yes, your Honor.

2            THE COURT:  And then we're going to have to take a

3      break in a minute for my reporter.

4            MR. JONES:  Yes, your Honor.

5            THE COURT:  You're saying I can infer from the fact

6      that LBRY was engaged, actively engaged in market making

7      activities for LBC that they understood that this would be a

8      substantial investment use of LBC and they needed to have

9      market making to prevent wild swings in the value of LBC

10     whenever one of these holders of a substantial amount decides

11     to dump it.  If it was just people who are using LBC for

12     consumptive purposes, it would sort of gurgle along at a

13     steady and hopefully significantly increasing but not a need

14     to have market making you would say?

15           MR. JONES:  That is our argument, your Honor.  Yes.

16           THE COURT:  I suppose their argument would be if we

17     want LBC to be valuable at all, we've got to have viable

18     markets, and if there aren't viable markets, we can't --

19     nobody is going to hold an LBC for any purpose because they

20     can't -- it's completely nonliquid.

21           MR. JONES:  Well, that may be what they say, but

22     you can certainly have LBC in a Pocketful of Quarters kind of

23     way that you wouldn't have that concern.  It's only when you

24     have -- people want to have these and hold onto them and have

25     the value go up in the future that you're concerned about

1   that.

2                   THE COURT:  Let's stop in a minute.

3                   MR. JONES:  Yes, your Honor.

4                   THE COURT:  I want to ask this one question.  Just

5   so people know, I have another thing at 3:30 that I've got to

6   do.  We'll take a break.  We'll come back and finish your

7   argument, give LBRY a brief chance to respond.  Then LBRY will

8   present on its fair notice argument, give you a brief chance

9   to respond.  I've got to wrap up by 3:30.

10                  So if you accept the view, as I think many people

11  do, that blockchains like the one LBRY operates have great

12  potential utility for our society -- and we want to encourage

13  people to use things like blockchains at least under certain

14  circumstances.  Obviously, people have different views about

15  it consumes too much energy, it's not good for society, but

16  there are a lot of people that think they have great economic

17  utility and real potential.

18                  It seems an essential part of an operation of

19  blockchain that you have to incentivize people that validate

20  blocks of the blockchain, and the way in which that's been

21  traditionally done is through a digital asset.

22                  Is there in the SEC's mind a way in which LBRY

23  could operate the LBRY blockchain using LBC as a digital asset

24  that would not qualify LBC as a digital asset -- as a

25  security?  Excuse me.

1          MR. JONES:  Your Honor, I want to be very careful

2     for this answer.

3          THE COURT:  I understand.

4          MR. JONES:  I am not a commissioner appointed by

5     the senate.  I am not a policy maker.  I am a lowly trial

6     attorney, enforcement attorney who's in charge of enforcing

7     the law as it stands now.

8          THE COURT:  Well, let me just suggest -- because

9     I'm none of those things.  I'm not even a lowly SEC attorney.

10    I'm lower than that.

11          Couldn't they operate as Pocketful of Quarters and

12    use LBC in the same way that a token in Pocketful of Quarters

13    was used which generated an SEC no-action letter?

14          MR. JONES:  Your Honor, to answer as honestly as I

15    can without making any policy for the Commission, I believe

16    there are probably several ways that all are focused on the

17    Howey test.  And if you can disqualify yourself from a certain

18    part of the Howey test then, all things being equal, you're

19    probably operating in a way that would be allowed.  The

20    Pocketful of Quarters no-action letter.  The no-action letters

21    the Commission has issued.

22          If you can make it so there's not an expectation of

23    profits, if there's no common enterprise, that's a way that,

24    you know, that's talked about.

25          If there's no reasonable efforts of others, if

1    you're not putting in any efforts, as your Honor was talking

2    about before, perhaps, and without binding the Commission in

3    any way, perhaps all of those would be ways that you could do

4    a blockchain program without violating the Howey test.

5              But from my perspective, your Honor, I have the

6    Howey test, and I can see what LBRY has done.

7              THE COURT:  Are there ways if you conclude that

8    it's -- again, you can't bind the SEC.

9              MR. JONES:  Correct.

10             THE COURT:  I understand.  I'm just trying to gain

11   this out.

12             If it did qualify as a security -- as we all know,

13   there are vast, vast quantities of transactions that are

14   securities transactions that are exempt from registration

15   requirements.  Indeed, the private placement market is bigger

16   than the registered market so there are more trillions of

17   dollars exchanged in the private market than the public

18   market.

19             Would someone like LBRY be able to qualify under

20   one of the exemptions, the many exemptions that exist?

21             MR. JONES:  Your Honor, I would presume that if

22   you're -- I don't want to say that LBRY could because LBRY has

23   done certain things.

24             If you're a company who's putting out tokens and

25   you qualify for the exemptions, there's nothing in my

1   understanding that says because you're a blockchain company

2   you don't qualify for the exemptions.

3           If you're going to make a general solicitation,

4   you're going to have a hard time qualifying for the

5   exemptions.

6           THE COURT:  Well, there are small dollar

7   solicitations.  There are interstate solicitations.

8           MR. JONES:  Yes, your Honor.

9           THE COURT:  You know, there are exemptions --

10          MR. JONES:  Absolutely.

11          THE COURT:  -- which are gigantic in number.

12          Okay.  I just was curious about that.  I'm not

13  trying to bind the SEC.  I just was interested in the

14  counterfactual -- if we deem blockchain to be useful and we

15  deem digital assets to be important to function as a

16  blockchain and we don't want people to have to engage in the

17  burden of registration, are there ways that this could be done

18  that wouldn't subject the blockchain creator to the obligation

19  to register.

20          It seems to me that there are, but I don't know --

21  one thing that would not be able to do, which is a company

22  that wants to rely on the growth and the value of its holding

23  of its coin as the means to finance the growth of the company.

24          MR. JONES:  Right.

25          THE COURT:  It's very hard to do that and have it

1    not be a Howey investment contract under your client's view,

2    right?

3              MR. JONES:  And so, your Honor, that's exactly what

4    LBRY did here.  In fact, they put out a whole post, it's

5    Exhibit 43, about how there's a whole new way of doing

6    business, and we can create these tokens.  We don't have to

7    exploit our customers because we can sell these tokens because

8    they'll go up in value over time, and that's how we'll fund

9    and build our business.

10             So that latter part, the part where you said it's

11   very hard for it not to be an investment contract, that's what

12   LBRY did.

13             But in my personal opinion, I think which may be

14   what the Court is also expressing, there are ways to not run

15   afoul of the Howey test and still run a blockchain.

16             THE COURT:  Yeah.  That's what I'm just wondering,

17   you know, because it does seem that there are very important

18   valuable uses of blockchain technology and there would be

19   seemingly ways to run a blockchain successfully without the

20   digital asset being a security, like Pocketful of Quarters,

21   but it would be hard to do that if your business model is we

22   don't need large amounts of venture capital.  We don't need to

23   charge people for stuff.  We will just build a blockchain with

24   a digital asset that will increase in value in the future as

25   we build out and succeed with the blockchain because that's

1   quintessentially people who -- it goes up in value because

2   people want to buy it.  People want to buy it because it's

3   going to become more valuable in the future because the

4   company builds it up.  That's sort of quintessentially <u>Howey</u>.

5   That's your position?

6            MR. JONES:  That is, your Honor.

7            THE COURT:  All right.

8            Again, take a short break.  As soon as my court

9   reporter is ready, we'll come back, hear LBRY's response,

10  LBRY's argument about fair notice, your response, and then

11  we'll wrap up, okay?

12           MR. JONES:  Thank you, your Honor.

13           (RECESS)

14           THE COURT:  So just to anticipate something I

15  assume LBRY is going to ask you, I want your answer first.

16           You place great weight on things LBRY said in

17  connection with or loosely or more directly related to

18  offerings of LBC.  LBRY says, look, that's one tiny fraction

19  of all the things we said about LBC and our app, and we

20  actually said things like don't look at it as an investment,

21  you know, and they swamp those few things that you point to.

22  What's your response to that?

23           MR. JONES:  A couple of responses there, your

24  Honor.

25           First of all, they don't swamp it with everything

1    they said about LBC.  They swamp it with everything they've

2    said about everything.  New functionality.  Hey, we got a new

3    video.  This person is joining our platform.  We're a bunch of

4    cool guys.  This is the guy that we created that we write a

5    pen name under.

6           It's not all the things we said about LBC.  This is

7    a small fraction.  The things that the Commission have cited

8    that they said about LBC or the things that they've said about

9    LBC, that's -- I mean, we put in a lot of stuff because that's

10   what they've said.

11          And you won't find anywhere in the record submitted

12   by LBRY except one time where they said don't expect a profit.

13   Don't think this is going to go up over the long-term.  We're

14   not working on this.  You will not make a -- this will not go

15   up in value.  They say nothing like that except one time.

16          The one time they say it is when they're selling

17   hundreds of thousands of tokens to Flipside Crypto, the

18   investment club that you and I were talking about before, your

19   Honor.  And they say as an afterthought, after the deal is

20   consumed, oh, by the way, we are very conscious of the

21   securities laws.  This is not for investment.  This is for use

22   on the platform.  Not credible.  In fact, perhaps proving the

23   opposite in the fact that they felt that --

24          THE COURT:  That kind of disclaimer you would say

25   is of really no value.  It's just designed to show the

1  awareness that this is potentially an offering of security?

2          MR. JONES:  Correct, your Honor.

3          So I think Mr. Miller is right when he says you

4  look at the promotional materials.  You know, when they talked

5  about LBC, they talked about it in the way that the Commission

6  has presented with its many exhibits, and LBRY has not

7  presented any exhibits that show that they talked about it in

8  a different way.

9          And so, yes, they may have said 8,000 things, but

10  the test is not about how verbose the defendant is, as we say

11  in our brief, or reticent.  The question is when they talk

12  about LBC -- and in many of the cases there's two or three

13  documents.

14          THE COURT:  Let me ask you about reticence.  What's

15  the oil well case, the Supreme Court's oil well case about

16  leases of the land in --

17          MR. JONES:  It's <u>Joiner</u>, your Honor.

18          THE COURT:  <u>Joiner</u>.

19          MR. JONES:  Yes.

20          THE COURT:  What the Court in <u>Joiner</u> said was this

21  might well be a different case had they not engaged in any

22  kind of promotional statements.

23          Do you think a complete absence of promotional

24  statements would be sufficient for a company like this?

25          MR. JONES:  I don't, your Honor.

1            And, first, I don't think I necessarily agree with

2      you exactly what the Court says in <u>Joiner</u>.

3            THE COURT:  I'm trying to do it from memory.

4            MR. JONES:  In <u>Joiner</u> -- and Judge Selya talks

5      about this actually.  In <u>Joiner</u> they say if you had never said

6      that this exploratory drilling part of the deal could render

7      you some profit, right, they say the exploratory drilling part

8      of the deal is the part that drives the expectation of

9      profits.  Otherwise, I think they call it a leasehold interest

10     in what is otherwise a, you know, possibly oil-filled,

11     probably dry piece of land.

12            So I think the point that's being made in <u>Joiner</u>

13     there is -- you know, normally, like in <u>Forman</u>, you might have

14     just a leasehold interest, but once you put an exploratory

15     drilling part on it that actually gives it the value, the

16     economic reality of that transaction is that there's an

17     expectation of profits which we can see by the fact that you

18     talked about it and highlighted it.  I don't think, your

19     Honor, if they hadn't talked about it but still had it, that

20     the <u>Joiner</u> Court might have said, well, there is no

21     expectation of profits here.

22            And the reason I say that, your Honor, is because

23     the courts in analyzing this, whether it's <u>Joiner</u> or <u>SG</u> or

24     <u>Forman</u> or <u>Telegram</u> or <u>Kik</u>, they look at not just what is said,

25     and I think it's inappropriate to look at just what it said.

1    They look at the structure of the transaction.

2            Here LBRY creates these things.  It holds back 400

3    million.  It starts to sell them out in the world.  And then

4    it makes statements.

5            But the whole structure of the transaction in the

6    first place, which is we are going to fund our business -- our

7    business model, as you said, is -- and it was admitted as

8    testimony and submitted as part of this record.  All of the

9    money to build LBRY --

10           THE COURT:  So your point is -- at least your

11   perspective, again not binding the SEC, but you're saying even

12   if they had been completely silent but had structured the

13   transactions the way they did, engaged in the transactions,

14   held back the 400,000, whatever, million, whatever --

15           MR. JONES:  Yes, your Honor.

16           THE COURT:  -- all of that, that would have been

17   enough.  You don't need these statements in this case to

18   satisfy Howey.

19           MR. JONES:  I believe that's right, your Honor,

20   because I don't believe that the securities laws permit you to

21   put out what is a security in an economic reality and stay

22   quiet and evade the securities laws.  That's what I have to

23   look out for here, that there's some loophole created that,

24   hey, you know, we never said this was going up, but everything

25   we did showed that that's what we thought and the whole part

1    of the transaction that that's how it worked, and it did.

2              I want to say one more thing, your Honor, before I

3    sit down.

4              THE COURT:  One more thing, and then I've got to

5    let LBRY have a turn.

6              MR. JONES:  Of course, our Honor.

7              You seem to think that the Commission was buying

8    into this off-chain/on-chain ratio.  We think that's bunk.

9    The way that it's presented --

10             THE COURT:  I thought you were making arguments

11   based on on-chain/off-chain ratio.

12             MR. JONES:  We're making I think rebuttal arguments

13   based on if you actually look at the data, here's what it is,

14   your Honor, and in fact we've rebutted it in our --

15             THE COURT:  So you agree with me that it doesn't

16   necessarily tell you which uses are consumptive or not?

17             MR. JONES:  No, your Honor.

18             The on-chain transaction is extraordinarily

19   problematic.  We've outline that in our Daubert motion we just

20   submitted to you.

21             THE COURT:  I have not seen it.

22             MR. JONES:  Of course, your Honor.  There's more

23   than enough here.

24             But not only is it bunk in the way that it's done,

25   not only is it not a reliable proxy for consumptive use, it's

1    not a -- even if it was, it's not a workable test.  You can't

2    have the securities laws basically say, well, you don't know

3    whether it's a security until five years down the line when

4    you see if enough of these people bought it and not enough of

5    those people.

6            THE COURT:  No.  I agree that it couldn't work as a

7    test in and of itself.  The issue is, is it a relevant -- can

8    it be a relevant factor at all in consideration, and I think

9    this is where you and LBRY may disagree.  I think they say

10   evidence of what subjective intent of acquirers of a digital

11   asset, evidence of that is potentially useful, and so if we

12   were able to show here in a perfect world 100 percent of the

13   acquirers of LBC acquired it for consumptive use and we were

14   able to prove that conclusively, that they would say that's

15   very, very strong evidence that -- just like people who bought

16   the apartments wanted to live there and not the stock, people

17   who bought LBC and in fact used it entirely for consumptive

18   purposes wanted to use it for consumptive purposes, not for

19   investment.  So that's why I think at least in theory in

20   extreme cases it might be relevant.  It's not dispositive.

21   I'm just saying it may be a factor that I can consider.

22           MR. JONES:  I understand, your Honor, but I think

23   the key part of what you said at the end there was that they

24   bought it for consumptive purposes and not for investment

25   purposes.

1          THE COURT:  Right.

2          MR. JONES:  Once you're in for investment purposes,

3    even for part of it, even by some people, even, you know, a

4    fraction of those people, you're in securities land.

5          THE COURT:  Yeah, but if you're buying -- people

6    buy houses.  Do you live in a house you own?

7          MR. JONES:  I do, your Honor.

8          THE COURT:  If you have, you probably think, you

9    know what, rather than rent a house, I'm going to buy a house.

10         MR. JONES:  Yes.

11         THE COURT:  Because over time I'm going to make

12   some appreciation in the value of the house or maybe it's a

13   hedge against inflation or something else.  It's primarily I

14   want to live in it, you know, but houses are, like under the

15   family resemblance test or something, they wouldn't be

16   investment contracts necessarily, but the point is that there

17   are things that people acquire both because they have some

18   investment value but principally because they have some

19   consumptive value which are not going to satisfy the Howey

20   test.

21         MR. JONES:  Absolutely, your Honor.  And I would

22   say in most of those circumstances it's going to fail on a

23   different part of the Howey test before you even get to

24   expectation of profits.  Your house is not a common

25   enterprise.

1          THE COURT:  Right.

2          MR. JONES:  And to the extent it goes up in profit,

3     it's because possibly you improve it.

4          So I would say there absolutely are, your Honor,

5     there are Beanie Babies in the world, but they're not LBC.

6          Thank you, your Honor.

7          THE COURT:  All right.  So let me hear from LBRY

8     briefly in response to what you've heard, and then your

9     argument on fair notice, and then I can only give you about

10    ten minutes at most and then I'll get a brief response from

11    the SEC, and then we'll wrap up.

12         MR. MILLER:  Thank you, your Honor.

13         We completely disagree with the SEC's analysis here

14    that simply running an application on a blockchain where an

15    entity owns those tokens turns those tokens into a security.

16    That is not the test.

17         THE COURT:  Well, I don't think it's the test, but

18    I also don't think that's what they're saying.

19         MR. MILLER:  Well, we believe -- let me change a

20    little point here.

21         Your Honor has been focusing on what type of

22    promotional material is enough.  What is enough?

23         We think the SG case in using the word the

24    principal attraction, we believe that the Price case which

25    said, used the word primarily, and we believe that -- and

1    that's an Eleventh Circuit case, we believe the Second

2    Circuit's case in SEC versus Aqua-Sonic where they said the

3    overall emphasis, those words, particularly in the First

4    Circuit SG case, mean something.  We think they were put there

5    for a reason.

6              Next point, your Honor.

7              THE COURT:  I mean, I'm going to have to think more

8    about that.  I do think it's a point worth considering, but I

9    don't think it involves a mechanical counting up of the number

10   of investors and their subjective statements as to what they

11   acquired the asset for.  That would be an impossible to

12   administer test and shouldn't really be the focus, but your

13   point is not that because you agree that it's a reasonable

14   investor test and you agree that it's economic reality and you

15   agree that it's totality of circumstances.  You're just saying

16   subjective intent can be relevant and this is evidence of

17   subjective intent, and when there's an undeniable, substantial

18   in your view, consumptive use, the SEC isn't really able to

19   prove that using the reasonable objective purchaser standard

20   that this is an acquisition or an offer because of expectation

21   of profit?

22             MR. MILLER:  That's correct.  And I think although

23   we believe that the evidence presented, which when looked at

24   by a reasonable investor here, would suggest that LBRY is not

25   promoting it for investment.

1    We do recognize that there's a counterargument here

2  and question whether either side would be -- whether it would

3  be appropriate for the Court to rule on summary judgment for

4  either side given the arguments.

5    THE COURT:  I'm either going to rule on

6  cross-motions or I'm going to hold a trial and rule.  It's not

7  like we're going to have a jury decide this case, right?  I

8  assume -- I haven't looked, but you haven't made some demand

9  for a jury, which would be very unusual.

10    I'm just not sure what else I would uncover at

11  trial that I don't already have in front of me.  I mean, it

12  seems like you've both done a good job of putting together the

13  core arguments on your respective positions.  But in any

14  event, I hear your point on that.

15    MR. MILLER:  And lastly, your Honor, if the SEC is

16  right about how they interpret this, and that is go look at an

17  application on a blockchain and look what they say about the

18  token, and when you look at what they say about the token, it

19  talks about -- what is it talking about?  It's talking about

20  the underlying blockchain and the fact that they're building a

21  protocol, and because they own tokens in that blockchain that

22  makes it a security.

23    I think that is turning the entire <u>Howey</u> test

24  upside down.  It's then converting it into I think a

25  subjective test, not a reasonable investor test that is

1    looking at promotional materials.

2              Again, I would argue if LBRY -- if the LBRY credits

3    are tokens, then thousands of companies that run on Ethereum

4    platform, that use Bitcoin, they're all going to be deemed to

5    be security.

6              THE COURT:  Yeah, that's a bit of an overstatement.

7    I mean something like Bitcoin that doesn't have an entity, a

8    business that's trying to build out the Bitcoin blockchain and

9    isn't offering anything to anybody, it's completely different.

10             MR. MILLER:  It does have -- Bitcoin has been

11   forked many times.  Not many times but a few times.  And who's

12   done that?  The members.  The people who run those notes.

13   Just like LBRY, just like Ethereum, those are members who make

14   determinations of we should do this in the software.  It's

15   more advantageous for all the users.  And so if people adopt

16   it, then it's forked.

17             So there's nothing different between Bitcoin, which

18   is the transfer of value, and LBRY.  It's a transfer of value.

19   That's all it is.  It's -- can people believe that it's an

20   investment?  Certainly.  But what is -- and it goes back to

21   what did LBRY do to promote this.  That's what you need to

22   look at.  I think the courts are saying look at the

23   promotional material.  And when you look at the promotional

24   material, you don't have what the SEC has alleged in SEC

25   versus Telegram, SEC versus Kik.  You don't have any of these

1    issues of a private place memoranda, what someone normally

2    would think of.

3              I think, your Honor, we're struggling with dual

4    purposes.  The reason you don't have those cases is because

5    the government usually passes on those cases because they

6    recognize, well, people can disagree on whether it's

7    investment or whether it's use.  We're not going to go

8    prosecute this case.

9              For some reason they made this a case, and we think

10   under Howey, its progeny, the First Circuit case law of SG,

11   this does not constitute -- LBRY credits do not constitute

12   securities.

13             THE COURT:  Okay.  Thank you.  Did you want to say

14   anything more on the fair notice argument?  You raised it in

15   your brief.  I think I understand it, but if there's anything

16   you want to add on that.

17             MR. MILLER:  No.  Nothing further, your Honor.

18             THE COURT:  All right.

19             Any last comment from you before we wrap up?

20             MR. Jones:  No, your Honor.  We absolutely believe

21   this is ripe for summary judgment, and we think the case law

22   supports you deciding it as a question of law.

23             THE COURT:  Okay.  I'll take the matter under

24   advisement.  I think it's been well-argued.  The oral argument

25   has been helpful to me.  It's a significant issue.  I want to

1    make sure I devote substantial time to it.  It may be 30 to 60

2    days before I get out a ruling on it.

3            I'm going to stay LBRY's need to respond to the

4    Daubert motion because it isn't going to take -- I'm not going

5    to take that into account when ruling on this matter, and I'm

6    not considering the supplemental expert disclosure either.  So

7    you don't have to answer the Daubert motion.  I'm not going to

8    look at it.  If you want to answer it, you can, but I just

9    don't want to make you work unnecessarily.  I tend to take

10   those motions before trial anyway.  And before I determine

11   there's a need for trial here, I don't think there's a need in

12   ruling on the Daubert motion.

13           So the time for you to respond to that is stayed

14   until further order of the Court.

15           If I determine that there's a triable matter left

16   at the end of this, I'll schedule a further status conference

17   to discuss any remaining matters that have to be done.  So I

18   wouldn't expect the parties to be either engaging in

19   substantial additional discovery now or doing anything, filing

20   things with the Court.  I have this briefed.  I'm ready to go.

21   Give me my time to rule on it.  Then we'll revisit if

22   necessary.

23           Is that acceptable to you?

24           MR. JONES:  It's absolutely acceptable, your Honor.

25           Just as a matter of clarification, when we asked to

1  have the trial pushed to October 4th there were automatic

2  pretrial submission dates.

3            THE COURT:  Everything is stayed until further

4  order of the Court.

5            MR. JONES:  Thank you, your Honor.

6            THE COURT:  I have to decide whether there's a

7  triable case here.  I don't want people to spend money on

8  things that might not be necessary.

9            MR. JONES:  We appreciate that.

10            THE COURT:  I recognize how expensive litigation

11  is.  It's now in my hands for a while.  If there's something

12  that survives after this, we'll meet again and set up new

13  deadlines and all of that, okay?

14            It is important.  I want to get it done.  I'm going

15  to try to get it done expeditiously.  I hope by the end of

16  August, but certainly by the end of September I'll have

17  something, and then we can chat, okay?

18            All right.  Thank you.  That concludes the hearing.

19            MR. MILLER:  Thank you, your Honor.

20            MR. JONES:  Thank you, your Honor.

21            (Conclusion of hearing at 3:15 p.m.)

22

23

24

25

```
 1                 C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate transcription of

 6   the within proceedings, to the best of my knowledge, skill,

 7   ability and belief.

 8

 9

10   Submitted:  7-31-22          /s/   Susan M. Bateman _____
                                  SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```