UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Securities and Exchange Commission

      v.                                   Case No. 21-cv-260-PB
                                        Opinion No. 2022 DNH 138

LBRY, Inc.

## MEMORANDUM AND ORDER

The Securities and Exchange Commission (SEC) contends that LBRY, Inc. offered and sold unregistered securities in violation of Section 5 of the Securities Act of 1933. LBRY responds that it does not need to comply with the Securities Act because its alleged security, a blockchain token called LBC, is not a security at all. Instead, it argues that LBC functions as a digital currency that is an essential component of the LBRY Blockchain. LBRY also asserts that the SEC's attempt to treat LBC as a security violates its right to due process because the agency did not give LBRY fair notice that its offerings of LBC are subject to the securities laws. The parties have filed cross-motions for summary judgment addressing both issues.

## I.    BACKGROUND

The nascent technology known as blockchain operates in the background of this dispute. From its earliest days, proponents of blockchain technology have envisioned it as fundamentally altering many aspects of

modern life. See Satoshi Nakamoto, Bitcoin: A Peer-to-Peer Electronic Cash System (2008), https://bitcoin.org/bitcoin.pdf (outlining the idea for a peer-to-peer electronic payment system). As LBRY explains, a blockchain is essentially a "decentralized ledger maintained by a network of independently owned computers." See Kauffman Decl., Doc. No. 61-3 at 2 ¶ 5. Verified data is held in decentralized "block[s]" linked together via cryptographic consensus protocols. See id. at 2 ¶ 9. New data is connected to previous blocks, forming a chain. See id. at 2 ¶ 6. Digital tokens are used to compensate "miners" who validate transactions and allow for peer-to-peer "transfers of value," which are then logged in the decentralized ledger. See id. at 2 ¶¶ 6, 9; see also Morici v. Hashfast Techs. LLC, No. 5:14-cv-00087-EJD, 2015 WL 906005, at *2 (N.D. Cal. Feb. 27, 2015) (further discussing the technical details of "mining").

A. The Development of the LBRY Network

LBRY began as an effort to harness blockchain technology to allow users to share videos, images, and other digital content without a centralized host such as YouTube. See Def.'s Mem., Doc. No. 61-1 at 3. LBRY asserts that its LBRY Network is "the first decentralized, open-source, fully encrypted content distribution service built using the same blockchain technology that underlies Bitcoin." See Introducing LBRY: The Bitcoin of Content, Doc. No. 61-9 at 1. The LBRY Network is comprised of three components: "(1) the

LBRY Blockchain, (2) the LBRY Data Network, and (3) the applications layer[.]" Kauffman Decl., Doc. No. 61-3 at 3 ¶ 11. LBRY developed the "LBRY Desktop Application" to run on the LBRY Network.[1] Id. at 9 ¶ 26. LBRY has also developed other applications to run on the network, as have other third-party developers. Id. at 4 ¶ 11. LBRY Credits, or LBC, is the native digital token of the LBRY Blockchain. Id. at 4 ¶ 12. It is used to compensate miners, but it can also be spent on the LBRY Blockchain to publish content, create "channel[s]" that associate content with a single user, tip content creators, purchase paywall content, or "boost[]" channels or content in search results. See id. at 5-6 ¶ 17. Users generally must pay a fee in LBC in order to "interact with the LBRY Network for anything beyond viewing free content." Id. at 4 ¶ 12.

The LBRY Network was designed to eventually have a circulation of approximately 1 billion LBC. See id. at 4 ¶ 13. Most of the LBC will be released in the future to compensate miners, but when the LBRY Blockchain launched in June 2016, LBRY reserved a "pre-mine" of 400 million LBC for itself. See id. at 5-6 ¶¶ 14-15; see also Kauffman Dep., Doc. No. 62-20 at 5. It then sorted its LBC into three buckets: (1) 200 million into a "Community

---

[1] LBRY has renamed this application "Odysee." Kauffman Decl., Doc. No. 61-3 at 10 ¶ 35.

Fund," to be used for "spreading usage and adoption" of the Network by
"rewarding early adopters," "recruiting producers," and "rewarding
contributors to the community"; (2) 100 million into an "Institutional Fund,"
to allow for "the formation of institutional partnerships, as well as for grants
and donations to nonprofits and other [NGOs] with similar values as LBRY";
and (3) 100 million into the aptly named "Operational Fund," to be used for
"operational purposes." See Kauffman Decl., Doc. No. 61-3 at 5 ¶ 14.

        LBRY's co-founders largely self-funded their initial development
efforts, but they did raise "a small amount of funds from a number of angel
investors." See Def.'s Mem., Doc. No. 61-1 at 5. In September 2016, the
company also obtained $500,000 in debt financing through Pillar VC, a
venture capital firm. See Kauffman Decl., Doc. No. 61-3 at 9 ¶ 29. Since then,
LBRY has largely relied on sales and transfers of LBC to fund its operations.
See 9/28/2016 LBRY Article, Doc. No. 57-8.

        To date, the company has spent approximately half of its pre-mined
LBC through various transactions. See Kauffman Decl., Doc. No. 61-3 at 4
¶ 14. LBRY assigned 2 million of its pre-mined LBC to Pillar to extend the
company's debt financing. See Token Issuance Agreement, Doc. No. 64-30. It
sold 1.7 million LBC to three other entities: Flipside Crypto, a company that
identifies, acquires, and stores cryptographic assets for investment clubs, and
a pair of online trading platforms, ShapeShift and CoinEx. See Finer Letter,

4

Doc. No. 64-18 at 4; Kauffman Dep., Doc. No. 56-7 at 28; LBRY Quarterly Credit Report, Doc. No. 64-12 at 8. It sold more than 9.8 million LBC to the public directly through LBRY applications and another 44.1 million LBC through various digital asset trading platforms. See Moon Pay Agreement, Doc. No. 65-12; Pl's Statement of Facts, Doc. No. 55-2 at 20 ¶¶ 84-87. And it used more than 142 million LBC to incentivize users, software developers, and software testers, as well as compensate employees and contractors. See LBRY Amended Response, Doc. No. 64-17.

B. The Enforcement Action

The SEC brought this enforcement action in March 2021. See Compl., Doc. No. 1 at 1. The agency's sole claim is that LBRY's unregistered offerings of LBC violate sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c). Compl., Doc. No. 1 at 15. The SEC seeks injunctive relief, disgorgement of monies obtained through LBRY's offerings, and civil penalties. Id. at 15-16.

## II.   STANDARD OF REVIEW

Summary judgment is warranted "only if the record, construed in the light most amiable to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." Perea v. Editorial Cultural, Inc., 13 F.4th 43, 50 (1st Cir. 2021) (quoting Irobe v. USDA, 890 F.3d 371, 377 (1st Cir. 2018)) (cleaned up). I need not consider factual disputes immaterial to the legal issues under

review in ruling on a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"). When parties cross-move for summary judgment, I "view each motion separately, drawing all inferences in favor of the nonmoving party." See Giguere v. Port Res. Inc., 927 F.3d 43, 47 (1st Cir. 2019) (quoting Fadili v. Deutsche Bank Nat'l Tr. Co., 772 F.3d 951, 953 (1st Cir. 2014)); see also Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, I must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." See Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

## III.   ANALYSIS

To establish a prima facie violation of Section 5 of the Securities Act, the SEC must prove that LBRY offered or sold securities in interstate commerce without filing a registration statement. See SEC v. GenAudio Inc., 32 F.4th 902, 939 (10th Cir. 2022); see also SEC v. Kahlon, 873 F.3d 500, 504 (5th Cir. 2017). LBRY does not challenge the SEC's contention that it offered and sold LBC in interstate commerce without registering its offerings with the SEC. Nor does it argue that its past offerings fall within an exemption to

the registration requirement. Thus, the only issues impeding a finding that LBRY violated Section 5 are LBRY's claim that it did not offer LBC as a security and its argument that it was not given fair notice that it needed to register its offerings. I address each issue in turn.

A. Did LBRY Offer LBC as a Security?

When Congress adopted the Securities Act, "it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." Reves v. Ernst & Young, 494 U.S. 56, 61 (1990). One such instrument is an "investment contract," which the Supreme Court defined in SEC v. W.J. Howey Co. as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298-99 (1946); see also SEC v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001). Consistent with the broad reach of the Securities Act, "[t]his definition 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" SEC v. Edwards, 540 U.S. 389, 393 (2004) (quoting Howey, 328 U.S. at 299). The focus of the inquiry is on the objective economic realities of the transaction rather than the form that the transaction takes. United Hous. Found. v. Forman, 421 U.S. 837, 848 (1975); see also Warfield v. Alaniz, 569 F.3d 1015,

1021 (9th Cir. 2009) ("Under <u>Howey</u>, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'").

The First Circuit has broken the <u>Howey</u> test into three parts: "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party." <u>SG Ltd.,</u> 265 F.3d at 46. Here, only the third component of the <u>Howey</u> test is in dispute. Thus, the issue to be decided is whether the economic realities surrounding LBRY's offerings of LBC led investors to have "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."[2] <u>See</u> <u>Forman,</u> 421 U.S. at 852. I analyze the evidence that bears on this issue by first examining LBRY's representations to prospective purchasers and the company's business model. I then turn to LBRY's

---

[2]  In <u>Howey</u>, the Court stated that the expected profits from an investment must be due "<u>solely</u>" to the efforts of a promoter or a third party. 328 U.S. at 299 (emphasis added). "The courts of appeals have been unanimous in declining to give literal meaning to the word 'solely' in" applying <u>Howey</u>. <u>SG Ltd.,</u> 265 F.3d at 55. I join their number. The requirement is instead satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." <u>Id.</u> (quoting <u>SEC v. Glenn W. Turner Enters.,</u> 474 F.2d 476, 482 (9th Cir. 1973)); <u>accord</u> <u>United States v. Leonard,</u> 529 F.3d 83, 88 n.6 (2d Cir. 2008).

argument that it has not offered LBC as a security because some purchasers

acquired LBC for use on the LBRY Network.

1. LBRY's Representations to Potential Purchasers

The SEC identifies multiple statements by LBRY that it claims led

potential investors to reasonably expect that LBC would grow in value as the

company continued to oversee the development of the LBRY Network. LBRY

minimizes the significance of these statements, and points to its many

disclaimers that it did not intend for LBC to be purchased as an investment,

but the SEC is correct. LBRY has - at key moments and despite its

protestations - been acutely aware of LBC's potential value as an investment.

And it made sure potential investors were too.

When LBRY launched the LBRY Network in June 2016, LBC's market

capitalization was a healthy $140 million. See 7/15/2016 LBRY Article, Doc.

No. 57-11. This, despite the Network's relative infancy and limited usability.

By the following month, LBC's market capitalization had ballooned to $1.2

billion. Id. In response, LBRY issued a blog post reflecting on LBC's

skyrocketing value. See id.

LBRY captioned the post: "1.2B Market Cap and We Don't Care." Id. It

began by touting the rapid growth in LBC's value, but frankly acknowledged

that it could not say whether the current valuation was justified. Id. At that

point, only three videos were available on the blockchain, each produced by

LBRY itself. See id. And LBRY's staff were hard at work "frantically debugging" and developing its product. Id. What LBRY did claim to know though was "that the long-term value proposition of LBRY is tremendous, but also dependent on our team staying focused on the task at hand: building this thing." Id. It then closed the post by announcing a policy of neutrality with respect to LBC's price but plainly stating that "[o]ver the long-term, the interests of LBRY and the holders of [LBC] are aligned." Id.

In August 2016, the COO of LBRY, Josh Finer, emailed a potential investor explaining that the company was "currently negotiating private placements of LBC with several [other] investors" and asked the recipient to write him back "if there is interest" so the two could "chat." See COO Email, Doc. No. 59-7.[3] The thrust of the email (subject line: "LBRY Credits Now Trading – LBC") is clear. See id. After briefly noting that the platform was up and running, the COO explained how LBC are being traded on "major crypto exchanges" and that trading volume is moving at a healthy clip. See id. The "opportunity is obvious," wrote the COO, "buy a bunch of credits, put them away safely, and hope that in 1-3 years we've appreciated even 10% of how

---

[3]  LBRY disputes the SEC's claim that the recipient was an investor but does not say who the recipient actually was. See Def.'s Fact Responses, Doc. No. 74-25 at 7 ¶ 65.

much Bitcoin has in the past few years." Id. He wraps up by pitching LBRY's commitment to building its Network: "[i]f our product has the utility we plan, the credits should appreciate accordingly." Id.

By November 2016, LBC's price was down, and some LBC investors were getting jittery. Jeremy Kauffman, LBRY's CEO, published a blog post titled "Acryptypical: The CEO of LBRY on the price of LBC," outlining his view of LBRY's condition and providing "a canonical answer to questions about the price of LBC." See 11/15/2016 Article, Doc. No. 57-21. LBC's price was low, he contended, because of simple economics: the supply of LBC entering circulation through mining was outpacing the demand for new tokens. See id. And demand was low because, at that point, "there [was] no reason to buy" LBC. See id. When LBRY launched, Kauffman explained, it was "the barest, minimum proof-of-concept [application] possible." Id. Although it had only been a few months since the launch, LBRY still stressed its long-term goal of "buil[ding] a product that is compelling enough to change people's habits," replacing "YouTube" and "Amazon." See id. And while investors were unlikely to make a "quick buck," Kauffman encouraged them to "hold onto [their LBC] (or spend it to buy some of [LBRY's] great content . . . .)." Id. LBRY's message was clear: We are a work in progress. LBC reflects that. Bear with us.

11

In another communication, this time on Reddit, a user who was "trying to do [their] research before putting in [their] money" asked some general questions about how LBRY would manage its holdings of LBC. See Reddit Thread, Doc. No. 57-20. In response, LBRY's Community Manager explained that the only way LBC will be "worth something in the future is if LBRY delivers on their promises to create a revolutionary way to share and monetize content." See id. The thread also includes another Redditor advising the community manager on what information "would help people with their investment decisions." See id.

Another relevant representation came in an interview with Mike Vine, LBRY's "Technology Evangelist". See Vine Interview, Doc. No. 57-19. Vine explained how the future "value of LBRY credits" would depend on "the success of our media marketplace." See id. When the interviewer asked how LBRY would keep "stolen[,] . . . unsavory, or downright illegal" content from the protocol, Vine's response betrayed LBRY's powerbroking role within its ecosystem by explaining that LBRY might be able to use its "position as the 'market maker' of [LBC] to basically make it more expensive for people to abuse the network." See id.

In January 2018, Kauffman wrote further on the benefits of blockchain technology in another essay entitled "Blockchain is Love, Blockchain is Life." See 1/10/2018 LBRY Article, Doc. No. 57-16. There, he wrote about what he

called the "incentive problem[]" in developing open-source alternatives to existing technologies that are controlled by private companies. See id. One solution to this problem, as Kauffman saw it, was to be found in blockchain technology, which allowed for blockchain tokens to be used to realign incentives. See id. Because a blockchain token "has value in proportion to the usage and success of the network," developers are incentivized to work to develop and promote new uses for blockchain. Id. As Kauffman put it:

> It means that the people who discover and utilize a new protocol or network when it's just getting off the ground can reap substantial value by being there first. This solves the incentive problems around being a first-mover and softens the pain of using a service that probably won't be as feature-rich or slick as established competitors' options. It provides a source of funding for the development of the protocol. The creators can use the token to pay for the salaries and equipment required to get it started.

Id.

And in yet another post, this time in October 2020, LBRY provided another positive update. See 10/14/2020 LBRY Article, Doc. No. 57-24. It explained that it still saw itself as meeting the consumer "demand for a user-owned and controlled alternative to YouTube and big tech." See id. Indeed, its work creating a "compelling token economy centered around digital content exchange" was still "imminently achievable" with just "some tweaks." See id. LBRY also touted the enormous potential it saw in continuing to develop its application on its blockchain. Other blockchain companies, the post asserted,

are forced to rely on "some third-party" to "magicly [sic] build a world-class application" on their blockchains. See id. Not LBRY. And since "[a]pplications used by billions of people can be worth trillions of dollars," LBRY was uniquely poised to "deliver that value" by "own[ing] the whole stack." See id.

These statements are representative of LBRY's overall messaging about the growth potential for LBC, and thus the SEC is correct that potential investors would understand that LBRY was pitching a speculative value proposition for its digital token. LBRY's messaging amounts to precisely the "not-very-subtle form of economic inducement" the First Circuit identified in SG as evidencing Howey's "expectation of profits." See SG Ltd., 265 F.3d at 54-55.

LBRY does not disavow its statements regarding LBC's value or price, but notes that the statements the SEC identifies constitute only 0.25% of "the total number of posts and messages the company has published since its inception." See Def.'s Obj., Doc. No. 74 at 5. But this statistic relies on a misleading denominator. Of course, like many other companies, LBRY regularly publishes statements on a range of topics, and could not argue that the 8,805 tweets it identified having posted, see id., all pertain in equal measure to its views of LBC's long-term value proposition. Since LBRY makes no effort to tally the number of comparable statements to those identified by the SEC, its argument lacks weight.

14

LBRY also relies on the fact that it informed some potential purchasers of LBC that the company was not offering its token as an investment. But a disclaimer cannot undo the objective economic realities of a transaction. See SEC v. Telegram Grp. Inc., 448 F. Supp.3d 352, 365 (S.D.N.Y. 2020) (citing SG Ltd., 265 F.3d at 54) ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the [c]ourt but are not dispositive.").

2. LBRY's Business Model

As I just laid out, LBRY made no secret in its communications with potential investors that it expected LBC to grow in value through its managerial and entrepreneurial efforts. But even if it had never explicitly broadcast its views on the subject, any reasonable investor who was familiar with the company's business model would have understood the connection.

From its inception, LBRY's profitability turned on its ability to grow the value of LBC by increasing usage of the LBRY Network. As Kauffman explained in an October 2016 informal business plan, LBC was the means by which LBRY and other early adopters would be able to profit as use of the network increased. See LBRY Plan, Doc. No. 62-2 at 9. This was because "[e]ach percentage of [LBC] can be thought of as having a value proportional to the sum of all information transacted through the network." Id. In other words, as demand for information stored on the blockchain increased, so too

would LBC's value. Accordingly, Kauffman reasoned, "[g]iven this situation, the most reasonable path to profit is to reserve a portion of the cryptocurrency." Id. Later in the same plan, he discussed the company's liquidation value by stating "[s]ince LBRY's most significant asset will be its credits, it could simply liquify these credits at a return of 10-10,000x on any investment." Id. at 10.

Similarly, in a post on its website titled "Answers to Big Questions From our Reddit AMA," LBRY responded to the question "How does the company behind LBRY make money?" by stating:

> The LBRY protocol has a built-in digital currency that allows it to function, called LBRY Credits. These Credits are very similar to bitcoins. Having a built-in digital currency creates an opportunity for a new kind of business that has never existed: the protocol-first enterprise . . . LBRY Inc. has reserved 10% of all LBRY Credits to fund continued development and provide profit for the founders. Since Credits only gain value as the use of the protocol grows, the company has an incentive to continue developing this open-source project.

9/28/2016 LBRY Article, Doc. No. 57-8.

The problem for LBRY is not just that a reasonable purchaser of LBC would understand that the tokens being offered represented investment opportunities - even if LBRY never said a word about it. It is that, by retaining hundreds of millions of LBC for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers. This structure, which any reasonable

purchaser would understand, would lead purchasers of LBC to expect that they too would profit from their holdings of LBC as a result of LBRY's assiduous efforts.

Simply put, by intertwining LBRY's financial fate with the commercial success of LBC, LBRY made it obvious to its investors that it would work diligently to develop the Network so that LBC would increase in value. As LBRY said, "[o]ver the long-term, the interests of LBRY and the holders of Credits are aligned." <u>See</u> 7/15/2016 LBRY Article, <u>Doc. No. 57-11</u>. The SEC's burden is made all the easier by statements LBRY made about its managerial efforts, like how "the long-term value proposition of LBRY is . . . dependent on our team staying focused on the task at hand: building this thing." <u>See</u> <u>id.</u> By its own account, LBRY expended significant managerial efforts to develop its Network and increase the value of LBC.

3. Consumptive Uses for LBC

LBRY's primary response to the SEC's claim starts with two generally uncontested facts: (1) LBC is a utility token designed for use on the LBRY Blockchain, and (2) some unknown number of purchasers of LBC acquired it at least in part with the intention of using it rather than holding it as an investment. Building from there, LBRY leaps to the conclusion that LBC cannot be a security even if LBRY offered it as an investment. LBRY is mistaken about both the facts and the law.

Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract. Despite LBRY's insistence to the contrary, I cannot reject the SEC's contention that LBRY offered LBC as a security simply because some LBC purchases were made with consumptive intent. Were it otherwise, the Securities Act would be unable to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" wherever a token held some consumptive utility. See Howey, 328 U.S. at 299. Accordingly, statements from a subset of LBC holders that they purchased LBC for use on the LBRY Blockchain is of limited relevance in determining whether LBRY offered it as a security. See Warfield, 569 F.3d at 1021 ("[W]hile the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised.").

In summary, what the evidence in the record discloses is that LBRY promoted LBC as an investment that would grow in value over time through the company's development of the LBRY Network. While some unknown number of purchasers may have acquired LBC in part for consumptive

18

purposes, this does not change the fact that the objective economic realities of LBRY's offerings of LBC establish that it was offering it as a security.[4]

## B. Did LBRY Receive Fair Notice?

LBRY argues that I should nonetheless deny the SEC's motion because it did not receive fair notice that its offerings were subject to the securities laws. In pressing this argument, LBRY has abandoned any broad claim that it lacked fair notice of the way in which the <u>Howey</u> test applies to digital tokens in general. Def.'s Obj., <u>Doc. No. 74</u> at 24. Instead, it complains that it lacked fair notice because, until the SEC brought this action, "the Commission historically and consistently focused its guidance, as well as its enforcement efforts, exclusively on the issuance of digital assets in the context of an [Initial Coin Offering] ICO." <u>Id.</u>

The principal problem with LBRY's fair notice argument is that it offers nothing more to support its position than its bald claim that this is the first case in which the SEC has attempted to enforce the registration requirement against an issuer of digital tokens that did not conduct an ICO.

---

[4] LBRY argues in the alternative that it should not be required to register future offerings of LBC even if its prior offerings were subject to Section 5's registration requirement. I decline to address this argument on the present record because LBRY has not explained why possible future offerings of LBC should be treated differently from the company's past offerings.

LBRY does not point to any specific statement by the SEC suggesting that companies need only comply with the registration requirement if they conduct an ICO. Nor does LBRY offer any persuasive reading of Howey that would cause a reasonable issuer to conclude that only ICOs are subject to the registration requirement. The test outlined in Howey is necessarily a fact-specific one, in which no single fact will likely be dispositive. While participation in an ICO may be relevant to the analysis, it will not determine the outcome in a case like this, where the undisputed evidence leaves no doubt that LBRY offered and sold LBC as a security.

LBRY relies on the Second Circuit's decision in Upton v. SEC for the proposition that the SEC may not impose a sanction for violating the securities laws "pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public." See 75 F.3d 92, 98 (2nd Cir. 1996). But, as the SEC notes, the facts of Upton bear no resemblance to the present case. Upton involved an attempt by the SEC to sanction the CFO of a brokerage firm for violating an SEC rule that established a formula for setting the amount of money that the brokerage was required to maintain in a customer reserve account. Id. at 93. Although it was undisputed that the brokerage had at all times complied with the "literal terms" of the rule, an administrative law judge relied on a novel interpretation of the rule by the SEC to conclude that the CFO could be sanctioned. Id. at 94-96. Because the

SEC did not give public notice of its new interpretation until after the brokerage had ended its offensive practice, the Second Circuit vacated the sanction imposed by the Commission. Id. at 98.

The present case is obviously quite different from the problem the court confronted in Upton. The SEC has not based its enforcement action here on a novel interpretation of a rule that by its terms does not expressly prohibit the relevant conduct. Instead, the SEC has based its claim on a straightforward application of a venerable Supreme Court precedent that has been applied by hundreds of federal courts across the country over more than 70 years. While this may be the first time it has been used against an issuer of digital tokens that did not conduct an ICO, LBRY is in no position to claim that it did not receive fair notice that its conduct was unlawful.

## IV.   CONCLUSION

As I have explained, the only issues raised by the parties' cross-motions for summary judgment are whether LBRY offered LBC as a security and whether LBRY received fair notice that it needed to register its offerings. Because no reasonable trier of fact could reject the SEC's contention that LBRY offered LBC as a security, and LBRY does not have a triable defense that it lacked fair notice, the SEC is entitled to judgment. The SEC's Motion for Summary Judgment (Doc. No. 55) is granted, and LBRY's Motion for

Summary Judgment (Doc. No. 61) is denied. The Clerk shall schedule a

status conference to discuss the process for resolving any remaining issues.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 7, 2022

cc:     Counsel of Record