**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
SECURITIES AND EXCHANGE                    :
COMMISSION,
                                           :
                Plaintiff,
                                           :
        -against-                          :          Civil Action No. 1:21-cv-00260-PB
                                           :
LBRY, INC.,
                                           :
                Defendant.
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
```

**LBRY, INC.'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION TO LIMIT THE COMMISSION'S REMEDIES**

Defendant LBRY, Inc. ("LBRY") respectfully submits this Memorandum of Law in

support of its Motion to Limit the Remedies to which the Securities and Exchange Commission

(the "Commission") is entitled.  Through this action, the Commission seeks the imposition of the

following remedies:  a permanent injunction, disgorgement and a civil monetary penalty.

Compl. at Prayer for Relief.  Under the facts and circumstances of this case - which do not

involve any allegations of fraud and relate solely to violations of the registration requirement

under Section 5 of the Securities Act of 1933 (the "Securities Act") - such remedies are

unwarranted and inappropriate.

*First*, the issuance of a permanent injunction in this case requires a finding that LBRY is

"reasonably likely" to violate Section 5 of the Securities Act in the future.  As an initial matter,

given this Court's holding on summary judgment and LBRY's current financial situation, LBRY

intends to dissolve as soon as possible.  *See* Declaration of Jeremy Kauffman ("Kauffman

Decl.") ¶ 1.  It would thus be impossible for LBRY - as a non-existent entity - to commit any

future violations of Section 5 of the Securities Act.  Moreover, as the CEO of LBRY, Jeremy

-1-

Kauffman, acknowledged at the November 21, 2022 status conference ("November 21 Conference"), and as he attests to in his attached declaration, LBRY is willing to completely divest itself of all of the remaining LBRY Credits ("LBC") in its custody (approximately 119.5 million). Kauffman Decl. ¶ 3. Accordingly, once LBRY "burns" its remaining LBC tokens or, in the alternative, donates them to a third-party charitable entity with no affiliation to LBRY, there is absolutely no risk that LBRY will violate Section 5 in the future, as it will no longer be in possession of any LBC to sell. More importantly, once LBRY has divested itself of its remaining pre-mined tokens, secondary token holders will no longer have any reasonable expectation of profit based on the entrepreneurial or managerial efforts of LBRY. That is, because LBRY will no longer hold any pre-mined tokens - thereby severing its "financial fate [from] the commercial success of LBC" (Memorandum and Order ("Order") at 17) - any LBC tokens in the secondary market that holders are using for consumptive purposes would not constitute a security.

*Second*, with respect to disgorgement, the Supreme Court clearly established in *Liu v. S.E.C.*, 140 S. Ct. 1936 (2020), that the total amount of disgorgement cannot exceed "a wrongdoer's net unlawful profits" and, accordingly, "courts must deduct legitimate expenses before ordering disgorgement." *Id.* at 1943, 1950. As the Commission alleged in its Complaint, and as further demonstrated in the attached declaration of Mr. Kauffman, all of the assets LBRY received from its sales of LBC were used "to fund its business operations." Compl. ¶ 27; Kauffman Decl. ¶ 4. Notwithstanding the Commission's prior admissions, *see* Compl. ¶¶ 6, 16-17, 27; Commission's Summary Judgment Motion (ECF 55-1) at 3, 12-13, the SEC now appears to suggest - in contravention of *Liu* - that LBRY incurred no legitimate business expenses.

*Finally*, given that LBRY did not engage in fraud or deceptive conduct, and given that its Section 5 violation occurred during a time of great uncertainty concerning the regulatory landscape governing digital assets, only a nominal civil monetary penalty is warranted in this case.

For the reasons set forth below, LBRY respectfully requests that the Court issue an Order denying the Commission's request for a permanent injunction; denying the Commission's request for disgorgement; and imposing a first-tier civil monetary penalty of no more than $50,000 against the company.

## **BACKGROUND**

As the Court is aware, the Commission filed its Complaint on March 29, 2021, alleging that LBRY failed to register its offer and sale of digital tokens, LBC, in violation of Section 5 of the Securities Act.  The Commission requested in its Prayer for Relief that the Court "[e]nter a permanent injunction" against LBRY; "[o]rder [LBRY] to disgorge its ill-gotten gains"; and "[o]rder [LBRY] to pay appropriate civil penalties in accordance with Section 20(d) of the Securities Act."  Compl. at Prayer for Relief.  LBRY and the Commission filed cross-motions for summary judgment on May 4, 2022 addressing the sole issue of liability: i.e., whether LBRY was required to register the LBC that it offered and sold as a security under Section 5 of the Securities Act.  On November 7, 2022, the Court granted the Commission's Motion for Summary Judgment, denied LBRY's Motion for Summary Judgment, and held that, "by retaining hundreds of millions of LBC for itself, LBRY . . . signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers."  Order at 16.

Following the November 21 Conference, during which the Court urged the Commission to work with LBRY to resolve this litigation, including by providing clarity to secondary LBC

holders (noting LBRY's offer to divest itself of its remaining LBC), LBRY provided the Commission with a settlement proposal consistent with the framework laid out by the Court.  As the parties were unable to reach an agreeable resolution, however, LBRY is left with no choice but to file the instant Motion seeking an Order limiting the remedies to which the Commission is entitled in this case.

## **ARGUMENT**

### I.   **THE COMMISSION IS NOT ENTITLED TO A PERMANENT INJUNCTION UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE**

#### a. **Legal Standard**

A permanent injunction is appropriate only "where a defendant has violated the securities laws and the SEC demonstrates a reasonable likelihood that the defendant will do so again in the future." *S.E.C. v. Smith*, No. 14-cv-192, 2015 WL 4067095, at *9 (D.N.H. July 2, 2015); *see also S.E.C. v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (describing the legal standard for issuance of an injunction as "reasonable likelihood of recidivism")*.*  While federal courts are "vested with wide discretion when an injunction is sought to prevent future violations of the statutory securities laws," *Smith*, 2015 WL 4067095, at *9, courts have also noted that a permanent injunction is a "drastic remedy" that "should not be granted lightly, especially when the conduct has ceased," *S.E.C. v. Boey*, No. 07-cv-39, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) (citing *S.E.C. v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992)).  For that reason, the Commission "carries a heavy burden to justify its imposition," and must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence."  *Id.* (citing *S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574, F.2d 90, 99-100 (2d Cir. 1978)).

Whether the Commission has satisfied its burden of demonstrating a reasonable likelihood of future violations is "typically assessed by looking at several factors, none of which

is determinative." *Sargent*, 329 F.3d at 39 (citing *S.E.C. v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984)).  Courts consider, among other things, "the nature of the violation, including its egregiousness and its isolated or repeated nature" and "whether the defendants will, owing to their occupation, be in a position to violate again," *id.*, as well as the "sincerity of the defendant's assurances against future violations" and "the degree of scienter," *Smith*, 2015 WL 4067095, at *9.

The facts in this matter are markedly distinct from the *Smith* case.  In *Smith*, an enforcement action involving an investment fraud scheme, this Court issued a permanent injunction where the defendant "contributed to the scheme with extreme recklessness as both an attorney and a paymaster"; his "participation in the scheme extended over multiple years and helped to persuade at least four investors to contribute, and lose, over $2 million to the fraud"; and he "offered no assurance that he will not commit further violations of the securities laws" and rather "expressed his intention to continue seeking work as a paymaster in the future."  *Id.* at *10; *see also S.E.C. v. Esposito*, 260 F. Supp. 3d 79, 94 (D. Mass. 2017) (holding that a permanent injunction was warranted where the Commission alleged that defendant engaged in "an elaborate and deliberate scheme to defraud investors"); *S.E.C. v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 283 (D. Mass. 2015) (issuing a permanent injunction where the Commission alleged that defendant engaged in "an elaborate, deliberate, and prolonged scheme to defraud thousands of investors"); *S.E.C. v. Wall*, No. 19-cv-00139, 2020 WL 1539919, at *8-9 (D. Me. Mar. 31, 2020) (holding that a permanent injunction was warranted where "defendants' violations were part of a pattern lasting more than four years and harming approximately 90 investors," "the conduct was flagrant and deliberate, involving blatant misrepresentations concerning the safety . . . of the investment and glaring omissions to report the risks," and

defendants "cast a wide net in trolling for potential investors, indiscriminately inviting anyone . . . to fall victim to their fraudulent scheme").

By contrast, courts have denied the Commission's request for a permanent injunction where the defendant is unlikely to commit future violations, including where the defendant entity is insolvent and non-operational, and where the defendant has accepted the finding of liability against it without further appeal.  *See, e.g.*, *S.E.C. v. John Adams Trust Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988) ("To suggest that [defendant] itself, now an insolvent corporation without employees or facilities, may rise phoenix-like from the ashes to do further harm to non-existent clients or an unsuspecting public is more akin to distant prophecy than to the requisite showing of a realistic likelihood or a real probability of violations.") (internal quotations omitted); *Sargent*, 329 F.3d at 39-40 (affirming lower court's denial of injunction where defendant's current position did "not put him in a position where future violations are likely" and defendant's "acceptance of the jury verdict without further appeal is sufficient acknowledgment of the wrongfulness of his conduct"); *Boey*, 2013 WL 3805127, at *3 (holding that a permanent injunction was not warranted where the Commission "has not shown any realistic likelihood that [defendant] will commit similar violations in the future"); *cf. S.E.C. v. Ingoldsby*, No. 88-cv-1001, 1990 WL 120731, at *3 (D. Mass. May 15, 1990) ("Absent a showing of bad faith, the defendant should not be prejudiced for presenting a vigorous defense and requiring the SEC to meet its proper evidentiary burden both at trial and at the injunctive relief stage of the judicial proceedings.").

        **b.   As LBRY Intends to Divest Itself of All its Remaining Tokens and Dissolve the Corporate Entity, There is Absolutely no Likelihood of Future Violations, and a Permanent Injunction is Not Warranted**

Here, after LBRY divests itself of all remaining LBCs in its custody and dissolves its corporate entity, there is absolutely no likelihood - let alone a reasonable likelihood - that LBRY

will commit future violations of Section 5 of the Securities Act.  First and foremost, due to the

Court's recent ruling on summary judgment and its financial situation, LBRY plans to dissolve

as soon as possible.  Kauffman Decl. ¶ 1.  With respect to its current financial situation,

moreover, LBRY has far more debt than it has assets - with assets of approximately $1.8 million

($200,000 of cash and a note receivable of $1.6 million) and liabilities of approximately $3.5

million.  *Id.* ¶ 2.  LBRY's current balance sheet, attached as Exhibit 1 to Mr. Kauffman's

declaration, makes plain that the company is on its last leg.  Kauffman Decl., Ex. 1 (LBRY

Balance Sheet).  In other words, it is entirely inconceivable that a soon-to-be non-existent LBRY

will "rise phoenix-like from the ashes to do further harm to non-existent clients or an

unsuspecting public," rendering a permanent injunction plainly unnecessary and unwarranted

under the facts and circumstances of this case.  *John Adams Trust*, 697 F. Supp. at 577.

LBRY currently has in its custody approximately 119.5 million remaining LBC.

Kauffman Decl. ¶ 3.  As indicated both by Mr. Kauffman at the November 21 Conference, and

as attested to in his attached declaration, LBRY is willing to divest itself of all its remaining

tokens - either by "burning" them or by donating them to an unaffiliated non-profit organization

controlled by individuals with no affiliation with or association to LBRY.  *Id.*  Accordingly,

without any remaining pre-mined LBC in its possession, LBRY cannot possibly commit any

further violations of the Securities Act through the sale or offering of those tokens.  More

importantly, once LBRY divests itself of its remaining pre-mined LBCs and dissolves as a

corporate entity, any secondary LBC in circulation would not be deemed to be securities because

holders of LBC will no longer have "a reasonable expectation of profits to be derived from the

entrepreneurial or managerial efforts of others" given that LBRY's interests and the interests of

the secondary holders will no longer be "aligned."[1]  Order at 8, 17 (citing *United Hous. Found. v. Forman*, 421 U.S. 837, 852 (1975)).

Turning to the other factors considered by courts in the assessment of whether there is a "reasonable likelihood of recidivism," the facts in this litigation weigh heavily against the imposition of a permanent injunction.  First, LBRY's conduct was far from egregious.  Unlike other cases within this Circuit where permanent injunctions were issued - involving, among other things, deliberate or reckless years-long schemes to defraud investors - LBRY was found to have engaged in the offer and sale of unregistered tokens at a time when the laws governing the registration of crypto assets were less than clear and the Commission's guidance on this topic was even more ambiguous than it is today.  Mr. Kauffman and other LBRY employees did not act with scienter in their creation and development of the LBRY blockchain and the pre-mine of LBC, and neither the Commission's pleadings nor the Court's Order contain even a suggestion of fraudulent intent on behalf of LBRY or its personnel.

## II. AS THE COMMISSION HAS ADMITTED, THE FUNDS LBRY RAISED FROM ITS SALES OF LBC WERE USED FOR LEGITIMATE BUSINESS EXPENSES, AND DISGORGEMENT IS THEREFORE AN INAPPROPRIATE REMEDY

### a. Legal Standard

Disgorgement, an equitable remedy, "prevents a defendant from profiting from his securities violations" and "is intended to deprive wrongdoers of profits they illegally obtained by

---

[1] As the Commission itself has acknowledged, digital assets can morph from securities to non-securities.  Indeed, as William Hinman, the former Director of the Division of Corporation Finance of the Commission, recognized, "the analysis of whether something is a security is not static and does not strictly inhere to the instrument" and, accordingly, an instrument that may have constituted an investment contract at one time "may no longer represent a security offering" if circumstances surrounding the digital asset, the network on which it functions or the sale itself change.  William Hinman, Dir. Sec. Exch. Comm'n Div. Corp. Fin., Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), *available at* https://www.sec.gov/news/speech/speech-hinman-061418.  LBRY has repeatedly attempted to obtain clarity on the status of LBC held by secondary holders that use LBC for consumption on the LBRY blockchain.  This was once again raised during the November 21 Conference.  Despite many attempts, the Commission has refused to provide clarity and has decided to regulate through enforcement and sanctions.

violating the securities laws." *Sargent*, 329 F.3d at 40; *see also Boey*, 2013 WL 3805127, at *1

(holding that disgorgement "does not serve to punish or fine the wrongdoer, but simply serves to

prevent [his] unjust enrichment"). Courts have "broad discretion not only in determining

whether or not to order disgorgement but also in calculating the amount to be disgorged." *S.E.C.

v. Druffner*, 802 F. Supp. 2d 293, 297 (D. Mass. 2011) (quoting *S.E.C. v. First Jersey Sec., Inc.*,

101 F.3d 1450, 1474-75 (2d Cir. 1996)). Disgorgement should equate to "a reasonable

approximation of profits causally connected to the violation." *S.E.C. v. Happ*, 392 F.3d 12, 31

(1st Cir. 2004); *see also Smith*, 2015 WL 5138085, at *1 ("[T]he measure for disgorgement is

broadly the amount by which [the defendant] was unjustly enriched by the fraudulent scheme.")

(internal quotations omitted).

　　　The Supreme Court has recently made clear that, to avoid transforming the equitable

remedy of disgorgement into a punitive sanction, the amount of disgorgement to be awarded to

victims cannot exceed "a wrongdoer's net unlawful profits." *Liu*, 140 S. Ct. at 1942-43. To that

end, the Supreme Court held that "courts must deduct legitimate expenses before ordering

disgorgement." *Id.* at 1950; *see also S.E.C. v. Navellier & Assocs.* ("*Navellier*"), No. 17-cv-

11633, 2021 WL 5072975, at *4 (D. Mass. Sept. 21, 2021) (quoting *Liu* and explaining that

disgorgement is calculated by "deducting legitimate expenses" from "net profits from

wrongdoing"). While the Supreme Court left open the question of what constitutes a "legitimate

expense," it explained that "the cost and expense of conducting [a] business" and the "marginal

costs incurred in producing the revenues that are subject to disgorgement" should be deducted

from any calculation. *Liu*, 140 S. Ct. at 1950. It further added that payments "toward lease

payments and . . . equipment [used in pursuit of a legitimate business purpose] . . . arguably have

value independent of fueling a fraudulent scheme." *Id.* at 1950; *see also Navellier*, 2021 WL

5072975, at *5-6 (stating that expenses related to defendant's legitimate investment advisory business, including research expenses and the portion of salaries associated with servicing client accounts, may be deducted, but holding that expenses in pursuit of defendant's fraud should not).

**b. As Courts Must Deduct Legitimate Expenses Before Ordering Disgorgement, and LBRY Used All Funds Raised Through its Sales of LBC to Operate its Business, Disgorgement is Not Warranted**

*Liu* and its progeny require that a defendant's legitimate business expenses be deducted from its net profits in calculating the appropriate amount of disgorgement. Pursuant to the Commission's unambiguous admissions contained in its pleadings - that the assets raised by LBRY in connection with its sales of LBC were used to "fund its business operations" and "pay for the operational costs to grow the LBRY network," Compl. ¶¶ 6, 27 - any disgorgement award would exceed LBRY's net unlawful profits and thus violate *Liu*. As outlined in the attached declaration of Mr. Kauffman, LBRY used all of the funds that it raised through its sales of LBC for the purpose of running and operating its business - including, *inter alia*, for payroll; payment of independent contractors; legal and compliance fees; and information and technology expenses. Kauffman Decl. ¶ 4; *id.* at Ex. 2 (LBRY's Profit & Loss Statement). Notwithstanding the Commission's allegations in the Complaint that LBRY used the funds it raised to "develop its network," Compl. ¶ 17 - a position that it, notably, reasserted in its summary judgment briefing after discovery in the case had closed (*see* Commission's Summary Judgment Motion (ECF 55-1) at 3, 12-13) - it nevertheless now suggests that those legitimate business expenses should not be deducted from a disgorgement award. The Commission's attempt to reverse course at this late stage in the litigation, however, should be rejected.

Moreover, as the Commission itself concedes, LBRY is not alleged to have engaged in any fraudulent conduct and the sole violation at issue in this case is one for failing to register LBRY's digital asset as a security. Given that no fraud is alleged and given that all of LBRY's

-10-

assets went toward the operation of its legitimate business activities, there can be no argument

that any such expenses went toward "fueling a fraudulent scheme" and should thus not be

deducted from a disgorgement calculation. *Liu*, 140 S. Ct. at 1950; *see also S.E.C. v.*

*MacDonald*, 699 F.2d 47, 54 (1st Cir. 1983) (en banc) ("The court's power to order

disgorgement extends only to the amount with interest by which the defendant profited from his

wrongdoing.").

## III.  A NOMINAL FIRST-TIER CIVIL PENALTY IS APPROPRIATE UNDER THE CIRCUMSTANCES

### a.  Legal Standard

Section 20(d)(2) of the Securities Act of 1933 authorizes courts to impose civil monetary

penalties against those who violate securities laws.  15 U.S.C. § 77t(d)(2).  Such civil penalties

are intended to "penalize [the] defendant for . . . illegal conduct." *Sargent*, 329 F.3d at 41; *see*

*also Boey*, 2013 WL 3805127, at *2 (stating that civil penalties are "intended to punish and deter

securities law violations") (internal quotations omitted).  Section 20(d)(2) provides three "tiers"

of penalties that the court has the discretion to impose, with each tier prescribing increasing fines

based on the severity of a defendant's conduct.  15 U.S.C. § 77t(d)(2).  Within each of the three

tiers, a penalty "shall not exceed the greater of" a set amount per violation:  in the case of a

corporate entity, $50,000 for a first-tier violation; $250,000 for a second-tier violation; and

$500,000 for a third-tier violation.  *Id.*; *see also S.E.C. v. Smith*, No. 14-cv-192, 2015 WL

5793999, at *1 (D.N.H. Oct. 1, 2015).  Tier I penalties are available for all violations and the

amount of the penalty "shall be determined by the court in light of the facts and circumstances."

15 U.S.C. § 77t(d)(2).  Meanwhile, "Tier II penalties require fraud, deceit, manipulation, or a

deliberate or reckless disregard of a regulatory requirement, and Tier III penalties require the

Tier II elements plus substantial losses or . . . significant risk of substantial losses to other

persons." *S.E.C. v. Gomes*, No. 20-cv-11092, 2022 WL 11804022, at *2 (D. Mass. Oct. 20, 2022) (citing *S.E.C. v. Kern*, 425, F.3d 143, 153 (2d Cir. 2005)).

While the statutory tiers set forth the maximum penalty that may be imposed, the "actual amount of the penalty" is "left up to the discretion of the district court," based on the particular facts of each case. *S.E.C. v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005); *see also Smith*, 2015 WL 5793999, at *3 (describing a court's "considerable discretion in this area"). As the statute does not define "violation," courts have employed various methodologies for determining the number of violations at issue for purposes of calculating the appropriate penalty. Among other methodologies, courts have imposed a penalty for each statute the defendant is found to have violated, *see, e.g.*, *S.E.C. v. Premier Links, Inc.*, No. 14-cv-7375, 2022 WL 5422661, at *6-7 (E.D.N.Y. July 27, 2022) (multiplying the third-tier $150,000 penalty by four to reflect defendant's violation of four different securities laws), and have also imposed a single penalty in cases in which the securities violations at issue arose out of a single scheme, *see, e.g.*, *S.E.C. v. Interinvest Corp., Inc.*, No. 15-12350, 2016 WL 8711689, at *1 (D. Mass. Dec. 23, 2016) (imposing a single penalty where defendant "carr[ied] out a single scheme"). Courts may also look to the number of violative transactions or the number of investors to whom illegal conduct was directed. *See In re Reserve Fund Secs. & Derivative Litig.*, No. 09-cv-4346, 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 30, 2013).

In determining the appropriate level of penalty, courts have considered numerous factors, including, "(1) the egregiousness of the violation, (2) the defendant's scienter, (3) the repeated nature of the violation, (4) defendant's admission of wrongdoing and cooperation with authorities, and (5) the defendant's financial situation." *Smith*, 2015 WL 5793999, at *1. *Compare S.E.C. v. Druffner*, 802 F. Supp. 2d 293, 298-99 (D. Mass. 2011) (denying the

Commission's request for civil penalties where defendant was "unemployed" and did not have the ability to pay civil penalties), *and S.E.C. v. Spencer Pharm. Inc.*, No. 12-cv-12334, 2015 WL 5749436, at *7-8 (D. Mass. Sept. 30, 2015) (declining to impose the maximum third-tier civil penalty of $725,000 for a non-natural person, and instead imposing a $150,000 fine per entity, where the entities "are effectively defunct and without any significant corporate assets"), *with S.E.C. v. Locke Cap. Management, Inc.*, 794 F. Supp. 2d 355, 370-371 (D.R.I. 2011) (imposing the maximum penalty where defendant's conduct evinces "conscious intent to defraud" and where it "spanned a number of years and reflects a great effort to piece together a fraud scheme, cover it up, and then continue to lie about it throughout this litigation"), *and S.E.C. v. Knox*, No. 18-cv-12058, 2022 WL 1912877, at *3 (D. Mass. June 3, 3022) (imposing the maximum third-tier civil penalty where defendants' "conduct consisted of deceit and manipulation" and their violations were "deliberate, egregious, and long-lasting"), *and Esposito*, 260 F. Supp. 3d at 93 (imposing the maximum third-tier civil penalty where defendant was "instrumental in an illicit scheme to evade the securities laws' registration requirements," "acted with scienter in misappropriating investor funds," and "caused investors to suffer substantial losses").

     **b.  A Nominal, First-Tier Penalty Is All That is Warranted Under the Circumstances**

     Here, the Court should impose a single, first-tier penalty of $50,000 against LBRY.  As an initial matter, it is undisputed that LBRY has not engaged in "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and its conduct thus does not necessitate the imposition of a Tier II or III penalty.  15 U.S.C. § 77t(d)(2).  This leaves the Court to determine - within its sole discretion, and based on the factors set forth herein - the appropriate civil penalty under Tier I.

Application of the factors courts consider in determining the appropriate level of penalty to impose weigh heavily in favor of the imposition of only a modest penalty in this case. First, LBRY's conduct was not egregious and it did not act with scienter. Indeed, as this Court recognized at the November 21 Conference, LBRY entered the cryptocurrency market during a time of great uncertainty as to the regulatory requirements governing digital assets and the application of Section 5 to those assets, particularly ones - like LBC - with consumptive uses. In fact, noting that LBRY did not act with fraudulent intent, the Court encouraged the Commission to attempt to fashion a resolution with LBRY that would give the market the clarity it so desperately seeks. Furthermore, the last sale of LBC occurred nearly two years ago - in or around February 2021 - and before the Commission filed its Complaint in this litigation. This shows LBRY's intent to await guidance from the Commission and the Court before engaging in further sales. Moreover, LBRY has accepted the decision of the Court and does not intend to appeal the Court's ruling on summary judgment. Finally, LBRY's financial situation, as described herein, is dire. As the financial information appended to Mr. Kauffman's declaration makes clear, LBRY is unable to pay millions of dollars, or even hundreds of thousands of dollars, in civil penalties. Kauffman Decl., Ex. 1 (LBRY Balance Sheet).

Accordingly, in light of these factors, the court should impose a single penalty of $50,000 based on LBRY's violation of a single statute. A civil penalty based on, for example, the number of transactions at issue or investors impacted would result in an exceedingly excessive penalty, which is not warranted under the facts and circumstances of this case.

## **CONCLUSION**

For the foregoing reasons, Defendant LBRY respectfully requests that this Court deny the

Commission's request for a permanent injunction and disgorgement and impose a modest first-tier

civil penalty against LBRY.

Dated: December 7, 2022                    Respectfully submitted,

                                          LBRY, INC.

                                          */s/  Timothy J. McLaughlin* (NH Bar # 19570)
                                          William E. Christie
                                          Timothy J. McLaughlin
                                          Shaheen & Gordon, P.A.
                                          107 Storrs Street
                                          P.O. Box 2703
                                          Concord, NH 03302
                                          (603) 819-4231
                                          wchristie@shaheengordon.com
                                          tmclaughlin@shaheengordon.com


                                          */s/  Keith W. Miller*
                                          Keith W. Miller (*pro hac vice*)
                                          Rachel S. Mechanic (*pro hac vice*)
                                          Emily C. C. Drinkwater (*pro hac vice*)
                                          Perkins Coie LLP
                                          1155 Avenue of the Americas, 22nd Floor
                                          New York, New York 10036-2711
                                          (212) 262-6900
                                          KeithMiller@perkinscoie.com
                                          Rmechanic@perkinscoie.com
                                          Edrinkwater@perkinscoie.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  December 7, 2022                              */s/ Keith W. Miller*                              
                                                                      Keith W. Miller