# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

  -v.-

LBRY, INC.,

        Defendant.

Civil Action No. 1:21-cv-00260-PB

**BRIEF FOR AMICUS CURIAE INVESTOR CHOICE ADVOCATES NETWORK IN SUPPORT OF DEFENDANTS' MOTION TO LIMIT THE COMMISSION'S REMEDIES WITH CONSENT OF ALL PARTIES**

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* submits the following corporate disclosure statement: Investor Choice Advocates Network ("ICAN") is a nonprofit, public interest organization working to expand access to markets by underrepresented investors and entrepreneurs.[1] ICAN has no parent corporation, and no publicly held company has a 10% or greater ownership in ICAN.

---

[1] All parties have consented to the filing of this brief. Plaintiff's consent was contingent on receiving sufficient time to respond to this brief, which appears to have been addressed with the Court's Order Granting Motion to Extend Time to Object/Respond to Motion to Limit the Commission's Remedies to December 19. 2022.  No party or party's counsel, and no person other than ICAN and its counsel, authored this brief in whole or in part or contributed money intended to fund preparing or submitting the brief.

## TABLE OF CONTENTS

                              **Page**

STATEMENT OF INTEREST ............................................................................................................ v

I.     INTRODUCTION .................................................................................................................. 1

II.    ARGUMENT ......................................................................................................................... 1

        A.     *Howey* is Properly Applied to Each "Scheme," Not Each Underlying Asset. ................................................................................................................... 1

        B.     A *Howey* Analysis Must be Performed at the Time of Each Offer or Sale. ........... 3

        C.     Secondary Market LBC Token Transactions Should Not be Categorically Enjoined, Because Such Sales May Not be Securities Offerings. ........................ 4

        D.     LBC Can be Permissibly Bought and Sold in Secondary Markets Even if They are Securities. ................................................................................................ 6

III.   CONCLUSION ...................................................................................................................... 7

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hocking v. Dubois*,
  885 F.2d 1449 (9th Cir. 1989) ................................................................................... 2

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990) ...................................................................................................... 1

*SEC v. Aqua-Sonic Products Corp.*,
  524 F. Supp. 866 (S.D.N.Y. 1981) ........................................................................... 3

*SEC v. Telegram Grp. Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................................................... 3

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ............................................................................................ *passim*

*United States v. Wolfson*,
  405 F.2d 779 (2d Cir.1968) ...................................................................................... 6

**Statutes**

15 U.S.C.
  § 77b(a)(11) ................................................................................................................ 6
  § 77d(a)(1) .................................................................................................................. 6
  § 77d(e) ....................................................................................................................... 6
  § 77d(e)(1)(B) ............................................................................................................. 6

**Regulations**

CFR §230.144 ................................................................................................................ 6, 7

**Other Authorities**

William Hinman, Div. of Corp. Fin., SEC, Remarks at the Yahoo Finance All
  Markets Summit: Crypto, *Digital Asset Transactions: When Howey Met Gary
  (Plastic)* (June 14, 2018) ........................................................................................... 3

Jay Clayton, Chairman, SEC, Letter to Rep. Ted Budd, (March 7, 2019) ................ 4

Memorandum, SEC, Framework for "Investment Contract" Analysis of Digital
  Assets, (April 3, 2019) ........................................................................................... 3, 5

## STATEMENT OF INTEREST

*Amicus* is the Investor Choice Advocates Network ("ICAN"). ICAN is a nonprofit organization that advocates for expanding access to markets—including markets for digital assets—for underrepresented investors and entrepreneurs who do not share the same access and market power as those with more assets and resources.

ICAN has a significant interest in limiting the scope of the SEC's regulatory power to those functions authorized by statute and permissible under the United States Constitution. As an organization speaking on behalf of underrepresented market participants, ICAN also has a significant interest in ensuring the SEC's power to regulate securities does not improperly hamper the ability of individuals and organizations seeking to engage in secondary market transactions that might be impacted by this Court's orders.

**I.      INTRODUCTION**

"The test outlined in *Howey* is necessarily a fact-specific one, in which no single fact will likely be dispositive." Dkt. #86 at 20. Because facts can change, determining whether a digital asset transaction on the secondary market amounts to an offer or sale of a security necessitates a careful legal analysis. Such a transaction-by-transaction inquiry does not lend itself to injunctive relief, especially not the extraordinary remedy of a permanent injunction that could directly affect non-parties. Dkt. #1 at 15–16 (Prayer for Relief).

Future transactions involving the token at issue in this case—LBRY Credits ("LBC")—may or may not constitute securities offerings. Consumptive uses of LBC are not offers or sales at all; non-parties should not be precluded from using a functioning blockchain and associated applications. Moreover, several securities law exemptions and safe harbors permit unaffiliated entities to buy and sell securities in secondary markets. If the Court is inclined to grant injunctive relief, we urge the Court to carve out the following: (1) consumptive use of LBC and (2) secondary market transactions of LBC by persons unaffiliated with LBRY, Inc. ("LBRY"). Such action is necessary as a matter of public policy to avoid uncertainty for holders of LBC and the digital asset industry as a whole, and to avoid inadvertently chilling non-parties' lawful activity.

**II.     ARGUMENT**

    **A.  *Howey* is Properly Applied to Each "Scheme," Not Each Underlying Asset.**

Congress crafted an intentionally broad definition of "security" to recognize the "virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes[.]" *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (internal citations omitted). Though at times amorphous, the definition of "security" has bounds.

For example, an orange grove is not by itself a security.  Neither are most digital assets.  Yet orange groves and digital assets can be sold as part of an investment contract.  That does not necessarily mean, however, that an orange grove or a digital asset is itself a security.  Only *transactions* that bundle certain rights and obligations are investment contracts.  *SEC v. W.J. Howey Co.* and its progeny provide the framework for the analysis.  328 U.S. 293 (1946).

Courts and litigants now recite *Howey's* three (or four) part substantive test from memory.  The **scope** of the *Howey* test—applying the factors to specific schemes—gets less attention.  "In defining the term investment contract, *Howey* itself uses the terms 'contract, transaction or scheme,' leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general 'scheme' of profit seeking activities."  *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) (internal citations omitted).

*Howey* itself illustrates this concept.  The investment contract in *Howey* involved the sale of real estate parcels in an orange grove, *coupled with* a service contract with the offeror, by which an affiliate would maintain lots, pick fruit, and market the harvest.  328 U.S. at 295–96.  In holding the arrangement constituted an "investment contract," the Supreme Court emphasized that rather than a traditional land conveyance, purchasers were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents."  *Id.* at 299.  The *Howey* investment contract was the *entire scheme*, not the oranges or the orange grove.

There is nothing about *Howey* and its progeny—nor any SEC rulemaking about which amicus is aware—that warrants treating digital assets categorically differently from orange groves.  In fact, Plaintiffs' former Director of the Division of Corporation Finance made clear that this distinction—scheme vs. asset—applies in the digital realm: "[T]he token—or coin—or

whatever the digital information packet is called—all by itself is not a security, just as the orange groves in *Howey* were not." William Hinman, Div. of Corp. Fin., SEC, Remarks at the Yahoo Finance All Markets Summit: Crypto, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018).[2]

This Court applied *Howey's* (and the SEC's) test by assessing the "objective economic realities of LBRY's **offerings** of LBC" to determine whether LBRY "was offering [LBC] as a security," rather than whether LBC was or is a security. Dkt. #86 at 19 (emphasis added). This distinction is key. Amicus urges the Court to deploy the same analysis should it choose to order injunctive relief: disaggregate LBC offerings from LBC tokens.

### B.  A *Howey* Analysis Must be Performed at the Time of Each Offer or Sale.

Timing is everything for *Howey*. In order to evaluate the "economic realities" of a scheme or transaction, one must look at the facts and circumstances as they are, not as they were yesterday or years ago. "*Howey* requires the Court to examine the series of understandings, transactions, and undertakings at the time they were made." *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368 (S.D.N.Y. 2020); *see also SEC v. Aqua-Sonic Products Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) ("The enterprise and the described materials, by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place[.]"). The analysis requires subsequent offers or sales to be separately evaluated, taking into consideration any changes to the scheme in question.

The time-specific nature of the analysis means a token once sold as a part of a security offering may well not later be a security (or part of an investment contract). Plaintiff agrees.[3]

---

[2] Transcript *available at* https://www.sec.gov/news/speech/speech-hinman-061418.
[3] While we recognize that SEC policy statements and guidelines are not law and do not constitute binding precedent, the SEC should be bound to its own statements as a party to this action.

-3-

On March 7, 2019, then SEC Chairman Jay Clayton stated that "the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument." Jay Clayton, Chairman, SEC, Letter to Rep. Ted Budd, (March 7, 2019).[4]  He further clarified that a digital asset "may be offered and sold initially as a security because it meets the definition of an investment contract, but that designation may change over time if the digital asset later is offered and sold in such a way that it will no longer meet that definition. . . . [A] digital asset transaction may no longer represent an investment contract if, for example, purchasers would no longer reasonably expect a person or group to carry out the essential managerial or entrepreneurial efforts.  Under those circumstances, the digital asset may not represent an investment contract under the *Howey* framework."  *Id*.

A finding that LBC tokens were once part of a scheme that constituted a securities offering does not necessarily mean LBC tokens embody securities today—or that they will in the future.  This Court should avoid crafting an injunction that would take the facts and circumstances as they existed during LBRY's pre-March 2021 LBC offerings and apply those circumstances—and the determination that the earlier sales constituted a securities offering—to future LBC transactions, which may well be conducted under different conditions.  Instead, any remedy should permit analyses of future LBC transactions to occur *in the future*.

C. **Secondary Market LBC Token Transactions Should Not be Categorically Enjoined, Because Such Sales May Not be Securities Offerings.**

An order enjoining all future LBC transactions—or chilling those transactions by its scope or language—would be overbroad.  Future LBC transactions by non-affiliates of LBRY should not be a part of any relief granted by this Court, because LBC offerings may cease (or have ceased) to be investment contracts.

---

[4] *Available at* https://www.coincenter.org/app/uploads/2020/05/clayton-token-response.pdf.

Precisely how and when a token ceases to be a security is not essential to the Court's analysis. It may be difficult to identify the exact moment when water turns to ice. But, one can look at water and know it is water, and look at ice and know that it is ice. Nor must the Court define under what circumstances LBC token sales will cease (or have ceased) to be securities offerings. The Court need only recognize that the facts and circumstances around an offering *can* change.

The SEC's Strategic Hub for Innovation and Financial Technology issued an illustrative "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") on April 3, 2019.[5] Among other things, the Framework provides non-exhaustive lists of factors to consider "[i]n evaluating whether a digital asset *previously* sold as a security should be *reevaluated* at the time of later offers or sale." *Id.*[6] (emphasis added). Many of the "factors" relevant to LBRY and LBC have already changed. For example, the number of daily on-network transactions using LBC has grown from about 5,400 on July 1, 2017 to nearly 220,000 as of April 12, 2022, an increase of about 4,000%. Declaration of Jeremy Kaufman in Support of LBRY's Motion for Summary Judgment, Dkt. #61, at ¶57. And, LBRY has not sold LBC since "in or around February 2021." Declaration of Jeremy Kaufman in Support of LBRY's Motion to Limit Remedies ("Kaufman Decl. ISO Remedies Motion"), Dkt. #89, at ¶5.

The facts and circumstances surrounding LBRY may continue to evolve. If, as LBRY

---

[5] Memorandum, SEC, *Framework for "Investment Contract" Analysis of Digital Assets*, (Apr. 3, 2019), *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[6] Footnote 1 to the Framework cautions that it is "not a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content." Amicus agrees that the Framework does not have the force of law, rule, or regulation. It should nevertheless be binding on the SEC, because Plaintiff has and continues to host it on the www.sec.gov website as industry guidance.

declares, the entity dissolves and divests itself of its remaining pre-mined tokens, the *Howey* analysis may look quite different.  *See* Kaufman Decl. ISO Remedies Motion, at ¶1.  Any order by the Court should acknowledge that the circumstances regarding LBRY and LBC have changed, and they are likely to continue changing.

### D. LBC Can be Permissibly Bought and Sold in Secondary Markets Even if LBC are Securities.

An injunction prohibiting consumptive use or secondary sales of LBC tokens would be overbroad even if the Court found that all LBC tokens were, are, and will forever be securities.  Consumptive use of LBC does not constitute an investment of money and is therefore not a security offering.  Even if a secondary market transaction is an offer of a security, many, if not all, unaffiliated secondary market sellers of LBC would be able to avail themselves of exemptions.  Such market participants could therefore buy and sell LBC tokens without violating securities laws.

Section 4(1) provides that the registration requirements of Section 5 do not apply to "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).[7]  LBRY has not issued LBC since March 2021 and "is willing to divest itself of all remaining tokens" such that it cannot later issue LBC.  Kaufman Decl. ISO Remedies Motion, at ¶¶3, 5.  To the extent non-affiliated persons fall within the broad definition of "underwriter" ("any person who has purchased from an issuer with a view to . . . the distribution of any security," 15 U.S.C. § 77b(a)(11)), Rule 144 offers a safe harbor.  CFR §230.144.  A person satisfying the applicable conditions of Rule 144 is deemed not to be engaged in a distribution of the securities, is not an underwriter for purposes of Section 2(a)(11), and is thereby eligible for the Section 4(1) exemption.  *Id.*  For persons who are not an affiliate (and have not been for at least three

---

[7] *See also United States v. Wolfson,* 405 F.2d 779, 782 (2d Cir.1968).

months), the only requirement to qualify for Rule 144 is to have held the security for at least one year. *Id.* According to the record, any LBC holder who purchased from LBRY necessarily did so no later than March 2021—well over one year ago. *See* Kaufman Decl. ISO Remedies Motion, at ¶5.

Even if a transaction-specific analysis determined LBC tokens were offered as part of an investment contract, the majority of secondary market transactions in LBC would be exempt from registration under Section 4(1) and/or protected by the Rule 144 Safe Harbor or another available exemption from registration.[8] This Court should not enjoin such lawful transactions.

## III. CONCLUSION

For the foregoing reasons, if the Court intends to enter an injunctive remedy, amicus urges the Court to narrowly tailor relief and expressly permit (1) consumptive use of LBC and (2) LBC transactions in secondary markets by persons unaffiliated with LBRY.

December 15, 2022

Respectfully submitted,

INVESTOR CHOICE ADVOCATES NETWORK

By its attorneys,

*/s/ Jennifer L. Parent*
Jennifer L. Parent, Bar No. 11342
McLane Middleton, Professional Association
900 Elm Street, P.O. Box 326
Manchester, NH 03105-0326
603-625-6464
*jennifer.parent@mclane.com*

---

[8] Other securities law exemption for resales include, without limitation, Section 4(a)(7) of the Securities Act for certain resales to "accredited investors" and Regulation S for resales to non-U.S. persons meeting specified conditions. *See, e.g.*, 15 U.S.C. § 77d(1)(e)(1)(B).

Nicolas Morgan* (CA 166441)
PAUL HASTINGS LLLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071
Telephone: 1(213) 683-6000
Facsimile: 1(213) 627-0705
*nicolasmorgan@paulhastings.com*

Eric Sibbitt* (CA 192413)
Ken Herzinger* (CA 209688)
Derek Wetmore* (CA 291600)
Lisa Rubin* (CA 317355)
Erin Zatlin* (CA 327316)
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA 94111
Telephone: 1(415) 856-7027
Facsimile: 1(415) 856-7100
*ericsibbitt@paulhastings.com*
*kennethherzinger@paulhastings.com*
*derekwetmore@paulhastings.com*
*lisarubin@paulhastings.com*
*erinzatlin@paulhastings.com*

*Not admitted to practice in the D.N.H. court.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


Dated: December 15, 2022             */s/ Jennifer Parent*
                                     Jennifer L. Parent (NH 11342)