UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>     v.<br><br>LBRY, INC.,<br><br>               Defendant. | Civil Action No. 21-cv-00260-PB |

### COMMISSION'S OPPOSITION TO LBRY'S MOTION TO LIMIT THE COMMISSION'S REMEDIES

Plaintiff Securities and Exchange Commission hereby opposes Defendant LBRY, Inc.'s premature motion to limit the Commission's remedies in this case. The remedies the Commission seeks, including injunctive relief, disgorgement, and a civil penalty, are all authorized and appropriate. First, the Court should enjoin LBRY, including its wholly-owned subsidiary Odysee, from violating Section 5 of the Securities Act of 1933 ("Securities Act") and conducting unregistered offerings of crypto asset securities. For more than six years, including while this litigation was on-going, LBRY persistently offered and sold LBC as investment contracts in violation of Section 5(a) and 5(c) of the Securities Act. Based upon LBRY's past conduct and future intentions to continue operating as before under the new name "Odysee," there is a reasonable likelihood LBRY will violate Section 5 again. Second, LBRY unjustly enriched itself through its illegal offering, and the Court should order disgorgement, calculated according to the equitable principles identified in *Liu v. SEC*. Currently, the Commission and the Court lack sufficient information to make that calculation. LBRY's submission lacks sufficient

detail of its gross receipts and relevant expenses. Lastly, the Court should order LBRY to pay a civil penalty equal to LBRY's gross pecuniary gain.

## I. THE COURT SHOULD ENJOIN LBRY

The Court should enjoin LBRY, including -- as its agent -- its new wholly-owned subsidiary Odysee, because there is a reasonable likelihood it will violate Section 5 again. Section 20(b) of the Securities Act provides for the imposition of injunctive relief preventing future violations of the securities laws upon a showing that a defendant has violated the securities laws and that there is a reasonable likelihood of future violations. 15 U.S.C. § 77t(b); *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) ("The legal standard for issuing an injunction is "reasonable likelihood of recidivism, not an imminent threat of it."). To determine the reasonable likelihood of any future violation, courts consider the totality of the circumstances surrounding the defendant and its violation of the securities laws and consider a number of factors, including: (1) the isolated or recurrent nature of the violation; (2) the egregiousness of the conduct; (3) the defendant's recognition of wrongful conduct; (4) whether the defendant will, owing to its business, be in a position to violate again; and (5) the sincerity of the defendant's assurances against future violations. *See, e.g., Sargent*, 329 F.3d at 39; *SEC v. Smith*, No. 14-cv-192-PB, 2015 WL 4067095, at *9 (D.N.H. July 2, 2015). None of the factors are dispositive. *See SEC v. Muraca*, No. 17-cv-11400, 2019 WL 6619297, at *8 (D. Mass. December 5, 2019) (enjoining currently incarcerated defendant based on nature of violations). "The existence of past violations may give rise to an inference that there will be future violations." *SEC v. Enviro Bd. Corp.*, No. CV-16-6427-R, 2017 WL 4586335, *4 (C.D. Cal. May 9, 2017).

Applying these factors, the Court should enter a permanent injunction restraining LBRY from violating Section 5(a) and 5(c) of the Securities Act and from participating, directly or

indirectly, in any unregistered crypto asset securities offering. See Ex. 1 (proposed language of injunction). First, as found by the Court, LBRY's illegal unregistered offering was a continuous effort conducted over more than five years, which took numerous forms. *SEC v. LBRY, Inc.*, -- F. Supp. 3d --, No. 21-cv-260-PB, 2022 WL 16744741, at *2 (D.N.H. November 7, 2022). LBRY offered and sold LBC as investment contracts to institutional investors, to investors through LBRY applications, to investors through crypto asset trading platforms, and to compensate and incentivize employees, contractors, users, software developers, and software testers. *Id.* LBRY concedes in its motion that it has sold more than 280 million LBC from its pre-mine. See Def.'s Memo, Dkt. No. 89 at 7. LBRY's violations were not isolated incidents. They occurred regularly, perhaps daily, for the entire history of the company.

Despite its claims, LBRY's misconduct occurred after this case was started on March 29, 2021. In its motion, LBRY claims that its "last sale of LBC occurred nearly two years ago - in or around February 2021 - and before the Commission filed its Complaint in this litigation." See Def.'s Memo, Dkt. No. 89 at 14. LBRY's claim contradicts the record in this case. As found by the Court, LBRY "sold more than 9.8 million LBC to the public directly through LBRY applications." *LBRY*, -- F. Supp. 3d --, 2022 WL 16744741, at *2 (citing SEC's Stmt. of Undisputed Facts in Support of its Mot. for Sum. J. ("Stmt. of Fact") ¶¶86-87). In its opinion, the Court was referring to LBRY's sales of LBC made with the assistance of MoonPay, Inc. In November 2021, MoonPay produced to the Commission sales records showing that LBRY continued to sell LBC through at least November 2021. See Ex. 104 to SEC's Stmt. of Facts, Dkt. No. 65-13, attached hereto as Ex. 2 (LBC sale summary). Plus, LBRY's profit and loss statement from March 2021 – October 2021 shows LBRY made $2.7 million from the sale of

LBC during that time. *See* Ex. 114 to SEC's Stmt. of Facts, Dkt. No. 65-23, attached hereto as Ex. 3 (LBRY financial statement).

The evidence also shows that LBRY kept selling into 2022. For example, LBRY's Chief Technology Officer testified in March 2022 that LBRY was then running the "MoonPay" server, which was used to sell LBC. *See* Ex. 4 (Excerpt from the Deposition Transcript of Alex Grintsvayg at 124:18-125:6 and Deposition Ex. 93). He also testified that in March 2022 LBRY was still selling LBC to him through its employee purchase program. *Id.* at 270:20-273:1. Plus, one of LBRY's websites, Odysee.com, currently offers LBC. *See* Ex. 5 (Odysee.com printout). Despite LBRY' claims, it does not appear LBRY has stopped selling LBC either through its applications, to its employees, or through its websites.

Second, while not involving fraud, LBRY's misconduct is more serious than a simple unregistered offering. LBRY's violation included offers and sales specifically intended to effect or alter the trading markets for LBC. LBRY's offers and sales went beyond just selling its pre-mine. LBRY directed its agent to use its accounts to trade more than 7.4 billion LBC on multiple crypto asset trading platforms in an effort to influence the price. Using its market maker, LBRY traded more than nine times all the LBC currently in existence. *Compare* Ex. 6 (total LBC supply from coinmarketcap.com).

Third, LBRY has not recognized its conduct was unlawful.

Fourth, LBRY remains in a position to violate Section 5 today. It still operates, still possesses the ability to offer and sell unregistered crypto asset securities, and intends to keep operating and offering LBC. Towards the end of 2021, months after the Commission filed its complaint in this case, LBRY formed a new wholly-owned subsidiary called Odysee to run LBRY's web application Odysee.com that uses the LBRY Network and LBRY Blockchain. *See*

Ex. 7 (Excerpt from the Deposition Transcript of Jeremy Kauffman testimony at 54:4-56:22). LBRY had developed and launched Odysee.com in 2020 to upgrade and replace its prior web application called LBRY.tv.  See Ex. 4 at 190:16-17 (Grintsvayg Tr.); Ex. 11 (Odysee.com timeline).  After forming Odysee, LBRY transferred the Odysee.com business, the assets associated with the business, and two-thirds of its employees to Odysee, but retained 100% ownership and control.  See Ex. 5 to SEC's Stmt. of Facts, Dkt. No. 62-5, attached hereto as Ex. 8 ("LBRY in 2022"); Ex. 7 at 54:23-55:16 (Kauffman Tr.).  LBRY has also been "loaning" money to Odysee, and has loaned more than $1.6 million in the past year while this litigation has been on-going.  See Ex. 1 to Kauffman Decl., Dkt. No. 89-3.  At minimum, Odysee is either a part of LBRY or its agent, and, as such, Odysee is in active concert or participation with LBRY. As mentioned above, Odysee continues to offer LBC on its website and likely has a substantial amount of LBC to sell LBC through its rewards programs.

While LBRY professes its willingness to dissolve, its willingness does not extend to the largest part of its operation, Odysee.  Recently, LBRY stated publicly that Odysee will continue to operate even after LBRY dissolves.  See Ex. 9 (LBRY social media post).  That means LBRY will continue its efforts to grow, promote, and develop the LBRY Network, just under a new name.  LBRY cannot evade an injunction by transferring its operations mid-litigation to a new corporate subsidiary.  See Fed. R. Civ. P. 65(d)(2) (injunctive relief extends to agents, servants, employees, and all persons in active concert or participation with it); see also Hillsborough Invest. Corp. v. SEC, 276 F.2d 665, 667-68 (1st Cir. 1960) (upholding permanent injunction requiring defendant to register securities after defendant used different forms of securities in attempt to evade preliminary injunction).

LBRY's offer to "burn" its pre-mine is also unavailing. LBRY does not need the specific LBC in its pre-mine to commit a future violation of Section 5. It could mine LBC or receive LBC from a third-party and then, in turn, offer and sell them as an investment contract like it did before. It could re-acquire the LBC securities it has sold and offer them again. It previously traded billions of LBC on crypto asset trading platforms and could do so again. It could offer and sell non-LBC crypto asset securities in violation of Section 5. There exists a low barrier to creating new crypto assets. Moreover, LBRY has not made any representations about Odysee's future offers of LBC from the LBC in its possession. LBRY's assurances are neither complete nor sincere, and an injunction is appropriate. *See Smith*, 2015 WL 4067095, at *10 (finding reasonable likelihood where defendant sought to continue in the same line of work); *see also SEC v. Olins*, 762 F.Supp.2d 1193, 1196 (N.D. Cal. 2011 (finding reasonable likelihood of recidivism due to broad-based nature of Section 5 violations and intent to work in industry).

The Commission seeks a permanent injunction restraining LBRY from violating Section 5 and from conducting unregistered offerings of crypto asset securities. LBRY flooded the market with hundreds of millions of crypto asset securities from its unregistered offering. That is LBRY's doing. LBRY did not provide those who acquired the securities with the information required by law so they could make informed decisions. In this case, the Commission simply wants LBRY's illegal unregistered offering to stop.[1] It is not seeking in this case an order directing LBRY to destroy securities or discontinue operations. For however long LBRY, including its agent Odysee, remains operating, it should comply with Section 5 and be enjoined from violating it. The Commission should not be required to closely monitor how LBRY is

---

[1] To the extent other persons are violating the securities laws, the Commission also wants them to stop. But other misconduct – even that related to LBRY or LBC – is not part of this case. No other facts are developed nor are other parties before the Court.

6

handling crypto assets. *SEC v. Culpepper*, 270 F.2d 241, 250 (1st Cir. 1959) (affirming injunction where defendants' sales of securities was difficult to police).

In contrast, the Commission is *not* seeking an order prohibiting all third-parties from buying or selling LBC. The two proposed amicus briefs filed with the Court seek orders from the Court outside the scope of the present case and controversy. They both focus on undefined "secondary market sales" and seek declaratory judgments about indeterminate future transactions involving anyone but LBRY. *Compare* Fed. R. Civ. P. 65(d)(2). With no stake in the present litigation about what <u>LBRY</u> should be enjoined from doing, their arguments quickly devolve into the theoretical. One concedes that any judicial "analyses of future LBC transactions" involving third-parties must "occur *in the future*." Dkt. No. 92 at 4. The Court found that LBRY offered and sold more than 200 million LBC as investment contracts to others. The facts have not changed in the last month. Moreover, the Court's analysis hinged on the economic realities of the transactions and the way in which LBRY made its offer and not on the subjective intent of any particular acquirer, like amicus petitioner Ms. Brockwell. In its order, the Court declined to address future offerings by LBRY. *LBRY*, -- F. Supp. 3d --, 2022 WL 16744741, at *n.4. The Court should likewise decline to entertain the amicus briefs' arguments about future offerings by third-parties.

## II.     THE COURT SHOULD ORDER DISGORGEMENT OF LBRY'S UNJUST ENRICHMENT

Disgorgement is an authorized and appropriate remedy in this case to deprive LBRY of any illegally obtained gain. In enforcement actions, disgorgement is equal to a defendant's unjust enrichment. The Securities Exchange Act of 1934 expressly authorizes the Court to grant disgorgement in enforcement actions "of any unjust enrichment by the person who received such unjust enrichment as a result" of their securities laws violation. 15 U.S.C. § 78u(d)(3), (7).

Disgorgement is a "profit-based measure of unjust enrichment" that is measured by the defendant's "wrongful gain," and is ordered to reflect the "foundational principle" of equity that "it would be inequitable that a wrongdoer should make a profit out of his own wrong." *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020) (internal quotations omitted); *SEC v. Sargent*, 329 F.3d 34 (1st Cir. 2003) (disgorgement "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws").

As a form of equitable relief, disgorgement is meant to restore the "status quo," and disgorgement should not exceed a wrongdoer's net gain. *Liu*, 140 S. Ct. at 1942-43, 1949-50 (internal quotations omitted). As a result, "[c]ourts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into the account." *Id.*, 140 S. Ct. at 1949-50 (quotation and citation omitted) (also citing Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment h, at 216 for general rule that a "defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement."). Thus, "courts must deduct legitimate expenses before ordering disgorgement…." *Liu*, 140 S. Ct. at 1950.

In calculating disgorgement, the amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation" and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC v. Navellier & Assocs, Inc.,* No. 17-cv-11633, 2021 WL 5072975, *1-2 (D. Mass. Sept. 19, 2021) (applying this standard after *Liu*). Once the SEC carries its initial burden, the "burden shifts to the defendant to demonstrate that the disgorgement figure is not a reasonable approximation." *SEC v. Heartland Group Ventures, LLC*, No. 4:21-cv-01310-O, 2022 WL 1527542, at 2 (N.D. Tex. March 18, 2022)

(citations and quotations omitted); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) (defendant bears burden to "clearly demonstrate that the disgorgement figure was not a reasonable approximation."). "All doubts concerning the amount of disgorgement must be resolved against the violator." *SEC v. Sierra Brokerage Servs. Inc.*, 608 F. Supp. 2d 923, 968 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir. 2013). Here, LBRY bears the risk on uncertainty and the burden of establishing the inaccuracy of a reasonable approximation.

### A. **LBRY's Gross Receipts Are At Least Approximately $22 Million**

LBRY's gross receipts for its Section 5 violation equal the value it received in exchange for its sale of 280 million LBC from its pre-mine and from its market making activity on the multiple crypto asset trading platforms. The Commission currently lacks from LBRY sufficient information to calculate this amount precisely, but approximates it totals more than $22 million.

LBRY pre-mined 400 million LBC in October 2015 before it launched the LBRY blockchain in June 2016. According to LBRY's motion, it has over time sold more than 280 million LBC (400 million minus the 119.5 million LBC reportedly still in its custody). In addition to originally selling LBC from its pre-mine, LBRY bought and sold more than 7.4 billion LBC in its accounts on crypto trading platforms when it enlisted a market maker to influence the markets.

According to LBRY's interrogatory answers, as of September 30, 2021, LBRY had received a total of $14,668,794 in cash and crypto assets from its sales of LBC. *See* Ex. 15 to SEC's Stmt. of Facts, Dkt. No. 62-15, attached hereto as Ex. 10 at 15. It is unclear what sales of LBC are represented by LBRY's interrogatory answer, but it likely understates LBRY's proceeds. For example, as mentioned above, LBRY was still selling securities to buyers after September 30,

9

2021 through its applications using MoonPay and was still selling to its own employees. *Supra* page 3, *see* Ex. 2 (LBC sale summary).

As the Court found, LBRY also offered and sold LBC to users, software testers, software developers, and contractors in exchange for their time, labor, and services. *LBRY*, -- F. Supp. 3d --, 2022 WL 16744741, at *2. From 2015 through the present, LBRY promised and issued more than 142 million LBC through these programs.[2] *Id.* The time, labor, and services, LBRY received in exchange for the securities it sold can be valued at the then current market value of LBC. *See* Restatement (Third) of Restitution and Unjust Enrichment §51(2) ("value for restitution purposes of benefits obtained by the misconduct of the defendant, culpable or otherwise, is not less than their market value.").

LBRY has not produced information regarding when the sales to users, software testers, software developers, and contractors exactly occurred. Using the limited data from LBRY, the Commission estimates LBRY gained $7,483,177 in value from these sales. This amount was calculated using the average market price of LBC during the respective quarterly periods during which LBRY sold tranches of LBC for those purposes.[3] The Commission has quarterly data on approximately 91 million LBC for these types of sales for the period July 2016 through September 2020. The Commission lacks data regarding when the remaining 51 million LBC were sold. Consequently, the average market price for the period from October 2020 until November 19, 2021 (the date of LBRY's interrogatory answers) was applied to the balance.

---

[2] Nearly all of the securities were sold within the 5-year statute of limitations for disgorgement in this case. The complaint was filed on March 29, 2021, and it appears LBRY offered and sold a relatively small number of LBC to beta testers, consultants, and others prior to March 29, 2016. The LBC for these early sales remained in LBRY's possession until at least July 2016 when LBRY began transferring LBC. The maximum number of sales prior to March 29, 2016 would likely be the total number of LBC that LBRY reported transferring in the 3rd quarter of 2016, which equaled 267,778 LBC. We did not include any of the 267,778 LBC in the approximation of gross proceeds.
[3] The average market price for LBC for the periods was calculated using price data provided by LBRY's expert to the Commission during discovery.

In sum, on these limited facts, the gross receipts from LBRY's illegal offering equals at least $22,151,971.

### B. **LBRY's Legitimate Business Expenses Are Unknown**

LBRY does not provide the Court with sufficient information to determine the amount of any legitimate business expenses. In its motion, LBRY does not identify any expenses. One of its exhibits putatively lists all profits and liabilities since May 2016, but LBRY does not explain the significance of that date or why all expenses running from May 2016 should be deducted from LBRY's gross receipts. *See* Ex. 2 to Kauffman Decl., Dkt. No. 89-4. Indeed, the timing of expenses is relevant to the analysis, but LBRY does not identify when expenses occurred. Moreover, LBRY's profit and loss statement includes a category called "Other expenses" and it amounts to nearly $3 million. *Id.* LBRY provides no explanation what that is, and the affidavit of Jeremy Kauffman submitted along with the motion does not even acknowledge those expenses. *See* Kauffman Decl., Dkt. No. 89-2.

Similarly, LBRY does not identify any costs associated with its illegal offer. It does not identify how much it paid MoonPay, Altonomy, or any other agent to assist with the unregistered offering. It does not identify any promotion or advertising costs associated with its unregistered offering. Courts applying *Liu* have determined that various different types of expenses are not deductible from gross receipts under the law of unjust enrichment. In short, just because expenses are related to a non-fraudulent business does not make them *per se* deductible. The Commission, and, in turn, the Court lack the requisite information to ascertain how much should be deducted. As a result, LBRY has not sustained its burden and any risk of uncertainty rightfully falls on it. *Happ*, 392 F.3d at 31 ("risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty.").

Lastly, even under LBRY's theory that all expenses are deductible, disgorgement remains available. LBRY currently has cash in its bank accounts which represent ill-gotten gains from sales of LBC that LBRY has not yet spent. Under LBRY's proposed theory, LBRY was unjustly enriched by that money and it should be disgorged. LBRY has not provided a consolidated balance sheet showing its assets combined with those of its wholly-owned subsidiary, Odysee. LBRY has "loaned" Odysee more than $1.6 million from the proceeds of LBC sales within the last year. Under LBRY's proposed theory, if Odysee has retained any money in its bank accounts, those are likewise subject to disgorgement. Without discovery of Odysee's financials, the Court cannot calculate disgorgement even under LBRY's theory.[4] Given the practical realities here and whether any additional information from LBRY is forthcoming, it should be LBRY that bears the risk of any uncertainty.

### III.  LBRY's PENALTY SHOULD BE SUFFICIENT TO DETER WRONGDOING

The Court should impose a penalty on LBRY equal to its gross pecuniary gain in order to deter LBRY and others from conducting illegal unregistered offerings. Section 20(d)(1) of the Securities Act authorizes civil penalties in federal court proceedings against any person who violates the Securities Act. These penalties are intended to "punish and deter securities law violations." *SEC v. Smith*, No. 14-cv-192-PB, 2015 WL 5793999, at *1 (D.N.H. October 1, 2015) (quotation omitted). Imposing a civil monetary penalty may follow a three-step process: "(1) set the appropriate tier based on the defendant's conduct, (2) determine the statutory maximum penalty from the defendant's gross pecuniary gain and number of 'violations,' and (3) exercise discretion to assess an appropriate penalty within that statutory range." *Id.* at *2.

---

[4] A disgorgement award should include prejudgment interest. *See Smith*, 2015 WL 4067095, at *10 (awarding pre-judgment interest to stop defendant "from receiving the benefit of what would otherwise be an interest-free loan.")

Following the process outlined in *Smith*, the first step is to determine the right penalty tier. Section 20(d) of the Securities Act sets forth three penalty tiers. In the first tier, penalties are imposed for "violations" of the statute, without more. *See* 15 U.S.C. § 77t(d)(2)(A). The second tier covers securities violations which involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* at § 77t(d)(2)(B). Finally, third tier violations are second tier securities violations which additionally "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* at § 77t(d)(2)(C). The statutory penalty amount, adjusted for inflation, for a violation by LBRY of each tier equals: 1st tier - $103,591; 2nd tier - $517,955; and 3rd tier - $1,035,909.

Here, LBRY for years – even in 2021 and 2022 after being sued – recklessly disregarded the regulatory requirement of registering its offering. Thus, a second (or perhaps third) tier penalty is available despite LBRY not being charged with fraud. Regardless which tier is most applicable though, the Court may, under all three tiers, impose a penalty up to the "gross amount of pecuniary gain to such defendant as a result of" the defendant's violation.

The second step is to determine the maximum penalty. As detailed above, LBRY's gross pecuniary gain equals approximately $22,151,971. The Court has broad discretion in determining the number of "violations" under the statute. *Happ*, 392, F.3d at 32; *SEC v. Duncan*, No. 3:19-cv-11735, 2022 WL 952266, at *4 (D. Mass. March 30, 2022) (noting statute does not define "violation"). It could be the number of buyers or the number of different ways LBRY sold LBC. The simplest approach is to define the maximum penalty as LBRY's gross pecuniary gain for one violation, taking the years-long illegal unregistered offering as a whole.

The third step is to choose the appropriate penalty within the range set by the first two steps. A court may consider several factors in evaluating whether or not to assess civil penalties,

13

such as: (1) the egregiousness of the violation; (2) the willingness to admit wrongdoing; (3) the isolated or repeated nature of the violations; (4) the degree of scienter involved; (5) the defendant's willingness to cooperate with the authorities; and (6) the defendant's current financial situation. *SEC v. Knox*, No. 18-12058-RGS, 2022 WL 1912877, at *3 (D. Mass. June 3, 2022). Courts also consider the extent to which other remedies ordered, such as disgorgement, may indirectly impact the desired deterrent effect of a penalty. *See generally SEC v. Harkins*, No. 19-cv-02418, 2022 WL 3597453, at *17-18 (D. Colo. August 23, 2022) (noting that, coupled with full disgorgement, a penalty of half defendant's gross pecuniary gain was sufficient deterrence).

Applying these factors, a penalty equal to LBRY's full pecuniary gain of $22,151,971 is fair and reasonable under the circumstances. Many of these factors were discussed above in Part I about injunctive relief, and we incorporate the discussion herein. Additional considerations warrant penalizing LBRY for its gross pecuniary gain. First, LBRY has not cooperated with the authorities. It ignored an investigation subpoena and failed to respond to information requests.

Second, LBRY's total liability needs to deter it and others from conducting illegal unregistered offers. The Court should impose a penalty on LBRY that makes violating the securities law unprofitable. LBRY and all other violators receive a windfall if they are able to raise tens of millions of dollars illegally and only pay a $50,000 penalty as LBRY proposes. Such a small penalty relative to the size of the wrongdoing does not deter, it incentivizes misconduct. Wrongdoers will view their potential liability as just another expense to be priced into the cost of doing business. Especially if disgorgement is low, to deter LBRY and others, the Court should impose a penalty of LBRY's gross pecuniary gain of $22,151,971. *Compare SEC v. Mahabub*, 411 F.Supp.3d 1163, 1175-76 (D. Colo. 2019) (imposing penalty equal to defendants' gross pecuniary gain from offerings due to violations of anti-fraud provisions and

Section 5 after Court awarded disgorgement in same amount), *affirmed by SEC v. GenAudio Inc.*, 32 F.4th 902, 954-55 (10th Cir. April 26, 2022).

      A mitigating factor here is LBRY's current financial situation. Even though LBRY has yet to detail its full financial situation, including Odysee, LBRY likely does not have $22 million in liquid assets. The Court may factor that into account. LBRY's ability to pay, however, is one factor among many, and is not dispositive. There is nothing in the securities laws barring the Court from imposing a penalty on LBRY greater than its current ability to pay. *GenAudio*, 32 F.4th at 955 (*citing SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008)). Moreover, reducing LBRY's penalty to an amount it can pay today would result in unfair and potentially absurd results. It would reward wrongdoers for dissipating their assets. Those who violated Section 5 in the same manner and raised the same amount of money illegally could face significantly different penalties based upon how quickly they spent the proceeds. Such a reduction would also ignore LBRY's stated intent to continue operating as Odysee and its ability to pay a penalty from future revenue generated by advertising and fees. Lastly, when balancing LBRY's current ability to pay against the need to deter, the Court should weigh deterrence more heavily. Reducing LBRY's penalty to an amount still in excess of its ability to pay likely does LBRY no practical benefit. Reducing LBRY's penalty to the potentially small amount it can readily pay now will not deter others from deciding in the future to conduct an illegal unregistered offering.

      In conclusion, the Court should impose a penalty equal to LBRY's gross pecuniary gain; enjoin LBRY from violating Section 5 and from unregistered offerings of crypto asset securities; and order disgorgement and prejudgment interest in an amount appropriate under the law.

[Remainder of page intentionally left blank]

Dated:  December 19, 2022

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

*/s/ Peter Bryan Moores*
Peter Bryan Moores (Mass Bar No. 658033)
Amy Harman Burkart (Mass. Bar No. 651828)
Marc Jones (Mass Bar No. 645910)
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-4576 (Moores direct)
mooresp@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 19, 2022, I caused true and correct copies of the foregoing to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

*/s/ Peter Bryan Moores*
Peter Bryan Moores