UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

```
------------------------------------- X
SECURITIES AND EXCHANGE               :
COMMISSION,
                                      :
           Plaintiff,
                                      :   Civil Action No. 1:21-cv-00260-PB
    -against-
                                      :
LBRY, INC.,
                                      :
           Defendant.
                                      :
------------------------------------- X
```

# LBRY, INC.'S REPLY IN SUPPORT OF ITS
# MOTION TO LIMIT THE COMMISSION'S REMEDIES

Perkins Coie LLP
1155 Avenue of the Americas
New York, New York 10036

*Attorneys for LBRY, Inc.*

Notwithstanding the Court's clear admonition to the Commission at the November 21, 2022 conference to work in good faith with LBRY, Inc. ("LBRY" or the "Company") to resolve this matter on reasonable terms and in such a manner as to provide clarity to the industry, the Commission now does the exact opposite in its request for remedies: it seeks excessive and unfair remedies and provides no clarity. In doing so, the Commission completely ignores certain facts that must be factored into any determination of remedies, including that LBRY will dissolve and divest itself of all remaining pre-mined LBC. Once dissolved, there is absolutely no possibility of future securities violations by the Company. The Commission's overreach is plainly demonstrated by its attempt to enjoin Odysee — an entirely distinct and separate entity from LBRY that is engaged in different business activities. Moreover, there is absolutely no correlation between the value of LBC and Odysee's operations. The Commission's far overreaching demand for unfair remedies should be rejected, and the Court should deny the Commission's request for a permanent injunction and disgorgement and impose a modest first-tier civil penalty against LBRY.

## ARGUMENT

### I. Permanent Injunctive Relief Against LBRY — And Now Newly-Identified Odysee — Is Not Warranted

#### A. Odysee is a Separate and Distinct Entity from LBRY

The crux of the Commission's argument in support of injunctive relief appears to be that LBRY "remains in a position to violate Section 5 today" — notwithstanding its intention to dissolve and divest any remaining pre-mined LBC — because Odysee "uses the LBRY Network and LBRY Blockchain." *Id.* at 4. This statement improperly conflates LBRY and Odysee, two distinct entities engaged in separate operations.[1] Although Odysee uses the LBRY blockchain, it

---

[1] Furthermore, the Commission's argument that "Odysee is either a part of LBRY or its agent, and as such, Odysee is in active concert or participation with LBRY" and therefore is subject to any injunction against LBRY pursuant to Federal Rule of Civil Procedure ("FRCP") 65(d)(2) misstates the law. *See* Opp'n at 5. FRCP 65(d)(2) is "derived from the common law doctrine that a decree of injunction not only binds the [] defendant but also those identified

Case 1:21-cv-00260-PB   Document 100   Filed 12/26/22   Page 3 of 13

does not have — and never has had — any involvement in the development or maintenance of the LBRY blockchain.  Declaration of Julian Chandra ("Chandra Decl.") ¶ 18.  In fact, Odysee is not dependent on the LBRY blockchain and can run on other blockchains.  *Id.* ¶ 17.  Moreover, Odysee's revenue is generated entirely from advertising, premium memberships and creator payments, which it receives in U.S. dollars.  *Id.* ¶ 15.  Odysee is not — and never has been — engaged in the sale of LBC, and accordingly derives no revenue from it.  *Id.* ¶ 15, 20-21.  Additionally, all LBC currently in Odysee's possession — which are used entirely for consumptive purposes, such as enabling Odysee users to publish articles or videos — was acquired by Odysee on the open market.  *Id.* ¶¶ 19, 21.

Moreover, Odysee is entirely distinct from LBRY:  it is independently-run, with its own organizational structure, office, board of directors and bank account.  Chandra Decl. ¶ 1-9.  No LBRY personnel are employed by Odysee or otherwise involved in Odysee's day-to-day operations.  *Id.* ¶ 6-8.  And, although Odysee has borrowed $1.6 million (in cash) from LBRY, this was a standard business loan that has been used by Odysee to operate its business and pay its employees.  *Id.* ¶ 11.

For all these reasons, no purchaser of LBC would have a reasonable "expectation of profits [in connection with its acquisition of LBC] to be derived solely from the efforts of [Odysee]."  *S.E.C. v. SG Ltd.*, 265 F.3d 42, 46 (1st Cir. 2001).  Indeed, the basis of the Court's decision on the parties' cross-motions for summary judgment was that "by retaining hundreds of millions of LBC

---

with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). A subsidiary corporation is in privity with its parent "in respect to the common corporate business" to the extent it is "so identified in interest with [the parent] that [it] represents precisely the same legal right in respect to the subject matter involved" in the injunction. *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1136 (D.C. Cir. 2009) ("[S]ubsidiaries of Defendants may be personally bound by the order to the extent that they are agents of or in privity with Defendants in the common corporate business of manufacturing, designing, marketing, or selling cigarettes."). Here, Odysee's business purpose and operations are distinct and it is therefore not in privity with LBRY.

2

for itself, LBRY . . . signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers." Order at 16.  Odysee, however, does not possess or sell any pre-mined LBC, nor does it engage in any advertising or promotional material relating to the LBRY network or LBC and its "growth potential."  As there is simply no linkage between the Odysee operation and the value of LBC such that a secondary holder of LBC would have a reasonable expectation that Odysee's business efforts would have any impact on the value of his or her LBC, the *Howey* test is not, and cannot be, satisfied.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  The Commission's suggestion that a permanent injunction as against Odysee is warranted simply because Odysee *uses* the LBRY blockchain is a gross misapplication of the *Howey* test — which must be applied on a transaction-by-transaction basis.  *See Marine Bank v. Weaver*, 455 U.S. 551, 560, n.11 (1982).

### B. It is Impossible for LBRY to Violate Section 5 in the Future Given Its Plans to Immediately Dissolve and Divest Itself of all Remaining LBC

Given LBRY's plans to imminently dissolve and divest itself of all remaining LBC in its possession, there is simply no possibility that it will engage in future violations of the Securities Act.  LBRY Opening Brief ("Br.") at 6-7.  Any economic incentive that purchasers of LBC may have once had based on LBRY's "motivat[ion] to work tirelessly to improve the value of its blockchain" in order to increase the value of its pre-mine (Order at 16) disappears entirely once LBRY divests itself of its remaining pre-mined LBC and dissolves as a corporate entity.  *See* Br. at 6-8.  Indeed, as soon as LBRY divests itself of any remaining LBC and dissolves, any secondary LBC in circulation would no longer constitute a security because holders of LBC will not have "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of [LBRY]" given that LBRY's interests and the interests of the secondary holders will no longer be "aligned." Order at 8 (citing *United Hous. Found. v. Forman*, 421 U.S. 837, 852 (1975)), 17.  The

3

Commission side steps this argument, merely stating that "LBRY's offer to 'burn' its pre-mine is [] unavailing," because it could, for example, "mine LBC" or "re-acquire the LBC securities it has sold and offer them again." Opp'n at 6.   However, the Commission seems to be forgetting that LBRY will no longer exist as an entity, so doing any of those things would be impossible.

        **C.**     **LBRY did not Engage in Deliberate or Reckless Conduct**

The Commission also claims that an injunction is warranted because "LBRY's illegal unregistered offering was a continuous effort conducted over more than five years." Opp'n at 3. What the Commission fails to mention is the fact that LBRY's "continuous effort" occurred at a time when the law governing the registration of crypto assets, as well as the Commission's guidance on this topic, was ambiguous, to say the least.  Br. at 8.  In light of the uncertainty concerning what sales of digital assets were or were not permissible, LBRY's conduct was decidedly not deliberate, reckless or fraudulent, and the imposition of an injunction on that basis is thus unwarranted.  *Cf. S.E.C. v. Esposito*, 260 F. Supp. 3d 79, 94 (D. Mass. 2017) (holding that a permanent injunction was warranted where the Commission alleged that defendant engaged in "an elaborate and deliberate scheme to defraud investors"); *S.E.C. v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 283 (D. Mass. 2015) (issuing a permanent injunction where the Commission alleged that defendant engaged in "an elaborate, deliberate, and prolonged scheme to defraud thousands of investors").[2]

---

[2] In fact, LBRY stopped selling LBC on the open market in February 2021 — before the commencement of this action — because the Commission had officially notified LBRY that it believed it was selling unregistered securities in the form of LBC. *See* December 26, 2022 Declaration of Jeremy Kauffman (Second Kauffman Decl.) ¶ 2.  The Commission makes much of the fact that LBRY continued to sell LBC through MoonPay and to its employees past the filing of the Complaint, but LBRY viewed these sales as distinct from ones on the secondary market, particularly given that Moonpay sales were clearly consumptive in nature. *Id.* ¶ 3-4.  But, in any event, this entire issue is a red herring, as these few additional months of sales — all of which predate this Court's Order — do not suggest that there is a reasonable likelihood that LBRY will violate Section 5 in the future, as is required for an injunction to issue.  And, most importantly, as explained *supra*, given that LBRY will cease to exist, it would be, as a practical matter, impossible for LBRY to commit any future violations of Section 5.

4

**II.     The Commission Is Not Entitled to $22 Million In Disgorgement**

The Commission's request for at least $22 million in disgorgement is plainly "not a reasonable approximation of profits causally connected to the violation." *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).  Not only does it vastly overstate LBRY's proceeds from its sales of LBC, but it also fails to deduct any of LBRY's legitimate business expenses, as required by the Supreme Court in *Liu v. S.E.C.*, 140 S. Ct. 1936, 1943 (2020).

*First*, the Commission states that although it lacks "sufficient information to calculate" LBRY's "gross receipts" associated with the proceeds it obtained from sales of LBC, it approximates — based on rough, back-of-the-envelope math — that LBRY's net profits total "more than $22 million." Opp'n at 9.  Notwithstanding the wide-ranging and intrusive nature of the discovery sought and obtained by the SEC,[3] it still requests that the Court issue an amount in disgorgement that is simply not supported by the record.

As LBRY previously disclosed to the Commission, as of November 2021, LBRY had obtained $14,668,794.46 — from its sales of LBC.  *See* Opp'n at Ex. 10.  In particular, as LBRY stated in its November 19, 2021 Responses and Objections to the Commission's first set of interrogatories: "As of September 30, 2021, LBRY had deposited into its bank accounts approximately $12,168,794.46 in proceeds derived from sales of LBC . . . .  In addition, as of the date of this response, LBRY holds digital assets that are currently worth approximately $2.5 million that it received from sales of LBC." *Id.*  Contrary to the Commission's claims, this interrogatory response included in its calculation all of LBRY's sales of LBC through the Moonpay application, as well as any sales to employees and to "users, software testers, software

---

[3] It should be noted that discovery in this case was quite comprehensive and the SEC employed staff from the Division of Economic and Risk Analysis to provide assistance.  As such, to now suggest that it cannot reasonably calculate the total amount of LBC allegedly sold, and therefore a fair approximation of disgorgement, without further discovery fails to meet the Commission's burden.

developers, and contractors" as of the date of the response. Opp'n at 9-10. Moreover, between November 2021, when LBRY submitted its interrogatory response, and January 2022, LBRY obtained an additional $1,800 ($50.00 per employee per paycheck) through sales of LBC to certain of its employees. Second Kauffman Decl. ¶ 4. This was a result of legacy benefits program offered by the Company. *Id*. Accordingly, LBRY's total proceeds from its sales of LBC equals $14,670,594.46 (the $14,668,794.46 disclosed in LBRY's interrogatory response plus the additional $1,800 LBRY obtained between November 2021 and January 2022 through employee sales) — not $22 million.

*Next,* after grossly inflating the total amount of proceeds earned by LBRY through its sales of LBC, the Commission goes on to claim that "LBRY does not provide the Court with sufficient information to determine the amount of any legitimate business expenses." Opp'n at 11. But in making this argument, the Commission ignores its own Complaint, in which it unambiguously admits that any assets raised by LBRY in connection with its sales of LBC were used to "fund its business operations" and "pay for the operational costs to grow the LBRY network." Compl. ¶¶ 6, 27; *see also* Commission's Summary Judgment Motion (ECF 55-1) at 11) ("Any cash proceeds generated from sales [of LBC] were transferred to LBRY's bank accounts and used for operational expenses."). Pursuant to the Commission's own allegations, then, any disgorgement award would exceed LBRY's net unlawful profits and therefore violate *Liu*. *See* Br. at 10.

And in any event, LBRY has met its burden by providing sufficient information to demonstrate that all the proceeds it obtained through its sales of LBC were used for the operation of the business. *See* December 7, 2022 Declaration of Jeremy Kauffman ("First Kauffman Decl.") ¶ 4; *id.* at Ex. 2 (LBRY's Profit & Loss Statement). The Commission's objections to certain aspects of LBRY's profit and loss statement ("P&L Statement") are unfounded. First, although

6

the Commission suggests an issue with the fact that the P&L Statement begins in May 2016, the reality of the LBRY operation is that the Company had no substantial assets or expenses prior to that date. Second Kauffman Decl. ¶ 6. Second, the "[o]ther expenses" category that the Commission questions represents the markdown of the value of LBC to $0 — the current value of those tokens. *Id.* ¶ 7. Finally, while the Commission claims that LBRY does not identify any of its promotion or advertising costs, the P&L Statement makes clear that LBRY spent $342,257.71 on advertising; $135,080.00 on PR firm fees; and $14,223.71 on promotional expenses. *See* First Kauffman Decl. at Ex. 2. Because LBRY has demonstrated — and the Commission has likewise alleged — that the proceeds raised by LBRY in connection with its sales of LBC were used for operational expenses, thus rendering all its expenses legitimate business expenses, LBRY has sustained its burden of identifying the deductible business expenses under *Liu* and its progeny.[4]

Next, the Commission baldly asserts that "even under LBRY's theory that all expenses are deductible, disgorgement remains available" because "LBRY currently has cash in its bank accounts." Opp'n at 12. As sworn to in the attached declaration of Mr. Kauffman, as of December 23, 2022, LBRY has only $33,117.10 in its bank account. Second Kauffman Decl. ¶ 8. In addition, the paychecks LBRY employees received during the last pay cycle (on December 1, 2022) are the last paycheck that they will ever receive from the Company. *Id.* ¶ 9.

Finally, the Commission states that under "LBRY's proposed theory," Odysee's assets are "likewise subject to disgorgement." Opp'n at 12. Putting aside the fact that Odysee is not a defendant and it thus strains credulity that the Commission now seeks relief against a non-party,

---

[4] The Commission states — without citing to a single case — that "Courts applying *Liu* have determined that various different types of expenses are not deductible." Opp'n at 11. LBRY's review of the relevant case law within the First Circuit has revealed that, since *Liu*, the courts that have determined that certain types of expenses are not deductible have done so where those expenses are "[f]raud-[f]urthering." *S.E.C. v. Navellier & Assocs.*, No. 17-cv-11633, 2021 WL 5072975, at *5 (D. Mass. Sept. 21, 2021). Therefore, the Commission's statement that "just because expenses are related to a non-fraudulent business does not make them *per se* deductible," Opp'n at 11, is a misstatement of *Liu* and the decisions in this Circuit applying *Liu*.

Odysee is also insolvent.  *See* Chandra Decl. ¶ 22.  Odysee currently has $7,631.57 in its bank account and still owes $1.6 million to LBRY, which it cannot repay.  *Id.*

### III.     A $22 Million Civil Penalty Is Not Warranted

After applying a "three-step process," the Commission concludes that the Court should impose a civil penalty equal to LBRY's "gross pecuniary gain in order to deter LBRY and others from conducting illegal unregistered offerings."  Opp'n at 12.  Each step of the Commission's analysis is flawed.

With respect to the first step in its analysis — determining the "the right penalty tier" to apply — the Commission states that LBRY "recklessly disregarded the regulatory requirement of registering its offering," and mentions, without citing to a single case, that "a second (or perhaps third) tier penalty is available[.]"  Opp'n at 13.  Contrary to the Commission's bald and unsupported assertion, there is absolutely no evidence — and the Commission has notably put forth none — that LBRY "recklessly disregarded" any regulatory requirements in connection with its offers and sales of LBC.  By contrast, and as this Court recognized at the November 21, 2022 status conference, LBRY entered the cryptocurrency market during a time of great uncertainty concerning the regulatory landscape governing digital assets.  *See* Br. at 14.

Second, with respect to its determination of the maximum penalty, the Commission rejects the tier approach and states that this Court should impose a penalty equal to LBRY's gross pecuniary gain.  Opp'n at 13.  But this recommendation is based on the flimsy rationale that it is the "simplest approach," "taking the years-long illegal unregistered offering as a whole."  *Id.*  The Commission fails to mention why other accepted methodologies for determining the number of violations at issue for purposes of calculating the appropriate penalty under the tier approach — such as imposing a penalty for each statute the defendant was found to have violated or, alternatively, imposing a single penalty where the violation arose out of a single scheme — are not

8

applicable. Indeed, the Commission's suggestion that the Court "tak[e] the years-long illegal unregistered offering as a whole" is substantially similar in approach — and therefore equally as "simple" — as imposing a single penalty where the securities violations at issue arises out of a single scheme. *See, e.g.*, *S.E.C. v. Johnston*, 368 F. Supp. 3d 247, 255 (D. Mass. 2019); *see also S.E.C. v. Interinvest Corp., Inc.*, No. 15-12350, 2016 WL 8711689, at *1 (D. Mass. Dec. 23, 2016) (stating that where a defendant has violated securities laws in carrying out a single scheme, it is appropriate to impose a single penalty); *S.E.C. v. Rabinovich & Assocs., LP*, No. 07 Civ. 10547, 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (finding one violation where defendant's conduct was part of "a single scheme or plan").

Under the third step, which instructs the court to "exercise [its] discretion to assess an appropriate penalty within th[e] statutory range," Opp'n at 12, the Commission concludes that "a penalty equal to LBRY's full pecuniary gain" is "fair and reasonable under the circumstances," *id.* at 14. In reaching this conclusion — which is supported by neither law nor facts — the Commission proclaims that the "total liability [imposed] needs to deter [LBRY] and others from conducting illegal unregistered offers." *Id.* With respect to LBRY, deterrence is not necessary, given that the Company will dissolve in the coming weeks and divest any remaining pre-mined tokens. As to general deterrence, that factor needs to be considered in the context of LBRY's conduct during the time at which it was undertaken versus the regulatory landscape as it now exists. That is, LBRY entered the cryptocurrency market at a time when the regulatory requirements on crypto asset issuers were incredibly unclear. Much has changed since that time, and given the Commission's recent aggressive approach of policy by enforcement, there is simply no need to deter others from similar conduct; they are already adequately deterred.

Finally, the Commission's "gross pecuniary gain" approach is unsupported by recent

9

precedent. In particular, in *S.E.C. v. Kik*, 429. F. Supp. 3d 169, 176-178 (S.D.N.Y. 2020), a Section 5 enforcement action involving the illegal sale of $100 million in unregistered "Kin" tokens, Kik received a civil penalty of only $5 million — far less than the total amount it earned through its sales of its digital assets. This Section 5 case is therefore more similar to *Kik* than *S.E.C. v. Harkins* and the other fraud cases relied upon by the Commission. *See S.E.C. v. Knox*, No. 18-12058-RGS, 2022 WL 1912877, at *3 (D. Mass. June 3, 2022) (imposing the maximum third-tier civil penalty where defendants' "conduct consisted of deceit and manipulation" and their violations were "deliberate, egregious, and long-lasting"). In *Harkins*, for example, defendant's fraudulent scheme involved "flagrant, intentional, and recurrent lies to investors, which were especially egregious because [defendant] knew that some of his investors were giving him substantial portions or even all of their life savings." No. 19-cv-02418, 2022 WL 3597453, at *15 (D. Colo. Aug. 23, 2022) (internal quotations omitted). Due to defendant's "high degree of scienter," failure to "ever admit[] wrongdoing," "obstructive behavior," inability to pay, along with the large investor losses that resulted from defendant's fraudulent scheme, the court imposed a civil penalty equal to one-half of each defendant's disgorgement amount, totaling $3,502,166.64. *Id.* at *15-16, *18.

The Commission's proposed civil penalty of approximately $22 million — over six times larger than the penalty in *Harkins*, a case involving egregious fraud, and five times larger than the penalty in *Kik*, a Section 5 case where defendant raised significantly more than LBRY in its sales of tokens — is therefore plainly unwarranted and further evidence of the Commission's far overreaching in this case. *See* Br. at 14.

## **CONCLUSION**

For the foregoing reasons, Defendant LBRY respectfully requests that this Court deny the Commission's request for a permanent injunction and disgorgement and impose a modest first-tier civil penalty against LBRY.

| | |
|---|---|
| Dated: December 26, 2022 | Respectfully submitted, |

                                                        LBRY, INC.

/s/ Timothy J. McLaughlin  (NH Bar # 19570)
William E. Christie
Timothy J. McLaughlin
Shaheen & Gordon, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302
(603) 819-4231
wchristie@shaheengordon.com
tmclaughlin@shaheengordon.com


/s/ Keith W. Miller
Keith W. Miller (*pro hac vice*)
Rachel S. Mechanic (*pro hac vice*)
Emily C. C. Drinkwater (*pro hac vice*)
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
(212) 262-6900
KeithMiller@perkinscoie.com
Rmechanic@perkinscoie.com
Edrinkwater@perkinscoie.com

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  December 26, 2022          */s/ Keith W. Miller*
                                                  Keith W. Miller